UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MATTHEW TOTILO, individually and on behalf of himself and all others similarly situated, | : : : | |
| | : | Case No. 07-cv-10991-LAK |
| Plaintiff | : | |
| v. | : | |
| STEVEN F. HERBERT and JAMES P. GROSS, | : : | |
| Defendants. | : | |

## DECLARATION OF LISA ALBERT

LISA ALBERT, under penalty of perjury, deposes and states:

1.      I am a member of the law firm of King & Spalding LLP and am one of the attorneys for Steven F. Herbert and James P. Gross ("Defendants").  I submit this declaration in support of Defendants' Motion to Dismiss the Complaint and Defendants' Motion, In Alternative To Their Motion To Dismiss, To Transfer This Case To The Northern District Of Geogria Pursuant To 28 U.S.C. § 1404(a)in the above-captioned action.

2.      Annexed hereto as Exhibit A is a true and correct copy of the Declaration of James P. Gross.

3.      Annexed hereto as Exhibit B is a true and correct copy of the Complaint filed in *Adcock v. NetBank, Inc., et al.,* 1:07-cv-2298 (BBM) (N.D. Ga) dated September 19, 2007.

4.      Annexed hereto as Exhibit C is a true and correct copy of the Complaint filed in *Vahdat v. NetBank, Inc., et al.,* 1:07-cv-2631 (BBM) (N.D. Ga.) dated October 22, 2007.

5.      Annexed hereto as Exhibit D is a true and correct copy of the Declaration of Steven F. Herbert.

6.    Annexed hereto as Exhibit E is a true and correct copy of the NetBank Press Release entitled "NetBank, Inc. Announces Change in Executive Leadership," dated October 3, 2006.

7.    Annexed hereto as Exhibit F is a true and correct copy of the NetBank Press Release entitled "NetBank, Inc. Continues Strategic Reorganization with Disposition of Meritage Mortgage and Beacon Credit Services," dated November 8, 2006.

8.    Annexed hereto as Exhibit G is a true and correct copy of the NetBank Press Release entitled "NetBank Reaches Agreement with EverBank for Sale of Select Assets and Assumption of Deposit Liabilities," dated May 21, 2007.

9.    Annexed hereto as Exhibit H is a true and correct copy of the Associate Press article entitled "Freidman, Billins, Ramsey Anaylst Predicts NetBank's Assets Will Soon Be Worthless," dated May 22, 2007.

10.    Annexed hereto as Exhibit I is a true and correct copy of the NetBank Form 8-K dated August 6, 2007.

11.    Annexed hereto as Exhibit J is a true and correct copy of the Form 8-K dated September 17, 2007.

12.    Annexed hereto as Exhibit K is a true and correct copy of the Federal Deposit Insurance Commission ("FDIC") Press Release PR-81-2007 dated September 28, 2007

13.    Annexed hereto as Exhibit L is a true and correct copy of the FDIC Dividend History (NetBank).

14.    Annexed hereto as Exhibit M is a true and correct copy of the NetBank Press Release entitled "NetBank Sells ATM and Merchant Servicing Operation," dated May 1, 2007.

15.    Annexed hereto as Exhibit N is a true and correct copy of the NetBank Press Release entitled "NetBank, Inc. Reports Results for Fourth Quarter 2006," dated February 21, 2007.

16.    Annexed hereto as Exhibit O is a true and correct copy of the Southern District of New York Judicial Caseload Profile, *available at* http://www.uscourts.gov/cgi-bin/cmsd2006.pl.

17.    Annexed hereto as Exhibit P is a true and correct copy of the Northern District of Georgia Judicial Caseload Profile, *available at* http://www.uscourts.gov/cgi-bin/cmsd2006.pl.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 11, 2008

*/s/ Lisa Albert*
Lisa Albert (LA-7264)

# EXHIBIT A

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MATTHEW TOTILO, individually and on   :
behalf of himself and all others similarly   :
situated,                                   :     Case No. 07-cv-10991-LAK
             Plaintiff        :
                                  :
v.                                 :
STEVEN F. HERBERT and        :
JAMES P. GROSS,           :
            Defendants.    :

## DECLARATION OF JAMES P. GROSS

1.     My name is James P. Gross. I am over eighteen years of age and am competent to make the following declaration.

2.     I have been employed as NetBank, Inc.'s Chief Financial Officer, Principal Financial Officer, and Principal Accounting Officer since October 5, 2006.

3.     NetBank, Inc., is incorporated under the laws of the state of Georgia and has its headquarters and principal place of business in Alpharetta, Georgia. Prior to September 28, 2007, NetBank, FSB, was a wholly-owned subsidiary of NetBank, Inc. and a federal savings bank chartered under United States law having its headquarters and principal place of business in Alpharetta, Georgia.

4.     I currently reside in Columbia, South Carolina.

5.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This _11th_ day of February, 2008.

_James P. Gross_
James P. Gross

# Exhibit B

# ORIGINAL

FILED IN CLERK'S OFFICE
U.S D.C. Atlanta

SEP 19 2007

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

-------------------------------------------------x

JOHNNY R. ADCOCK,                    :
on Behalf of Himself                 :
and All Others Similarly Situated,   :
                                     :
                                     :
         Plaintiff,                  :
                                     :
                                     :
         v.                          :
                                     :
                                     :
NETBANK, INC., STEVEN F.             :
HERBERT and DOUGLAS K.               :
FREEMAN,                             :
                                     :
                                     :
         Defendants.                 :

-------------------------------------------------x

1 07-CV-2298
DOCKET NO. _____

**CLASS ACTION**
**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Johnny R. Adcock ("Plaintiff"), individually and on behalf of all

other persons similarly situated, by his undersigned attorneys, for his complaint

against Defendants, alleges the following based upon personal knowledge as to

himself and his own acts, and information and belief as to all other matters, based

upon, *inter alia*, the investigation conducted by and through his attorneys, which

included, among other things, a review of the Defendants' public documents,

conference calls and announcements made by Defendants, United States Securities

and Exchange Commission ("SEC") filings, wire and press releases published by

and regarding NetBank, Inc. ("NetBank" or the "Company"), securities analysts

reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that further substantial evidentiary matter exists for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of persons who purchased or otherwise acquired NetBank securities (the "Class") between May 1, 2006 and September 17, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      It is alleged that throughout the Class Period, Defendants made materially false and misleading statements which artificially inflated the value of NetBank common stock. Specifically, Defendants repeatedly represented, beginning in May 2006, that NetBank was restructuring its operations to rid its strong core banking business from high risk non conforming loan origination operations and other business segments which detracted from the performance of its core business. Defendants claimed its restructuring was largely complete by February 2007 and that investor could rely on the book value of the Company as reflecting its true value. However, Defendants shocked the financial community by disclosing that as of May 21, 2007, NetBank's core banking business was so deficient in meeting regulatory capital requirements that bank regulators compelled

NetBank to consummate a $2.5 billion asset sale at a significant $60-70 million loss in order to cover NetBank depositors as required by law. The Company's common stock price plummeted 66% – from $1.75 per share on May 18, 2007 to $0.59 per share on May 21, 2007 on massive volume of 11,190,400 shares – *over forty-five times* the previous days' volume.

3.   On August 6, 2007, after the close of the markets, NetBank announced that its wholly-owned retail mortgage business, Market Street Mortgage Corporation ("Market Street"), was completely valueless.   The Company announced that it would record a non-cash impairment *charge of $24.6 million* for the value of goodwill assigned to Market Street when the value of goodwill assigned to Market Street at June 30, 2007 was *$24.6 million*.

4.   In the same August 6, 2007 Form 8-K, NetBank announced that the NASDAQ securities exchange was delisting the Company's common stock from trading.   Thus, far from merely a ministerial issue, NetBank had been unable to comply with the NASDAQ requirements (since it had not been able to file the 2006 Form 10-K and its Form 10-Q for the quarter ended March 31, 2007 (the "First Quarter 2007 10-Q") on or before July 18, 2007), because its valuation of its core businesses was utterly fraudulent and its new auditors were struggling with these violations of Generally Accepted Accounting Principles ("GAAP").

5.      Further, in the same announcement, NetBank disclosed that the Office of Thrift Supervision ("OTS") had notified NetBank that it was undercapitalized and was required to respond with a capital restoration plan no later than September 13, 2007 that would satisfy applicable regulations.

6.      The reaction of the markets to this news was sharp and swift.  On August 7, 2007, NetBank's stock price dropped to $0.14 per share from its previous day's close of $0.20 per share, *a 30% drop in one day* on massive volume of 5,190,600 shares.

7.      However, this was not the end of the fraud.  On August 22, 2007, the Company announced that it had entered into a settlement with insurance companies concerning litigation over the insurance companies' alleged breached of contract in connection with guarantees for certain revenue streams.  The settlement with one insurance company provided NetBank with a cash infusion of $19.25 million.  Together with the proposed asset sale to EverBank Financial Corp. ("EverBank") announced on May 21, 2007, Defendants further gave investors the illusion that NetBank could be properly capitalized.

8.      On this news, NetBank's stock price *doubled* from 0.06 per share on August 22, 2007 (on volume of 34,089 shares) to 0.12 per share on August 23, 2007 (on astounding volume of *6,294,574* shares).

9.    Shockingly, on September 17, 2007, EverBank announced that it had terminated its purchase of the NetBank assets because it had become "clear" to EverBank that NetBank would not be able to meet its regulatory requirements.

10.    On this news, NetBank's stock price closed at $0.08 per share.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

12.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1331.

13.    Venue is proper in this District pursuant to §27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. §1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company maintains its executive offices in this Judicial District.

14.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

5

## **PARTIES**

15.    Plaintiff Johnny R. Adcock, as set forth in the accompanying certification incorporated by reference herein, purchased the publicly traded securities of NetBank securities in an open and efficient market at artificially inflated prices during the Class Period and has been damaged thereby.

16.    Defendant NetBank, Inc., is incorporated in Georgia and maintains its executive offices at 1015 Windward Ridge Parkway, Alpharetta, GA 30005. The Company was founded in 1996 and represents itself as a financial holding company that operates a family of businesses focused primarily on consumer and small business banking as well as conforming mortgage lending.[1]  The Company's retail banking franchise, NetBank, FSB, is the nation's oldest active Internet bank serving retail and business customers in all 50 states.[2]  As of February 21, 2007, there were 46,425,000 outstanding shares of NetBank, Inc.  The Company's shares are traded on the NASDAQ securities exchange, an open and efficient market.

[1]  Wholly owned subsidiaries of NetBank, Inc., include NetBank, FSB ("NetBank, FSB"), a federal savings bank, MG Reinsurance Company ("MG Reinsurance"), a captive reinsurance company, NetInsurance, Inc. ("NetInsurance"), a licensed insurance agency, and NB Partners, Inc. ("NB Partners"), a corporation involved in strategic partnering opportunities

[2]  Netbank, FSB owns or owned, during all or part of the Class Period, all of the outstanding common stock of Market Street Mortgage Corporation ("Market Street"), a retail mortgage company, NetBank Payment Systems, Inc. ("NBPS"), a provider of ATM and merchant processing services for retail and other non-bank businesses, Meritage Mortgage Corporation ("Meritage"), a wholesale non-conforming mortgage provider, and Financial Technologies, Inc. ("FTI"), a provider of transaction processing services to financial services companies.

6

17.     Defendant Steven F. Herbert ("Herbert") was, from the inception of the Class Period through October 5, 2006, NetBank's Chief Financial Officer ("CFO"). From October 5, 2006 through the end of the Class Period, Herbert was NetBank's Chief Executive Officer ("CEO"). Herbert came to NetBank in 2002 after the Company acquired Resource Bancshares Mortgage Group ("RBMG"), where Herbert had served as the CFO prior to the acquisition.

18.     Defendant Douglas K. Freeman ("Freeman") was, from April 1, 2002 through October 5, 2006, NetBank's CEO and became Chairman of its Board of Directors on January 29, 2003. Like Herbert, Freeman joined NetBank in 2002 after the Company acquired RBMG, where he served as the CEO. Freeman received a lump-sum payment of $2.9 million as a severance package when he left NetBank in late 2006.

19.     Defendants Herbert and Freeman are collectively referred to hereinafter as the "Individual Defendants."

20.     During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of NetBank, was privy to non-public information concerning the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees,

7

attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew that NetBank's core businesses were valueless and disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.    The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of NetBank's business.

22.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their

8

issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

23.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to NetBank's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of NetBank's securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of NetBank publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding NetBank's business, operations and

management and the intrinsic value of NetBank securities; and (ii) caused Plaintiff and members of the Class to purchase NetBank publicly traded securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

25. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the publicly-traded securities of NetBank between May 1, 2006 and September 17, 2007, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of NetBank, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

26. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NetBank common stock was actively traded on the NASADQ securities exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NetBank or its transfer

agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

28.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

29.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of NetBank;

(c)    whether the prices of NetBank's publicly traded securities were artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained

damages and the proper measure of damages.

30.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

#### NetBank Enters The Subprime Mortgage Market

31.    In late 2001, NetBank, Inc. acquired RBMG, of which Meritage Mortgage Corp. ("Meritage"), a subprime lender, was a subsidiary.  The CFO of Meritage was Herbert and its CEO was Freeman.  As a result of this acquisition of RBMG, Herbert became the CFO of NetBank, and Freeman was brought on as NetBank's new CEO.

32.    Prior to this acquisition, NetBank had minimal if any involvement in the non-conforming mortgage market.  Its core businesses prior to the acquisition were consumer and small business banking in addition to conforming mortgage lending.

33.     In order to prop up the Company's stock price, the Defendants delineated between the Company's so-called core business of consumer and small business lending and "conforming" mortgage lending, of which its wholly-owned subsidiary, Market Street Mortgage Corporation ("Market Street") was a part, and "non-conforming" mortgages.

34.     Mortgage loans are divided into two broad categories.

(a)     The first category, conforming mortgages, includes mortgages that have terms and conditions that follow the guidelines and standards set forth by Fannie Mae and Freddie Mac and thus, are understood to be safer, less risky investments.  Fannie Mae and Freddie Mac, two stockholder-owned corporations, purchase mortgage loans complying with the guidelines from mortgage lending institutions such as NetBank, package the mortgages into securities and sell the securities to investors. By doing so, Fannie Mae and Freddie Mac, like Ginnie Mae, provide a continuous flow of affordable funds for home financing that results in the availability of mortgage credit for Americans.  Fannie Mae and Freddie Mac guidelines establish the maximum loan amount, borrower credit and income requirements, down payment, and suitable properties. Fannie Mae and Freddie Mac announce new loan limits every year.

(b)    The second category is called non-conforming loans.  A non-conforming loan is a loan that fails to meet bank criteria for funding.  Reasons for a loan's non-conformance include the loan amount is higher than the conforming loan limit (for mortgage loans), lack of sufficient credit, the unorthodox nature of the use of funds, or the collateral backing it.  In many cases, non-conforming loans can be funded by hard money lenders, or private institutions/money.  A large portion of real-estate loans are qualified as non-conforming because either the borrower's financial status or the property type does not meet bank guidelines.  Non-conforming loans can be either A-rated paper (less risky) or subprime loans (more risky).  Subprime lending is risky for both lenders and borrowers due to the combination of high interest rates, poor borrower credit history, and the murky financial circumstances often associated with subprime applicants.  A subprime loan is offered at a rate higher than A-paper loans due to the increased risk.

35.    In order to decrease the risk of default relating to subprime non-conforming mortgages (as well as, in fact, conforming mortgages), it is essential that the borrower institute a strong set of internal controls to accurately assess the credit worthiness of each borrower.  This is especially important since, as Freeman told the *Atlanta Journal and Constitution* on July 27, 2006, even if non-conforming loans are not bad, "investors who buy the loans will sell them back if

14

any discrepancy or misrepresentation [by the borrower] is later found in documents associated with those loans."

36.    Mortgage originators then "package" large volumes of these home loans to be used as collateral in massive mortgage-backed security ("MBS") offerings (or collateralized debt obligations ("CDOs")) to investors such as hedge funds, allowing the originators to further finance their activities.

37.    With a very strong housing market in the United States in the late 1990s and early 2000s, numerous lending institutions were very willing to provide mortgages to low credit high risk borrowers as they relied on the elevated value of the housing markets to protect them against defaults. These mortgages were then packaged for sale to investors. In early 2006, as the housing market began to cool, however, two painful trends that surfaced in the secondary market for non-prime mortgages: (1) Sales of home equity loans for borrowers with the weakest credit and the smallest cash down payments produced sizable discounts as investors took into account the end of rapid home price appreciation as a safety net for such borrowers, as well as other credit concerns; however, lender pricing did not take these into account; and (2) forced repurchases of subprime loans experiencing delinquencies early in their lives began to rise. The increase reflects both a spike in "early payment defaults" and more aggressive enforcement of related contractual

clauses by the investors, especially Wall Street conduits.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

### NetBank Begins Its Restructuring In The Face Of A Cooling Housing Market

38.    As the housing market began to cool in 2006, NetBank faced increasing pressure on its operations and finances.  As set forth above, demands for repurchases of loans increased dramatically, defaults increased and investors curtailed their purchases of CDOs, thereby limiting the cash available for NetBank to lend to borrowers.  This cash crunch led to NetBank's decision to restructure the Company in order to conserve its capital and preserve its tangible book value.  The "restructuring" had four major components: (1) sell its mortgage servicing platform; (2) sell or exit its non-conforming mortgage business; (3) sell other non-core operations; and (4) execute a private placement to raise capital.

39.    As early as May 1, 2006, NetBank announced a plan to sell its mortgage servicing platform along with most of its portfolio of mortgage servicing rights.  The Company stated that "[m]anagement estimates such a sale would likely free up between $20 and $35 million in risk-based capital that the company currently has allocated to its servicing asset. *Management would then have the opportunity to redeploy this capital in other business initiatives that it believes can generate higher returns or better serve shareholder interest.*"  NetBank

16

further stated that this proposed sale is part of *"management's continuous,*
*proactive capital management program"*:

> **NetBank, Inc. Pursues Possible Sale of its Mortgage**
> **Servicing Platform and Asset: Decision Relates to**
> **Management's Ongoing Capital Management**
> **Strategy and Belief Underlying Capital Can be**
> **Optimized in Other Areas**
>
> ATLANTA, May 1, 2006 (PRIMEZONE) -- NetBank,
> Inc. (Nasdaq:NTBK), a diversified financial services
> provider and parent company of NetBank (r)
> (www.netbank.com), today announced a plan to sell its
> mortgage servicing platform along with most of its
> portfolio of mortgage servicing rights. T*he proposed sale*
> *is part of management's continuous, proactive capital*
> *management program. Management estimates such a*
> *sale would likely free up between $20 and $35 million*
> *in risk-based capital that the company currently has*
> *allocated to its servicing asset. Management would then*
> *have the opportunity to redeploy this capital in other*
> *business initiatives that it believes can generate higher*
> *returns or better serve shareholder interest.*
>
> *"When we committed to this line of business as part of*
> *our overall income diversification strategy for the*
> *company, we set a goal of growing the servicing asset to*
> *at least the $25 billion mark," said Douglas K.*
> *Freeman, chairman and chief executive officer. "Based*
> *on our analysis, we needed to reach this minimum level*
> *to rationalize our investment and to have the asset serve*
> *as an effective macro hedge against our mortgage*
> *production network.*
>
> "The economic and market environments have changed
> dramatically since we initiated our plan, and we have not
> been able to achieve the level of growth in the servicing

17

asset we had anticipated," Freeman added. ***"Given prevailing business conditions, we have determined the mortgage servicing business no longer represents the best use of our capital.***

"Our obligation first and foremost is to create value for our shareholders," Freeman concluded. "Although we will continue to plan for the long-term and persist in the face of short-term operational pressures when it is right to do so, we will also remain flexible and have the conviction to revise our business strategy when it clearly furthers the interest of our shareholders."

Other details or likely results of the proposed sale include:

<div align="center">

\*   \*   \*

</div>

•   A sale should improve the company's earnings profile. Management could immediately redeploy available capital in additional earning asset growth at the bank. This would result in interest margin expansion and incremental income growth on a carry-forward basis. A certain level of earnings volatility would also be eliminated since quarterly servicing results can vary greatly. Any operational cost savings would generally be offset by the loss of escrow deposits related to the servicing asset. These deposits represent an interest-free source of liquidity that management would likely have to replace with interest-bearing liabilities.

•   The sale would entail a significant one-time restructuring charge. However, management would seek to moderate the impact of the charge on the company's tangible book value. The effect on tangible book value would be part of management's criteria in approving any transaction.

<div align="center">

18

</div>

> • The company intends to keep a small servicing operation to service its own mortgage production before it is delivered into the capital markets. Management may also choose to retain certain portions of its current servicing portfolio for strategic purposes or to facilitate a deal.
>
> As of March 31, the company's core servicing asset was comprised of $13.0 billion in loans. Management believes the underlying mortgage servicing platform could be scaled up to the $35.0 billion mark almost immediately using the operation's existing facility and infrastructure.

40.    On this news, NetBank's stock price rose from $6.84 per share on May 1, 2006 to $6.94 per share on May 2, 2006.

41.    The statements set forth in paragraph 39 above were materially false and misleading because they failed to disclose that the Company's financial distress was due to the failure of its core operations and that selling off parts of its mortgage business or other non-core operations would not be enough to resuscitate the Company.

42.    On October 3, 2006, the Company announced that Herbert would assume the position of CEO, replacing Douglas K. Freeman, who, like Herbert, joined NetBank in 2002 after the Company acquired RBMG, for whom Freeman was CEO.

43.   On this news, NetBank's stock price rose from $5.96 per share on
October 3, 2006 to $6.16 per share on October 4, 2006.

44.   On October 13, 2006, NetBank announced that it had sold the
servicing rights on $8.5 billion of mortgages – or 70% of its servicing portfolio –
to two buyers and took a higher-than-expected $19.3 million loss:

> **Company to Record Related Charges of Approximately $0.61 Per Share in the Third Quarter; Impact on Book Value to Be Half This Amount Due to Timely Disposal of Hedges**
>
> ATLANTA, Oct. 13, 2006 (PRIMEZONE) -- NetBank, Inc. (Nasdaq:NTBK), parent company of NetBank*&reg;* (www.netbank.com) and a leading mortgage lender, today announced that the company has sold most of its mortgage servicing rights ("MSRs") associated with conventional, agency-eligible loans. *These MSRs accounted for approximately 70% of NetBank's portfolio, and the unpaid principal balance ("UPB") on the underlying mortgages totaled $8.5 billion.* The MSRs were sold in two separate transactions. The larger, more significant deal involved MSRs for Fannie Mae and Freddie Mac loans. These MSRs had a related UPB of approximately $8.2 billion, and they were acquired by IXIS Real Estate Capital Inc. ("IXIS"). A different buyer purchased a pool of Ginnie Mae MSRs with UPB of approximately $230 million. Both transactions closed on September 29 and were recognized as third quarter events.
>
> Financial and other details of the sale include:
>
> -     One-time expenses of approximately $0.61 per share. The combined sales price for the MSRs was $119

million, which fell below the carrying value that the company had recognized on these particular MSRs. As a result of this difference, the company recorded an after-tax loss of $19.3 million on the sale. The company also elected to liquidate the Ginnie Mae mortgage-backed securities that it held as an on-balance sheet hedge. The company recorded an after-tax loss of $8.7 million on the sale of those securities. These charges along with other transaction-related costs equate to after-tax expenses of $28.1 million or $0.61 per share.

- *Limited impact on tangible book value. The sale of the company's on-balance sheet hedges improved the company's equity position on an after-tax basis by $13.8 million or $.30 per share and partially offsets the one-time expenses outlined above at the equity or tangible book level.* As hedges, the Ginnie Mae securities were valued on a mark-to-market basis. The value of these hedges improved throughout the third quarter. The company ultimately realized a smaller loss on these hedges than the unrealized loss it recognized in its equity calculation on June 30, 2006.

- Sub-servicing contract. As part of its negotiation with IXIS, the company reached an agreement to continue servicing the Fannie Mae and Freddie Mac MSRs on IXIS' behalf. The company had planned to maintain a servicing operation to handle the MSRs it is retaining as well as to service its own mortgage production during the time between origination and delivery into the secondary market. This sub-servicing agreement should provide the company with a source of fee income and greater operational efficiency through scale and leverage.

45.    On this news, NetBank's stock price rose from $6.11 per share on October 13, 2006 to $6.17 per share on October 16, 2006, the next trading day.

46. The statements set forth in paragraph 44 above were materially false and misleading because they failed to disclose that the Company's financial distress was due to the failure of its core operations and that selling off parts of its mortgage business or other non-core operations would not be enough to resuscitate the Company. In addition, it failed to disclose that the Company's tangible book value was declining rapidly even with the restructuring due to the failure of the Company's core businesses.

47. The "strategic restructuring" continued when, on November 6, 2006, NetBank announced that it had essentially ended its non-conforming mortgage loan financing operations. The Company announced that it had "executed a personnel placement agreement" with Lime Financial Services ("Lime") whereby Lime would "extend employment offers to the majority of the company's non-conforming mortgage sales force[.]" Incredibly, there was so little value to the Company's non-conforming mortgage portfolio that NetBank "did not receive any material financial or other considerations under the agreements":

> **Company Exits Non-Conforming Mortgage and RV, Boat and Aircraft Financing Businesses; Actions Will Result in Immediate, Meaningful Improvement to Operating Performance**
>
> ATLANTA, Nov 6, 2006 (PrimeZone Media Network via COMTEX News Network) -- NetBank, Inc. (Nasdaq:NTBK), parent company of NetBank*&reg;*

22

(www.netbank.com) and a leading mortgage lender, *today announced the company completed two separate transactions that effectively end its non-conforming mortgage and RV, boat and aircraft financing operations: 1) The company executed a personnel placement agreement with Lime Financial Services in Portland, Oregon, whereby Lime Financial Services will extend employment offers to the majority of the company's non-conforming mortgage sales force and a smaller but significant number of the operations support staff by November 15, 2006*; and 2) A sale of select assets to members of the senior management team of the company's RV, boat and aircraft financing operation.

The company did not receive any material financial or other considerations under the agreements, but management viewed them as a positive since they allowed the company to mitigate substantial severance and shutdown costs that the company would likely have incurred otherwise. Since the agreements did not cover the full scope of the operations, the company still has personnel and other commitments to address to fully exit both lines of business. Management currently expects to record pre-tax expense of $6.0 million to $7.5 million in the fourth quarter to cover those remaining obligations. The company had already written off the goodwill related to both businesses.

*"Since the beginning of October, we have been working aggressively to refocus the company on its core banking and conforming mortgage competencies,"* said Steven F. Herbert, chief executive officer.

*"We said then that our priorities were to exit or spin off any underperforming or non-core businesses so we could restore the company to profitability as quickly as possible and to improve the company's overall operating*

*profile.* Our decision to exit the non-conforming mortgage and RV, boat and aircraft lending businesses contribute to those goals in a meaningful way, especially when you consider the steepness of the quarterly losses we have been incurring in the non-conforming channel.

"We also committed to protecting capital as much as possible during this process," Herbert continued. "We were happy to execute the transactions that we did since they saved us real dollars in severance and shutdown costs. *But, regardless of the deals, it was critical for us to move quickly on these businesses. The cost of carrying them for another quarter or two would have destroyed more value than we probably could have derived under the best possible transaction circumstances.*"

The company's non-conforming mortgage operations are expected to cease by year-end. Once the transfer of staff to Lime Financial Services is completed, the company will take the necessary steps to end Meritage's broker relationships and to close any in-process loans. The company's RV, boat and aircraft financing operations ended with the sale of select assets. Beacon continues operation today as an independent company under the same management team.

(Emphasis supplied).

48. As a further step in the "restructuring," on November 7, 2006, FTI, a subsidiary of NetBank which offered "financial institutions technology solutions" such as QuickPost, a deposit and payment forwarding service, announced that it was "in the process of a shutdown and will cease operations" by December 31, 2006. FTI stated that its decision was "based on financial concerns. The company

24

had yet to break even and *now lacks sufficient capital* to expand its business to the scale needed to achieve profitability." (Emphasis supplied).

49.    The statements set forth in paragraphs 47-48 above were materially false and misleading because they failed to disclose that the Company's financial distress was due to the failure of its core operations and that selling off parts of its mortgage business or other non-core operations would not be enough to resuscitate the Company.  In addition, it failed to disclose that the Company's tangible book value was declining rapidly even with the restructuring due to the failure of the Company's core businesses.

### NetBank Announces Its Third Quarter 2006 Financial Results

50.    On November 8, 2006, NetBank announced its operating results for its third quarter ended September 31, 2006.  NetBank reported dramatic losses of $73.3 million or $1.58 per share for the quarter, compared with an after-tax loss of $1.4 million or $.03 per share during the same quarter in the prior year:

> **Reorganization Charges Drive Loss of $1.58 Per Share**
>
> ATLANTA, Nov 8, 2006 (PrimeZone Media Network via COMTEX News Network) -- NetBank, Inc. (Nasdaq:NTBK), parent company of NetBank*&reg;* (www.netbank.com) and a leading mortgage lender, today reported financial results for the quarter ended September 30, 2006. The company recorded an after-tax loss of $73.3 million or $1.58 per share for the period,

25

compared with an after-tax loss of $1.4 million or $.03 per share during the same quarter a year ago. On a year-to-date basis, the company recorded an after-tax loss of $116 million or $2.50 per share, versus a net loss of $1.1 million or $.02 per share during the first nine months of 2005.

*Book value declined by $1.22 per share from $7.48 on June 30, 2006 to $6.26 on September 30, 2006. However, the impact on the company's tangible book value was substantially less. Tangible book value declined $.70 per share from $5.80 on June 30, 2006 to $5.10 on September 30, 2006. On an after-tax basis, the reported loss included a $19.5 million expense of non-deductible goodwill and a $2.4 million expense of deductible goodwill, both of which did not negatively impact tangible book value.* In addition, the company sold certain on-balance sheet investments allocated as economic hedges of its mortgage servicing rights ("MSRs") during the quarter. The unrealized loss on these securities was already deducted from tangible book value on June 30 through other comprehensive loss included in the equity section of the balance sheet. Thus, the realized loss on those securities did not impact tangible book value. (Details related to amounts excluded from tangible book value are provided in the attached Reconciliation of Non-GAAP Financial Measures.)

(Emphasis supplied).

51.     Through this period of news in mid-November 2006, NetBank's stock price essentially remained unchanged, moving from $5.36 per share on November 6, 2006 to $5.38 per share on November 14, 2006.

52.   The statements set forth in paragraph 50 above were materially false and misleading because they failed to disclose that the Company's financial distress was due to the failure of its core operations and that selling off parts of its mortgage business or other non-core operations would not be enough to resuscitate the Company.  In addition, it failed to disclose that the Company's tangible book value was declining rapidly even with the restructuring due to the failure of the Company's core businesses.

### Ernst & Young Resigns As NetBank's Independent Auditor

53.   On November 9, 2006, NetBank filed a Form 8-K with the SEC indicating that on October 10, 2006, Ernst & Young LP ("E&Y") had resigned as NetBank's independent auditor.  E&Y's resignation as the Company's independent accountant became effective on November 9, 2006, with the filing of the Company's Quarterly Report on Form 10-Q for the three-month and nine-month periods ended September 30, 2006.  The Company gave the reason for the resignation as a weakness in internal controls in connection with "the determination and estimation of the change in fair value of the Company's portfolio of mortgage loan funding commitments where the interest rate had been locked." NetBank further stated that "[i]n 2005, the Company implemented certain changes to its internal controls to address the material weakness over the

Company's rate locks and determined that the material weakness existing at December 31, 2004 was corrected."

54.     NetBank further downplayed the reasons for E&Y's resignation, stating that "[t]he audit reports of E&Y on the Company's consolidated financial statements for the fiscal years ended December 31, 2004 and 2005 did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles."

55.     On this news, NetBank's stock price increased from $4.99 per share on November 9, 2006 to $5.02 per share on November 10, 2006.

56.     The statements set forth in paragraphs 53-54 above were materially false and misleading in that they falsely led investors to believe that the delay in filing the 2006 Form 10-K was not due to a substantive issue and that any problems had been corrected.  These statements omitted to state that in fact, the reason for the failure to timely file was the failure of Defendants to comply with GAAP in valuing its core mortgage portfolio and, through that, its tangible book value.

### NetBank's Private Placement of Its Common Stock

57.     In the final phase of the restructuring, on January 13, 2007, NetBank announced a private placement of 6,500,000 shares of its common stock at a price

of $3.90 per share, with proceeds of approximately $23.7 million:

> **NetBank, Inc. Announces Pricing of Private Placement of Its Common Stock**
>
> ATLANTA, Jan. 3, 2007 (PRIME NEWSWIRE) -- NetBank, Inc. (Nasdaq:NTBK) today announced the pricing of a private placement of 6,500,000 shares of its common stock at a price of $3.90 per share to a combination of new and existing institutional investors. The Company expects to receive proceeds of approximately $23.7 million, net of private placement fees and estimated legal and other expenses of the placement agent associated with the issuance. The Company intends to use the net proceeds of this offering for general corporate purposes. The closing of the transaction is expected to occur on Friday, January 5, 2007, subject to the satisfaction of closing conditions

58.     The private placement did indeed close on January 5, 2007, and in announcing it, NetBank stressed that this was one of the final steps in its restructuring and was intended to, *inter alia*, "maintain [NetBank's] optimum capitalization":

> **NetBank, Inc. Closes Private Placement of Common Stock**
>
> ***Additional Capital Supports Company's Strategic Reorganization***; **Dilution to Shareholders Kept to a Minimum**
>
> ATLANTA, Jan. 8, 2007 (PRIME NEWSWIRE) -- NetBank, Inc. (Nasdaq:NTBK) completed a private placement of 6.5 million shares of its common stock on

Friday, January 5. The private placement was fully subscribed. Seven institutional investors purchased the shares at a price of $3.90 per share, with more than three-fourths of the offering being acquired by two of the investors. The sale generated approximately $23.7 million in new capital for the company, net of private placement commissions and expenses to JMP Securities LLC, the sole placement agent in the transaction.

"We are pleased with the transaction and believe it serves the best interest of long-term shareholders," said Steven F. Herbert, chief executive officer. *"We are in the final phase of the corporate restructuring plan we started three months ago. The plan centers on returning the company to profitability as quickly as possible by exiting underperforming businesses and refocusing attention on our core retail and small business banking operations as well as our prime mortgage businesses. We believe the additional capital will allow us to maintain optimal capitalization within the bank*; support new asset and deposit growth; and potentially invest in other key initiatives.

(Emphasis supplied).

59.    As a result of expected dilution of NetBank shares, NetBank's stock price slipped slightly, from $4.30 per share on January 3, 2007 to $4.14 per share on January 5, 2007.

60.    The statements set forth in paragraphs 57-58 above were materially false and misleading because they failed to disclose that the Company's financial distress was due to the failure of its core operations and that neither this cash infusion nor selling off parts of its mortgage business or other non-core operations

30

would not be enough to resuscitate the Company.

### NetBank Misleads Investors Regarding the Late Filing of Its 2006 Form 10-K

61.     On January 3, 2006, in connection with the private placement, NetBank informed investors for the first time that as a result of E&Y's resignation and an inability to find a replacement, the filing of the 2006 Form 10-K might be delayed, leading to a possible delisting by the NASDAQ stock exchange if the 2006 Form 10-K is not filed by March 16, 2007. The Company did not present the possible late filing as at all problematic, instead focusing on the fact that it simply had not yet been able to find a replacement despite the Audit Committee's diligent efforts:

> ***Our Delay in Engaging an Auditor May Result in our Inability to Timely File Our Annual Report on Form 10-K for the Year Ending December 31, 2006***
>
> On October 10, 2006, Ernst & Young LLP ("E&Y"), the independent registered public accounting firm of the Company for the fiscal year ended December 31, 2005, resigned effective upon the filing with the Commission of the Company's Quarterly Report on Form 10-Q for the three-month and nine-month periods ended September 30, 2006.  E&Y's resignation as the Company's independent registered public accounting firm became effective on November 9, 2006, with the filing of the Company's Quarterly Report on Form 10-Q for the three-month and nine-month periods ended September 30, 2006.  During each of the fiscal years ended December 31, 2004 and December 31, 2005 and the subsequent

interim period from January 1, 2006 through the effective date of E&Y's resignation on November 9, 2006 there were no disagreements between the Company and E&Y on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of E&Y, would have caused E&Y to make reference to the subject matter of the disagreement in connection with its reports on the consolidated financial statements for such years.

**Since prior to the effective date of E&Y's resignation, the Audit Committee of the Board of Directors of the Company has been engaged in the process of selecting an independent registered public accounting firm ("Auditor") for the fiscal year ending December 31, 2006. To date, the Company has been unsuccessful in engaging a new Auditor. There can be no assurance that we will be able to engage a new Auditor that will be able to perform and complete the audit of our 2006 financial statements (the "2006 Audit") by March 16, 2007, the last date we are permitted to timely file our Annual Report on Form 10-K for the year ending December 31, 2006 (the "2006 Form 10-K") with the Securities and Exchange Commission ("the Commission") before we become a late filer ("Late Filer").** The 2006 Audit and the related auditor attestation regarding our internal control over financial reporting required by the Sarbanes-Oxley Act of 2002 and related Commission rules, will be required for us to complete and file our 2006 Form 10-K.

*Our Failure to Timely File our Annual Report on Form 10-K for the Year Ending December 31, 2006 May Lead to A Delisting of Our Common Stock from the NASDAQ Global Market*

(Underline supplied; other emphases in original).

32

62.    On this news, NetBank's stock price remained stable, closing at $4.30 per share on both January 3 and 4, 2007.

63.    The statements set forth in paragraph 61 above were materially false and misleading in that they falsely led investors to believe that the delay in filing the 2006 Form 10-K was not due to a substantive issue, but rather was merely the procedural result of not being able to engage an auditor in time to file.    These statements omitted to state that in fact, the reason for the failure to timely file was the failure of Defendants to comply with GAAP in valuing its core mortgage portfolio and, through that, its tangible book value.

64.    On February 15, 2007, in a filing with the SEC on Form 8-K, NetBank announced that it had selected Porter Keadle Moore, LLP ("PKM") as its new independent auditor and repeated the false and misleading statement that it was the procedural delay in selecting a new auditor that might prevent NetBank from timely filing the 2006 Form 10-K.    Indeed, the Company falsely represented to shareholders that it expected to file the 2006 Form 10-K no later than June 31, 2007:

> **Item   4.01   Changes   in   Registrant's   Certifying Accountants.**
>
> On February 13, 2007, NetBank, Inc. (the "Company") engaged Porter Keadle Moore, LLP ("PKM") as its new

independent registered public accounting firm for the fiscal year ended December 31, 2006. The engagement of PKM was approved by the Audit Committee of the Board of Directors of the Company. PKM replaced the Company's former independent registered public accounting firm that resigned effective November 9, 2006.

\* \* \*

PKM will begin its examination of the Company for purposes of conducting the 2006 audit as soon as possible. *However, as previously disclosed in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission ("SEC") on January 3, 2007 (the "Prior Form 8-K"), due to the timing of the engagement of PKM, the Company does not expect that PKM will be able to perform and complete the audit of our 2006 financial statements, and related auditor attestation regarding our internal control over financial reporting, by our compliance deadline of March 16, 2007, the last date the Company is permitted to timely file its Annual Report on Form 10-K for the year ended December 31, 2006 ("2006 Form 10-K") with the SEC. The Company currently believes that the 2006 audit will be completed in June 2007 and expects to file the 2006 Form 10-K with the SEC on or before June 30, 2007, although no assurance can be given.*

As previously disclosed in the Prior Form 8-K, if the Company is not able to timely file its 2006 Form 10-K, it will not be in compliance with the continued listing requirements of the NASDAQ Stock Market ("NASDAQ") for the listing of the Company's common stock. In such event, the Company would expect to receive notification from NASDAQ of potential delisting of the Company's common stock shortly after the March

34

16, 2007 compliance deadline passes. After receipt of such notification, the Company would have the opportunity to request a hearing with NASDAQ, which would stay delisting proceedings pending the completion of the hearing process. If the Company receives notice of potential delisting, the Company intends to use all reasonable efforts to regain compliance with the listing requirements as soon as possible, but there can be no guarantee that the Company will regain compliance, or will be able to demonstrate a plan to regain compliance, in time to avoid delisting by NASDAQ. For information regarding the risks associated with delisting of our common stock, see Exhibit 99.2 of the Prior Form 8-K under the heading, "Our Failure to Timely File our Annual Report on Form 10-K for the Year Ending December 31, 2006 May Lead to A Delisting of Our Common Stock from the NASDAQ Global Market," which information is incorporated herein by reference.

65.    On this news, NetBank's stock price dropped from $3.60 per share on February 15, 2007 to $3.55 per share on January 16, 2007.

66.    The statements set forth in paragraph 64 above were materially false and misleading in that they falsely led investors to believe that the delay in filing the 2006 Form 10-K was not due to a substantive issue, but rather was merely the procedural result of not being able to engage an auditor in time to file.  These statements omitted to state that in fact, the reason for the failure to timely file was the failure of Defendants to comply with GAAP in valuing its core mortgage portfolio and, through that, its tangible book value.

35

**February 21, 2007: NetBank Announces Fourth Quarter and Year End 2006 Financial Results and Assures Investors Regarding the Restructuring and SEC Filings**

67.     On February 21, 2007, NetBank announced its preliminary unaudited results for the year ended December 31, 2006. NetBank recorded an after-tax loss of $86.3 million or $1.86 per share during the fourth quarter, compared with *net income* of $895,000 or $.02 per share during the same quarter in 2005. NetBank further recorded a net loss of $202 million or $4.36 per share for the full year, compared with a net loss of $180,000 or $.00 per share for 2005

68.     The Company again gave investors the impression that the only reason the filing of the 2006 Form 10-K might be late is that PKM was only "recently engaged" and that it expected the 2006 Form 10-K would be filed:

> The results set forth in this press release are preliminary and unaudited. *As previously reported, the company recently engaged Porter Keadle Moore, LLP ("PKM") to replace Ernst & Young LLP as its independent auditor.* These preliminary results are subject to potential adjustments, which may be material, arising from subsequent events or the audit of the company's financial statements for the year ended December 31, 2006 by PKM. *The company currently believes that the 2006 audit, and related auditor attestation regarding the company's internal control over financial reporting, will be completed in June 2007 and expects to file its Annual Report on Form 10-K for the 2006 fiscal year*

> *with the SEC on or before June 30, 2007*, although no
> assurance can be given.

(Emphasis supplied).

69.     The statements set forth in the preceding paragraph 68 above were

materially false and misleading in that they falsely led investors to believe that the

delay in filing the 2006 Form 10-K was not due to a substantive issue, but rather

was merely the procedural result of not being able to engage an auditor in time to

file.  These statements omitted to state that in fact, the reason for the failure to

timely file was the failure of Defendants to comply with GAAP in valuing its core

mortgage portfolio and, through that, its tangible book value.

70.     The February 21, 2007 report of NetBank's fourth quarter and year

end 2006 financial results also contained a section called "Key items worth noting"

in which management represented that the "worst of the non-conforming loan

repurchase problem is now behind the company" and that the impact of the

restructuring on the Company's tangible book value was "lessened, being reduced

only to $3.50 on December 31, 2006 from $5.10 on September 30, 2006":

> Key items worth noting include the following. All comparisons are on a
> sequential quarter basis unless noted otherwise.
>
> •    Accelerated Repurchase Activity.  As previously
> announced, repurchase requests in the non-conforming
> mortgage channel rose sharply following management's
> decision to close the business and accelerated further at the end

37

of the year. Provisions for the non-conforming channel were $30.3 million, an increase of $25.7 million from last quarter. Overall, provisions for the financial intermediary segment were $32.0 million versus $12.2 million the prior quarter. *Management believes the worst of the non-conforming loan repurchase problem is now behind the company given the accelerated repurchase requests already received relative to the limited non-conforming production over the second half of 2006.*

\*     \*     \*

•     *Impact on Tangible Book Value Lessened.* Book value declined by $1.94 per share from $6.26 on September 30, 2006 to $4.32 on December 31, 2006. However, the impact on the company's tangible book value was less. *Tangible book value declined by $1.60 per share from $5.10 on September 30, 2006 to $3.50 on December 31, 2006. On an after-tax basis, the reported loss included the $9.7 million write down related to the company's ATM and merchant processing business mentioned above that did not negatively impact tangible book value.* (Details related to amounts excluded from tangible book value are provided in the attached Reconciliation of Non-GAAP Financial Measures.)

(Emphasis supplied).

71.    On this news, NetBank's stock price rose from $3.57 per share on February 20, 2007 to $3.62 per share on February 21, 2007.

72.    The statements set forth in paragraph 65 above were materially false and misleading because they failed to disclose that the Company's financial distress was due to the failure of its core operations and that selling off parts of its mortgage business or other non-core operations would not be enough to resuscitate

38

the Company. In addition, it failed to disclose that the Company's tangible book value was becoming worthless even with the restructuring due to the failure of the Company's core businesses.

73. The February 21, 2007 report of NetBank's fourth quarter and year end 2006 financial results also contained a section called "Management Commentary" in which Herbert told investors that "in the span of 90 days," NetBank was able to "substantially execute a restructuring plan designed to stabilize the company's operating profile and capital position," that the Company had finally "emerged" from the "tunnel" of the restructuring having moved closer to our goal of restoring profitability and stabilizing book value" and now were ready to take their "next steps":

> Management Commentary
>
> "Last year, we were at a crossroads as a company," said Steven F. Herbert, chief executive officer. "Market and economic pressures combined with our poor financial performance demanded dramatic changes.
>
> ***"I'm proud of the fact that, in the span of 90 days, we were able to substantially execute a restructuring plan designed to stabilize the company's operating profile and capital position.*** During the quarter, we sold, exited or shut down our non-conforming mortgage operation; our RV, boat and aircraft financing business; FTI and the QuickPost service; and NetInsurance. We consolidated two of our indirect conforming mortgage operating centers into our Columbia facility, and during December, we substantially effected a shut down of our

39

auto lending unit.

"The final item remaining to be checked off our 'to do' list is the completion of the sale of our ATM and merchant processing business. We have a non-binding letter of intent in place and we are optimistic that a definitive agreement will be reached soon and the deal will close by the end of the first quarter. I am also pleased that we can check off 'engage an audit firm' which wasn't on our original list of things to do.

*"When we began this process, I likened it to driving through a tunnel. We had a roadmap, but we went in not knowing exactly what things would look like on the other side. Now that we've emerged, we're evaluating our next steps.* As we announced earlier this month, we are exploring longer-term strategic alternatives to drive shareholder value. We may also need to consider some different scenarios to proactively manage our risk-based capital.

"I'd be remiss if I didn't thank our associates for all the hard work they have done since last October. *That work has moved us closer to our goal of restoring profitability and stabilizing book value.* While we evaluate our next steps, our operating priorities will continue to be moving our indirect conforming mortgage operation back toward breakeven as quickly as possible and generating cost-effective deposit growth at the bank."

74.    On these reassurances to the market, NetBank's stock price rose from

$3.57 per share on February 20, 2007 to $3.62 per share on February 21, 2007.

75.    The statements set forth in paragraph 73 above were materially false

and misleading because far from successfully executing a plan that "stabilize[d] the

company's operating profile and capital position" or "emerg[ing]" from the

"tunnel" of the restructuring, Defendants failed to disclose that the Company's financial distress was due to the failure of its core operations and that selling off parts of its mortgage business or other non-core operations would not be enough to resuscitate the Company. In addition, it failed to disclose that far from "stabilizing book value," the Company's tangible book value was declining rapidly even with the restructuring and cash infusion due to the failure of the Company's core businesses.

**NetBank Still Is Unable To Timely File Its 2006 Form 10-K and is Delisted By NASDAQ**

76. On March 23, 2007, the Company announced that on March 20, 2007, it had received a letter from the NASDAQ stock market stating that its inability to file timely the 2006 Form 10-K served as a basis for the company's common stock to be subject to delisting, further perpetuating the myth that the only reason for the failure to timely file the 2006 Form 10-K was the delay in retaining new independent auditors after the resignation of E&Y:

> **NetBank, Inc. Receives NASDAQ Notice of Non-Compliance**
>
> **Company to Request Hearing Before NASDAQ Listing Qualifications Panel**
>
> ATLANTA, Mar 23, 2007 (PrimeNewswire via COMTEX News Network) -- NetBank, Inc. (Nasdaq:NTBK) today announced that on March 20,

2007, it received a staff determination notice from the Nasdaq Stock Market stating that the company's common stock is subject to delisting. The notice, which was anticipated by the company in its current report on Form 8-K filed with the Securities and Exchange Commission on February 15, 2007, was issued in accordance with standard NASDAQ procedures as a result of the delayed filing of the company's Annual Report on Form 10-K for the 2006 fiscal year (the "10-K"). Timely filing of periodic reports is a requirement for continued listing under NASDAQ Marketplace Rule 4310(c)(14).

Management will request a hearing before a NASDAQ Listing Qualifications Panel in which it will outline its plan for regaining compliance. There can be no assurance that the panel will grant the company's request for continued listing. Pending a decision by the panel, NetBank shares will remain listed on the NASDAQ Global Market.

*As previously reported, the company was unable to timely file its 10-K due to the delay in engaging a new independent auditor after its former independent auditor resigned effective November 9, 2006.* On February 15, 2007, the company reported that it engaged Porter Keadle Moore, LLP ("PKM") to replace Ernst & Young LLP as its independent auditor. *The company currently believes that the 2006 audit, and related auditor attestation regarding the company's internal control over financial reporting, will be completed in June 2007 and expects to file its 10-K with the SEC on or before June 30, 2007, although no assurance can be given.*

77. On this news, NetBank's stock price rose slightly from $2.41 per share on March 23, 2007 to $2.42 per share on March 26, 2007, the next trading day.

78. On May 15, 2007, the Company announced that on May 14, 2007, it had received a letter from the NASDAQ stock market stating that its inability to file timely its March 31, 2007 Form 10-Q served as "additional basis for the company's common stock to be subject to delisting." In addition, NetBank announced that while the Company had released preliminary unaudited results for the December 31, 2006 year, the year-end statements would remain open to "additional evidence with respect to conditions that existed at the date of the balance sheet and affect estimates inherent in the process of preparing the audited financial statements," and for the first time indicated that this may require NetBank to "push back" and record certain unidentified "subsequent events" in its year-end financial statements:

**NetBank, Inc. Receives Additional NASDAQ Notice of Non-Compliance**

**Company Recently Outlined Plans for Regaining Compliance During Hearing Before NASDAQ Listing Qualifications Panel; Also Announces It Will Delay Reporting Q1 2007 Results Until It Regains Compliance**

ATLANTA, May 15, 2007 (PrimeNewswire via

43

COMTEX News Network) -- NetBank, Inc. (Nasdaq:NTBK) today announced that on May 14, 2007, it received an additional staff determination notice from the NASDAQ Stock Market stating that the company's inability to timely file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 (the "10-Q"), serves as an additional basis for the company's common stock to be subject to delisting. The notice, which was anticipated by the company, was issued in accordance with standard NASDAQ procedures. Timely filing of periodic reports is a requirement for continued listing under NASDAQ Marketplace Rule 4310(c)(14).

As previously announced, the company received a similar letter on March 20, 2007, when it was unable to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2006 (the "10-K"). In response to that letter, the company requested, and was granted, a hearing before a NASDAQ Listing Qualifications Panel. The hearing was held on May 3, 2007. During the hearing, the company presented its plan for regaining compliance. Since the company is unable to file its 10-Q before its 10-K has been filed, management currently expects to file the 10-K and 10-Q concurrently on or before June 30, 2007, although no assurance can be given.

The May 14, 2007, NASDAQ notice states that the 10-Q delinquency serves as an additional basis for delisting the company's securities on the NASDAQ Global Market and that the NASDAQ Listing Qualifications Panel will consider this additional basis before rendering its decision regarding the company's continued listing on the NASDAQ Global Market. There can be no assurance that the panel will grant the company's request for continued listing. Pending a decision by the panel, NetBank shares will remain listed on the NASDAQ Global Market.

44

The company also announced that it will delay reporting its results for the quarter ended March 31, 2007, until its auditors have completed the audit of the company's financial statements for the year ended December 31, 2006, and the company has filed the 10-K. While the company reported preliminary, unaudited results for its year ended December 31, 2006, the subsequent events period applicable to our financial statements for the year ended December 31, 2006, will remain open until the completion of the audit. ***Under applicable accounting pronouncements, events that occur or information that becomes available subsequent to the December 31, 2006, balance sheet date but before issuance of the year-end audited financial statements that provide additional evidence with respect to conditions that existed at the date of the balance sheet and affect the estimates inherent in the process of preparing the audited financial statements would be required to be "pushed back" and recorded in the year-end financial statements. The company currently expects that it may be required to "push back" and record in its year-end financial statements certain subsequent event items in accordance with these accounting pronouncements.*** However, until the subsequent events period is closed, the company will not be in a position to review or quantify such charges or their effect on its previously reported preliminary, unaudited results at year-end. Upon reporting final year-end and first quarter results, the company will identify the nature and amount of charges, if any, that were required to be pushed back to 2006.

***As previously reported, the company was unable to timely file its 10-K due to the delay in engaging a new independent auditor after its former independent auditor resigned effective November 9, 2006.*** On February 15, 2007, the company reported that it engaged Porter Keadle Moore, LLP ("PKM") to replace Ernst & Young LLP as its independent auditor.

79.   On this news, NetBank's stock price dropped slightly from $1.95 per share on May 15, 2007 to $1.90 per share on May 16, 2007.

80.   The statements set forth in paragraphs 76 and 78 above were materially false and misleading in that they falsely led investors to believe that the delay in filing the 2006 Form 10-K was not due to a substantive issue, but rather was merely the procedural result of not being able to engage an auditor in time to file.  These statements omitted to state that in fact, the reason for the failure to timely file was the failure of Defendants to comply with GAAP in valuing its core mortgage portfolio and, through that, its tangible book value.

**NetBank Continues To Shed Assets**

81.   In the midst of its materially false and misleading statements regarding its failure to timely file required filings with the SEC, NetBank continued to sell off assets in an effort to raise capital.

82.   On May 1, 2007, the Company announced that it sold its ATM and Merchant Servicing Operation for $18 million, which included initial cash proceeds of $16.5 million.  Herbert portrayed this sale as a "win-win" that would increase NetBank's tangible assets and tangible book value even though he admitted that "NetBank was carrying the assets on its balance sheet at a higher value than the sales price" and therefore the Company would "record an additional

impairment charge of approximately $2.0 million to bring the book value of the assets into line with the sales price."

### NetBank Sells ATM and Merchant Servicing Operation

### Acquirer Pays $18.0 million for Unit's Principal Operating Assets and Assumes Management Effective Tuesday, May 1, 2007

ATLANTA, May 1, 2007 (PrimeNewswire via COMTEX News Network) -- NetBank, Inc. (Nasdaq:NTBK), parent company of NetBank (www.netbank.com), an online financial services provider and national prime mortgage lender, today announced a transaction involving NetBank's ATM and merchant servicing operation. NetBank Payment Systems sold its principal operating assets and net working capital yesterday to PAI ATM Services, LLC, a subsidiary of Payment Alliance International, Inc. ("PAI"). The assets consisted primarily of servicing contracts on more than 8,500 ATMs nationwide. The sales price for the assets totaled $18.0 million, resulting in initial cash proceeds of $16.5 million after adjustment for the estimated book value of the net working capital acquired.

*NetBank was carrying the assets on its balance sheet at a higher value than the sales price. The bank will therefore record an additional impairment charge of approximately $2.0 million to bring the book value of the assets into line with the sales price.* It is important to note that the ATM servicing contracts were recognized on the bank's balance sheet as intangible assets. *Through the sale, the bank monetized them and thus converted them from an intangible into a tangible. This means the bulk of the cash proceeds represents new tangible capital that management can put to work in additional*

47

> *asset growth at the bank or other cost-saving initiatives.
> It also directly increases the company's overall tangible
> book value.*
>
> "We mentioned several months ago our intention to sell
> this operation as part of our larger corporate
> reorganization effort," said Steven F. Herbert, Chief
> Executive Officer ("CEO"), NetBank, Inc. "We said then
> that the operation was well managed and had real value.
> But, it simply did not fit in with our core banking and
> mortgage focus. It required significant capital to operate
> and therefore represented a strain or distraction on our
> resources.
>
> *"The deal with PAI is a win-win proposition,"* Herbert
> concluded. "PAI will be able to invest more in the
> operation and preserve the jobs of the talented team we
> had in place. In turn, *we have generated significant new
> tangible capital. This money will prove important in our
> effort to maintain proper regulatory capital ratios and
> to protect shareholder value as we fight to get the
> company back on track financially through further
> restructuring or other alternatives."*

83.    On these reassurances to the market that NetBank actually had

increased its tangible book value in this further stage of the restructuring, the

Company's stock price rose from $1.96 per share on May 1, 2007 to $2.07 per

share on May 2, 2007.

84.    The statements set forth in paragraph 82 above were materially false

and misleading because far from being a "win" for NetBank that generated

additional capital for turning around the Company, as Defendants well-knew, no

48

amount of additional funding would save the Company since its financial distress was so deeply rooted in the failure of its core operations. In addition, it failed to disclose that the Company's tangible book value in fact continued to decline rapidly even with the restructuring and multiple cash infusions due to the failure of the Company's core businesses.

### May 21, 2007: NetBank Sells Core Assets and Discloses For the First Time That It Was Compelled To Do So By Regulatory Agencies

85.    To the utter shock of the market, on May 21, 2007, NetBank announced that it had been forced to sell core assets – outside the context of the restructuring – in order to cover its bank deposit obligations. This sale was not done willingly but rather, as the Company disclosed for the first time, was compelled by bank regulators who "advised" NetBank management to find an "alternative" to the restructuring to shore up NetBank's "capital and earnings trends" "*immediately* [to] cover all of the bank's deposit obligations."

86.    In addition, this announcement represented the first time that the Company acknowledged that the problems it faced were not due to the weakened housing market and flat yield curves, but actually related to the "weakened fundamentals of *our core businesses.*"

87.    In response to regulator concerns, NetBank sold off – at a loss of between $60-70 million – NetBanks' $2.5 billion in core and brokered deposits;

49

NetBank's held for investment loan portfolio; all of the assets and liabilities of NetBank Business Finance, the Company's small business equipment leasing and financing operation; and the NetBank brand and related trademarks and service marks:

**NetBank Reaches Agreement With EverBank for Sale of Select Assets and Assumption of Deposit Liabilities**

**Transaction is Expected to Close by End of June 2007; NetBank Begins Immediate Shut-Down of Third-Party Mortgage Origination Business**

ATLANTA, May 21, 2007 (PrimeNewswire via COMTEX News Network) -- NetBank, Inc. (Nasdaq:NTBK), parent company of NetBank (www.netbank.com), an online financial services provider and national prime mortgage lender, today announced that the bank has executed an asset purchase and liability assumption agreement with EverBank, an FDIC-insured, federal savings bank and subsidiary of EverBank Financial Corp., a privately held financial services holding company headquartered in Jacksonville, Fla., with approximately $4.7 billion in assets. *The purchase price represents a discount to the current carrying value of the assets and liabilities being conveyed, and NetBank anticipates recording a loss on sale of between $60 and $70 million at close.*

The transaction is expected to close by the end of June 2007, subject to regulatory approval, and relates to the broader initiative the company began earlier in the year to consider strategic alternatives that would allow management to serve the interests of its customers, while protecting the company's equity position from continued erosion. The company has been under extreme financial

50

pressure for more than a year due to a difficult mortgage origination market, a flat yield curve environment and other factors. These pressures have resulted in large operating losses that have significantly reduced the company's capital position and prompted heightened regulatory oversight.

NetBank worked closely with regulators as it evaluated various opportunities. *Regulators have been increasingly concerned about the bank's capital and earnings trends and advised management to find an alternative immediately that covered all of the bank's deposit obligations.* NetBank and EverBank expect to execute a separate transition service agreement where NetBank will continue to support the deposit relationships after the close until EverBank converts these relationships to its core online banking platform sometime in the third quarter.

The primary assets and liabilities in the transaction include:

 * The bank's held for investment loan portfolio;
 * All of the assets and liabilities of NetBank Business Finance, the
   bank's small business equipment leasing and financing operation;
 * *The bank's $2.5 billion in core and brokered deposits*; and
 * The NetBank brand and related trademarks and service marks.

Management Commentary

*"In spite of our best efforts to improve the company's operating profile through the restructuring plan we undertook last year, our company has remained very vulnerable and at risk due to the weakened*

51

*fundamentals of our core businesses*," said Steven F. Herbert, chief executive officer, NetBank, Inc. "Our mortgage operations continue to struggle in the face of a highly competitive marketplace, especially the third-party origination channel. *Bank earnings have also fallen sharply as we have had to de-leverage the balance sheet in order to maintain risk-based capital ratios within appropriate regulatory guidelines*.

<p style="text-align:center">*     *     *</p>

"The transaction we are announcing today monetizes a significant portion of the company's assets and will allow the bank to fulfill all of its deposit liabilities. . . .

"By transferring the deposit relationships and resolving the chief concern of regulators, we are now positioned to move forward with other restructuring initiatives, such as the shutdown of our third-party mortgage origination business, NetBank Funding Services.

"Our remaining businesses will include our mortgage servicing operation, along with our retail prime mortgage franchise, Market Street Mortgage," Herbert concluded. "We are actively evaluating their long-term strategic alternatives as well as those of the parent company as a whole. We have also retained our CMC claim and the deferred tax asset that we generated in the fourth quarter of 2006. After consummation of the EverBank transaction, we will focus intensely on prosecuting the CMC sureties and pursuing our claim against them, which we now estimate at $150 million."

88. In response to this disastrous news, the shocked market reacted sharply and swiftly. NetBank's stock price plummeted from $1.75 per share on May 18, 2007 to $0.59 per share on May 22, 2007 (the next trading day) *an over*

*66% drop in price* on massive volume of 11,190,400 – *over forty-five times* the previous days' volume.

89. On May 22, 2007, as reported by the Associated Press, Friedman, Billings, Ramsey analyst Paul J. Miller Jr. said the net value of NetBank's assets, which the bank currently estimated at $25 million to $45 million, is "careening toward zero." He downgraded NetBank to "Underperform" from "Market Perform." Miller cut his price target for NetBank's common stock to zero, from $2.00.

90. In response to this rating and the related news article, NetBank's stock price fell further, from $0.59 per share on May 21, 2007 to $0.37 per share on May 22, 2007.

91. However, Herbert continued the charade that the failure to timely file with the SEC was merely a "delay" rather than a substantive problem that threatened the very continuation of the Company as a going concern. Herbert stated as follows:

> "Our effort to manage and address these pressures was further complicated by the delay of the annual audit and greater day-to-day regulatory oversight and involvement."

92. This statement remained materially false and misleading in that they falsely led investors to believe that the delay in filing the 2006 Form 10-K and

First Quarter 2007 Form 10-Q was not due to a substantive issue, but rather was

merely the procedural result of not being able to engage an auditor in time to file.

These statements omitted to state that in fact, the reason for the failure to timely

file was the failure of Defendants to comply with GAAP in valuing its core

mortgage portfolio and, through that, its tangible book value.

### August 6, 2007: NetBank Discloses For The First Time That One Of Its Core Operations Has Been Materially Overvalued

93.     On August 6, 2007, NetBank filed a Form 8-K with the SEC (the

"August 6, 2007 8-K") disclosing for the first time that one of its core operations,

Market Street, NetBank's wholly-owned retail mortgage business, was

substantially overvalued in violation of GAAP and *in fact had no value at all*,

resulting in a non-cash impairment charge of approximately $24.6 million for the

impairment of goodwill assigned to Market Street where the carrying value of

Market Street was exactly the amount written off – $24.6 million:

> **Item 2.06  Material Impairments.**
>
> *Goodwill*
>
> **At June 30, 2007, the carrying value of the goodwill that NetBank, Inc. (the "Company") assigned to its subsidiary, Market Street Mortgage Corporation ("Market Street"), the Company's wholly-owned retail mortgage business, was approximately $24.6 million.** In accordance with generally accepted accounting principles ("GAAP"), the Company evaluates the carrying value of

goodwill assigned to its subsidiaries on an annual basis and also on an interim basis if events indicate possible impairment.

As previously reported in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission ("SEC") on June 21, 2007, the Company announced that it was exploring strategic alternatives regarding Market Street. ***Based on the information the Company obtained during the course of its consideration of such other opportunities for Market Street, and the likelihood of execution of one or more of such other opportunities, the Company determined that an event indicative of impairment had occurred with respect to Market Street.***

As a result, the Company evaluated the carrying value of goodwill of Market Street, and on August 2, 2007, authorized officers of the Company concluded that a material impairment charge with respect to the carrying value of goodwill assigned to Market Street is required under GAAP. ***As a result, for the second quarter ending June 30, 2007, the Company expects to record a non-cash impairment charge of approximately $24.6 million (both pre-tax and after tax) for the impairment of goodwill assigned to Market Street.***

94.     In the same Form 8-K, the Company announced that the NASDAQ stock exchange was finally delisting NetBank stock due to its failure to file timely the 2006 Form 10-K and the First Quarter 2007 Form 10-Q. This finally allowed investors to determine that, far from being a merely ministerial delay that caused the late filings, it was in fact the failure of Defendants to properly value their core businesses in accordance with GAAP that caused the delinquency.

95.     Moreover, the August 6, 2007 Form 8-K also disclosed that the Office

of Thrift Supervision ("OTS") had notified NetBank that it was undercapitalized

and was required to respond with a capital restoration plan no later than September

13, 2007 that would satisfy applicable regulations:

> On August 3, 2007, NetBank received written notice from the
> Office of Thrift Supervision (the "OTS") that NetBank was
> undercapitalized (the "Notice"). NetBank is required to file a
> capital restoration plan with the OTS by no later than
> September 13, 2007 (the "Capital Plan"), which must satisfy
> OTS regulations governing such plans.
>
> Due to NetBank's capital category and as provided in the
> Notice, NetBank is subject to various restrictions, including
> limits on (i) capital distributions;
> (ii) growth in total assets; (iii) acquisitions of new companies or
> offices;
> (iv) engaging in any new lines of business; and (iv) accepting,
> renewing or rolling over of brokered deposits. The Notice also
> provides that the OTS may not approve any requests that
> NetBank files for increases in compensation or payment of
> bonuses to senior executive officers until after the OTS has
> approved the Capital Plan. The OTS may impose additional
> restrictions on NetBank through a prompt corrective action
> directive, and has indicated that it intends to issue such a
> directive in the near future.
>
> ***In order for the Capital Plan to satisfy OTS regulations, the
> Company, as NetBank's parent holding company, will be
> required to guarantee NetBank's compliance.*** As part of this
> guarantee, the Company must (i) take any actions required by it
> under the Capital Plan; (ii) take any actions necessary to enable
> NetBank to perform under the Capital Plan; and (iii) utilize its
> available assets (other than shares of NetBank itself) when
> directed to do so by the OTS, to enable NetBank to implement

the Capital Plan. As a result of the Company's obligations under the Notice, the Company believes that its outstanding common stock may have little or no value. Accordingly, investment in the Company's common stock would be highly speculative.

(Emphasis supplied).

96.    In response to this shocking news, NetBank's stock price plummeted further, from $0.20 per share on August 6, 2007 to $0.14 per share on August, 7, 2007, a 30% drop in one day.

### August 22, 2007: NetBank announces Settlements With Insurance Companies Totaling $19,250,000

97.    Despite this news, Defendants' fraud continued on August 22, 2007, when the Company disclosed that it had entered into settlements resolving Company claims against certain insurance companies for breaches of contract, fraud and bad faith in connection with the insurance companies' issuance of surety bonds and insurance policies guaranteeing payment of certain payment streams generated by various equipment leases:

Item 8.01 Other Events.

NetBank ("NetBank, FSB"), a federally chartered savings bank and wholly-owned subsidiary of the Company, and Illinois Union Insurance Company ("Illinois Union") entered into a Settlement Agreement, Mutual Release and Policy Rescission dated as of August 21, 2007, providing for the settlement of NetBank, FSB's pending claims against Illinois Union and the payment of $19,250,000 to NetBank, FSB, subject to court approval of the settlement.

As reported in the Company's previous filings with the Securities and Exchange Commission (the "SEC"), NetBank, FSB filed a complaint in January 2002 against Commercial Money Center, Inc. ("CMC"), Illinois Union, Safeco Insurance Company of America ("Safeco"), and Royal Indemnity Company ("Royal," and together with Illinois Union and Safeco, collectively referred to as the "Sureties"). CMC was the originator and subservicer of various equipment leases (the "Leases"). NetBank, FSB purchased most of the payment streams generated by the subject Leases from CMC (the "Payment Streams"). The Sureties are insurance companies that issued surety bonds and insurance policies guaranteeing payment of the Payment Streams (the "Bonds") and also served as master servicers of the Leases. The NetBank, FSB action against the Sureties alleges several claims, including claims for breach of contract, fraud and bad faith, and seeks, among other things, payment under and enforcement of the Bonds. The claims of NetBank, FSB against CMC, Safeco, and Royal remain pending.

<p style="text-align:center">*     *     *</p>

Although NetBank, FSB during the past five and a half years has vigorously attempted to collect the amounts it believes are owed to it by the Sureties, the Company expects that without reaching settlements with the Sureties, it may take years to realize upon the amounts owed.

As previously reported in the Company's Current Report on Form 8-K filed with the SEC on August 6, 2007, the Company anticipated recording impairment charges for the quarter ended June 30, 2007, on goodwill related to Market Street Mortgage Corporation, the Company's wholly owned retail mortgage subsidiary, and on long-lived assets owned by NetBank, FSB, most with respect to its NetBank Funding Services division, the Company's third-party conforming mortgage business. These impairment charges were estimated at $24.6 and $25.0 million,

respectively, on both a pre- and after-tax basis. *Additionally, the Company disclosed that the Office of Thrift Supervision (the "OTS") had notified NetBank, FSB that it was undercapitalized and must respond with a capital restoration plan that fully satisfies the regulations governing such plans by no later than September 13, 2007.*

*The above-mentioned developments along with others factored into NetBank, FSB's receptivity to the settlement with Illinois Union at this time. The proposed settlement was approved by the OTS and the Company.*

(Emphasis supplied).

98.    On this news, NetBank's stock price *doubled* from 0.06 per share on August 22, 2007 (on volume of 34,089 shares) to 0.12 per share on August 23, 2007 (on astounding volume of *6,294,574* shares).

99.    The statements set forth in paragraph 97 were materially false and misleading because, in combination with the proposed sale of assets to EverBank, this cash infusion falsely led investors to believe that the Company could now be in compliance with OTS requirements.

### September 17, 2007:  EverBank Terminates Its Agreement to Purchase NetBank Assets When It Becomes "Clear" that NetBank Would Not Receive Regulatory Approval

100.  However, on September 17, 2007, it was finally disclosed that NetBank would not be in compliance with banking requirements.  In news even more shocking than the news of August 6, 2007, as a result of NetBank's

problems, on September 17, 2007, EverBank announced that it had "terminated its agreement to acquire NetBank's consumer deposit accounts, business finance division and other assets under the transaction announced on May 21, 2007 [because it has become] clear that *NetBank would not be able to complete certain conditions required to close and receive regulatory approval*." (Emphasis supplied).

101. NetBank's September 17, 2007 Form 8-K filed with the SEC announcing the termination of the agreement stated that "EverBank's letter [terminating the agreement] states that NetBank is in breach of its representations and warranties as the basis for its termination of the Purchase Agreement."

102. NetBank's stock price closed at $0.08 per share on September 17, 2007.

## ADDITIONAL SCIENTER ALLEGATIONS

103. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal

securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding NetBank, their control over, and/or receipt and/or modification of NetBank's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning NetBank, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

104. The markets for NetBank's securities were open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, NetBank's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired NetBank securities relying upon the integrity of the market price of NetBank's securities and market information relating to NetBank, and have been damaged thereby.

105. During the Class Period, Defendants materially misled the investing public, thereby inflating the prices of NetBank's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed

to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

106. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about NetBank's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of NetBank and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

107. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of NetBank's securities and operated as a fraud or deceit on Class Period purchasers of NetBank's securities by failing to disclose the truth about its core

businesses and its lending policies and practices. When the full impact of Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of NetBank's securities fell precipitously as the prior artificial inflation came out. As a result of their purchases of NetBank's securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages under the federal securities laws.

108. By failing to disclose the truth about its core businesses and lending policies and practices, Defendants presented a misleading picture of NetBank's operations and financial performance. Thus, instead of disclosing during the Class Period the truth about NetBank's operations and financial performance, Defendants caused NetBank to conceal the truth.

109. Defendants' false and misleading statements had the intended effect and caused NetBank's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $7.10 per share on May 1, 2006, the start of the Class Period.

110. As a direct result of Defendants' disclosures on August 6, 2007, NetBank's common stock price fell precipitously. These drops removed the inflation from the price of NetBank's securities, causing real economic loss to investors who had purchased the Company's securities during the Class Period.

111.   The approximate 92% decline in the price of NetBank's common stock after these disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of NetBank's common stock price declines negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of NetBank's securities and the subsequent significant decline in the value of NetBank's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

112.   At all relevant times, the market for NetBank's securities was an efficient market for the following reasons, among others:

(a)   NetBank's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   as a regulated issuer, NetBank filed periodic public reports with the SEC and the NASDAQ;

64

(c)     NetBank regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     NetBank was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

113.   As a result of the foregoing, the markets for NetBank's securities promptly digested current information regarding NetBank from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of NetBank's securities during the Class Period suffered similar injury through their purchase of NetBank's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

114.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not

identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of NetBank who knew that those statements were false when made.

## COUNT I

### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants

115. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

116. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding NetBank's business, operations, management and the intrinsic value of NetBank securities; and (ii) cause Plaintiff

and other members of the Class to purchase NetBank's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

117. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for NetBank's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

118. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of NetBank as specified herein.

119. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in

67

acts, practices, and a course of conduct as alleged herein in an effort to assure investors of NetBank's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about NetBank and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of NetBank's securities during the Class Period.

120. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other

data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

121.   The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing NetBank's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

122.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market

prices of NetBank's securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of NetBank's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired NetBank securities during the Class Period at artificially high prices and were damaged thereby.

123.  At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding NetBank's financial results, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their NetBank securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

124.  By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

125.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

126.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

127.   The Individual Defendants acted as controlling persons of NetBank within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.   The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by

71

Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

128. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

129. As set forth above, NetBank and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  Atlanta, Georgia
        September 19, 2007

                        SCHOENGOLD SPORN
                        LAITMAN & LOMETTI , P.C.

                        /s/ w/e/p by

                        Samuel P. Sporn (SPS-4444)
                        Joel P. Laitman (JL-8177)
                        Jay P. Saltzman (JS-7335)
                        Daniel B. Rehns (DR-5506)
                        19 Fulton Street, Suite 406
                        New York, New York 10038
                        Telephone: (212) 964-0046
                        Facsimile (212) 267-8137

73

**ANDERSEN, TATE & CARR, PC**

Render C. Freeman, Esq.
Georgia Bar No. 275910
Thomas T. Tate, Esq.
Georgia Bar No. 698879
Elizabeth Clack-Freeman
Georgia Bar No. 126888
1505 Lakes Parkway, Suite 100
Lawrenceville, Georgia 30043
Telephone: 770-822-0900
Facsimile: 770-236-9759

**Plaintiff's Co-Lead Counsel**

769315_1.DOC

## CERTIFICATION OF NETBANK INC.
## SECURITIES CLASS ACTION COMPLAINT

I, Johnny R. Adcock, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.    I have reviewed the complaint filed in this case (the "Complaint"), and authorize the filing thereof.

2.    I am willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

3     During the Class Period (as defined in the Complaint), I purchased and/or sold the security that is the subject of the Complaint as set forth on the attached Schedule A

4     I did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

5.    During the three year period preceding the date of my signing this Certification, I have not served nor sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.    I will not accept any payment for serving as a representative party on behalf of the Class beyond my pro rata share of any possible recovery except for an award, as ordered by the Court, for reasonable costs and expenses directly relating to my representation of the Class.

Signed under the penalties of perjury, this 10th day of September, 2007

Johnny R. Adcock

*Schoengold Sporn Laitman & Lometti, P C , 19 Fulton Street, New York, NY 10038 (866) 348-7700*

## SCHEDULE A

| DATE | BUY/SELL | NO. OF SHARES | PRICE PER SHARE |
|------|----------|---------------|-----------------|
| 02/26/2007 | Buy | 1,600 | $ 3.5399 |
| 02/26/2006 | Buy | 400 | $ 3.5394 |

*Schoengold Sporn Laitman & Lometti, P C , 19 Fulton Street, New York, NY 10038 (866) 348-7700*

# EXHIBIT C

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 2 2 2007

JAMES N. HATTEN, CLERK
By [signature] Deputy Clerk



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

```
-------------------------------------------------- x
ARASH VAHDAT                              )
on Behalf of Himself                      )
and All Others Similarly Situated,        )
                                          )
        Plaintiff,                        )
                                          )
v.                                        )
                                          )
NETBANK, INC., STEVEN F.                  )
HERBERT and DOUGLAS K.                    )
FREEMAN,                                  )
                                          )
        Defendants.                       )
-------------------------------------------------- x
```

1:07-CV-2631

~~DOCKET NO.~~

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

BBM

## INTRODUCTION

Plaintiff, Arash Vahdat ("Plaintiff"), brings this securities fraud action on

behalf of himself and as a class action on behalf of all persons or entities who

purchased or acquired the securities of NetBank, Inc. ("NetBank" or the

"Company") during the period from May 1, 2006 and September 17, 2007,

inclusive (the "Class Period"), against NetBank and certain of its officers and/or

directors for violations of the Securities Exchange Act of 1934 (the "Exchange

Act").

Defendant NetBank was a financial holding company that focused primarily

on consumer and small business banking as well as conforming mortgage lending

and operated an internet retail banking franchise. Defendant NetBank had its principal place of business in Alpharetta, Georgia.

1.     During the Class Period, Defendants issued materially false and misleading statements regarding the Company's growth, business, prospects, and then-current financial condition which artificially inflated the price of NetBank common stock. Beginning in May of 2006, Defendants made a series of disclosures stating that the Company was restructuring its operations to rid its strong core banking business from high-risk non conforming loan origination operations and other business segments that detracted from the performance of its core business. Not only did Defendants allege that NetBank's restructuring was largely complete by February 2007, Defendants misrepresented the truth when it indicated that investors could rely on the book value of the Company as reflecting its true value. Defendants shocked the financial community by disclosing that as of May 21, 2007, NetBank's core banking business was so deficient in meeting regulatory capital requirements that bank regulators compelled NetBank to consummate a $2.5 billion asset sale at a significant $60-70 million loss in order to cover NetBank depositors as required by law. The Company's common stock price plummeted 66% - from $1.75 per share on May 18, 2007 to $0.59 per share on

May 21, 2007 on massive volume of 11,190,400 shares - over forty-five times the previous days' volume.

2.  On August 6, 2007, after the close of the markets, NetBank announced that its wholly-owned retail mortgage business, Market Street Mortgage Corporation ("Market Street"), was completely valueless. The Company announced that it would record a non-cash impairment charge of $24.6 million for the value of goodwill assigned to Market Street when the value of goodwill assigned to Market Street at June 30, 2007 was $24.6 million.

3.  NetBank announced in the same August 6, 2007 Form 8-K, that the NASDAQ securities exchange was delisting the Company's securities from trading for failure to file the 2006 Form 10-K and its Form 10-Q for the quarter ended March 31, 2007 (the "First Quarter 2007 10-Q") on or before July 18, 2007.

4.  Thus, far from merely a ministerial issue, NetBank had been unable to comply with the NASDAQ requirements, because its valuation of its core businesses was utterly fraudulent and its new auditors were struggling with these violations of Generally Accepted Accounting Principles ("GAAP").

5.  Finally, in the same August 6, 2007 announcement, NetBank disclosed that the Office of Thrift Supervision ("OTS") had notified the Company that it was

undercapitalized and was required to respond with a capital restoration plan that would satisfy applicable regulations no later than September 13, 2007.

6.      The reaction of the markets to this news was sharp and swift. On August 7, 2007, NetBank's stock price dropped to $0.14 per share from its previous day's close of $0 .20 per share, a *30% drop in one day* on a massive volume of 5,190,600 shares.

7.      Two weeks later, on August 22, 2007, the Company announced that it had entered into a settlement with insurance companies concerning litigation over the insurance companies' alleged breached of contract in connection with guarantees for certain revenue streams.  The settlement with one insurance company provided NetBank with a cash infusion of $19.25 million.

8.      Reporting the strength of the $19.25 million in settlement and the proposed asset sale to EverBank Financial Corp. ("EverBank") announced on May 21, 2007, Defendants further gave investors the illusion that NetBank could be properly capitalized.

9.      On this news, NetBank's stock price *doubled* from $0.06 per share on August 22, 2007 (on volume of 34,089 shares) to $0.12 per share on August 23, 2007 (on astounding volume of 6,294,574 shares).

4

10.     Shockingly, just one month later, on September 17, 2007, EverBank announced that it had terminated its purchase of the NetBank assets because it had become "clear" to EverBank that NetBank would <u>not</u> be able to meet its regulatory requirements.

11.     On this news, NetBank's stock price closed at $0 .08 per share.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and (1337) and § 27 of the Exchange Act (15 U.S. C. § 78aa).

13.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated under § 10(b) by the SEC (17 C.F.R. §240.10b-5).

14.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Defendants were incorporated in this District and maintained their chief executive offices and principal place of business, located at 1015 Windward Ridge Parkway, Alpharetta, Georgia 30005, within this District.

15.   In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

16.   Plaintiff Arash Vahdat ("'Vahdat" or "Plaintiff") purchased NetBank securities as described in the attached certification, as was damaged thereby.

17.   Defendant NetBank was founded in 1996 and represented itself as a financial holding company that operated a family of businesses focused primarily on consumer and small business banking as well as conforming mortgage lending.[1] The Company's retail banking franchise, NetBank, FSB, is the nation's oldest active Internet bank serving retail and business customers in all 50 states.[2]  As of February 21, 2007, there were 46,425,000 outstanding shares of NetBank, Inc. The Company's shares are traded on the NASDAQ securities exchange, an open and efficient market.

---

[1]  Wholly owned subsidiaries of NetBank, Inc ., include NetBank, FSB ("NetBank, FSB"), a federal savings bank, MG Reinsurance Company ("MG Reinsurance"), a captive reinsurance company, NetInsurance, Inc. ("NetInsarance"), a licensed insurance agency, and NB Partners, Inc. ("NB Partners"), a corporation involved in strategic partnering opportunities.

[2]  Netbank, FSB owns or owned, during all or part of the Class Period, all of the outstanding common stock of Market Street Mortgage Corporation ("Market Street"), a retail mortgage company, NetBank Payment Systems, Inc. ("NBPS"), a provider of ATM and merchant processing services for retail and other non-bank businesses, Meritage Mortgage Corporation ("Meritage"), a wholesale non-conforming mortgage provider, and Financial Technologies, one . ("FTI"), a provider of transaction processing services to financial services companies.

18.     Defendant Steven F. Herbert ("Herbert") served as Chief Financial Officer ("CFO") of the Company from the beginning of the Class Period through October 5, 2006 and as Chief Executive Officer ("CEO") of the Company from October 5, 2006, though the end of the Class Period.  Herbert came to NetBank in 2002 after the Company acquired Resource Bancshares Mortgage Group ("RBMG"), where Herbert had served as the CFO prior to the acquisition.

19.     Defendant Douglas K . Freeman ("Freeman") served as Chief Executive Officer of the Company from April 1, 2002 though October 5, 2006 and as Chairman of the Board of Directors of the Company beginning on January 29, 2003.  Freeman joined NetBank in 2002 after the Company acquired RBMG, where he served as the CEO.  Freeman received a lump-sum payment of $2.9 million as a severance package when he left NetBank in late 2006.

20.     Defendants Herbert and Freeman are collectively referred to hereinafter as the "Individual Defendants."

21.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filing, press releases, and other publications, as alleged herein, are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers and directors of

NetBank directly participated in the day-to-day management of NetBank, was directly involved in the daily operations of NetBank at the highest levels, and was privy to confidential proprietary information concerning the NetBank and its business, finances, products, markets, operations, financial condition, present and future business prospects and legal/regulatory matters, as alleged herein. Because of their possession of such information, the Individual Defendants knew that NetBank's core businesses were valueless and disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

22.    The Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false amd misleading statements and information in this Complaint. The Individual Defendants, because of their position of control and authority as officers and directors of the Company, had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Company's business.

23.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its

8

reports, press releases and presentations to securities analysts and through them, to

the investing public. The Individual Defendants were provided with copies of the

Company's reports and press releases alleged herein to be misleading, prior to or

shortly after their issuance and had the ability and opportunity to prevent their

issuance or cause them to be corrected. Thus, the Individual Defendants had the

opportunity to commit the fraudulent acts alleged herein.

24.    As officers, directors, and/or controlling persons of a publicly traded

company whose common stock was registered with the SEC pursuant to the

Exchange Act, traded on the NASDAQ and governed by the federal securities

laws, the Individual Defendants each had a duty to promptly disseminate accurate

and truthful information about the Company's financial condition and

performance, growth, operations, financial statements, business, products, markets,

management, earnings and present and future business prospects, to correct any

previously issued statements that had become materially misleading or untrue, so

that the market price of the Company's securities would be based upon truthful and

accurate information. The Individual Defendants' misrepresentations and omissions

during the Class Period violated these requirements and obligations.

25.    The Individual Defendants are liable as participants in a fraudulent

scheme and course of conduct that operated as a fraud or deceit on purchasers of NetBank publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding NetBank's business, operations and management and the intrinsic value of NetBank securities; and (ii) caused Plaintiff and members of the Class to purchase NetBank publicly traded securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

26.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) n behalf of a class consisting of all those who purchased publicly-traded securities of NetBank during the period from May 1, 2006 through and including September, 17, 2006, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, member of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

27.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NetBank common stock was actively traded on the NASDAQ securities exchange. While the exact number

of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NetBank or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

28. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

29. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

30. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are whether:

(a) the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of NetBank;

(c)     the prices of NetBank's publicly traded securities were artificially inflated during the Class Period; and

(d)     members of the Class have sustained damages and the proper measure of such damages.

31.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

### NetBank Enters The Subprime Mortgage Market

32.     In late 2001, NetBank acquired RBMG, of which Meritage

Mortgage Corp. ("Meritage"), a subprime lender, was a subsidiary. Herbert served as the CFO of Meritage and Freeman served as the CEO of Meritage. As a result of the RBMG acquisition, Herbert became the CFO of NetBank, and Freeman became NetBank's new CEO.

33.     Prior to this acquisition, NetBank had minimal, if any, involvement in the non-conforming mortgage market. NetBank's core businesses prior to the acquisition were consumer and small business banking, in addition to conforming mortgage lending.

34.     In order to prop up the Company's stock price, the Defendants delineated between the Company's so-called "core business" of consumer and small business lending and "conforming" mortgage lending, of which its wholly-owned subsidiary, Market Street Mortgage Corporation ("Market Street") was a part, and its "non-conforming" mortgages.

35.     Mortgage loans are divided into two broad categories.

(a)     The first category, conforming mortgages, includes mortgages that have terms and conditions that follow the guidelines and standards set forth by Fannie Mae and Freddie Mac and thus, are understood to be safer, less risky investments. Fannie Mae and Freddie Mac, two stockholder-owned corporations, purchase mortgage loans complying with the guidelines from mortgage lending

institutions such as NetBank, package the mortgages into securities and sell the securities to investors. By doing so, Fannie Mae and Freddie Mac, like Ginnie Mae, provide a continuous flow of affordable funds for home financing that results in the availability of mortgage credit for Americans. Fannie Mae and Freddie Mac guidelines establish the maximum loan amount, borrower credit and income requirements, down payment, and suitable properties. Fannie Mae and Freddie Mac announce new loan limits every year.

   (b)   The second category is called non-conforming loans. A non-conforming loan is a loan that fails to meet bank criteria for funding . Reasons for a loan's non-conformance include the loan amount is higher than the conforming loan limit (for mortgage loans), lack of sufficient credit, the unorthodox nature of the use of funds, or the collateral backing it . In many cases, non-conforming loans can be funded by hard money lenders, or private institutions/money. A large portion of real-estate loans are qualified as non-conforming because either the borrower's financial status or the property type does not meet bank guidelines. Non-conforming loans can be either A-rated paper (less risky) or subprime loans (more risky). Subprime lending is risky for both lenders and borrowers due to the combination of high interest rates, poor borrower credit history, and the murky

financial circumstances often associated with subprime applicants. A subprime loan is offered at a rate higher than A-paper loans due to the increased risk.

36. In order to decrease the risk of default relating to subprime nonconforming mortgages (as well as, in fact, conforming mortgages), it is essential that the borrower institute a strong set of internal controls to accurately assess the credit worthiness of each borrower. This is especially important since, as Freeman told the *Atlanta Journal and Constitution* on July 27, 2006, even if non-conforming loans are not bad, "investors who buy the loans will sell them back if any discrepancy or misrepresentation [by the borrower] is later found in documents associated with those loans."

37. Mortgage originators then "package" large volumes of these home loans to be used as collateral in massive mortgage-backed security ("MBS") offerings (or collateralized debt obligations ("CDOs")) to investors such as hedge funds, allowing the originators to further finance their activities.

38. With a very strong housing market in the United States in the late 1990s and early 2000s, numerous lending institutions were very willing to provide mortgages to low credit high risk borrowers as they relied on the elevated value of the housing markets to protect them against defaults. These mortgages were then packaged for sale to investors.

39.    In early 2006, as the housing market began to cool, however, two painful trends that surfaced in the secondary market for non-prime mortgages: (1) Sales of home equity loans for borrowers with the weakest credit and the smallest cash down payments produced sizable discounts as investors took into account the end of rapid home price appreciation as a safety net for such borrowers, as well as other credit concerns; however, lender pricing did not take these into account ; and (2) forced repurchases of subprime loans experiencing delinquencies early in their lives began to rise. The increase reflects both a spike in "early payment defaults" and more aggressive enforcement of related contractual clauses by the investors, especially Wall Street conduits.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### Restructuring In The Face Of A Cooling Housing Market

40.    As the housing market began to cool in 2006, NetBank faced increasing pressure on its operations and finances.  As set forth above, demands for repurchases of loans increased dramatically, defaults increased and investors curtailed their purchases of CDOs, thereby limiting the cash available for NetBank to lend to borrowers.  This cash crunch led to NetBank's decision to restructure the Company in order to conserve its capital and preserve its tangible book value.  The

"restructuring" had four major components: (1) sell its mortgage servicing platform; (2) sell or exit its non-conforming mortgage business ; (3) sell other non-core operations; and (4) execute a private placement to raise capital.

41.    As early as May 1, 2006, NetBank announced a plan to sell its mortgage servicing platform along with most of its portfolio of mortgage servicing rights.  The Company stated that "[m]anagement estimates such a sale would likely free up between $20 and $35 million in risk-based capital that the company currently has allocated to its servicing asset. *Management would then have the opportunity to redeploy this capital in other business initiatives that it believes can generate higher returns or better serve shareholder interest.*"  NetBank further stated that this proposed sale is part of "*management's continuous, proactive capital management program*":

> NetBank, Inc. Pursues Possible Sale of its Mortgage Servicing Platform and Asset: Decision Relates to Management's Ongoing Capital Management Strategy and Belief Underlying Capital Can be Optimized in Other Areas
>
> ATLANTA, May 1, 2006 (PRIMEZONE) -- NetBank, Inc. (Nasdaq:NTBK), a diversified financial services provider and parent company of NetBank (r) (www.netbank.com), today announced a plan to sell its mortgage servicing platform along with most of its portfolio of mortgage servicing rights. *The proposed sale is part of management's continuous, proactive capital management program. Management estimates such a*

17

*sale would likely free up between $20 and $35 million in risk-based capital that the company currently has allocated to its servicing asset. Management would then have the opportunity to redeploy this capital in other business initiatives that it believes can generate higher returns or better serve shareholder interest.*

*"When we committed to this line of business as part of our overall income diversification strategy for the company, we set a goal of growing the servicing asset to at least the $25 billion mark, " said Douglas K. Freeman, chairman and chief executive officer. "Based on our analysis, we needed to reach this minimum level to rationalize our investment and to have the asset serve as an effective macro hedge against our mortgage production network."*

"The economic and market environments have changed dramatically since we initiated our plan, and we have not been able to achieve the level of growth in the servicing asset we had anticipated," Freeman added. *"Given prevailing business conditions, we have determined the mortgage servicing business no longer represents the best use of our capital.*

"Our obligation first and foremost is to create value for our shareholders," Freeman concluded. "Although we will continue to plan for the long-term and persist in the face of short-term operational pressures when it is right to do so, we will also remain flexible and have the conviction to revise our business strategy when it clearly furthers the interest of our shareholders."

Other details or likely results of the proposed sale include:

<div align="center">

\*      \*      \*

</div>

• A sale should improve the company's earnings profile. Management could immediately redeploy available capital in additional earning asset growth at the bank. This would result in interest margin expansion and incremental income growth on a carry-forward basis. A certain level of earnings volatility would also be eliminated since quarterly servicing results can vary greatly. Any operational cost savings would generally be offset by the loss of escrow deposits related to the servicing asset. These deposits represent an interest-free source of liquidity that management would likely have to replace with interest-bearing liabilities.

• The sale would entail a significant one-time restructuring charge. However, management would seek to moderate the impact of the charge on the company's tangible book value. The effect on tangible book value would be part of management's criteria in approving any transaction.

• The company intends to keep a small servicing operation to service its own mortgage production before it is delivered into the capital markets . Management may also choose to retain certain portions of its current servicing portfolio for strategic purposes or to facilitate a deal.

As of March 31, the company's core servicing asset was comprised of $13.0 billion in loans. Management believes the underlying mortgage servicing platform could be scaled up to the $35.0 billion mark almost immediately using the operation's existing facility and infrastructure.

42. On this news, NetBank's stock price increased from $6.84 per share on May 1, 2006 to $6.94 per share on May 2, 2006.

43.     The statements set forth in paragraph 41 above were materially false and misleading because they failed to disclose that the Company's financial distress was due to the failure of its core operations and that selling off parts of its mortgage business or other non-core operations would not be enough to resuscitate the Company.

44.     On October 3, 2006, the Company announced that Herbert would serve as CEO, replacing Douglas K. Freeman, who, like Herbert, joined NetBank in 2002 after the Company acquired RBMG, for whom Freeman was CEO.

45.     On this new information, NetBank's stock price increased from $5.96 per share on October 3, 2006 to $6.16 per share on October 4, 2006.

46.     On October 13, 2006, NetBank announced that it had sold the servicing rights on $8 .5 billion of mortgages - or 70% of its servicing portfolio - to two buyers and took a higher-than-expected $19.3 million loss:

**Company to Record Related Charges of Approximately $0.61 Per Share in the Third Quarter; Impact on Book Value to Be Half This Amount Due to Timely Disposal of Hedges**

ATLANTA, Oct. 13, 2006 (PRIMEZONE) -- NetBank, Inc. (Nasdaq:NTBK), parent company of NetBank*&reg;* (www.netbank.com) and a leading mortgage lender, today announced that the company has sold most of its mortgage servicing rights ("MSRs") associated with conventional, agency-eligible loans. *These MSRs accounted for approximately 70% of*

20

*NetBank's portfolio, and the unpaid principal balance ("UPB") on the underlying mortgages totaled $8.5 billion.* The MSRs were sold in two separate transactions. The larger, more significant deal involved MSRs for Fannie Mae and Freddie Mac loans. These MSRs had a related UPB of approximately $8.2 billion, and they were acquired by IXIS Real Estate Capital Inc. ("IXIS"). A different buyer purchased a pool of Ginnie Mae MSRs with UPB of approximately $230 million. Both transactions closed on September 29 and were recognized as third quarter events.

Financial and other details of the sale include:

- One-time expenses of approximately $0 .61 per share. The combined sales price for the MSRs was $119 million, which fell below the carrying value that the company had recognized on these particular MSRs. As a result of this difference, the company recorded an aftertax loss of $19.3 million on the sale. The company also elected to liquidate the Ginnie Mae mortgage-backed securities that it held as an on-balance sheet hedge. The company recorded an after-tax loss of $8.7 million on the sale of those securities. These charges along with other transaction-related costs equate to after-tax expenses of $28.1 million or $0.61 per share.

- *Limited impact on tangible book value. The sale of the company's on-balance sheet hedges improved the company's equity position on an after-tax basis by $13.8 million or 130 per share and partially offsets the one-time expenses outlined above at the equity or tangible book level.* As hedges, the Ginnie Mae securities were valued on a mark-to-market basis. The value of these hedges improved throughout the third quarter. The company ultimately realized a smaller loss on these hedges than the unrealized loss it recognized in its equity calculation on June 30, 2006.

21

> \- Sub-servicing contract. As part of its negotiation with IXIS, the company reached an agreement to continue servicing the Fannie Mae and Freddie Mac MSRs on IXIS' behalf. The company had planned to maintain a servicing operation to handle the MSRs it is retaining as well as to service its own mortgage production during the time between origination and delivery into the secondary market. This sub-servicing agreement should provide the company with a source of fee income and greater operational efficiency through scale and leverage.

47. On this new information, NetBank's stock price increased from $6.11 per share on October 13, 2006 to $6.17 per share on October 16, 2006, the next trading day.

48. The statements set forth in paragraph 46 above were materially false and misleading because they failed to disclose that the Company's financial distress was due to the failure of its core operations and that selling off parts of its mortgage business or other non-core operations would not be enough to resuscitate the Company. In addition, it failed to disclose that the Company's tangible book value was declining rapidly even with the restructuring due to the failure of the Company's core businesses.

49. The "strategic restructuring" continued when, on November 6, 2006, NetBank announced that it had essentially ended its non-conforming mortgage loan financing operations. The Company announced that it had "executed a

22

personnel placement agreement" with Lime Financial Services ("Lime") whereby

Lime would "extend employment offers to the majority of the company's non-

conforming mortgage sales force[.]" Incredibly, there was so little value to the

Company's non-conforming mortgage portfolio that NetBank "did not receive any

material financial or other considerations under the agreements":

> **Company Exits Non-Conforming Mortgage and RV, Boat and Aircraft Financing Businesses; Actions Will Result in Immediate, Meaningful Improvement to Operating Performance**
>
> ATLANTA, Nov 6, 2006 (PrimeZone Media Network via COMTEX News Network) -- NetBank, Inc. (Nasdaq:NTBK), parent company of NetBank*&reg;* (www.netbank.com) and a leading mortgage lender, *today announced the company completed two separate transactions that effectively end its non-conforming mortgage and RV, boat and aircraft financing operations: 1) The company executed a personnel placement agreement with Lime Financial Services in Portland, Oregon, whereby Lime Financial Services will extend employment offers to the majority of the company's non-conforming mortgage sales force and a smaller but significant number of the operations support staff by November 15, 2006; and 2)* A sale of select assets to members of the senior management team of the company's RV, boat and aircraft financing operation.
>
> The company did not receive any material financial or other considerations under the agreements, but management viewed them as a positive since they allowed the company to mitigate substantial severance and shutdown costs that the company would likely have incurred otherwise. Since the agreements did not cover

the full scope of the operations, the company still has personnel and other commitments to address to fully exit both lines of business. Management currently expects to record pre-tax expense of $6.0 million to $7.5 million in the fourth quarter to cover those remaining obligations. The company had already written off the goodwill related to both businesses.

*"Since the beginning of October, we have been working aggressively to refocus the company on its core banking and conforming mortgage competencies," said Steven F. Herbert, chief executive officer.*

*"We said then that our priorities were to exit or spin off any underperforming or non-core businesses so we could restore the company to profitability as quickly as possible and to improve the company's overall operating profile.* Our decision to exit the non-conforming mortgage and RV, boat and aircraft lending businesses contribute to those goals in a meaningful way, especially when you consider the steepness of the quarterly losses we have been incurring in the non-conforming channel.

"We also committed to protecting capital as much as possible during this process," Herbert continued.  "We were happy to execute the transactions that we did since they saved us real dollars in severance and shutdown costs. *But, regardless of the deals, it was critical for us to move quickly on these businesses. The cost of carrying them for another quarter or two would have destroyed more value than we probably could have derived under the best possible transaction circumstances."*

The company's non-conforming mortgage operations are expected to cease by year-end. Once the transfer of staff to Lime Financial Services is completed, the company will take the necessary steps to end Meritage's broker relationships and to close any in-process loans.   The

24

company's RV, boat and aircraft financing operations ended with the sale of select assets. Beacon continues operation today as an independent company under the same management team.

*(Emphasis supplied)* .

50.     As a further step in the "restructuring," on November 7, 2006, FTI, a subsidiary of NetBank which offered "financial institutions technology solutions" such as QuickPost, a deposit and payment forwarding service, announced that it was "'in the process of a shutdown and will cease operations" by December 31, 2006. FTI stated that its decision was "based on financial concerns.  The company had yet to break even and now lacks sufficient capital to expand its business to the scale needed to achieve profitability." (Emphasis supplied).

51.     The statements set forth in paragraphs 49-50 above were materially false and misleading because they failed to disclose that the Company's financial distress was due to the failure of its core operations and that selling off parts of its mortgage business or other non-core operations would not be enough to resuscitate the Company. In addition, it failed to disclose that the Company's tangible book value was declining rapidly even with the restructuring due to the failure of the Company's core businesses.

## Third Quarter 2006 Financial Results Announced

52.    On November 8, 2006, NetBank announced its operating results for its

third quarter ended September 31, 2006.  NetBank reported dramatic losses of

$73.3 million or $1.58 per share for the quarter, compared with an after-tax loss of

$1.4 million or $ .03 per share during the same quarter in the prior year:

> **Reorganization Charges Drive Loss of $1.58 Per Share**
>
> ATLANTA, Nov 8, 2006 (PrimeZone Media Network via COMTEX News Network) -- NetBank, Inc. (Nasdaq:NTBK), parent company of NetBank*&reg;* (www.netbank.com) and a leading mortgage lender, today reported financial results for the quarter ended September 30, 2006 . The company recorded an after-tax loss of $73.3 million or $1.58 per share for the period, compared with an after-tax loss of $ .4 million or $.03 per share during the same quarter a year ago.  On a year-to-date basis, the company recorded an after-tax loss of $116 million or $2.50 per share, versus a net loss of $1.1 million or $ .02 per share during the first nine months of 2005.
>
> *Book value declined by $1.22 per share from $7.48 on June 30, 2006 to $6.26 on September 30, 2006. However, the impact on fire company's tangible book value was substantially less.   Tangible book value declined & 70 per share from $5.80 on June 30, 2006 to $5.10 on September 30, 2006. On air after-tax basis, the reported loss included a $19.5 million expense of non-deductible goodwill and a $2.4 million expense of deductible goodwill, both of which did not negatively impact tangible book value.  In addition, the company sold certain on-balance sheet investments allocated as*

economic hedges of its mortgage servicing rights ("MSRs") during the quarter. The unrealized loss on these securities was already deducted from tangible book value on June 30 through other comprehensive loss included in the equity section of the balance sheet. Thus, the realized loss on those securities did not impact tangible book value. (Details related to amounts excluded from tangible book value are provided in the attached Reconciliation of Non-GAAP Financial Measures .)

(Emphasis supplied ).

53.     Through this period of news in mid-November 2006, NetBank's stock price essentially remained unchanged, moving from $5.36 per share on November 6, 2006 to $5.38 per share on November 14, 2006.

54.     The statements set forth in paragraph 52 above were materially false and misleading because they failed to disclose that the Company's financial distress was due to the failure of its core operations and that selling off parts of its mortgage business or other non-core operations would not be enough to resuscitate the Company. In addition, it failed to disclose that the Company's tangible book value was declining rapidly even with the restructuring due to the failure of the Company's core businesses .

### NetBank's Independent Auditor, Ernst & Young, Resigns

55.     On November 9, 2006, NetBank filed a Form 8-K with the SEC indicating that on October 10, 2006, Ernst & Young LP ("E&Y") had resigned as

NetBank's independent auditor . E&Y's resignation as the Company's independent accountant became effective on November 9, 2006, with the filing of the Company's Quarterly Report on Form 10-Q for the three-month and nine-month periods ended September 30, 2006. The Company gave the reason for the resignation as a weakness in internal controls in connection with "the determination and estimation of the change in fair value of the Company's portfolio of mortgage loan funding commitments where the interest rate had been locked." NetBank further stated that "[i]n 2005, the Company implemented certain changes to its internal controls to address the material weakness over the Company's rate locks and determined that the material weakness existing at December 31, 2004 was corrected."

56.     NetBank further downplayed the reasons for E&Y's resignation, stating that "[t]he audit reports of E&Y on the Company's consolidated financial statements for the fiscal years ended December 31, 2004 and 2005 did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles."

57.     As a result of this information, NetBank's stock price increased from $4.99 per share on November 9, 2006 to $5.02 per share on November 10, 2006.

58.    The statements set forth in paragraphs 55-56 above were materially false and misleading in that they falsely led investors to believe that the delay in filing the 2006 Form 10-K was not due to a substantive issue and that any problems had been corrected. These statements omitted to state that in fact, the reason for the failure to timely file was the failure of Defendants to comply with GAAP in valuing its core mortgage portfolio and, through that, its tangible book value.

## NetBank's Private Placement of Its Common Stock

59.    In the final phase of the restructuring, on January 13, 2007, NetBank announced a private placement of 6,500,000 shares of its common stock at a price of $3 .90 per share, with proceeds of approximately $23.7 million:

> **NetBank, Inc. Announces Pricing of Private Placement of Its Common Stock**
>
> ATLANTA, Jan. 3, 2007 (PRIME NEWSWIRE) -- NetBank, Inc. (Nasdaq:NTBK) today announced the pricing of a private placement of 6,500,000 shares of its common stock at a price of $3.90 per share to a combination of new and existing institutional investors. The Company expects to receive proceeds of approximately $23.7 million, net of private placement fees and estimated legal and other expenses of the placement agent associated with the issuance. The Company intends to use the net proceeds of this offering for general corporate purposes. The closing of the transaction is expected to occur on Friday, January 5, 2007, subject to the satisfaction of closing conditions.

60.   The private placement did indeed close on January 5, 2007, and in announcing it, NetBank stressed that this was one of the final steps in its restructuring and was intended to, inter alia, "maintain [NetBank's] optimum capitalization":

> **NetBank, Inc. Closes Private Placement of Common Stock**
>
> ***Additional Capital Supports Company's Strategic Reorganization; Dilution to Shareholders Kept to a Minimum***
>
> ATLANTA, Jan. 8, 2007 (PRIME NEWSWIRE) -- NetBank, Inc. (Nasdaq:NTBK) completed a private placement of 6.5 million shares of its common stock on Friday, January 5. The private placement was fully subscribed. Seven institutional investors purchased the shares at a price of $3.90 per share, with more than three-fourths of the offering being acquired by two of the investors. The sale generated approximately $23.7 million in new capital for the company, net of private placement commissions and expenses to JMP Securities LLC, the sole placement agent in the transaction.
>
> "We are pleased with the transaction and believe it serves the best interest of long-term shareholders," said Steven F. Herbert, chief executive officer. *"We are in the final phase of the corporate restructuring plan we started three months ago. The plan centers on returning the company to profitability as quickly as possible by exiting underperforming businesses and refocusing attention on our core retail and small business banking operations as well as our prime mortgage businesses. We believe the additional capital will allow us to maintain optimal*

> *capitalization within the bank*; support new asset and deposit growth; and potentially invest in other key initiatives.

(Emphasis supplied).

61.     As a result of expected dilution of NetBank shares, NetBank's stock price dropped slightly, from $4.30 per share on January 3, 2007 to $4.14 per share on January 5, 2007.

62.     The statements set forth in paragraphs 59-60 above were materially false and misleading because they failed to disclose that the Company's financial distress was due to the failure of its core operations and that neither this cash infusion nor selling off parts of its mortgage business or other non-core operations would not be enough to resuscitate the Company.

## NetBank Misleads Investors Regarding the Late Filing of Its 2006 Form 10-K

63.     On January 3, 2006, in connection with the private placement, NetBank informed investors for the first time that as a result of E&Y's resignation and an inability to find a replacement, the filing of the 2006 Form 10-K might be delayed, leading to a possible delisting by the NASDAQ stock exchange if the 2006 Form 10-K is not filed by March 16, 2007.  The Company did not present the possible late filing as at all problematic, instead focusing on the fact that it simply

had not yet been able to find a replacement despite the Audit Committee's diligent

efforts:

> ***Our Delay in Engaging an Auditor May Result in our
> Inability to Timely File Our Annual Report on Form
> 10-K for the Year Ending December 31, 2006***
>
> On October 10, 2006, Ernst & Young LLP ("E&Y"), the
> independent registered public accounting firm of the
> Company for the fiscal year ended December 31, 2005,
> resigned effective upon the filing with the Commission of
> the Company's Quarterly Report on Form 10-Q for the
> three-month and nine-month periods ended September
> 30, 2006.    E&Y's resignation as the Company's
> independent registered public accounting firm became
> effective on November 9, 2006, with the filing of the
> Company's Quarterly Report on Form 10-Q for the three-
> month and nine-month periods ended September 30,
> 2006.  During each of the fiscal years ended December
> 31, 2004 and December 31, 2005 and the subsequent
> interim period from January 1, 2006 through the effective
> date of E&Y's resignation on November 9, 2006 there
> were no disagreements between the Company and E&Y
> on any matter of accounting principles or practices,
> financial statement disclosure, or auditing scope or
> procedure, which disagreements, if not resolved to the
> satisfaction of E&Y, would have caused E&Y to make
> reference to the subject matter of the disagreement in
> connection with its reports on the consolidated financial
> statements for such years.
>
> **Since prior to the effective date of E&Y's resignation,
> the Audit Committee of the Board of Directors of the
> Company has been engaged in the process of selecting
> an independent registered public accounting firm
> "Auditor") for the fiscal year ending December 31,
> 2006.  To date, the Company has been unsuccessful in**

**engaging a new Auditor. There can be no assurance that we will be able to engage a new Auditor that will be able to perform and complete the audit of our 2006 financial statements the "2006 Audit") by March 16, 2007, the last date we are permitted to timely file our Annual Report on Form 10-K for the year ending December 31, 2006 (the "2006 Form 10-K") with the Securities and Exchange Commission ("the Commission") before we become a late filer ("Late Filer").** The 2006 Audit and the related auditor attestation regarding our internal control over financial reporting required by the Sarbanes-Oxley Act of 2002 and related Commission rules, will be required for us to complete and file our 2006 Form 10-K.

***Our Failure to Timely File our Annual Report on Form 10-K for the Year Ending December 31, 2006 May Lead to A Delisting of Our Common Stock from the NASDAQ Global Market***

(Underline supplied; other emphases in original).

64.     On this news, NetBank's stock price remained stable, closing at $4.30 per share on both January 3 and 4, 2007.

65.     The statements set forth in paragraph 63 above were materially false and misleading in that they falsely led investors to believe that the delay in filing the 2006 Form 10-K was not due to a substantive issue, but rather was merely the procedural result of not being able to engage an auditor in time to file. These statements omitted to state that in fact, the reason for the failure to timely file was

the failure of Defendants to comply with GAAP in valuing its core mortgage portfolio and, through that, its tangible book value.

66.     On February 15, 2007, in a filing with the SEC on Form 8- K, NetBank announced that it had selected Porter Keadle Moore, LLP ("PKM") as its new independent auditor and repeated the false and misleading statement that it was the procedural delay in selecting a new auditor that might prevent NetBank from timely filing the 2006 Form 10-K. Indeed, the Company falsely represented to shareholders that it expected to file the 2006 Form 10-K no later than June 31, 2007:

> **Item  4.01  Changes  in  Registrant's  Certifying Accountants.**
>
> On February 13, 2007, NetBank, Inc . (the "Company") engaged Porter Keadle Moore, LLP ("PKM") as its new independent registered public accounting firm for the fiscal year ended December 31, 2006. The engagement of PKM was approved by the Audit Committee of the Board of Directors of the Company. PKM replaced the Company's former independent registered public accounting firm that resigned effective November 9, 2006.
>
> *              *              *
>
> PKM will begin its examination of the Company for purposes of conducting the 2006 audit as soon as possible. *However, as previously disclosed in the Company's Current Report on Form 8-K filed with the Securities  and  Exchange  Commission  ("SEC")  on*

*January 3, 2007 (the "Prior Form 8-K"), due to the timing of the engagement of PKM, the Company does not expect that PKM will be able to perform and complete the audit of our 2006 financial statements, and related auditor attestation regarding our internal control over financial reporting, by our compliance deadline of March 16, 2007, the last date the Company is permitted to timely file its Annual Report on Form 10-K for the year ended December 31, 2006 ("2006 Form 10-K") with the SEC. The Company currently believes that the 2006 audit will be completed in June 2007 and expects to file the 2006 Form 10-K with the SEC on or before June 30, 2007, although no assurance can be given.*

As previously disclosed in the Prior Form 8-K, if the Company is not able to timely file its 2006 Form 10-K, it will not be in compliance with the continued listing requirements of the NASDAQ Stock Market ("NASDAQ") for the listing of the Company's common stock. In such event, the Company would expect to receive notification from NASDAQ of potential delisting of the Company's common stock shortly after the March 16, 2007 compliance deadline passes. After receipt of such notification, the Company would have the opportunity to request a hearing with NASDAQ, which would stay delisting proceedings pending the completion of the hearing process. If the Company receives notice of potential delisting, the Company intends to use all reasonable efforts to regain compliance with the listing requirements as soon as possible, but there can be no guarantee that the Company will regain compliance, or will be able to demonstrate a plan to regain compliance, in time to avoid delisting by NASDAQ. For information regarding the risks associated with delisting of our common stock, see Exhibit 99.2 of the Prior Form 8-K under the heading, "Our Failure to Timely File our Annual Report on Form 10-K for the Year Ending December 31, 2006 May Lead to A Delisting of Our

Common Stock from the NASDAQ Global Market," which information is incorporated herein by reference.

67.    On this new information, NetBank's stock price dropped from $3.60 per share on February 15, 2007 to $3.55 per share on January 16, 2007.

68.    The statements set forth in paragraph 66 above were materially false and misleading in that they falsely led investors to believe that the delay in filing the 2006 Form 10-K was not due to a substantive issue, but rather was merely the procedural result of not being able to engage an auditor in time to file. These statements omitted to state that in fact, the reason for the failure to timely file was the failure of Defendants to comply with GAAP in valuing its core mortgage portfolio and, through that, its tangible book value.

## NetBank Announces Fourth Quarter and Year End 2006 Financial Results

69.    On February 21, 2007, NetBank announced its preliminary unaudited results for the year ended December 31, 2006. NetBank recorded an after-tax loss of $86.3 million or $1.86 per share during the fourth quarter, compared with net income of $895,000 or $.02 per share during the same quarter in 2005. NetBank further recorded a net loss of $202 million or $4.36 per share for the full year, compared with a net loss of $180,000 or $0.00 per share for 2005.

70.     The Company again gave investors the impression that the only reason
the filing of the 2006 Form 10-K might be late is that PKM was only "recently
engaged" and that it expected the 2006 Form 10-K would be filed:

> The results set forth in this press release are preliminary
> and unaudited. *As previously reported, the company
> recently engaged Porter Keadle Moore, LLP ("PKM") to
> replace Ernst & Young LLP as its independent auditor.*
> These preliminary results are subject to potential
> adjustments, which may be material, arising from
> subsequent events or the audit of the company's financial
> statements for the year ended December 31, 2006 by
> PKM. *The company currently believes that the 2006
> audit, and related auditor attestation regarding the
> company's internal control over financial reporting, will
> be completed in June 2007 and expects to file its Annual
> Report on Form 10-K for the 2006 fiscal year with the
> SEC on or before June 30, 2007,* although no assurance
> can be given.

(Emphasis supplied).

71.     The statements set forth in the preceding paragraph 70 above were
materially false and misleading in that they falsely led investors to believe that the
delay in filing the 2006 Form 10-K was not due to a substantive issue, but rather
was merely the procedural result of not being able to engage an auditor in time to
file. These statements omitted to state that in fact, the reason for the failure to
timely file was the failure of Defendants to comply with GAAP in valuing its core
mortgage portfolio and, through that, its tangible book value.

72.     The February 21, 2007 report of NetBank's fourth quarter and year end

2006 financial results also contained a section called "Key items worth noting" in

which management represented that the "worst of the non-conforming loan

repurchase problem is now behind the company" and that the impact of the

restructuring on the Company's tangible book value was "lessened, being reduced

only to $3.50 on December 31, 2006 from $5.10 on September 30, 2006":

> Key items worth noting include the following.   All
> comparisons are on a sequential quarter basis unless
> noted otherwise.
>
> •     Accelerated Repurchase Activity.   As previously
> announced, repurchase requests in the non-conforming
> mortgage channel rose sharply following management's
> decision to close the business and accelerated further at
> the end of the year.   Provisions for the non-conforming
> channel were $30.3 million, an increase of $25.7 million
> from last quarter.   Overall, provisions for the financial
> intermediary segment were $32.0 million versus $12.2
> million the prior quarter.   *Management believes the worst
> of the non-conforming loan repurchase problem is now
> behind the company given the accelerated repurchase
> requests already received relative to the limited non-
> conforming production over the second half of 2006.*
>
> *             *             *
>
> •     *Impact on Tangible Book Value Lessened.*   Book
> value declined by $1.94 per share from $6.26 on
> September 30, 2006 to $4.32 on December 31, 2006.
> However, the impact on the company's tangible book
> value was less.   *Tangible book value declined by $1.60
> per share from $5.10 on September 30, 2006 to $3.50 on*

> December 31, 2006. On an after-tax basis, the reported
> loss included the $9.7 million write down related to the
> company's ATM and merchant processing business
> mentioned above that did not negatively impact tangible
> book value. (Details related to amounts excluded from
> tangible book value are provided in the attached
> Reconciliation of Non-GAAP Financial Measures.)

(Emphasis supplied).

73.     On this new information, NetBank's stock price increased from $3.57 per share on February 20, 2007 to $3.62 per share on February 21, 2007.

74.     The statements set forth in paragraph 67 above were materially false and misleading because they failed to disclose that the Company's financial distress was due to the failure of its core operations and that selling off parts of its mortgage business or other non-core operations would not be enough to resuscitate the Company. In addition, it failed to disclose that the Company's tangible book value was becoming worthless even with the restructuring due to the failure of the Company's core businesses.

75.     The February 21, 2007 report of NetBank's fourth quarter and year end 2006 financial results also contained a section called "Management Commentary" in which Herbert told investors that "in the span of 90 days," NetBank was able to "substantially execute a restructuring plan designed to stabilize the company's operating profile and capital position," that the Company had finally "emerged"

39

from the "tunnel" of the restructuring having moved closer to our goal of restoring profitability and stabilizing book value" and now were ready to take their "next steps":

> Management Commentary
>
> "Last year, we were at a crossroads as a company," said Steven F. Herbert, chief executive officer. "Market and economic pressures combined with our poor financial performance demanded dramatic changes.
>
> *"I'm proud of the fact that, in the span of 90 days, we were able to substantially execute a restructuring plan designed to stabilize the company's operating profile and capital position.* During the quarter, we sold, exited or shut down our nonconforming mortgage operation; our RV, boat and aircraft financing business; FTI and the QuickPost service; and NetInsurance. We consolidated two of our indirect conforming mortgage operating centers into our Columbia facility, and during December, we substantially effected a shut down of our auto lending unit.
>
> "The final item remaining to be checked off our 'to do' list is the completion of the sale of our ATM and merchant processing business. We have a non-binding letter of intent in place and we are optimistic that a definitive agreement will be reached soon and the deal will close by the end of the first quarter. I am also pleased that we can check off 'engage an audit firm' which wasn't on our original list of things to do.
>
> *"When we began this process, I likened it to driving through a tunnel. We had a roadmap, but we went in not knowing exactly what things would look like on the other side. Now that we've emerged, we're evaluating our next*

*steps.* As we announced earlier this month, we are exploring longer-term strategic alternatives to drive shareholder value. We may also need to consider some different scenarios to proactively manage our risk-based capital.

"I'd be remiss if I didn't thank our associates for all the hard work they have done since last October. *That work has moved us closer to our goal of restoring profitability and stabilizing book value.* While we evaluate our next steps, our operating priorities will continue to be moving our indirect conforming mortgage operation back toward breakeven as quickly as possible and generating cost-effective deposit growth at the bank."

76. On these reassurances to the market, NetBank's stock price rose from $3.57 per share on February 20, 2007 to $3.62 per share on February 21, 2007.

77. The statements set forth in paragraph 75 above were materially false and misleading because far from successfully executing a plan that "stabilize[d] the company's operating profile and capital position" or "emerg[ing]" from the "tunnel" of the restructuring, Defendants failed to disclose that the Company's financial distress was due to the failure of its core operations and that selling off parts of its mortgage business or other non-core operations would not be enough to resuscitate the Company . In addition, it failed to disclose that far from "stabilizing book value," the Company's tangible book value was declining rapidly even with the restructuring and cash infusion due to the failure of the Company's core businesses.

41

**NetBank Still Is Unable To Timely File Its 2006 Form 10-K and Is Delisted By NASDAQ**

78.    On March 23, 2007, the Company announced that on March 20, 2007, it had received a letter from the NASDAQ stock market stating that its inability to file timely the 2006 Form 10-K served as a basis for the company's common stock to be subject to delisting.  Further perpetuating the myth that the only reason for the failure to timely file the 2006 Form 10-K was the delay in retaining new independent auditors after the resignation of E&Y; NetBank issued a release:

> **NetBank, Inc. Receives NASDAQ Notice of Non-Compliance**
>
> **Company to Request Hearing Before NASDAQ Listing Qualification s Panel**
>
> ATLANTA, Mar 23, 2007 (PrimeNewswire via COMTEX News Network) -- NetBank, Inc. (Nasdaq:NTBK) today announced that on March 20, 2007, it received a staff determination notice from the Nasdaq Stock Market stating that the company's common stock is subject to delisting. The notice, which was anticipated by the company in its current report on Form 8-K filed with the Securities and Exchange Commission on February 15, 2007, was issued in accordance with standard NASDAQ procedures as a result of the delayed filing of the company's Annual Report on Form 10-K for the 2006 fiscal year (the "10-K").  Timely filing of periodic reports is a requirement for continued listing under NASDAQ Marketplace Rule 4310(c)(14).
>
> Management will request a hearing before a NASDAQ Listing Qualifications Panel in which it will outline its

plan for regaining compliance. There can be no
assurance that the panel will grant the company's request
for continued listing. Pending a decision by the panel,
NetBank shares will remain listed on the NASDAQ
Global Market.

*As previously reported, the company was unable to timely
file its 10-K due to the delay in engaging a new
independent auditor after its former independent auditor
resigned effective November 9, 2006. On February 15,
2007, the company reported that it engaged Porter Keadle
Moore, LLP ("PKM") to replace Ernst & Young LLP as
its independent auditor. The company currently believes
that the 2006 audit, and related auditor attestation
regarding the company's internal control over financial
reporting, will be completed in June 2007 and expects to
file its 10-K with the SEC on or before June 30, 2007,
although no assurance can be given.*

79.     On this new information, NetBank's stock price rose slightly from

$2.41 per share on March 23, 2007 to $2.42 per share on March 26, 2007, the next

trading day.

80.     On May 15, 2007, the Company announced that on May 14, 2007, it

had received a letter from NASDAQ stock market stating that its inability to file

timely its March 31, 2007 Form 10-Q served as "additional basis for the company's

common stock to be subject to delisting." In addition, NetBank announced that

while the Company had released preliminary unaudited results for the December

31, 2006 year, the year-end statements would remain open to "additional evidence

with respect to conditions that existed at the date of the balance sheet and affect

estimates inherent in the process of preparing the audited financial statements," and

for the first time indicated that this may require NetBank to "push back" and record

certain unidentified "subsequent events" in its year-end financial statements:

**NetBank, Inc. Received Additional NASDAQ Notice of Non-Compliance**

**Company Recently Outlined Plans for Regaining Compliance During Hearing Before NASDAQ Listing Qualifications Panel; Also Announces It Will Delay Reporting Ql 2007 Results Until It Regains Compliance**

ATLANTA, May 15, 2007 (PrimeNewswire via COMTEX News Network) -- NetBank, Inc. (Nasdaq:NTBK) today announced that on May 14, 2007, it received an additional staff determination notice from the NASDAQ Stock Market stating that the company's inability to timely file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 (the "10-Q"), serves as an additional basis for the company's common stock to be subject to delisting. The notice, which was anticipated by the company, was issued in accordance with standard NASDAQ procedures. Timely filing of periodic reports is a requirement for continued listing under NASDAQ Marketplace Rule 4310(c)(14).

As previously announced, the company received a similar letter on March 20, 2007, when it was unable to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2006 (the "10-K"). In response to that letter, the company requested, and was granted, a hearing before a NASDAQ Listing Qualifications Panel. The hearing was held on May 3, 2007. During the hearing, the company presented its plan for regaining compliance. Since the company is unable to file its 10-Q

before its 10-K has been filed, management currently expects to file the 10-K and 10-Q concurrently on or before June 30, 2007, although no assurance can be given.

The May 14, 2007, NASDAQ notice states that the 10-Q delinquency serves as an additional basis for delisting the company's securities on the NASDAQ Global Market and that the NASDAQ Listing Qualifications Panel will consider this additional basis before rendering its decision regarding the company's continued listing on the NASDAQ Global Market. There can be no assurance that the panel will grant the company's request for continued listing. Pending a decision by the panel, NetBank shares will remain listed on the NASDAQ Global Market.

The company also announced that it will delay reporting its results for the quarter ended March 31, 2007, until its auditors have completed the audit of the company's financial statements for the year ended December 31, 2006, and the company has filed the 10-K. While the company reported preliminary, unaudited results for its year ended December 31, 2006, the subsequent events period applicable to our financial statements for the year ended December 31, 2006, will remain open until the completion of the audit. *Under applicable accounting pronouncements, events that occur or information that becomes available subsequent to the December 31, 2006, balance sheet date but before issuance of the year-end audited financial statements that provide additional evidence with respect to conditions that existed at the date of the balance sheet and affect the estimates inherent in the process of preparing the audited financial statements would be required to be "pushed back" and recorded in the year-end financial statements. The company currently expects that it may be required to "push back" and record in its year-end financial statements certain subsequent event items in accordance*

*with these accounting pronouncements.* However, until the subsequent events period is closed, the company will not be in a position to review or quantify such charges or their effect on its previously reported preliminary, unaudited results at year-end. Upon reporting final year-end and first quarter results, the company will identify the nature and amount of charges, if any, that were required to be pushed back to 2006.

*As previously reported, the company was unable to timely file its 10-K due to the delay in engaging a new independent auditor after its former independent auditor resigned effective November 9, 2006.* On February 15, 2007, the company reported that it engaged Porter Keadle Moore, LLP ("PKM") to replace Ernst & Young LLP as its independent auditor.

81.     On this new information, NetBank's stock price dropped slightly from $1.95 per share on May 15, 2007 to $1.90 per share on May 16, 2007.

82.     The statements set forth in paragraphs 78 and 80 above were materially false and misleading in that they falsely led investors to believe that the delay in filing the 2006 Form 10-K was not due to a substantive issue, but rather was merely the procedural result of not being able to engage an auditor in time to file. These statements omitted to state that in fact, the reason for the failure to timely file was the failure of Defendants to comply with GAAP in valuing its core mortgage portfolio and, through that, its tangible book value.

**NetBank Continues To Shed Assets**

83.     In the midst of its materially false and misleading statements regarding

its failure to timely file required filings with the SEC, NetBank continued to sell

off assets in an effort to raise capital.

84.     On May 1, 2007, the Company announced that it sold its ATM and

Merchant Servicing Operation for $18 million, which included initial cash

proceeds of $16 .5 million. Herbert portrayed this sale as a "win-win" that would

increase NetBank's tangible assets and tangible book value even though he

admitted that "NetBank was carrying the assets on its balance sheet at a higher

value than the sales price" and therefore the Company would "record an additional

impairment charge of approximately $2.0 million to bring the book value of the

assets into line with the sales price."

> **NetBank Sells ATM and Merchant Servicing Operation**
>
> **Acquirer Pays $18.0 million for Unit's Principal Operating Assets and Assumes Management Effective Tuesday, May 1, 2007**
>
> ATLANTA, May 1, 2007 (PrimeNewswire via COMTEX News Network) -- NetBank, Inc. (Nasdaq:NTBK), parent company of NetBank (www.netbank.com), an online financial services provider and national prime mortgage lender, today announced a transaction involving NetBank's ATM and merchant servicing operation. NetBank Payment Systems sold its principal operating assets and net working capital yesterday to PAI ATM Services, LLC, a subsidiary of

Payment Alliance International, Inc. ("PAP"). The assets consisted primarily of servicing contracts on more than 8,500 ATMs nationwide. The sales price for the assets totaled $18.0 million, resulting in initial cash proceeds of $16.5 million after adjustment for the estimated book value of the net working capital acquired.

*NetBank was carrying the assets on its balance sheet at a higher value than the sales price. The bank will therefore record an additional impairment charge of approximately $2.0 million to bring the book value of the assets into line with the sales price.* It is important to note that the ATM servicing contracts were recognized on the bank's balance sheet as intangible assets. *Through the sale, the bank monetized them and thus converted them from an intangible into a tangible. This means the bulk of the cash proceeds represents new tangible capital that management can put to work in additional asset growth at the bank or other cost-saving initiatives. It also directly increases the company's overall tangible book value.*

"We mentioned several months ago our intention to sell this operation as part of our larger corporate reorganization effort," said Steven F. Herbert, Chief Executive Officer ("CEO"), NetBank, Inc. "We said then that the operation was well managed and had real value. But, it simply did not fit in with our core banking and mortgage focus. It required significant capital to operate and therefore represented a strain or distraction on our resources.

*"The deal with PAI is a win-win proposition,"* Herbert concluded. "PAI will be able to invest more in the operation and preserve the jobs of the talented team we had in place. In turn, *we have generated significant new tangible capital. This money will prove important in our effort to maintain proper regulatory capital ratios*

48

> *and to protect shareholder value as we fight to get the*
> *company back on track financially through further*
> *restructuring or other alternatives."*

85.     On these reassurances to the market that NetBank actually had
increased its tangible book value in this further stage of the restructuring, the
Company's stock price rose from $1.96 per share on May 1, 2007 to $2.07 per
share on May 2, 2007.

86.     The statements set forth in paragraph 84 above were materially false
and misleading because far from being a "win" for NetBank that generated
additional capital for turning around the Company, as Defendants well-knew, no
amount of additional funding would save the Company since its financial distress
was so deeply rooted in the failure of its core operations. In addition, it failed to
disclose that the Company's tangible book value in fact continued to decline
rapidly even with the restructuring and multiple cash infusions due to the failure of
the Company's core businesses.

### May 21, 2007: NetBank Sells Core Assets and Discloses For the First Time That It Was Compelled To Do So By Regulatory Agencies

87.     To the utter shock of the market, on May 21, 2007, NetBank
announced that it had been forced to sell core assets - outside the context of the
restructuring - in order to cover its bank deposit obligations.  This sale was not
done willingly but rather, as the Company disclosed for the first time, was

49

compelled by bank regulators who "advised" NetBank management to find an "alternative" to the restructuring to shore up NetBank's "capital and earnings trends" "immediately [to] cover all of the bank's deposit obligations."

88.    In addition, this announcement represented the first time that the Company acknowledged that the problems it faced were not due to the weakened housing market and flat yield curves, but actually related to the "weakened fundamentals of our core businesses."

89.    In response to regulator concerns, NetBank sold off - at a loss of between $60-70 million - NetBanks' $2.5 billion in core and brokered deposits; NetBank's held for investment loan portfolio; all of the assets and liabilities of NetBank Business Finance, the Company's small business equipment leasing and financing operation; and the NetBank brand and related trademarks and service marks:

> **NetBank Reaches Agreement With EverBank for Sale of Select Assets and Assumption of Deposit Liabilities**
>
> **Transaction is Expected to Close by End of June 2007; NetBank Begins Immediate Shut-Down of Third-Party Mortgage Origination Business**
>
> ATLANTA, May 21, 2007 (PrimeNewswire via COMTEX News Network) -- NetBank, Inc. (Nasdaq:NTBK), parent company of NetBank (www.netbank.com), an online financial services provider and national prime mortgage lender, today

announced that the bank has executed an asset purchase and liability assumption agreement with EverBank, an FDIC-insured, federal savings bank and subsidiary of EverBank Financial Corp., a privately held financial services holding company headquartered in Jacksonville, Fla., with approximately $4 .7 billion in assets. *The purchase price represents a discount to the current carrying value of the assets and liabilities being conveyed, and NetBarrk anticipates recording a loss on sale of between $60 and $70 million at close.*

The transaction is expected to close by the end of June 2007, subject to regulatory approval, and relates to the broader initiative the company began earlier in the year to consider strategic alternatives that would allow management to serve the interests of its customers, while protecting the company's equity position from continued erosion. The company has been under extreme financial pressure for more than a year due to a difficult mortgage origination market, a flat yield curve environment and other factors. These pressures have resulted in large operating losses that have significantly reduced the company's capital position and prompted heightened regulatory oversight.

NetBank worked closely with regulators as it evaluated various opportunities. *Regulators have been increasingly concerned about the bank's capital and earnings trends and advised management to find an alternative immediately that covered all of the bank's deposit obligations.* NetBank and EverBank expect to execute a separate transition service agreement where NetBank will continue to support the deposit relationships after the close until EverBank converts these relationships to its core online banking platform sometime in the third quarter.

The primary assets and liabilities in the transaction

include:

* The bank's held for investment loan portfolio;
* All of the assets and liabilities of NetBank Business Finance, the bank's small business equipment leasing and financing operation;
* *The bank's $2.5 billion in core and brokered deposits;* and
* The NetBank brand and related trademarks and service marks.

Management Commentary

*"In spite of our best efforts to improve the company's operating profile through the restructuring plan we undertook last year, our company has remained very vulnerable and at risk due to the weakened fundamentals of our core businesses,"* said Steven F. Herbert, chief executive officer, NetBank, Inc. "Our mortgage operations continue to struggle in the face of a highly competitive marketplace, especially the third-party origination channel. *Bank earnings have also fallen sharply as we have had to de-leverage the balance sheet in order to maintain risk-based capital ratios within appropriate regulatory guidelines.*

\*      \*      \*

"The transaction we are announcing today monetizes a significant portion of the company's assets and will allow the bank to fulfill all of its deposit liabilities . . . .

"By transferring the deposit relationships and resolving the chief concern of regulators, we are now positioned to move forward with other restructuring initiatives, such as the shutdown of our third-party mortgage origination business, NetBank Funding Services.

> "Our remaining businesses will include our mortgage
> servicing operation, along with our retail prime mortgage
> franchise, Market Street Mortgage," Herbert concluded.
> "We are actively evaluating their long-term strategic
> alternatives as well as those of the parent company as a
> whole. We have also retained our CMC claim and the
> deferred tax asset that we generated in the fourth quarter
> of 2006.   After consummation of the EverBank
> transaction, we will focus intensely on prosecuting the
> CMG sureties and pursuing our claim against them,
> which we now estimate at $150 million ."

90.     In response to this disastrous news, the shocked market reacted

sharply and swiftly. NetBank's stock price plummeted from $1.75 per share on

May 18, 2007 to $0.59 per share on May 22, 2007 (the next trading day) *an over*

*66% drop in price* on massive volume of 11,190,400 - *over forty-five times the*

*previous days' volume.*

91.     The statements set forth in paragraph 89 above were materially false

and misleading because they failed to disclose that the executed asset purchase and

liability assumption agreement would not be enough to help save the Company

from its financial distress which was deeply rooted in the Company's weakened

fundamentals of its core businesses.

92.     On May 22, 2007, as reported by the Associated Press, Friedman,

Billings, Ramsey analyst Paul J. Miller Jr, said the net value of NetBank's assets,

which the bank currently estimated at $25 million to $45 million, is "careening

toward zero." He downgraded NetBank to "Underperform" from "Market

Perform." Miller cut his price target for NetBank's common stock to zero, from

$2.00.

93.     In response to this rating and the related news article, NetBank's stock

price fell further, from $0.59 per share on May 21, 2007 to $0.37 per share on May

22, 2007.

94.     However, Herbert continued the charade that the failure to timely file

with the SEC was merely a "delay" rather than a substantive problem that

threatened the very continuation of the Company as a going concern.  Herbert

stated as follows:

> "Our effort to manage and address these pressures was
> further complicated by the delay of the annual audit and
> greater    day-to-day    regulatory    oversight    and
> involvement."

95.     This statement remained materially false and misleading in that they

falsely led investors to believe that the delay in filing the 2006 Form 10-K and

First Quarter 2007 Form 10-Q was not due to a substantive issue, but rather was

merely the procedural result of not being able to engage an auditor in time to file.

These statements omitted to state that in fact, the reason for the failure to timely

file was the failure of Defendants to comply with GAAP in valuing its core

mortgage portfolio and, through that, its tangible book value.

**August 6, 2007: NetBank Discloses For The First Time That One Of Its Core Operations Has Been Materially Overvalued**

96.     On August 6, 2007, NetBank filed a Form 8-K with the SEC (the

"August 6, 2007 8-K") disclosing for the first time that one of its core operations,

Market Street, NetBank's wholly-owned retail mortgage business, was

substantially overvalued in violation of GAAP and, in fact, had no value at all.

This revelation resulted in a non-cash impairment charge of approximately $24.6

million for the impairment of goodwill assigned to Market Street. The carrying

value of Market Street was exactly the amount written off - $24.6 million:

> **Item 2.06 Material Impairments.**
>
> *Goodwill*
>
> *At June 30, 2007, the carrying value of the goodwill that NetBank, Inc. (the "Company") assigned to its subsidiary, Market Street Mortgage Corporation ("Market Street'), the Company's wholly-owned retail mortgage business, was approximately $24.6 million.* In accordance with generally accepted accounting principles ("GAAP"), the Company evaluates the carrying value of goodwill assigned to its subsidiaries on an annual basis and also on an interim basis if events indicate possible impairment.

As previously reported in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission ("SEC") on June 21, 2007, the Company announced that it was exploring strategic alternatives regarding Market Street. *Based on the information the Company obtained during the course of its consideration of such other opportunities for Market Street, and the likelihood of execution of one or more of such other opportunities, the Company determined that an event indicative of impairment had occurred with respect to Market Street.*

As a result, the Company evaluated the carrying value of goodwill of Market Street, and on August 2, 2007, authorized officers of the Company concluded that a material impairment charge with respect to the carrying value of goodwill assigned to Market Street is required under GAAP. *As a result, for the second quarter ending June 30, 2007, the Company expects to record a non-cash impairment charge of approximately $24.6 million (both pre-tax and after tax) for the impairment of goodwill assigned to Market Street.*

97.     In the same Form 8-K, the Company announced that the NASDAQ stock exchange was finally delisting NetBank stock due to its failure to file timely the 2006 Form 10-K and the First Quarter 2007 Form 10-Q . This finally allowed investors to determine that, far from being a merely ministerial delay that caused the late filings, it was in fact the failure of Defendants to properly value their core businesses in accordance with GAAP that caused the delinquency.

98.     Moreover, the August 6, 2007 Form 8-K also disclosed that the Office of Thrift Supervision ("OTS") had notified NetBank that it was undercapitalized

and was required to respond with a capital restoration plan no later than September

13, 2007 that would satisfy applicable regulations:

> On August 3, 2007, NetBank received written notice
> from the Office of Thrift Supervision (the "OTS") that
> NetBank was undercapitalized (the "Notice"). NetBank is
> required to file a capital restoration plan with the OTS by
> no later than September 13, 2007 (the "Capital Plan"),
> which must satisfy OTS regulations governing such
> plans.

> Due to NetBank's capital category and as provided in the
> Notice, NetBank is subject to various restrictions,
> including limits on (i) capital distributions; (ii) growth in
> total assets; (iii) acquisitions of new companies or
> offices; (iv) engaging in any new lines of business ; and
> (iv) accepting, renewing or rolling over of brokered
> deposits. The Notice also provides that the OTS may not
> approve any requests that NetBank files for increases in
> compensation or payment of bonuses to senior executive
> officers until after the OTS has approved the Capital
> Plan. The OTS may impose additional restrictions on
> NetBank through a prompt corrective action directive,
> and has indicated that it intends to issue such a directive
> in the near future.

> *In order for the Capital Plan to satisfy OTS regulations,
> the Company, as NetBank's parent holding company, will
> be required to guarantee NetBank's compliance.* As part
> of this guarantee, the Company must (i) take any actions
> required by it under the Capital Plan; (ii) take any actions
> necessary to enable NetBank to perform under the Capital
> Plan; and (iii) utilize its available assets (other than
> shares of NetBank itself) when directed to do so by the
> OTS, to enable NetBank to implement the Capital Plan.
> As a result of the Company's obligations under the
> Notice, the Company believes that its outstanding

> common stock may have little or no value. Accordingly,
> investment in the Company's common stock would be
> highly speculative.

(Emphasis supplied).

99.   In response to this shocking news, NetBank's stock price plummeted

further, from $0.20 per share on August 6, 2007 to $0.14 per share on August 7,

2007, a 30% drop in one day.

100.   The statements set forth in paragraphs 96 and 98 above were

materially false and misleading because they failed to disclose the Company's true

financial health and they failed to disclose that the Company's improper value of

its core businesses in accordance with GAAP was the cause of the delinquency in

the Company's 2006 Form 10-K and the First Quarter 2007 Form 10-Q.

**August 22, 2007: NetBank announces Settlements With
Insurance Companies Totaling $19,250,000**

101.   Despite this news, Defendants' fraud continued on August 22, 2007,

when the Company disclosed that it had entered into settlements resolving

Company claims against certain insurance companies for breaches of contract,

fraud and bad faith in connection with the insurance companies' issuance of surety

bonds and insurance policies guaranteeing payment of certain payment streams

generated by various equipment leases:

**Item 8.01 Other Events.**

NetBank ("NetBank, FSB"), a federally chartered savings bank and wholly-owned subsidiary of the Company, and Illinois Union Insurance Company ("Illinois Union") entered into a Settlement Agreement, Mutual Release and Policy Rescission dated as of August 21, 2007, providing for the settlement of NetBank, FSB's pending claims against Illinois Union and the payment of $19,250,000 to NetBank, FSB, subject to court approval of the settlement.

As reported in the Company's previous filings with the Securities and Exchange Commission (the "SEC"), NetBank, FSB filed a complaint in January 2002 against Commercial Money Center, Inc. ("CMC"), Illinois Union, Safeco Insurance Company of America ("Safeco"), and Royal Indemnity Company ("Royal," and together with Illinois Union and Safeco, collectively referred to as the "Sureties"). CMC was the originator and subservicer of various equipment leases (the "Leases"). NetBank, FSB purchased most of the payment streams generated by the subject Leases from CMC (the "Payment Streams"). The Sureties are insurance companies that issued surety bonds and insurance policies guaranteeing payment of the Payment Streams (the "Bonds") and also served as master servicers of the Leases. The NetBank, FSB action against the Sureties alleges several claims, including claims for breach of contract, fraud and bad faith, and seeks, among other things, payment under and enforcement of the Bonds. The claims of NetBank, FSB against CMC, Safeco, and Royal remain pending.

\*       \*       \*

Although NetBank, FSB during the past five and a half years has vigorously attempted to collect the amounts it

believes are owed to it by the Sureties, the Company expects that without reaching settlements with the Sureties, it may take years to realize upon the amounts owed.

As previously reported in the Company's Current Report on Form 8-K filed with the SEC on August 6, 2007, the Company anticipated recording impairment charges for the quarter ended June 30, 2007, on goodwill related to Market Street Mortgage Corporation, the Company's wholly owned retail mortgage subsidiary, and on long-lived assets owned by NetBank, FSB, most with respect to its NetBank Funding Services division, the Company's third-party conforming mortgage business. These impairment charges were estimated at $24.6 and $25.0 million, respectively, on both a pre- and after-tax basis. *Additionally, the Company disclosed that the Office of Thrift Supervision (the "OTS") had notified NetBank, FSB that it was undercapitalized and must respond with a capital restoration plan that fully satisfies the regulations governing such plans by no later than September 13, 2007.*

*The above-mentioned developments along with others factored into NetBank, FSB's receptivity to the settlement with Illinois Union at this time. The proposed settlement was approved by the OTS and the Company.*

(Emphasis supplied).

102. On this news, NetBank's stock price *doubled* from 0.06 per share on August 22, 2007 (on volume of 34,089 shares) to 0.12 per share on August 23, 2007 (on astounding volume of *6,294,574* shares).

103.    The statements set forth in paragraph ___ were materially false and misleading because, in combination with the proposed sale of assets to EverBank, this cash infusion falsely led investors to believe that the Company could now be in compliance with OTS requirements.

### EverBank Terminates Its Agreement to Purchase NetBank Assets

104.    However, on September 17, 2007, it was finally disclosed that NetBank would <u>not</u> be in compliance with banking requirements.  In news even more shocking than the news of August 6, 2007, as a result of NetBank's problems, on September 17, 2007, EverBank announced that it had "terminated its agreement to acquire NetBank's consumer deposit accounts, business finance division and other assets under the transaction announced on May 21, 2007 [because it has become] clear that *NetBank would not be able to complete certain conditions required to close and receive regulatory approval.*" (Emphasis supplied) .

105.    NetBank's September 17, 2007 Form 8-K filed with the SEC announcing the termination of the agreement stated that "EverBank's letter [terminating the agreement] states that NetBank is in breach of its representations and warranties as the basis for its termination of the Purchase Agreement."

106.    NetBank's stock price closed at $0.08 per share on September 17, 2007 .

## ADDITIONAL SCIENTER ALLEGATIONS

107.   As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding NetBank, their control over, and/or receipt and/or modification of NetBank's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning NetBank, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

108.   The markets for NetBank's securities were open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, NetBank's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired NetBank securities relying upon the integrity of

Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

111. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of NetBank's securities and operated as a fraud or deceit on Class Period purchasers of NetBank's securities by failing to disclose the truth about its core businesses and its lending policies and practices. When the full impact of Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of NetBank's securities fell precipitously as the prior artificial inflation came out. As a result of their purchases of NetBank's securities during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages under the federal securities laws.

112. By failing to disclose the truth about its core businesses and lending policies and practices, Defendants presented a misleading picture of NetBank's operations and financial performance. Thus, instead of disclosing during the Class Period the truth about NetBank's operations and financial performance, Defendants caused NetBank to conceal the truth.

113.   Defendants' false and misleading statements had the intended effect and caused NetBank's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $7.10 per share on May 1, 2006, the start of the Class Period.

114.   As a direct result of Defendants' disclosures on August 6, 2007, NetBank's common stock price fell precipitously.  These drops removed the inflation from the price of NetBank's securities, causing real economic loss to investors who had purchased the Company's securities during the Class Period.

115.   The approximate 92% decline in the price of NetBank's common stock after these disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of NetBank's common stock price declines negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, i.e., damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of NetBank's securities and the subsequent significant decline in the value of

NetBank's securities when Defendants' prior misrepresentations and other

fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

116. At all relevant times, the market for NetBank's securities was an

efficient market for the following reasons, among others:

(a)     NetBank's stock met the technical quantitative requirements for

listing, and was listed and actively traded on the NASDAQ, a highly efficient and

automated market;

(b)     As a regulated issuer, NetBank filed periodic public reports

with the SEC and the NASDAQ;

(c)     NetBank regularly communicated with public investors by the

way of established market communication mechanisms, including through regular

disseminations of press releases on the national circuits of major newswire services

and through other wide-ranging public disclosures, such as communications with

the financial press and other similar reporting services; and

(d)     NetBank was followed by several securities analysts employed

by major brokerage firms who wrote reports which were distributed to the sales

force and certain customers of their respective brokerage firms.  Each of these

reports was publicly available and entered the public marketplace.

66

117.   As a result of the foregoing, the markets for NetBank's securities promptly digested current information regarding NetBank from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of NetBank's securities during the Class Period suffered similar injury through their purchase of NetBank's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

118.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an

executive officer of NetBank who knew that those statements were false when made.

## COUNT I

### Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants

119.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

120.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding NetBank's business, operations, management and the intrinsic value of NetBank securities; and (ii) cause Plaintiff and other members of the Class to purchase NetBank's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

121.   Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for NetBank's securities in violation of Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

122.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of NetBank as specified herein.

123.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of NetBank's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about NetBank and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of NetBank's securities during the Class Period.

124.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

125.   The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of

70

concealing NetBank's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

126.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of NetBank's securities were artificially inflated during the Class Period. In ignorance of the fact that market prices of NetBank's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired NetBank securities during the Class Period at artificially high prices and were damaged thereby.

127.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding NetBank's financial results, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their NetBank securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

128.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

129.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

130.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

131. The Individual Defendants acted as controlling persons of NetBank within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

132. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

133.   As set forth above, NetBank and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

134.   Under these circumstances, all purchasers of NetBank's securities during the Class Period suffered similar injury through their purchase of NetBank's securities at artificially inflated prices and a presumption of reliance applies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.   Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs counsel as Lead Counsel;

B.   Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages

sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

      C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

      D.    Such other and further relief as the Court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

    Plaintiff hereby demands a trial by jury.

DATED:    Atlanta, Georgia
             October 22, 2007.

                        **CHITWOOD HARLEY HARNES LLP**

                        Martin D. Chitwood
                        MChitwood@chitwoodlaw.com
                        Georgia Bar No. 124950
                        Nikole M. Davenport
                        NDavenport@chitwoodlaw.com
                        Georgia Bar No. 206195
                        2300 Promenade II
                        1230 Peachtree Street, N.E.
                        Atlanta, GA  30309
                        Tel: 404-873-3900
                        Fax: 404-876-4476

## CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

I, _Arsh Uahdi_, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.     I have reviewed the Netbank, Inc. complaint and authorize its filing.

2.     I did not acquire the referenced securities at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.     I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.     I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

5.     I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except (list if any):

6.     I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is unaffected by my decision to serve as a representative party.

7.     I have made the following transactions in Netbank, Inc. [NTBK], and will provide records of those transactions upon request:

| Trade Date | No. of Shares | Price Per Share | Buy or Sell |
|---|---|---|---|
| 9/12/2007 | 58,500 | .08 | BUY |
| | | | |
| | | | |
| | | | |
| | | | |

**Please use and attach additional pages if necessary.**

**I declare under penalty of perjury that the foregoing is true and correct**

Executed this _29_ day of _September_, 2007

_____
Signature

# EXHIBIT D

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MATTHEW TOTILO, individually and on  :
behalf of himself and all others similarly  :
situated,                                 :        Case No. 07-cv-10991-LAK
               Plaintiff  :
                           :
v.                                        :
STEVEN F. HERBERT and                     :
JAMES P. GROSS,                           :
            Defendants.   :


## DECLARATION OF STEVEN F. HERBERT

1.      My name is Steven F. Herbert. I am over eighteen years of age and am competent to make the following declaration.

2.      I served as NetBank, Inc.'s Chief Executive Officer from October 5, 2006 through my voluntary resignation effective December 31, 2007.

3.      I currently reside in Columbia, South Carolina.

4.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This _11th_ day of February, 2008.

                                          Steven F. Herbert

EXHIBIT E



## NetBank, Inc. Announces Change in Executive Leadership

**Douglas K. Freeman Steps Down as Chairman and CEO; Board Names Steven F. Herbert as CEO and Director**

ATLANTA, Oct. 3, 2006 (PRIMEZONE) -- NetBank, Inc. (Nasdaq:NTBK), a diversified financial services provider and parent company of NetBank*&reg;*, (www.netbank.com), is announcing that Douglas K. Freeman, its chairman and chief executive officer, will step down from those roles and from the board of directors as of Thursday, October 5. The board has appointed Steven F. Herbert CEO and elected him as a director. Herbert has served as the company's chief finance executive since 2002. He also served in that capacity at Resource Bancshares Mortgage Group ("Resource Bancshares") prior to its acquisition by NetBank in 2002.

Other changes that will coincide with Freeman's departure include:

- Thomas H. Muller, Jr. will assume the role of chairman of the board of directors. Muller has served on the company's board since the company's inception. He has also chaired the company's audit committee since that time.
- David W. Johnson, Jr. will become vice chairman. Johnson has been a director since 2002. Johnson formerly served as president and a director of Resource Bancshares.
- James P. Gross has been promoted from controller to chief finance executive. Gross has served as controller since 2004. He previously served as director of Financial Planning and Reporting at NetBank and Resource Bancshares.

"I think a transition in leadership at this point in the company's life cycle is in the best interest of our shareholders," says Freeman. "Economic and market conditions have weighed heavily on the company's performance and impeded our ability to fully execute a number of the strategies we intended. Since the beginning of the year, we have begun to scale back a number of ancillary businesses to direct our more limited resources to the businesses that drive the best return for our shareholders. These efforts will result in a smaller, more streamlined organization with different executive management needs."

"Doug has contributed greatly to our company over the past five years, and the board appreciates the level of leadership he has provided," says Muller. "The board believes the company's core strengths reside in its banking and conforming mortgage activity. Relentless focus on these operations is the surest path to increasing shareholder value. We think Steve is the right person to guide the company through the changes we will make to pare down costs and leverage these businesses more effectively."

"We believe our bank and conforming mortgage businesses have upside potential, and I am excited about the prospect of leading the company in its next stage of development," says Herbert. "Our main objective over the next three to six months will be to stabilize the company's operating profile and return to profitability as quickly as possible. As we mentioned recently, we anticipate announcing a deal to sell the majority of our mortgage servicing portfolio soon. We are also actively exploring alternatives for our non-conforming mortgage business. You will now see us move quickly to execute on needed changes in other lines of business outside of the core banking and mortgage operations. We have a talented base of associates that I believe will support and fully engage in this rapid refocus."

Additional biographical and professional information on Muller, Johnson, Herbert and Gross is available on the company's corporate Web site at www.netbankinc.com. The Corporate Governance section of the site includes profiles on all directors and executive officers.

About NetBank, Inc.

NetBank, Inc. (Nasdaq:NTBK) operates with a diverse group of complementary financial services businesses that leverage technology for more efficient and cost effective delivery of services. Its primary areas of operation include personal and small business banking, retail and wholesale mortgage lending, and transaction processing. For more information, please visit www.netbankinc.com.

Forward-Looking Statements

Statements in this press release that are not historical facts are forward-looking statements that reflect management's current expectations, assumptions, and estimates of future performance and economic conditions. Such statements are made in reliance upon the safe harbor provisions of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. When used in this press release, the words "believe," "anticipate," "estimate," "expect," "may," "will," "should," "plan," "intend," "project" and similar expressions are intended to identify forward-looking statements. These forward-looking statements are subject to a number of risks and uncertainties that may cause actual results and future trends to differ materially from those expressed in or implied by such forward-looking statements. The company's consolidated results of operations and such forward-looking statements could be affected by many factors, including but not limited to: 1) the evolving nature of the market for Internet banking and financial services generally; 2) the public's perception of the Internet as a secure, reliable channel for transactions; 3) the success of new products and lines of business considered critical to the company's long-term strategy, such as small business banking and transaction processing services; 4) potential difficulties in integrating the company's operations across its multiple lines of business; 5) the cyclical nature of the mortgage banking industry generally; 6) a possible decline in asset quality; 7) changes in general economic or operating conditions which could adversely affect mortgage loan production and sales, mortgage servicing rights, loan delinquency rates and/or loan defaults; 8) the possible adverse effects of unexpected changes in the interest rate environment; 9) adverse legal rulings, particularly in the company's litigation over leases originated by Commercial Money Center, Inc.; 10) the company's ability to consummate in the near term a sale of a majority of its mortgage servicing rights; and/or 11) increased competition and regulatory changes. Further information relating to these and other factors that may impact the company's results of operations and such forward-looking statements are disclosed in the company's filings with the SEC, including under the caption "Item 1A. Risk Factors" in its Annual Report on Form 10-K for the year ended December 31, 2005 and Quarterly Report on Form 10-Q for the quarter ended June 30, 2006. Except as required by the federal securities laws, the company disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events, or otherwise.

CONTACT: NetBank, Inc.
Matthew Shepherd
(678) 942-2683
mshepherd@netbank.com

EXHIBIT F


**NetBank®**
Connect with your money

**NetBank, Inc. Reports Third Quarter Results**

Reorganization Charges Drive Loss of $1.58 Per Share

ATLANTA, Nov 8, 2006 (PrimeZone Media Network via COMTEX News Network) -- NetBank, Inc. (Nasdaq:NTBK), parent company of NetBank*®;* (www.netbank.com) and a leading mortgage lender, today reported financial results for the quarter ended September 30, 2006. The company recorded an after-tax loss of $73.3 million or $1.58 per share for the period, compared with an after-tax loss of $1.4 million or $.03 per share during the same quarter a year ago. On a year-to-date basis, the company recorded an after-tax loss of $116 million or $2.50 per share, versus a net loss of $1.1 million or $.02 per share during the first nine months of 2005.

Book value declined by $1.22 per share from $7.48 on June 30, 2006 to $6.26 on September 30, 2006. However, the impact on the company's tangible book value was substantially less. Tangible book value declined $.70 per share from $5.80 on June 30, 2006 to $5.10 on September 30, 2006. On an after-tax basis, the reported loss included a $19.5 million expense of non-deductible goodwill and a $2.4 million expense of deductible goodwill, both of which did not negatively impact tangible book value. In addition, the company sold certain on-balance sheet investments allocated as economic hedges of the mortgage servicing rights ("MSRs") during the quarter. The unrealized loss on these securities was already deducted from tangible book value on June 30 through other comprehensive loss included in the equity section of the balance sheet. Thus, the realized loss on those securities did not impact tangible book value. (Details related to amounts excluded from tangible book value are provided in the attached Reconciliation of Non-GAAP Financial Measures.)

The company's after-tax loss increased by $42.0 million on a quarter-over-quarter basis. Key trends worth noting include the following. All comparisons are on a sequential quarter basis unless noted otherwise.

- Decreased Earning Assets. The bank's average earning assets were down $348 million to $4.0 billion. The primary drivers of the decrease were the sale of $336 million of investment securities and $27.4 million of home equity loans during the quarter.

- Lower Net Interest Margin. The banking segment's net interest margin fell by 0.14% to 1.46% due to continuation of the flat yield curve, lower average asset balances and higher deposit costs.

- Flat Mortgage Production and Sales. Mortgage production in all channels remained soft due to lower origination volumes across the industry. Production totaled $2.4 billion, a decrease of $143 million or 5.5%. Sales were down as a result. Sales across all channels totaled $2.4 billion, a decrease of $66.8 million or 2.7%.

- Lower Mortgage Repurchase Expense. Although mortgage repurchase demands improved from last quarter, they remained at an elevated level. As a result, provision expense totaled $12.2 million this quarter, a decrease of $8.1 million from last quarter.

The board of directors determined earlier this year that the company needed to make significant changes to its operating plan to return to profitability and protect capital. As part of that effort, the board of directors voluntarily entered into a supervisory agreement with the bank's regulators at the Office of Thrift Supervision ("OTS") after the close of the third quarter. Under the agreement, the board will work with management to develop and execute a written, multi-year plan based upon the change in strategy. The board and management are in the process of finalizing this plan, which centers largely on the tactical initiatives management already has underway to refocus the business on its banking and conforming mortgage competencies. Additional details on this agreement can be found later in this release under the heading "Regulatory Matters."

Unusual Charges

Current quarter results include the following unusual charges.

- Mortgage Servicing Rights Sale. As reported earlier, the company sold most of its MSRs associated with conventional, agency-eligible loans in two, separate transactions during the quarter that resulted in an after-tax loss of $19.3 million. The company also elected to liquidate $336 million of investment securities that it held as an economic on-balance sheet hedge resulting in an after-tax loss of $8.7 million on the sale of those securities. The charges related to these transactions equated to an after-tax loss of $28.1 million or $.61 per share.

- Impairment of Goodwill. Management expensed goodwill on two of the company's business units during the quarter. The company recorded $19.5 million, or $.42 per share, in after-tax goodwill impairment associated with its non-conforming mortgage business. It also recorded after-tax impairment of $2.4 million, or $.05 per share, on a portion of the goodwill related to its ATM and merchant processing business.

Management Commentary

"This quarter's results reflect a company in transition," said Steven F. Herbert, chief executive officer. "It was very noisy with a number of unusual charges related to the steps we are taking to narrow our lines of business and refocus on our core banking and conforming mortgage operations. Our immediate focus is on stabilizing the company's operating profile, preserving capital and returning to profitability as quickly as possible. With that in mind, we moved quickly to execute on needed changes.

"During the quarter, we completed the sale of the majority of our MSR portfolio. Earlier this week, we announced transactions that are facilitating the exit of our non-conforming mortgage and RV, boat and aircraft financing operations. We have also made the decision to move forward with several other initiatives that are essential to our action plan. They include: implementing a plan to shut down FTI and the QuickPost service; completing a sale of our NetInsurance operation; consolidating our indirect, conforming mortgage loan operations into a central location; and downsizing our management team to reflect the more streamlined organization we are becoming.

"We currently estimate that these actions will be completed before year-end, and that one-time fourth quarter charges for all of them will total about $14 million to $15 million after tax. While we had hoped for more favorable outcomes, our plan fully contemplated the potential for the types of one-time, adverse impacts to tangible book value that we have seen.

"We are also considering options for our auto lending and ATM and merchant processing businesses. We estimate that a worst-case, one-time charge related to the options we are considering for the auto business would be about $1 million after tax. Given that most of the value of the ATM business is reflected as intangibles, tangible book value would be positively impacted if we were to move forward with any of the options being considered.

"So all-in it was a challenging quarter," Herbert concluded. "But it's exciting to be on the path forward again. I believe we have been able to implement our plan quickly and successfully. We remain on track to complete most of the changes before year end. Effectively all of it should be done by the end of the first quarter. And while we may not see the full benefits of our plan for a couple more quarters, I expect to see a significant improving trend in our operating profile going forward."

Retail Banking Segment Performance

Table 1 below details results in the company's Retail Banking segment. The segment reported a pre-tax loss of $1.7 million, compared to income of $788,000 from last quarter. Excluding QuickPost expenses, the decline is a result of the return to more normal provision expense levels from last quarter, as well as continued pressure on net interest income due to the flat yield curve and a smaller average asset base. This quarter we recorded a $2.4 million provision for credit losses compared to $972,000 in the previous quarter. The previous quarter's lower provision expense level was a result of a $1.9 million reduction in provision expense related to the sale of home equity loans held by the bank.

QuickPost expenses leveled off during the quarter at $3.3 million. While the company believes QuickPost is a useful service, NetBank can't afford losses at the current level. Management has decided to shut down this product as part of its effort to return to profitability. Excluding QuickPost, the segment's overall expense ratio remained relatively flat at 164 bps.

Table 1

|  | RETAIL BANKING | | |
|  | ($ in 000s, Unaudited) | | |
|  | 2006 | 2006 | |
|  | 3rd Quarter | 2nd Quarter | Change |
|  | ---------- | ---------- | --------- |
| Net interest income | $ 16,878 | $ 18,306 | $ (1,428) |

```
Provision for credit losses        2,410        972      1,438
                                 ----------  ----------  ---------

  Net interest income
    after provision             14,468      17,334     (2,866)
(Loss) gain on sales of loans      (33)        308       (341)
Fees, charges and other income   3,477       3,650       (173)
                                 ----------  ----------  ---------
  Total retail banking revenues  17,912      21,292     (3,380)
  Total retail banking expenses  16,334      17,310       (976)
                                 ----------  ----------  ---------

Pre-tax retail banking
  operations                      1,578       3,982     (2,404)
Net QuickPost, PowerPost &
  NetServ Results                (3,301)     (3,194)      (107)
                                 ----------  ----------  ---------
Pre-tax net (loss) income    $   (1,723)  $    788   $ (2,511)
                                 ==========  ==========  =========
Average earning assets       $3,975,800   $4,324,185 $(348,385)
Operations to average earning
 assets excluding QuickPost
Net interest income
  after provision                 1.46%       1.60%     (0.14)%
Gain on sale, fees, charges
  and other income                0.35%       0.37%     (0.02)%
                                 ----------  ----------  ---------
Total retail banking revenues     1.81%       1.97%     (0.16)%
Total retail banking expenses     1.64%       1.60%      0.04%
                                 ----------  ----------  ---------

  Pre-tax retail banking
    operations                    0.17%       0.37%     (0.20)%
                                 ==========  ==========  =========
```

Additional performance drivers behind Retail Banking segment performance include the following. All comparisons are on a sequential quarter basis unless noted otherwise.

- The company's business finance operation remains a consistently profitable contributor. Pre-tax earnings for the quarter were flat at $3.2 million. Its production was off by $19.3 million or 33% to $39.2 million as competition from other lenders increased.

- Our auto lending business recorded pre-tax earnings of $410,000, a 79% increase over the previous quarter due to prudent expense management.


Financial Intermediary Segment Performance

Table 2 below details results in the company's Financial Intermediary segment. The segment reported a pre-tax loss of $39.5 million this quarter compared with a loss of $22.9 million last quarter. The challenging mortgage market continues to weigh on the segment's performance, as did some of the unusual charges outlined earlier in this release.

As discussed above, management chose to expense goodwill on the company's non-conforming mortgage business. We had been exploring our options with respect to exiting the business and concluded that the existing level of goodwill no longer accurately reflected the value of the operation's brand and other market intangibles. Subsequently, the company decided to shut down its non-conforming mortgage operation during the fourth quarter.

We saw a decrease in the demand for mortgage repurchases from last quarter, but they remained at an elevated level during the current quarter. Management continues to believe the issue is both market-driven and systemic, and is focused on taking the necessary steps to address it. We have been evaluating ways to improve internal processes and are currently in the process of centralizing our indirect, conforming mortgage operating centers. The company's regional operating centers in Jacksonville, Portland and St. Louis are being consolidated into the Columbia, S.C. facility. Management believes that by centralizing our operations, we can improve communication and better ensure improved loan quality.

```
Table 2
                     FINANCIAL INTERMEDIARY
                     ($ in 000s, Unaudited)
                         2006         2006
                       3rd Quarter  2nd Quarter    Change
                       ----------   ----------   ---------
Net interest income    $   3,948    $   4,781   $    (833)
Gain on sales of loans     4,396       10,586     (6,190)
Loss on sale of MSRs         (96)        (152)        56
Other income                 272          895       (623)
Net Beacon credit services
  results                   (103)      (6,332)     6,229
Net MG Reinsurance results   898          597        301
                       ----------   ----------   ---------
  Total revenues           9,315       10,375     (1,060)
Salary and employee benefits 14,061    18,022     (3,961)
Occupancy and depreciation
  expense                  6,464        6,108        356
Other expenses             8,824        9,145       (321)
Goodwill impairment       19,505          --      19,505
                       ----------   ----------   ---------
  Total expenses          48,854       33,275     15,579
                       ----------   ----------   ---------
  Pre-tax loss         $ (39,539)   $ (22,900)  $ (16,639)
                       ==========   ==========  =========
Production            $2,439,654   $2,582,727  $(143,073)
Sales (includes
 intercompany sales)  $2,427,891   $2,494,743  $ (66,852)
Total revenues to sales     0.38%       0.42%     (0.04)%
Total expenses to production 2.00%      1.29%      0.71%
                       ----------   ----------   ---------
  Pre-tax margin          (1.62%)     (0.87%)    (0.75%)
                       ==========   ==========  =========
```

Additional performance drivers behind Financial Intermediary segment performance include the following. All comparisons are on a sequential quarter basis unless noted otherwise.

- Conforming production totaled $2.0 billion, a decrease of $76.9 million or 3.7% due to seasonal factors. Conforming sales remained flat at $2.0 billion. The channel's revenue margin fell to 43 bps, a decline of 50 bps, as a result of decreased gain on sale margins.

- Non-conforming production fell by 13.8% to $413 million as management continued to narrow the focus of the operation and reduced capacity accordingly. Non-conforming sales fell in turn to $435 million, a decrease of 19.1%.

Transaction Processing Segment Performance

Table 3 below details results in the company's Transaction Processing segment. The segment recorded a pre-tax loss of $2.4 million, compared to income of $631,000 the previous quarter. The loss is a result of a $2.4 million after-tax impairment to a portion of goodwill that management elected to take during the quarter. As the number of ATMs in our network, along with our total number of merchant processing contracts, has decreased, management felt the existing level of goodwill no longer accurately reflected the value of the operation's brand and other market intangibles.

```
Table 3
                        TRANSACTION PROCESSING
                        ($ in 000s, Unaudited)
                          2006          2006
                        3rd Quarter   2nd Quarter   Change
                        -----------   -----------   -------
Total revenue           $    5,517    $    5,173    $   344
Total expenses               7,894         4,542      3,352
                        -----------   -----------   -------
  Pre-tax (loss) income $   (2,377)   $      631    $(3,008)
                        ===========   ===========   =======
```

Additional performance drivers behind Transaction Processing segment performance include the following. All comparisons are on a sequential quarter basis unless noted otherwise.

- The number of ATMs in our network dropped by 3.7% to 8,427 machines. The ATMs that dropped from the network were inactive locations. The total number of ATM transactions processed during the quarter rose again, this time by 2.5% to 7.8 million.

- The total number of merchant processing terminals in deployment declined by 10.3% to 1,956. The decline represents inactive terminals that we no longer report in our POS portfolio.


Servicing Asset Segment Performance

Table 4 below details results in the company's Servicing Asset segment. The segment reported a pre-tax loss of $51.3 million compared with a pre-tax loss of $16.7 million last quarter. The loss was primarily centered in the company's sale of the majority of its mortgage servicing rights as reported earlier in this release. As a result of the sale, the company eliminated significant earnings volatility going forward, and will no longer have the same exposure to impairment and hedge-related losses.

```
Table 4
                          SERVICING ASSET
                        ($ in 000s, Unaudited)
                          2006          2006
                        3rd Quarter   2nd Quarter   Change
                        -----------   -----------   --------
Net interest income     $     395     $     887     $   (492)
Servicing fees              7,095         9,700       (2,605)
Loss on sale of MSRs      (29,702)          --       (29,702)
Other income                  102            35            67
                        ---------     ---------     --------
  Total revenue           (22,110)       10,622      (32,732)
Amortization of MSRs        6,981         9,890       (2,909)
Subservicing fees paid      2,345         2,409          (64)
Other expenses                543           716         (173)
                        ---------     ---------     --------
  Total expenses            9,869        13,015       (3,146)
                        ---------     ---------     --------
  Pre-tax servicing margin (31,979)      (2,393)     (29,586)
                        ---------     ---------     --------
(Loss) on hedges           (4,357)       (4,764)         407
Impairment                 (1,474)       (9,517)       8,043
Loss on sale of securities (13,461)         --       (13,461)
                        ---------     ---------     --------
Net hedge results         (19,292)      (14,281)      (5,011)
                        ---------     ---------     --------
Pre-tax loss            $(51,271)     $(16,674)     $(34,597)
                        ========      ========      ========
```

Additional performance drivers behind Servicing Asset segment performance include the following. All comparisons are on a sequential quarter basis unless noted otherwise.

- The average unpaid balance of the MSRs in our portfolio declined by 20.3% to $10.2 billion as a result of the MSR sale. Since the sale closed on the final day of the quarter, the full effect won't be seen until the fourth quarter.


Regulatory Matters

The board determined earlier in the year that the company needed to alter its business strategy given the losses it was sustaining and directed management to outline the steps necessary to return to profitability and preserve capital. The board ultimately approved these steps once presented and appointed a new CEO to see the initiatives through. The company's new chairman along with the new CEO outlined the initiatives to the OTS in detail upon their appointment in early October. The OTS responded favorably to this effort, and, as part of that discussion, indicated that it would require a more formal framework to further document the company's objectives during this transitional period.

The company's board of directors subsequently entered into a supervisory agreement to proactively address the bank's recent financial performance and the impact that losses have had on the bank's capital position over the past several quarters. The agreement sets forth specific strategies and actions the board will take to improve the bank's performance and to ensure proper practices in critical areas of operation and compliance. The board believes execution of such an agreement is prudent at this stage in the company's development as a sign of its commitment to effective oversight.

Under the agreement, the board has charged management with preparing and executing a written, multi-year business plan designed to 1) remedy the bank's underperforming lines of business: 2) to increase the percentage of core deposits versus brokered funds; and 3) to reduce the level of loan repurchases in the company's indirect mortgage operations. The initiatives management already has underway to exit all businesses that are not essential to the company's banking and conforming mortgage operations form the backbone of the plan. Management is also focused on lowering operational costs and reducing overhead so it can improve the competitiveness of the bank's deposit rates in the marketplace and resume meaningful deposit growth. The company has already begun to orchestrate changes in executive management and is in the process of making additional staffing adjustments to streamline operations and cut costs.

The board will monitor and report to the OTS on the bank's adherence to the business plan. The board also agreed to seek prior approval and to modify the bank's business plan before engaging in any new activity or operation not contemplated in the approved version of the plan.

The agreement went into effect on November 6 and will remain in force until the board and the OTS are satisfied with the bank's progress in resolving the underlying performance issues.

Fourth Quarter Earnings Outlook

The fourth quarter will be another transitional quarter as we make the remaining necessary changes. The current analyst estimates for the company's fourth quarter results range from a loss of $.07 per share to a loss of $.28 per share. Given our current outlook, we are presently biased toward the lower end of the range. There are some risks to the downside, but we fully expect to see marked improvement over third quarter results. We will provide meaningful guidance as we move the through the quarter.

Supplemental Financial Data

The company posts additional financial information directly to its Web site. We publish a report that breaks out quarterly results by line of business within each segment. The data is presented in a five-quarter format where current quarter results are shown alongside results from the most recent four quarters. This report is designed to give interested parties a more granular look at the company's results and to make it easier for them to monitor performance trends.

You can access this material at www.netbankinc.com. Go to the "Investor Relations" area and click on the "Financial Data" link. Within this same area, we post a monthly report that shows key operating statistics for the company's major lines of business. Management also uses this report to update the company's quarterly earnings guidance as needed. The company publishes this report around the 20th of each month and files it simultaneously with the Securities Exchange Commission under Form 8-K.

Conference Call Information

Management has scheduled a conference call to discuss today's reported results with investors, financial analysts and other interested parties. The call will be held today at 10 a.m. EST. Interested parties may dial in or listen via an audiocast on the company's Web site.


Call Title: NetBank, Inc. Earnings Announcement
Call Leader: Steven F. Herbert
Pass Code: NetBank
Domestic: 888-889-1959
International: +1-773-756-0814
One-Week Replay: 800-294-7483 or +1-203-369-3234

About NetBank, Inc.

NetBank, Inc. (Nasdaq:NTBK) is a financial holding company that operates a family of businesses focused primarily on consumer and small business banking as well as conforming mortgage lending. The company's businesses have a shared value proposition of providing consumers in select markets a superior combination of price, service and experience through skilled associates and advanced technology systems. Retail brands include NetBank and Market Street Mortgage. For more information, please visit www.netbankinc.com.

Non-GAAP Financial Measures

This press release contains non-GAAP financial measures within the meaning of Regulation G promulgated by the SEC, including tangible book value and tangible book value per share for the third quarter of 2006. Tangible book value is defined as total shareholders' equity reduced by recorded goodwill and other intangible assets. Tangible book value per share is defined tangible book value divided by total common shares outstanding. These non-GAAP financial measures exclude from total shareholders' equity our recorded goodwill and other intangible assets. Management believes that these non-GAAP financial measures, when considered together with the GAAP financial measures, provide information may be helpful for those investors who seek to evaluate our total stockholders' equity without giving effect to goodwill and other intangible assets. Management also believes that these non-GAAP financial measures enhance the ability of investors to analyze the company's business trends and to better understand the company's financial condition. In addition, the company may utilize non-GAAP financial measures as a guide in its forecasting, budgeting, and long-term planning process and to measure operating performance for some management compensation purposes. Any analysis of non-GAAP financial measures should be used only in conjunction with amounts presented in accordance with GAAP, including total shareholders' equity and goodwill and other intangible assets.

Forward-Looking Statements

Statements in this press release that are not historical facts are forward-looking statements that reflect management's current expectations, assumptions, and estimates of future performance and economic conditions. Such statements are made in reliance upon the safe harbor provisions of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934.

Forward-looking statements in this press release include but are not limited to: 1) Projected fourth quarter restructuring actions being completed by the end of the year; 2) The one-time charges related to projected fourth quarter restructuring actions totaling $14 million to $15 million: 3) Worst-case, one-time charges related to possible options being considered for the company's auto business being about $1 million after tax: 4) Tangible book value being positively impacted by any options being considered for company's ATM business: 5) Completion of the company's restructuring plan by the end of the first quarter 2007: 6) The prospect of a significant improvement trend in the company's operating profile going forward: 7) Management's belief that consolidating our indirect, conforming mortgage operations will lead to improved communication and further ensure loan quality.

These forward-looking statements are subject to a number of risks and uncertainties that may cause actual results and future trends to differ materially from those expressed in or implied by such forward-looking statements. The company's consolidated results of operations and such forward-looking statements could be affected by many factors, including but not limited to: 1) the evolving nature of the market for internet banking and financial services generally: 2) the public's perception of the internet as a secure, reliable channel for transactions: 3) the success of new products and lines of business considered critical to the company's long-term strategy, such as small business banking and transaction processing services: 4) potential difficulties in integrating the company's operations across its multiple lines of business: 5) the cyclical nature of the mortgage banking industry generally: 6) a possible decline in asset quality: 7) changes in general economic or operating conditions that could adversely affect mortgage loan production and sales, mortgage servicing rights, loan delinquency rates and/or loan defaults: 8) the possible adverse effects of unexpected changes in the interest rate environment: 9) adverse legal rulings, particularly in the company's litigation over leases originated by Commercial Money Center, Inc.: and 10) increased competition and regulatory changes.

Further information relating to these and other factors that may impact the company's results of operations and such forward-looking statements are disclosed in the company's filings with the SEC, including under the caption "Item 1A. Risks Factors" in its Annual Report on Form 10-K for the year ended December 31, 2005 and Quarterly Reports on Form 10-Q for the quarters ended June 30, 2006 and September 30, 2006. Except as required by the securities laws, the company disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

```
        Reconciliation of Non-GAAP Financial Measures
                  ($ in 000s, Unaudited)
                         September 30,      June 30,
                            2006             2006
                         ---------        ---------
Shareholders' equity      $290,598         $346,799
Goodwill and intangibles    53,849           77,778
                         ---------        ---------
Tangible equity           $236,749         $269,021
Outstanding shares          46,397           46,360
                         ---------        ---------
Tangible book value       $   5.10         $   5.80
                         =========        =========
                        NetBank, Inc.
            Consolidated Statements of Operations
            For the nine months ended September 30,
        (Unaudited and in 000's except per share data)
                            2006
        -----------------------------------------------
                                               Other/
```

| | Retail banking | Financial intermediary | Transaction processing | Servicing Asset | Corporate overhead |
|---|---|---|---|---|---|
| **Interest income:** | | | | | |
| Loans and leases | $90,106 | $73,840 | $ 27 | $ -- | $ 470 |
| Investment securities | 22,623 | 5 | -- | -- | -- |
| Short-term investments | 680 | 529 | -- | -- | -- |
| Inter-segment | 69,850 | 182 | -- | 8,312 | (78,344) |
| Total interest income | 183,259 | 74,556 | 27 | 8,312 | (77,874) |
| **Interest expense:** | | | | | |
| Deposits | 69,567 | -- | -- | -- | -- |
| Other borrowed funds | 41,055 | 2,797 | -- | 155 | 1,978 |
| Inter-segment | 16,487 | 55,483 | 284 | 6,549 | (78,803) |
| Total interest expense | 127,109 | 58,280 | 284 | 6,704 | (76,825) |
| Net interest income | 56,150 | 16,276 | (257) | 1,608 | (1,049) |
| Provision for credit losses | 6,381 | 102 | -- | -- | -- |
| Net interest income after provision for credit losses | 49,769 | 16,174 | (257) | 1,608 | (1,049) |
| **Non-interest income:** | | | | | |
| Mortgage servicing fees | 10 | 2,125 | 3,965 | 27,396 | -- |
| Amortization of MSRs | -- | (94) | -- | (27,418) | -- |
| (Impairment) recovery of MSRs | -- | -- | -- | (7,380) | -- |
| Losses on derivatives | -- | -- | -- | (15,819) | -- |
| (Loss) gain on sales of investment securities | -- | -- | -- | (13,461) | -- |
| Service charges and fees | 8,890 | -- | 6,430 | -- | -- |
| Gain on sales of loans | 276 | 40,966 | -- | -- | (409) |
| Loss on sales of MSRs | -- | (394) | -- | (29,702) | -- |
| Other income | 3,307 | 1,686 | 1,455 | 165 | (652) |
| Intersegment servicing/ processing fees | -- | -- | 9,343 | -- | (9,343) |
| Total non-interest income | 12,483 | 44,289 | 21,193 | (66,219) | (10,404) |
| **Non-interest expense:** | | | | | |
| Salaries and benefits | 14,985 | 52,742 | 7,370 | -- | 21,363 |
| Customer service | 8,169 | 8 | 256 | -- | 113 |
| Marketing costs | 4,281 | 4,641 | 232 | -- | 381 |
| Data processing | 8,233 | 2,030 | 1,607 | -- | 2,083 |
| Depreciation and amortization | 5,212 | 7,319 | 2,865 | -- | 2,182 |
| Office expenses | 6,671 | 4,813 | 1,381 | -- | (642) |
| Occupancy | 3,213 | 11,802 | 749 | -- | 5,048 |
| Travel and entertainment | 603 | 2,134 | 283 | -- | 657 |
| Professional fees | 1,888 | 3,211 | 1,124 | -- | 3,547 |
| Prepaid lost interest from curtailments | -- | 18 | -- | 1,836 | -- |
| Impairment of goodwill | -- | 25,863 | 3,682 | -- | -- |
| Other | 7,897 | 10,584 | 1,635 | 46 | (9,697) |
| Inter-segment servicing/ processing fees | 350 | 1,736 | -- | 7,257 | (9,343) |
| Total non-interest expense | 61,502 | 126,901 | 21,184 | 9,139 | 15,692 |
| Loss before income taxes | $ 750 | $ (66,438) | $ (248) | $ (73,750) | $(27,145) |

|                                         | 2006 | 2005 |
|-----------------------------------------|------------:|------------:|
|                                         | Consolidated | Consolidated |
|                                         | NetBank, Inc. | NetBank, Inc. |
| **Interest income:**                    |            |            |
| Loans and leases                        | $ 164,443  | $ 159,051  |
| Investment securities                   | 22,628     | 26,169     |
| Short-term investments                  | 1,209      | 1,557      |
| Inter-segment                           | --         | --         |
| **Total interest income**               | 188,280    | 186,777    |
| **Interest expense:**                   |            |            |
| Deposits                                | 69,567     | 48,992     |
| Other borrowed funds                    | 45,985     | 45,836     |
| Inter-segment                           | --         | --         |
| **Total interest expense**              | 115,552    | 94,828     |
| **Net interest income**                 | 72,728     | 91,949     |
| Provision for credit losses             | 6,483      | 7,389      |
| **Net interest income after provision for credit losses** | 66,245 | 84,560 |
| **Non-interest income:**                |            |            |
| Mortgage servicing fees                 | 33,496     | 38,746     |
| Amortization of MSRs                    | (27,512)   | (34,873)   |
| (Impairment) recovery of MSRs           | (7,380)    | 3,224      |
| Losses on derivatives                   | (15,819)   | (149)      |
| (Loss) gain on sales of investment securities | (13,461) | 4,182 |
| Service charges and fees                | 15,320     | 15,139     |
| Gain on sales of loans                  | 40,833     | 83,270     |
| Loss on sales of MSRs                   | (30,096)   | (448)      |
| Other income                            | 5,961      | 7,759      |
| Intersegment servicing/processing fees  | --         | --         |
| **Total non-interest income**           | 1,342      | 116,850    |
| **Non-interest expense:**               |            |            |
| Salaries and benefits                   | 96,460     | 92,649     |
| Customer service                        | 8,546      | 10,116     |
| Marketing costs                         | 9,535      | 9,697      |
| Data processing                         | 13,953     | 13,105     |
| Depreciation and amortization           | 17,578     | 17,693     |
| Office expenses                         | 12,223     | 9,422      |
| Occupancy                               | 20,812     | 18,411     |
| Travel and entertainment                | 3,677      | 4,223      |
| Professional fees                       | 9,770      | 13,276     |
| Prepaid lost interest from curtailments | 1,854      | 3,345      |
| Impairment of goodwill                  | 29,545     | --         |
| Other                                   | 10,465     | 10,756     |
| Inter-segment servicing/processing fees | --         | --         |
| **Total non-interest expense**          | 234,418    | 202,693    |
| **Loss before income taxes**            | (166,831)  | (1,283)    |
| Income tax benefit                      | 51,163     | 208        |
| **Net loss**                            | $(115,668) | $ (1,075)  |
| **Net loss per common and potential common shares outstanding:** |  |  |
| Basic                                   | $ (2.50)   | $ (0.02)   |
| Diluted                                 | $ (2.50)   | $ (0.02)   |
| **Weighted average common and potential common shares outstanding:** |  |  |
| Basic                                   | 46,316     | 46,201     |
| Diluted                                 | 46,316     | 46,201     |

NetBank, Inc.
Consolidated Statements of Operations
For the three months ended September 30,
(Unaudited and in 000's except per share data)
2006

|                          | Retail banking | Financial intermediary | Transaction processing | Servicing Asset | Other/ Corporate overhead |
|--------------------------|---------------:|-----------------------:|-----------------------:|----------------:|--------------------------:|
| **Interest income:**     |                |                        |                        |                 |                           |
| Loans and leases         | $28,384        | $23,556                | $ 13                   | $ --            | $ 217                     |
| Investment securities    | 6,119          | 2                      | --                     | --              | --                        |
| Short-term investments   | 173            | 187                    | --                     | --              | --                        |
| Inter-segment            | 23,584         | 71                     | --                     | 2,875           | (26,530)                  |
| **Total interest income**| 58,260         | 23,816                 | 13                     | 2,875           | (26,313)                  |
| **Interest expense:**    |                |                        |                        |                 |                           |
| Deposits                 | 24,554         | --                     | --                     | --              | --                        |
| Other borrowed funds     | 11,030         | 1,235                  | --                     | 61              | 698                       |
| Inter-segment            | 5,801          | 18,318                 | 94                     | 2,419           | (26,632)                  |
| **Total interest expense**| 41,385        | 19,553                 | 94                     | 2,480           | (25,934)                  |

```
------------------------------------------------------------
Net interest
  income        16,875    4,263       (81)      395     (379)
Provision for
  credit losses  2,410      (3)        --        --       --
------------------------------------------------------------
Net interest
  income after
  provision for
  credit losses 14,465    4,266       (81)      395     (379)
Non-interest
  income:
Mortgage
  servicing fees     4      587     1,296     7,095       --
Amortization
  of MSRs          --       (80)       --    (6,981)      --
(Impairment)
  recovery of
  MSRs             --        --        --    (1,474)      --
(Loss) gain on
  derivatives      --        --        --    (4,357)      --
Loss on sales
  of investment
  securities       --        --        --   (13,461)      --
Service charges
  and fees      3,256         1     2,267        --       --
(Loss) gain on
  sales of loans  (32)    5,276        --        --      (54)
Loss on sales
  of MSRs          --       (95)       --   (29,702)      --
Other income    1,168       526       403       102     (342)
Intersegment
  servicing/
  processing
  fees             --        --     2,867        --   (2,867)
------------------------------------------------------------
  Total non-
   interest
   income       4,396     6,215     6,833   (48,778)  (3,263)
Non-interest
  expense:
Salaries and
  benefits      4,839    14,827     2,190        --    5,922
Customer
  service       2,517         8       111        --       38
Marketing
  costs         1,206     1,076        85        --       84
Data processing 2,976       606       488        --      646
Depreciation
  and
  amortization  1,725     2,426       961        --      784
Office
  expenses      2,913     1,378       422        --     (193)
Occupancy         989     4,154       218        --    1,659
Travel and
  entertainment   155       579        65        --      199
Professional
  fees            550       965       312        --    1,194
Prepaid lost
  interest from
  curtailments     --         8        --       529
Impairment of
  goodwill         --    19,505     3,682        --       --
Other           2,603     4,077       595        14   (3,943)
Inter-segment
  servicing/
  processing
  fees            111       411        --     2,345   (2,867)
------------------------------------------------------------
  Total non-
   interest
   expense     20,584    50,020     9,129     2,888    3,523
------------------------------------------------------------
Loss before
 income taxes $(1,723) $(39,539)  $ (2,377) $(51,271) $(7,165)
============================================================
```

|                                          | 2006 | 2005 |
|------------------------------------------|------|------|
|                                          | Consolidated NetBank, Inc. | Consolidated NetBank, Inc. |
| Interest income:                         |      |      |
| Loans and leases                         | $ 52,170 | $58,092 |
| Investment securities                    | 6,121 | 8,502 |
| Short-term investments                   | 360 | 662 |
| Inter-segment                            | -- | -- |
| Total interest income                    | 58,651 | 67,256 |
| Interest expense:                        |      |      |
| Deposits                                 | 24,554 | 20,178 |
| Other borrowed funds                     | 13,024 | 16,848 |
| Inter-segment                            | -- | -- |
| Total interest expense                   | 37,578 | 37,026 |
| Net interest income                      | 21,073 | 30,230 |
| Provision for credit losses              | 2,407 | 2,708 |
| Net interest income after provision for credit losses | 18,666 | 27,522 |

Non-interest income:

| | | |
|---|--:|--:|
| Mortgage servicing fees | 8,982 | 13,292 |
| Amortization of MSRs | (7,061) | (12,729) |
| (Impairment) recovery of MSRs | (1,474) | 4,244 |
| (Loss) gain on derivatives | (4,357) | 795 |
| Loss on sales of investment securities | (13,461) | -- |
| Service charges and fees | 5,524 | 5,296 |
| (Loss) gain on sales of loans | 5,190 | 28,308 |
| Loss on sales of MSRs | (29,797) | (238) |
| Other income | 1,857 | 2,180 |
| Intersegment servicing/processing fees | -- | -- |
| | -------- | -------- |
| Total non-interest income | (34,597) | 41,148 |

Non-interest expense:

| | | |
|---|--:|--:|
| Salaries and benefits | 27,778 | 30,832 |
| Customer service | 2,674 | 3,596 |
| Marketing costs | 2,451 | 4,476 |
| Data processing | 4,716 | 4,318 |
| Depreciation and amortization | 5,896 | 6,080 |
| Office expenses | 4,520 | 3,600 |
| Occupancy | 7,020 | 6,558 |
| Travel and entertainment | 998 | 1,583 |
| Professional fees | 3,021 | 4,471 |
| Prepaid lost interest from curtailments | 537 | 1,262 |
| Impairment of goodwill | 23,187 | -- |
| Other | 3,346 | 3,924 |
| Inter-segment servicing/processing fees | -- | -- |
| | -------- | -------- |
| Total non-interest expense | 86,144 | 70,700 |
| | -------- | -------- |
| Loss before income taxes | (102,075) | (2,030) |
| Income tax benefit | 28,794 | 659 |
| | -------- | -------- |
| Net loss | $(73,281) | $(1,371) |
| | ======== | ======== |

Net loss per common and potential common shares outstanding:

| | | |
|---|--:|--:|
| Basic | $(1.58) | $(0.03) |
| Diluted | $(1.58) | $(0.03) |

Weighted average common and potential common shares outstanding:

| | | |
|---|--:|--:|
| Basic | 46,362 | 46,119 |
| Diluted | 46,362 | 46,119 |

NetBank, Inc.
Condensed Consolidated Balance Sheet
(Unaudited and in 000's)

| | September 30, 2006 | June 30, 2006 | September 30, 2005 |
|---|--:|--:|--:|
| **Assets** | | | |
| Cash and cash equivalents: | | | |
| Cash and due from banks | $ 347,980 | $ 72,807 | $189,930 |
| Cash equivalents and fed funds | 21,995 | 22,948 | 112,390 |
| | -------- | -------- | -------- |
| Total cash, cash equivalents and fed funds | 369,975 | 95,755 | 302,320 |
| Investment securities available for sale-at fair value | 252,546 | 574,590 | 681,420 |
| Stock of Federal Home Loan Bank of Atlanta-at cost | 36,507 | 46,002 | 69,952 |
| Loans held for sale | 946,475 | 972,004 | 1,459,717 |
| Loan and lease receivables-net of allowance for losses | 1,910,770 | 2,011,325 | 2,145,023 |
| Mortgage servicing rights - net | 39,076 | 203,406 | 193,798 |
| Accrued interest receivable | 16,555 | 16,416 | 16,113 |
| Furniture, equipment and capitalized software - net | 48,261 | 51,644 | 49,004 |
| Goodwill and other intangibles - net | 53,849 | 77,778 | 81,131 |
| Due from servicers and investors | 113,624 | 15,641 | 26,837 |
| Other assets | 61,770 | 77,444 | 89,998 |
| | -------- | -------- | -------- |
| Total assets | $3,849,408 | $4,142,005 | $5,115,313 |
| | ======== | ======== | ======== |
| **Liabilities** | | | |
| Deposits | $2,728,316 | $2,721,937 | $3,007,143 |
| Other borrowed funds | 654,033 | 867,619 | 1,444,018 |
| Subordinated debt | 32,477 | 32,477 | 32,477 |
| Accrued interest payable | 24,049 | 21,223 | 16,684 |
| Loans in process | 31,843 | 41,153 | 59,122 |
| Representations and warranties | 21,550 | 21,688 | 21,275 |
| Accounts payable and accrued liabilities | 65,633 | 88,471 | 132,250 |
| | -------- | -------- | -------- |
| Total liabilities | 3,557,901 | 3,794,568 | 4,712,969 |
| | -------- | -------- | -------- |
| Minority interests in affiliates | 909 | 638 | 561 |
| Shareholders' equity | | | |
| Preferred stock, no par | -- | -- | -- |
| Common stock, $.01 par | 528 | 528 | 528 |
| Additional paid-in capital | 434,303 | 433,809 | 432,202 |
| Retained (deficit) earnings | (78,661) | (5,282) | 39,180 |
| Accumulated other comprehensive loss, net of tax | (3,310) | (19,673) | (6,092) |
| Treasury stock, at cost | (62,262) | (62,583) | (62,628) |
| Unearned compensation | -- | -- | (1,407) |
| | -------- | -------- | -------- |
| Total shareholders' equity | 290,598 | 346,799 | 401,783 |

```
                                   -------------------------------
Total liabilities, minority
interests and shareholders'
equity                             $3,849,408  $4,142,005 $5,115,313
                                   ===============================
```

## NetBank, Inc. Consolidated
### Selected Financial and Operating Data
(Unaudited and in 000's except per share data)

| | Quarter Ended | | |
|---|---|---|---|
| | September 30, | June 30, | September 30, |
| | 2006 | 2006 | 2005 |
| Consolidated: | | | |
| Net loss | $ (73,281) | $ (31,436) | $ (1,371) |
| Total assets | $ 3,849,408 | $ 4,142,005 | $5,115,313 |
| Total equity | $ 290,598 | $ 346,799 | $ 401,783 |
| Shares outstanding | 46,397 | 46,360 | 46,358 |
| Return on average equity | (86.00%) | (34.39%) | (1.35%) |
| Return on average assets | (7.06%) | (2.79%) | (0.11%) |
| Book value per share | $ 6.26 | $ 7.48 | $ 8.67 |
| Tangible book value per share | $ 5.10 | $ 5.80 | $ 6.92 |
| NetBank, FSB: | | | |
| Deposits | $ 2,734,080 | $ 2,726,334 | $3,007,928 |
| Customers | 268,769 | 275,632 | 282,575 |
| Estimated Capital Ratios: | | | |
| Tier 1 core capital ratio | 6.38% | 6.77% | 6.09% |
| Total risk-based capital ratio | 10.13% | 10.79% | 10.21% |
| Asset quality numbers: | | | |
| CMC Lease portfolio | $ 25,505 | $ 25,615 | $ 26,435 |
| Non-performing loan and lease | | | |
| receivables | 7,300 | 6,227 | 6,481 |
| | ----------- | ----------- | ----------- |
| Total non-performing loan and | | | |
| lease receivables | 32,805 | 31,842 | 32,916 |
| Non-performing loans held for | | | |
| sale(a) | 50,418 | 32,896 | 27,432 |
| | ----------- | ----------- | ----------- |
| Total non-performing loans | | | |
| and leases | 83,223 | 64,738 | 60,348 |
| Repossessed assets(b) | 13,357 | 10,528 | 7,963 |
| | ----------- | ----------- | ----------- |
| Total non-performing assets | $ 96,580 | $ 75,266 | $ 68,311 |
| Allowance for credit losses | | | |
| (ALLL) | $ 26,477 | $ 27,371 | $ 26,730 |
| Net charge-offs of loan and | | | |
| lease receivables | $ (3,301) | $ (3,004) | $ (1,770) |
| Asset quality ratios: | | | |
| Total non-performing assets / | | | |
| average assets | 2.33% | 1.67% | 1.35% |
| ALLL / total non-performing | | | |
| loan and lease receivables | 80.71% | 85.96% | 81.21% |
| Net annualized charge-offs / | | | |
| total assets | 0.34% | 0.29% | 0.14% |
| Mortgage Banking: | | | |
| Production Activity: | | | |
| Retail | $ 779,963 | $ 975,201 | $1,089,137 |
| Correspondent | 833,138 | 703,166 | 1,025,626 |
| Wholesale | 392,350 | 401,107 | 692,828 |
| RMS | 21,487 | 24,360 | 74,180 |
| | ----------- | ----------- | ----------- |
| Total Agency-eligible | 2,026,938 | 2,103,834 | 2,881,771 |
| Non-conforming | 412,716 | 478,893 | 883,210 |
| | ----------- | ----------- | ----------- |
| Total | $ 2,439,654 | $ 2,582,727 | $3,764,981 |
| | =========== | =========== | =========== |
| Sales Activity: | | | |
| Third party sales | $ 2,419,711 | $ 2,494,743 | $3,631,112 |
| Intercompany sales | 8,180 | -- | 57,290 |
| | ----------- | ----------- | ----------- |
| Total sales | $ 2,427,891 | $ 2,494,743 | $3,688,402 |
| | =========== | =========== | =========== |
| Pipeline: | | | |
| Locked conforming mortgage | | | |
| loan pipeline | $ 610,853 | $ 962,059 | $ 1,053,315 |
| UPB of loans serviced: | $14,960,710 | $15,465,530 | $18,470,922 |

(a) Held for sale assets are carried at the lower of cost or market
    (LOCOM). LOCOM adjustments, under GAAP, are direct reductions
    of the assets' carrying values and are not considered
    allowances.

(b) Repossessed assets are carried at net realizable value.

This news release was distributed by PrimeZone, www.primezone.com

SOURCE: NetBank

NetBank, Inc.
Jim Gross
803-462-8160
jgross@netbank.com
Matthew Shepherd
404-759-0012
mshepherd@netbank.com

EXHIBIT  G


NASDAQ:NTBK

## NetBank Reaches Agreement With EverBank for Sale of Select Assets and Assumption of Deposit Liabilities

### Transaction is Expected to Close by End of June 2007; NetBank Begins Immediate Shut-Down of Third-Party Mortgage Origination Business

ATLANTA, May 21, 2007 (PrimeNewswire via COMTEX News Network) -- NetBank, Inc. (Nasdaq:NTBK), parent company of NetBank (www.netbank.com), an online financial services provider and national prime mortgage lender, today announced that the bank has executed an asset purchase and liability assumption agreement with EverBank, an FDIC-insured, federal savings bank and subsidiary of EverBank Financial Corp., a privately held financial services holding company headquartered in Jacksonville, Fla., with approximately $4.7 billion in assets. The purchase price represents a discount to the current carrying value of the assets and liabilities being conveyed, and NetBank anticipates recording a loss on sale of between $60 and $70 million at close.

The transaction is expected to close by the end of June 2007, subject to regulatory approval, and relates to the broader initiative the company began earlier in the year to consider strategic alternatives that would allow management to serve the interests of its customers, while protecting the company's equity position from continued erosion. The company has been under extreme financial pressure for more than a year due to a difficult mortgage origination market, a flat yield curve environment and other factors. These pressures have resulted in large operating losses that have significantly reduced the company's capital position and prompted heightened regulatory oversight.

NetBank worked closely with regulators as it evaluated various opportunities. Regulators have been increasingly concerned about the bank's capital and earnings trends and advised management to find an alternative immediately that covered all of the bank's deposit obligations. NetBank and EverBank expect to execute a separate transition service agreement where NetBank will continue to support the deposit relationships after the close until EverBank converts these relationships to its core online banking platform sometime in the third quarter.

The primary assets and liabilities in the transaction include:

```
 * The bank's held for investment loan portfolio;
 * All of the assets and liabilities of NetBank Business Finance, the
   bank's small business equipment leasing and financing operation;
 * The bank's $2.5 billion in core and brokered deposits; and
 * The NetBank brand and related trademarks and service marks.
```

Management Commentary

"In spite of our best efforts to improve the company's operating profile through the restructuring plan we undertook last year, our company has remained very vulnerable and at risk due to the weakened fundamentals of our core businesses," said Steven F. Herbert, chief executive officer, NetBank, Inc. "Our mortgage operations continue to struggle in the face of a highly competitive marketplace, especially the third-party origination channel. Bank earnings have also fallen sharply as we have had to de-leverage the balance sheet in order to maintain risk-based capital ratios within appropriate regulatory guidelines.

"Our effort to manage and address these pressures was further complicated by the delay of the annual audit and greater day-to-day regulatory oversight and involvement.

"The board of directors and executive management team have spent considerable time and effort over the past several months reviewing every opportunity presented to us as well as working to create others," Herbert continued. "In contemplating any action, we had the interests of our shareholders, customers and employees firmly in mind.

"The transaction we are announcing today monetizes a significant portion of the company's assets and will allow the bank to fulfill all of its deposit liabilities. EverBank offers a full line of products with industry leading deposits rates. It is better positioned than almost anyone else in the online banking marketplace to build on the value proposition that our customers came to us for in the first place.

"By transferring the deposit relationships and resolving the chief concern of regulators, we are now positioned to move forward with other restructuring initiatives, such as the shutdown of our third-party mortgage origination business, NetBank Funding Services.

"Our remaining businesses will include our mortgage servicing operation, along with our retail prime mortgage franchise, Market Street Mortgage," Herbert concluded. "We are actively evaluating their long-term strategic alternatives as well as those of the parent company as a whole. We have also retained our CMC claim and the deferred tax asset that we generated in the fourth quarter of 2006. After consummation of the EverBank transaction, we will focus intensely on prosecuting the CMC sureties and pursuing our claim against them, which we now estimate at $150 million."

Additional Details & Conference Call Information

NetBank and its affiliate, MG Reinsurance, a captive mortgage reinsurance operation, are finalizing additional agreements with EverBank. EverBank intends to acquire the bank's held-for-investment portfolio of mortgage servicing rights ("MSRs"). The loans associated with these MSRs currently have an underlying principal balance of $3.2 billion. EverBank also plans to purchase select assets and assume associated liabilities of MG Reinsurance.

NetBank has begun a shut down of its third-party conforming mortgage business, NetBank Funding Services. The process is expected to be complete in approximately 60 days. The unit has stopped taking locks on loans from its correspondent and broker partners but will honor locks in its pipeline through specified dates that the company will communicate today.

NetBank initiated litigation in 2002 over lease receivables originated by Commercial Money Center, Inc. ("CMC"). The CMC lease receivables that NetBank had purchased as an investment carried insurance policies or surety bonds guaranteeing payments in full in the event of a shortfall. NetBank pursued collection under these policies and bonds shortly after it ceased receiving payments on these investments. To date, the sureties -- which include Illinois Union Insurance Company, Royal Indemnity Company and SAFECO Insurance Company of America -- have not honored their obligations.

Management has scheduled an analyst-investor call to discuss the EverBank transaction. The call will be held today at 11 a.m. EDT. Interested parties may dial in or listen via an audiocast on the company's Web site.

```
Call Title:      NetBank Investor Call
Call Leader:     Steven F. Herbert
Pass Code:       NetBank
Domestic:        888-677-1895
International:   +1-210-795-9306
One-Week Replay: 866-511-1889
```

About NetBank, Inc.

NetBank, Inc. (Nasdaq:NTBK) is a financial holding company that operates a family of businesses focused primarily on consumer and small business banking, as well as conforming mortgage lending. The company's businesses have a shared value proposition of providing consumers in select markets an attractive combination of price, service and experience through skilled associates and advanced technology systems. Retail brands include NetBank and Market Street Mortgage. For more information, please visit www.netbankinc.com.

Forward-looking Statements

Statements in this press release that are not historical facts are forward-looking statements that reflect management's current expectations, assumptions, and estimates of future performance and economic conditions. Such statements are made in reliance upon the safe harbor provisions of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Forward-looking statements in this press release include, but are not limited to, the expectation: A) that final regulatory approval will be obtained and the closing of the transaction with EverBank will close by the end of June 2007; B) that we will be able to successfully prosecute our claims against the CMC sureties; and C) that we will complete the shut down of NetBank Funding Services within 60 days. These forward-looking statements are subject to a number of risks and uncertainties that may cause actual results and future trends to differ materially from those expressed in or implied by such forward-looking statements. The Company's consolidated results of operations and such forward- looking statements could be affected by many factors, including but not limited to: 1) the evolving nature of the market for internet banking and financial services generally; 2) the public's perception of the internet as a secure, reliable channel for transactions; 3) the success of new and existing products and lines of business considered critical to the company's long-term strategy; 4) potential difficulties

in integrating the company's operations across its multiple lines of business; 5) the cyclical nature of the mortgage banking industry generally; 6) a possible decline in asset quality; 7) changes in general economic or operating conditions that could adversely affect mortgage loan production and sales, mortgage servicing rights, loan delinquency rates and/or loan defaults; 8) the possible adverse effects of unexpected changes in the interest rate environment; 9) adverse legal rulings, particularly in the company's litigation over leases originated by Commercial Money Center, Inc.; 10) increased competition and regulatory changes; 11) any delay or difficulty in completion of the 2006 audit and the preparation of the first quarter financial statements; and 12) any material adjustments necessary as a result of the 2006 audit. Further information relating to these and other factors that may impact the Company's results of operations and such forward-looking statements are disclosed in the Company's filings with the SEC, including under the caption "Item 1A. Risks Factors" in its Annual Report on Form 10-K for the year ended December 31, 2005 and Quarterly Reports on Form 10-Q for the quarters ended June 30, 2006 and September 30, 2006, as well as Exhibit 99.2 to its Current Report on Form 8-K filed with the SEC on January 3, 2007, and Form 12b-25 filed with the SEC on May 11, 2007. Except as required by the securities laws, the Company disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

NTBK-F

This news release was distributed by PrimeNewswire, [www.primenewswire.com](www.primenewswire.com)

SOURCE: NetBank

```
NetBank, Inc.
        Matthew Shepherd
          678-942-2683
          mshepherd@netbank.com
        Rich Jeffers
          678-942-7596
          rjeffers@netbank.com
```

(C) Copyright 2007 PrimeNewswire, Inc. All rights reserved.

News Provided by COMTEX

EXHIBIT H

5 of 5 DOCUMENTS

Copyright 2007 Associated Press
All Rights Reserved
The Associated Press

**May** 22, 2007 Tuesday 11:15 AM GMT

**SECTION:** BUSINESS NEWS

**LENGTH:** 244 words

**HEADLINE: Friedman,** Billings, Ramsey analyst predicts **NetBank's** assets will soon be worthless

**DATELINE:** NEW YORK

**BODY:**

A **Friedman,** Billings, Ramsey analyst downgraded **NetBank** Inc. on Tuesday, saying the Internet bank will soon be worthless.

At its peak in roughly 10 years trading as a public company, **NetBank's** stock traded higher than $80. On Monday, the Alpharetta, Ga.-based company's shares sank 66.3 percent to 59 cents after the Web bank said it agreed to sell a big piece of its business at a discount.

**Friedman,** Billings, Ramsey analyst Paul J. **Miller** Jr. said the net value of **NetBank's** assets, which the bank currently estimated at $25 million to $45 million, is careening toward zero.

He downgraded **NetBank** to "Underperform" from "Market Perform." He cut his price target to zero, from $2.

Early Monday, **NetBank** said it agreed to sell a $3.2 billion mortgage loan portfolio, its business of lending money to small businesses that need to rent or buy equipment, and $2.5 billion in deposits to EverBank Financial Corp., a privately-owned bank based in Jacksonville, Fla.

**NetBank** will record a $60 million to $70 million accounting charge because it is selling these assets at a discount. The bank is still trying to sell its remaining businesses, which include collecting mortgage payments for other lenders and a prime mortgage business.

Chief Executive Steven F. Herbert said **NetBank** remains "very vulnerable and at risk due to the weakened fundamentals of our core businesses."

Herbert said high costs to raise money and competition for mortgage loans have eaten into bank profits.

**LOAD-DATE:** May 23, 2007

EXHIBIT I

# NETBANK INC

## FORM 8-K
### (Current report filing)

## Filed 8/6/2007 For Period Ending 8/2/2007

| | |
|---|---|
| Address | 1015 WINDWARD RIDGE PARKWAY |
| | ALPHARETTA, Georgia 30005 |
| Telephone | 770-343-6006 |
| CIK | 0001035826 |
| Industry | S&Ls/Savings Banks |
| Sector | Financial |
| Fiscal Year | 12/31 |

Powered By EDGAR Online

http://www.edgar-online.com/
© Copyright 2006. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Onlines Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 OR 15(d) of The Securities Exchange Act of 1934

Date of Report (Date of earliest event reported):  **August 2, 2007**

# NETBANK, INC.
### (Exact name of registrant as specified in its charter)

| Georgia | 0-22361 | 58-2224352 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **1015 Windward Ridge Parkway, Alpharetta, GA** | **30005** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code  **770-343-6006**

**N/A**
(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

*Goodwill*

At June 30, 2007, the carrying value of the goodwill that NetBank, Inc. (the "Company") assigned to its subsidiary, Market Street Mortgage Corporation ("Market Street"), the Company's wholly-owned retail mortgage business, was approximately $24.6 million.  In accordance with generally accepted accounting principles ("GAAP"), the Company evaluates the carrying value of goodwill assigned to its subsidiaries on an annual basis and also on an interim basis if events indicate possible impairment.

As previously reported in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission ("SEC") on June 21, 2007, the Company announced that it was exploring strategic alternatives regarding Market Street.  Based on the information the Company obtained during the course of its consideration of such other opportunities for Market Street, and the likelihood of execution of one or more of such other opportunities, the Company determined that an event indicative of impairment had occurred with respect to Market Street.

As a result, the Company evaluated the carrying value of goodwill of Market Street, and on August 2, 2007, authorized officers of the Company concluded that a material impairment charge with respect to the carrying value of goodwill assigned to Market Street is required under GAAP.  As a result, for the second quarter ending June 30, 2007, the Company expects to record a non-cash impairment charge of approximately $24.6 million (both pre-tax and after tax) for the impairment of goodwill assigned to Market Street.

*Furniture, Equipment, and Capitalized Software Costs*

At June 30, 2007, the net carrying value of certain long-lived assets (primarily consisting of furniture, equipment, and capitalized software costs) owned by NetBank, FSB ("NetBank"), a wholly-owned subsidiary of the Company, and by its third-party conforming mortgage business, NetBank Funding Services ("NFS"), was approximately $25.8 million.

As previously reported in the Company's Current Report on Form 8-K filed with the SEC on May 24, 2007, NetBank entered into an Asset Purchase Agreement with EverBank dated May 18, 2007, providing for the transfer of certain assets (other than the long-lived assets mentioned above) and liabilities of NetBank.  In addition, the Company simultaneously implemented a plan to shut down NFS during the second and third quarters of 2007.

As a result of the Asset Purchase Agreement with EverBank and the planned shut down of NFS, the Company determined that indicators of impairment existed with respect to the long-lived assets owned by NetBank and by NFS.   Based upon the information obtained in connection with this process, on August 2, 2007, authorized officers of the Company concluded that a material impairment charge with respect to the carrying value of these long-lived assets is required under GAAP.  As a result, for the second quarter ending June 30, 2007, the Company expects to record a non-cash impairment charge of approximately $25.0 million (both pre-tax and after tax) for the impairment of long-lived assets owned by NetBank and by NFS.

None of the impairment charges is expected to result in any future cash expenditures.

**Item 3.01  Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.**

As previously reported in the Company's Current Report on Form 8-K filed with the SEC on June 21, 2007, in relation to the Company's failure to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2006 (the "Form 10-K") and its Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 (the "Form 10-Q"), the Company received a written decision from the NASDAQ Stock Market ("NASDAQ") granting the Company's request for continued listing on NASDAQ, subject to certain conditions.  As a condition to continued listing, the Company was required file the Form 10-K and the Form 10-Q with the SEC on or before July 18, 2007 and make a written submission to the Panel addressing the Company's plan and ability to sustain long term compliance with all requirements for continued listing on NASDAQ.  As previously reported in the Company's Current Report on Form 8-K filed with the SEC on July 18, 2007, the Company was unable to file the Form 10-K and the Form 10-Q with the SEC on or before the NASDAQ deadline and requested from NASDAQ an extension of time to file the Form 10-K and Form 10-Q.

On August 3, 2007, the Company received a notice of delisting from NASDAQ stating that NASDAQ has determined to delist the Company's shares of common stock and will suspend trading of the Company's common stock on the NASDAQ Stock Market effective at the open of business Tuesday, August 7, 2007.

Following the suspension of trading of the Company's common stock on the NASDAQ Stock Market, the Company expects that its common stock will be quoted on the "Pink Sheets" beginning on August 7, 2007.  However, the Company has no control over its market makers' activities.  If quoted on the Pink Sheets, the Company expects that the trading symbol of its common stock will remain the same (NTBK or NTBK.PK).  Information on the Pink Sheets can be found at its internet web site www.pinksheets.com.

On August 3, 2007, NetBank received written notice from the Office of Thrift Supervision (the "OTS") that NetBank was undercapitalized (the "Notice").  NetBank is required to file a capital restoration plan with the OTS by no later than September 13, 2007 (the "Capital Plan"), which must satisfy OTS regulations governing such plans.

Due to NetBank's capital category and as provided in the Notice, NetBank is subject to various restrictions, including limits on (i) capital distributions; (ii) growth in total assets; (iii) acquisitions of new companies or offices; (iv) engaging in any new lines of business; and (iv) accepting, renewing or rolling over of brokered deposits.  The Notice also provides that the OTS may not approve any requests that NetBank files for increases in compensation or payment of bonuses to senior executive officers until after the OTS has approved the Capital Plan.  The OTS may impose additional restrictions on NetBank through a prompt corrective action directive, and has indicated that it intends to issue such a directive in the near future.

In order for the Capital Plan to satisfy OTS regulations, the Company, as NetBank's parent holding company, will be required to guarantee NetBank's compliance.  As part of this guarantee, the Company must (i) take any actions required by it under the Capital Plan; (ii) take any actions necessary to enable NetBank to perform under the Capital Plan; and (iii) utilize its available assets (other than shares of NetBank itself) when directed to do so by the OTS, to enable NetBank to implement the Capital Plan.  As a result of the Company's obligations under the Notice, the Company believes that its outstanding common stock may have little or no value.  Accordingly, investment in the Company's common stock would be highly speculative.

**SIGNATURES**

     Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

NETBANK, INC.

Date: August 6, 2007

By:          /s/ James P. Gross
                James P. Gross
                Chief Financial Officer

4

EXHIBIT J

# NETBANK INC

## FORM 8-K
(Current report filing)

## Filed 9/17/2007 For Period Ending 9/14/2007

| | |
|---|---|
| Address | 1015 WINDWARD RIDGE PARKWAY |
| | ALPHARETTA, Georgia 30005 |
| Telephone | 770-343-6006 |
| CIK | 0001035826 |
| Industry | S&Ls/Savings Banks |
| Sector | Financial |
| Fiscal Year | 12/31 |



http://www.edgar-online.com/
© Copyright 2006.  All Rights Reserved.
Distribution and use of this document restricted under EDGAR Onlines Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 OR 15(d) of The Securities Exchange Act of 1934

Date of Report (Date of earliest event reported):  **September 14, 2007**

# NETBANK, INC.
### (Exact name of registrant as specified in its charter)

| Georgia | 0-22361 | 58-2224352 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **1015 Windward Ridge Parkway, Alpharetta, GA** | **30005** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code  **770-343-6006**

**N/A**
(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐     Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐     Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐     Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐     Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

As NetBank, Inc. (the "Company") previously reported in its Current Report on Form 8-K filed with the Securities and Exchange Commission on May 24, 2007, NetBank, FSB (the "Bank"), a wholly-owned subsidiary of the Company, entered into an Asset Purchase Agreement dated May 18, 2007 (the "Purchase Agreement") with EverBank, a federal savings bank, pursuant to which the Bank had agreed to sell certain assets to EverBank and EverBank had agreed to the assumption of certain liabilities of the Bank.  On September 14, 2007, the Bank received a letter from EverBank notifying the Bank of EverBank's termination of the Purchase Agreement effective on September 14, 2007.  EverBank's letter states that NetBank is in breach of its representations and warranties as the basis for its termination of the Purchase Agreement.

EverBank has not advised the Bank or the Company of any specifics regarding the alleged breach.  The Company and the Bank do not believe that any breach has occurred.  However, since the required regulatory approvals were not received by August 31, 2007, and since the Purchase Agreement permits either party to terminate the Purchase Agreement without cause after that date, neither the Company nor the Bank presently contemplate contesting the termination.  Instead the Company intends to pursue such other strategic alternatives as may be available.

As a result of ongoing financial and regulatory pressure, the Company believes that its outstanding common stock may have little or no value. Accordingly, investment in the Company's common stock would be highly speculative.

<div align="center">**SIGNATURES**</div>

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

<div align="center">NETBANK, INC.</div>

Date: September 17, 2007

By:    /s/ Charles E. Mapson
       Charles E. Mapson
       Chief Legal Counsel

<div align="center">2</div>

EXHIBIT  K



| | | | | | | | |
|---|---|---|---|---|---|---|---|
| HOME | DEPOSIT INSURANCE | CONSUMER PROTECTION | INDUSTRY ANALYSIS | REGULATIONS & EXAMINATIONS | ASSET SALES | NEWS & EVENTS | ABOUT FDIC |

Advanced Search

Home > News & Events > Press Releases

## Press Releases

### FDIC Approves The Assumption of The Insured Deposits of Netbank, Alpharetta, Georgia

**FOR IMMEDIATE RELEASE**
**September 28, 2007**

**Media Contact:**
**David Barr (202) 898-6992**
**cell: (703) 622-4790**
**dbarr@fdic.gov**

The Board of Directors of the Federal Deposit Insurance Corporation (FDIC) today approved the assumption of the insured deposits of NetBank, Alpharetta, Georgia, by ING Bank, fsb, Wilmington, Delaware.

NetBank, with $2.5 billion in total assets and $2.3 billion in total deposits as of June 30, was closed today by the Office of Thrift Supervision, and the FDIC was named receiver.

The failed bank was an Internet bank and did not have any physical branches. Depositors of NetBank will automatically become depositors of ING Bank.

Over the weekend, customers can access their money by writing checks, or by using their debit or ATM cards. Checks drawn on the bank that did not clear before today will be honored up to the insured limit. Starting on the morning of Monday, October 1, customers will have full access to their insured deposits via the Internet and for the foreseeable future should continue to utilize NetBank's current Website to transact banking business.

ING Bank has agreed to assume $1.5 billion of the failed bank's insured non-brokered deposits for a one percent premium and will purchase $724 million of assets. NetBank had approximately $109 million in 1,500 deposit accounts that exceeded the federal deposit insurance limit. While these customers will have access to their insured deposits, they will become creditors of the receivership for the amount of their uninsured funds.

In addition to continued access to their insured deposits, depositors of NetBank with deposits in excess of the insurance limits will also receive an immediate payment of 50 percent of their uninsured balance from the FDIC as receiver.

NetBank also had approximately $744 million in brokered deposits that are not part of today's transaction. The FDIC will pay the brokers directly for the amount of their insured funds.

"When a bank fails, it touches almost every office and division in the corporation," said FDIC Chairman Sheila C. Bair. "As chairman, it makes me proud to see the hard work and dedication demonstrated by staff. Since we began insuring banks in 1934, not a single depositor has lost a penny of insured deposits. Customers of NetBank should have confidence and security knowing that they will have access to their insured funds in a timely and orderly manner."

Customers with questions about how deposit insurance works or who would like more information concerning the failure can visit NetBank's Website at http://www.netbank.com/; the FDIC's Web site at http://www.fdic.gov/bank/individual/failed/NetBank.html; or call toll-free at 1-888-256-6932. While the toll-

free number will be operational 24 hours a day, seven days a week, customers are encouraged to call before midnight, Eastern Daylight Time, if possible.

It is important to note that neither the FDIC as receiver nor ING Bank as the acquiring institution will e-mail customers of NetBank asking them to validate their deposits or to request personal, confidential information, such as account numbers, Social Security Number, driver's license number, etc. If customers receive e-mails asking for such personal information, they should consider them to be fraudulent in nature and should not respond.

The FDIC entered into a Loan Purchase Agreement with EverBank, Jacksonville, Florida, to purchase certain assets of NetBank. EverBank will purchase about $700 million of mortgages held by NetBank. The FDIC will retain the remaining $1.1 billion in assets for later disposition, including NetBank's leasing division, NetBank Business Finance which will continue operations. Loan customers should continue to make payments as usual.

The FDIC estimates the cost of this transaction to its Deposit Insurance Fund to be approximately $110 million. NetBank is the second FDIC-insured bank to fail this year and the first in Georgia since AmTrade International Bank, Atlanta, Georgia, was closed on September 30, 2002.

# # #

Congress created the Federal Deposit Insurance Corporation in 1933 to restore public confidence in the nation's banking system. The FDIC insures deposits at the nation's 8,615 banks and savings associations and it promotes the safety and soundness of these institutions by identifying, monitoring and addressing risks to which they are exposed. The FDIC receives no federal tax dollars - insured financial institutions fund its operations.

FDIC press releases and other information are available on the Internet at www.fdic.gov, by subscription electronically (go to www.fdic.gov/about/subscriptions/index.html) and may also be obtained through the FDIC's Public Information Center (877-275-3342 or 703-562-2200). **PR-81-2007**

Last Updated 9/28/2007                                    communications@fdic.gov

EXHIBIT L

FDIC: FDIC Dividends from Failed Banks



| HOME | DEPOSIT INSURANCE | CONSUMER PROTECTION | INDUSTRY ANALYSIS | REGULATION & EXAMINATIONS | ASSET SALES | NEWS & EVENTS | ABOUT FDIC |

Advanced Search

Home > Industry Analysis > Failed Banks > FDIC Dividends from Failed Banks

# FDIC Dividends from Failed Banks

## Current Dividend Payments for Selected Bank:

| Bank Number/Name/Date Closed | Dividend Type | Priority Paid | % Paid | Total Paid | Date Paid |
|---|---|---|---|---|---|
| 10001 - NETBANK, FSB, September 28, 2007 | Traditional | Depositors | 21.333% | 71.333% | December 18, 2007 |
| 10001 - NETBANK, FSB, September 28, 2007 | Traditional | Depositor | 50% | 50% | September 30, 2007 |

Back to Failed Bank Page

Back to Failed Bank Information page

FDIC's General Disclaimer

Last Updated 1/23/2008

dividends@fdic.gov



EXHIBIT M



# NetBank Sells ATM and Merchant Servicing Operation

## Acquirer Pays $18.0 million for Unit's Principal Operating Assets and Assumes Management Effective Tuesday, May 1, 2007

ATLANTA, May 1, 2007 (PrimeNewswire via COMTEX News Network) -- NetBank, Inc. (Nasdaq:NTBK), parent company of NetBank (www.netbank.com), an online financial services provider and national prime mortgage lender, today announced a transaction involving NetBank's ATM and merchant servicing operation. NetBank Payment Systems sold its principal operating assets and net working capital yesterday to PAI ATM Services, LLC, a subsidiary of Payment Alliance International, Inc. ("PAI"). The assets consisted primarily of servicing contracts on more than 8,500 ATMs nationwide. The sales price for the assets totaled $18.0 million, resulting in initial cash proceeds of $16.5 million after adjustment for the estimated book value of the net working capital acquired.

NetBank was carrying the assets on its balance sheet at a higher value than the sales price. The bank will therefore record an additional impairment charge of approximately $2.0 million to bring the book value of the assets into line with the sales price. It is important to note that the ATM servicing contracts were recognized on the bank's balance sheet as intangible assets. Through the sale, the bank monetized them and thus converted them from an intangible into a tangible. This means the bulk of the cash proceeds represents new tangible capital that management can put to work in additional asset growth at the bank or other cost-saving initiatives. It also directly increases the company's overall tangible book value.

"We mentioned several months ago our intention to sell this operation as part of our larger corporate reorganization effort," said Steven F. Herbert, Chief Executive Officer ("CEO"), NetBank, Inc. "We said then that the operation was well managed and had real value. But, it simply did not fit in with our core banking and mortgage focus. It required significant capital to operate and therefore represented a strain or distraction on our resources.

"The deal with PAI is a win-win proposition," Herbert concluded. "PAI will be able to invest more in the operation and preserve the jobs of the talented team we had in place. In turn, we have generated significant new tangible capital. This money will prove important in our effort to maintain proper regulatory capital ratios and to protect shareholder value as we fight to get the company back on track financially through further restructuring or other alternatives."

"This acquisition marks another important step in the growth and development of our company," said John J. Leehy, III, CEO, PAI. "The employees at NetBank Payment Systems are highly qualified and have extensive experience in the ATM industry. The group also catered to an attractive base of merchant customers that fits in well with our company's strategic focus and long-term objectives. We look forward to deepening the relationship with these customers over time through the addition of value-added services and solutions."

NetBank did not convey the NetBank Payment Systems name in the deal. PAI will operate the machines under the PAI ATM services name. PAI will re-brand the machines currently bearing the NetBank logo over the next 18 months. NetBank plans to honor its waiver of surcharges on these machines for its banking customers during the re-branding period.

About NetBank, Inc.

NetBank, Inc. (Nasdaq:NTBK) is a financial holding company that operates a family of businesses focused primarily on consumer and small business banking, as well as conforming mortgage lending. The company's businesses have a shared value proposition of providing consumers in select markets an attractive combination of price, service and experience through skilled associates and advanced technology systems. Retail brands include NetBank and Market Street Mortgage. For more information, please visit www.netbankinc.com.

This news release was distributed by PrimeNewswire, www.primenewswire.com

SOURCE: NetBank

```
NetBank, Inc.
         Rich Jeffers
           678-942-7596
           rjeffers@netbank.com
         Matthew Shepherd
```

```
678-942-2683
mshepherd@netbank.com
```

(C) Copyright 2007 PrimeNewswire, Inc. All rights reserved.

News Provided by COMTEX

EXHIBIT  N



**NetBank, Inc.**
NASDAQ:NTBK

# NetBank, Inc. Reports Results for Fourth Quarter 2006

## Anticipated Restructuring Costs and Heightened Non-Conforming Provision Expense Contribute to Loss of $1.86 Per Share

ATLANTA, Feb. 21, 2007 (PRIME NEWSWIRE) -- NetBank, Inc. (Nasdaq:NTBK), a diversified financial services provider and parent company of NetBank® (www.netbank.com), today reported preliminary, unaudited financial results for the year ended December 31, 2006. The company recorded an after-tax loss of $86.3 million or $1.86 per share during the fourth quarter, compared with net income of $895,000 or $.02 per share during the same quarter a year ago. The company recorded a net loss of $202 million or $4.36 per share for the full year, compared with a net loss of $180,000 or $.00 per share for 2005.

The results set forth in this press release are preliminary and unaudited. As previously reported, the company recently engaged Porter Keadle Moore, LLP ("PKM") to replace Ernst & Young LLP as its independent auditor. These preliminary results are subject to potential adjustments, which may be material, arising from subsequent events or the audit of the company's financial statements for the year ended December 31, 2006 by PKM. The company currently believes that the 2006 audit, and related auditor attestation regarding the company's internal control over financial reporting, will be completed in June 2007 and expects to file its Annual Report on Form 10-K for the 2006 fiscal year with the SEC on or before June 30, 2007, although no assurance can be given.

Key items worth noting include the following. All comparisons are on a sequential quarter basis unless noted otherwise.

- Accelerated Repurchase Activity. As previously announced, repurchase requests in the non-conforming mortgage channel rose sharply following management's decision to close the business and accelerated further at the end of the year. Provisions for the non-conforming channel were $30.3 million, an increase of $25.7 million from last quarter. Overall, provisions for the financial intermediary segment were $32.0 million versus $12.2 million the prior quarter. Management believes the worst of the non-conforming loan repurchase problem is now behind the company given the accelerated repurchase requests already received relative to the limited non-conforming production over the second half of 2006.

- Restructuring and Shutdown Costs. During the quarter, the company exited several lines of business at a total cost of $21.3 million, in line with the company's prior projections. Restructuring costs related to the company's exit of FTI/QuickPost; its RV, boat and aircraft financing unit; its insurance operation; its auto lending unit; and the consolidation of its indirect conforming mortgage regional operating centers totaled $12.8 million. Shutdown costs related to the discontinuation of the company's non-conforming mortgage operation totaled $8.5 million.

- Generation of Deferred Tax Asset. As reported earlier, the company generated a significant deferred tax asset during the quarter. We recorded a valuation allowance for the asset totaling $23.4 million or $0.50 per share.

- Impairment of Goodwill. As previously disclosed, management recorded a partial impairment charge related to goodwill and intangibles on the company's ATM and merchant processing business during the quarter. The company recorded $9.7 million, or $0.21 per share, in goodwill and intangibles impairment associated with this business. The remaining goodwill and intangibles of $18.1 million is consistent with the pricing ranges the company recently observed when marketing the business for sale.
- Impact on Tangible Book Value Lessened. Book value declined by $1.94 per share from $6.26 on September 30, 2006 to $4.32 on December 31, 2006. However, the impact on the company's tangible book value was less. Tangible book value declined by $1.60 per share from $5.10 on September 30, 2006 to $3.50 on December 31, 2006. On an after-tax basis, the reported loss included the $9.7 million write down related to the company's ATM and merchant processing business mentioned above that did not negatively impact tangible book value. (Details related to amounts excluded from tangible book value are provided in the attached Reconciliation of Non-GAAP Financial Measures.)

Management Commentary

"Last year, we were at a crossroads as a company," said Steven F. Herbert, chief executive officer. "Market and economic pressures combined with our poor financial performance demanded dramatic changes.

"I'm proud of the fact that, in the span of 90 days, we were able to substantially execute a restructuring plan designed to stabilize the company's operating profile and capital position. During the quarter, we sold, exited or shut down our non-

conforming mortgage operation; our RV, boat and aircraft financing business; FTI and the QuickPost service; and NetInsurance. We consolidated two of our indirect conforming mortgage operating centers into our Columbia facility, and during December, we substantially effected a shut down of our auto lending unit.

"The final item remaining to be checked off our 'to do' list is the completion of the sale of our ATM and merchant processing business. We have a non-binding letter of intent in place and we are optimistic that a definitive agreement will be reached soon and the deal will close by the end of the first quarter. I am also pleased that we can check off 'engage an audit firm' which wasn't on our original list of things to do.

"When we began this process, I likened it to driving through a tunnel. We had a roadmap, but we went in not knowing exactly what things would look like on the other side. Now that we've emerged, we're evaluating our next steps. As we announced earlier this month, we are exploring longer-term strategic alternatives to drive shareholder value. We may also need to consider some different scenarios to proactively manage our risk-based capital.

"I'd be remiss if I didn't thank our associates for all the hard work they have done since last October. That work has moved us closer to our goal of restoring profitability and stabilizing book value. While we evaluate our next steps, our operating priorities will continue to be moving our indirect conforming mortgage operation back toward breakeven as quickly as possible and generating cost-effective deposit growth at the bank."

Retail Banking Segment Performance

Table 1 below details results in the company's Retail Banking segment. The segment reported a pre-tax loss of $5.3 million, versus a loss of $1.7 million last quarter. Excluding expenses and restructuring costs for QuickPost, the decline is a result of a loss on the sale of a pool of auto loans. Exclusive of restructuring charges, the segment's expenses were down $1.0 million from the previous quarter.

The bank's average earning assets fell to $4.2 billion for the year, representing a decrease of $424 million or 9.2% from a year ago.

Table 1

RETAIL BANKING
($ in 000s, Unaudited)

|  | 2006 4th Quarter | 2006 3rd Quarter | Change |
|---|---|---|---|
| Net interest income | $   16,063 | $   16,878 | $     (815) |
| Provision for credit losses | 2,043 | 2,410 | (367) |
| Net interest income after provision | 14,020 | 14,468 | (448) |
| Loss on sales of loans | (1,856) | (33) | (1,823) |
| Fees, charges and other income | 3,720 | 3,477 | 243 |
| Total retail banking revenues | 15,884 | 17,912 | (2,028) |
| Total retail banking expenses | 15,399 | 16,334 | (935) |
| Restructuring costs - Online Bank | 629 | – | 629 |
| Pre-tax retail banking operations | (144) | 1,578 | (1,722) |
| Net QuickPost, PowerPost & NetServ results | (3,252) | (3,301) | 49 |
| Restructuring costs - QuickPost, PowerPost & NetServ | 1,920 | – | 1,920 |
| Pre-tax net loss | $    (5,316) | $    (1,723) | $    (3,593) |
| Average earning assets | $3,724,980 | $3,975,800 | $(250,820) |

| | | | |
|---|---|---|---|
| Operations to average earning assets excluding QuickPost | | | |
| Net interest income after provision | 1.50% | 1.46% | 0.04% |
| Gain on sale, fees, charges and other income | 0.20% | 0.35% | (0.15%) |
| | ---------- | ---------- | --------- |
| Total retail banking revenues | 1.70% | 1.81% | (0.11%) |
| Total retail banking expenses | 1.72% | 1.64% | 0.08% |
| | ---------- | ---------- | --------- |
| Pre-tax retail banking operations | (0.02)% | 0.17% | (0.19%) |
| | ========== | ========== | ========= |

Additional performance drivers behind Retail Banking segment performance include the following. All comparisons are on a sequential quarter basis unless noted otherwise.

- The company's business finance operation continues to deliver consistently positive results. Pre-tax earnings for the quarter were flat at $3.1 million. Production was up $5.1 million, or 13.2%, to $44.3 million.

- Our auto lending business recorded a pre-tax loss of $709,000 compared to earnings of $410,000 last quarter. The decline was due to restructuring costs as management commenced the closing of that operation.

Financial Intermediary Segment Performance

Table 2 below details results in the company's Financial Intermediary segment. The segment reported a pre-tax loss of $58.3 million this quarter compared with a loss of $39.5 million last quarter. The majority of the operating loss was centered in the company's discontinued non-conforming operation, which recorded a pre-tax loss of $44.0 million.

The company's conforming mortgage operations reported a pre-tax loss of $14.8 million, compared with a loss of $14.7 million last quarter. Conforming production fell by 28% to $1.5 billion due primarily to a drop in production during the quarter as management implemented a number of procedural and cultural changes within the indirect channel aimed at addressing the repurchase issues.

During the quarter, the company's regional operating centers in Jacksonville, Fla., and Portland, Ore., were consolidated into the Columbia, S.C., facility. Management elected to continue operating the center located in St. Louis, Mo., based on its improved performance following the implementation of procedural and cultural changes throughout the channel. Maintaining the St. Louis center also provides a separate facility that can serve as a back up or overflow operation.

Table 2

FINANCIAL INTERMEDIARY
($ in 000s, Unaudited)

| | 2006 4th Quarter | 2006 3rd Quarter | Change |
|---|---|---|---|
| | ---------- | ---------- | --------- |
| Net interest income | $ (3,150) | $ 2,408 | $ (5,558) |
| Gain on sales of loans | 10,311 | 5,927 | 4,384 |
| Loss on sale of MSRs | (60) | (96) | 36 |
| Other income | 481 | 245 | 236 |
| Net Beacon credit services results | (126) | (103) | (23) |
| Net MG Reinsurance results | 788 | 898 | (110) |
| | ---------- | ---------- | --------- |
| Total revenues | 8,244 | 9,279 | (1,035) |

```
Salary and employee benefits     10,225      11,136        (911)
Occupancy and depreciation
  expense                         4,596       5,110        (514)
Other expenses                    6,673       6,992        (319)
Restructuring-related costs         981           -          981
                             ----------  ----------   ---------
    Total expenses               22,475      23,238        (763)
                             ----------  ----------   ---------

Pre-tax loss from continuing
  operations                    (14,231)    (13,959)       (272)
                             ----------  ----------   ---------

Loss from discontinued
  operations                    (44,035)    (25,580)    (18,455)
                             ----------  ----------   ---------

Pre-tax loss from financial
  intermediary segment       $ (58,266)  $ (39,539)  $ (18,727)
                             ==========  ==========   =========

Production - continuing
  operations                 $1,461,458  $2,026,938  $(565,480)
Production - discontinued
  operations                 $  173,207  $  412,716  $(239,509)
Sales - continuing operations $1,531,728 $1,992,825  $(461,097)
Sales - discontinued
  operations                 $  242,095  $  435,066  $(192,971)

Total revenues to sales -
  continuing operations           0.54%       0.47%       0.07%
Total expenses to production -
  continuing operations           1.54%       1.15%       0.39%
                             ----------  ----------   ---------
  Pre-tax margin - continuing
    operations                   (1.00%)     (0.68%)     (0.32%)
                             ==========  ==========   =========
```

Additional performance drivers behind Financial Intermediary segment performance include the following. All comparisons are on a sequential quarter basis unless noted otherwise.

- Conforming production totaled $1.5 billion, a decrease of $565 million or 28% due to seasonal factors and management's decision to slow production as it implemented the changes mentioned above. Conforming sales fell by 23% to $1.5 billion. The channel's revenue margin improved to 54 bps.

- Gain on sales of loans in the conforming channel improved to $10.3 million, an increase of $4.4 million or 73.9%, due to improvements in net hedge results.

Transaction Processing Segment Performance

Table 3 below details results in the company's Transaction Processing segment. The segment recorded a pre-tax loss of $9.5 million, compared to a loss of $2.4 million the previous quarter.

The loss was driven primarily by management's decision to record a partial impairment charge related to goodwill and intangibles on the company's ATM and merchant processing business, as mentioned earlier in this release. The company began marketing the business for sale during the quarter and now has a non-binding letter of intent in place. Management elected to write down the carrying value of the underlying ATM and merchant processing contracts based on the pricing ranges it observed during the marketing effort.

Table 3

```
                      TRANSACTION PROCESSING
                       ($ in 000s, Unaudited)

                           2006         2006
                        4th Quarter  3rd Quarter      Change
                        -----------  -----------    -----------
Total revenue           $    5,754   $    5,517     $       237
Total expenses              15,243        7,894           7,349
                        -----------  -----------    -----------
   Pre-tax loss         $   (9,489)  $   (2,377)    $    (7,112)
                        ===========  ===========    ===========
```

## Servicing Asset Segment Performance

Table 4 below details results in the company's Servicing Asset segment. The segment reported a pre-tax loss of $2.3 million compared with a pre-tax loss of $51.3 million last quarter. The improvement was a result of the company's sale of the majority of its mortgage servicing rights at the end of the third quarter. Since the sale closed on the last day of the third quarter, the full effect wasn't seen until the fourth quarter. The sale enabled the company to eliminate significant earnings volatility going forward, and it will no longer have the same exposure to impairment and hedge-related losses.

```
Table 4

                      SERVICING ASSET
                   ($ in 000s, Unaudited)

                              2006       2006
                            4th Qtr    3rd Qtr      Change
                            --------   --------    --------
Net interest income         $   750    $   395     $   355
Servicing fees                2,139      7,095      (4,956)
Loss on sale of MSRs            532    (29,702)     30,234
Other income                    126        102          24
                            --------   --------    --------
   Total revenue              3,547    (22,110)     25,657
Amortization of MSRs          2,539      6,981      (4,442)
Subservicing fees paid          882      2,345      (1,463)
Other expenses                  108        543        (435)
                            --------   --------    --------
   Total expenses             3,529      9,869      (6,340)
                            --------   --------    --------
   Pre-tax servicing margin      18    (31,979)     31,997
                            --------   --------    --------
Loss on hedges                 (851)    (4,357)      3,506
(Impairment)                 (1,534)    (1,474)        (60)
Loss on sale of securities      110    (13,461)     13,571
                            --------   --------    --------
   Net hedge results         (2,275)   (19,292)     17,017
                            --------   --------    --------
Net pre-tax loss           $ (2,257)  $(51,271)   $ 49,014
                            ========   ========    ========
```

## First Quarter Earnings Outlook

Analyst estimates for first quarter results currently range from a loss of $0.08 to a loss of $0.24. Management is presently

biased to the lower end of the range and cautions there is still key downside risk related to:

* Moving our indirect conforming mortgage operation back to breakeven

* Our inability to recognize tax benefits until we return to profitability

Supplemental Financial Data

The company posts additional financial information directly to its Web site. We publish a report that breaks out quarterly results by line of business within each segment. This report is designed to give interested parties a more granular look at the company's results and to make it easier for them to monitor performance trends.

You can access this material at www.netbankinc.com. Go to the "Investor Relations" area and click on the "Financial Data" link. Within this same area, we post a monthly report that shows key operating statistics for the company's major lines of business. Management also uses this report to update the company's quarterly earnings guidance as needed. The company publishes this report around the 20th of each month and files it simultaneously with the Securities Exchange Commission under Form 8-K.

Conference Call Information

Management has scheduled a conference call to discuss today's reported results with investors, financial analysts and other interested parties. The call will be held today at 10 a.m. EST. Interested parties may dial in or listen via an audiocast on the company's Web site.

Call Title: NetBank, Inc. Earnings Announcement
Call Leader: Steven F. Herbert
Pass Code: NetBank
Domestic: 1-888-677-1895
International: +1-210-795-9306
One-Week Replay: 1-800-879-5513 or +1-402-220-4734

About NetBank, Inc.

NetBank, Inc. (Nasdaq:NTBK) is a financial holding company that operates a family of businesses focused primarily on consumer and small business banking as well as conforming mortgage lending. The company's businesses have a shared value proposition of providing consumers in select markets a superior combination of price, service and experience through skilled associates and advanced technology systems. Retail brands include NetBank and Market Street Mortgage. For more information, please visit www.netbankinc.com.

Preliminary, Unaudited Financial Information

While the company believes that the preliminary, unaudited information set forth in this release has been prepared in accordance with accounting principles generally accepted in the United States, or "GAAP," and that all adjustments necessary for a fair presentation thereof have been made, the company can give no assurance that all adjustments are final or that all adjustments necessary for a fair presentation of the financial results in accordance with GAAP have been identified. All results included in this press release shall be considered preliminary until the audit of the company's financial statements for the year ended December 31, 2006 is completed and the company files its 2006 Form 10-K.

Forward-Looking Statements

Statements in this press release that are not historical facts are forward-looking statements that reflect management's current expectations, assumptions, and estimates of future performance and economic conditions. Such statements are made in reliance upon the safe harbor provisions of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934.

Forward-looking statements in this press release include but are not limited to: 1) The company's expectation that it's 2006 Form 10-K will be filed with the SEC by the end of June 2007; 2) Management's belief that the worst of the non-conforming loan repurchase problem is now behind the company; 3) A definitive agreement regarding the sale of the company's ATM and merchant processing business being reached and the deal closing by the end of the first quarter; 4) A decision by management to undertake additional capital management strategies.

These forward-looking statements are subject to a number of risks and uncertainties that may cause actual results and future trends to differ materially from those expressed in or implied by such forward-looking statements. The company's consolidated results of operations and such forward-looking statements could be affected by many factors, including but not limited to: 1) the evolving nature of the market for internet banking and financial services generally; 2) the public's perception of the internet as a secure, reliable channel for transactions; 3) the success of new products and lines of business considered critical to the company's long-term strategy, such as small business banking and transaction processing services; 4) potential difficulties in

integrating the company's operations across its multiple lines of business; 5) the cyclical nature of the mortgage banking industry generally; 6) a possible decline in asset quality; 7) changes in general economic or operating conditions that could adversely affect mortgage loan production and sales, mortgage servicing rights, loan delinquency rates and/or loan defaults; 8) the possible adverse effects of unexpected changes in the interest rate environment; 9) adverse legal rulings, particularly in the company's litigation over leases originated by Commercial Money Center, Inc.; and 10) increased competition and regulatory changes.

Further information relating to these and other factors that may impact the company's results of operations and such forward-looking statements are disclosed in the company's filings with the SEC, including under the caption "Item 1A. Risks Factors" in its Annual Report on Form 10-K for the year ended December 31, 2005 and Quarterly Reports on Form 10-Q for the quarters ended June 30, 2006 and September 30, 2006, as well as Exhibit 99.2 to its Current Report on Form 8-K filed with the SEC on January 3, 2007. Except as required by the securities laws, the company disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

```
                Reconciliation of Non-GAAP Financial Measures
                          ($ in 000s, Unaudited)

                                 December 31,        September 30,
                                                         2006
                                 -------------------------------
Shareholders equity                $229,007            $290,598
Goodwill and intangibles             43,724              53,849
                                   --------            --------
Tangible equity                    $185,283            $236,749
Outstanding shares                   52,982              46,397
                                   --------            --------
Tangible book value              $    3.50           $    5.10
                                   ========            ========
```

```
                            NetBank, Inc.
                  Consolidated Statements of Operations
                    For the year ended December 31,
                     (In 000s except per share data)
                             (Unaudited)

                                      2006
                  ---------------------------------------------------------

                                                                Other/
                    Retail    Financial    Transaction  Servicing  Corporate
                    Banking   Intermediary Processing    Asset     overhead
                  ----------------------------------------------------------
Interest income:
Loans and
  leases          $117,553   $ 66,052   $    48    $     -    $     584
Investment
  securities        26,593          6         -          -            -
Short-term
  investments        1,131        748     1,007      1,027            -
Inter-segment       91,777        262         -      9,025    (101,064)
                  ----------------------------------------------------------
  Total interest
    income         237,054     67,068     1,055     10,052    (100,480)

Interest expense:
Deposits            96,838          -         -          -            -
Other borrowed
  funds             47,799        841       588        308        2,681
Inter-segment       20,248     59,996       373      7,387    (101,582)
```

| | | | | | |
|---|---|---|---|---|---|
| Total interest expense | 164,885 | 60,837 | 961 | 7,695 | (98,901) |
| Net interest income | 72,169 | 6,231 | 94 | 2,357 | (1,579) |
| Provision for credit losses | 8,424 | 112 | – | – | – |
| Net interest income after provision for credit losses | 63,745 | 6,119 | 94 | 2,357 | (1,579) |
| **Non-interest income:** | | | | | |
| Mortgage servicing fees | 14 | 2,107 | 5,994 | 29,534 | – |
| Amortization of MSRs | – | (147) | – | (29,957) | – |
| (Impairment) recovery of MSRs | – | – | – | (8,914) | – |
| Losses on derivatives | 153 | – | – | (16,562) | – |
| (Loss) gain on sales of investment securities | – | – | – | (13,461) | – |
| Service charges and fees | 11,450 | (1) | 8,521 | – | – |
| Gain on sales of loans | (1,581) | 53,407 | – | – | (470) |
| Loss on sales of MSRs | – | (455) | – | (29,702) | – |
| Other income | 4,183 | 2,155 | 1,470 | 822 | (933) |
| Intersegment servicing/ processing fees | – | – | 10,613 | – | (10,613) |
| Total non-interest income | 14,219 | 57,066 | 26,598 | (68,240) | (12,016) |
| **Non-interest expense:** | | | | | |
| Salaries and benefits | 19,744 | 52,347 | 9,647 | – | 27,863 |
| Customer service | 10,248 | – | 365 | – | 143 |
| Marketing costs | 5,757 | 4,831 | 293 | – | 455 |
| Data processing | 10,733 | 2,512 | 2,057 | – | 2,492 |
| Depreciation and amortization | 6,951 | 7,446 | 3,799 | – | 3,003 |
| Office expenses | 8,673 | 4,075 | 1,886 | – | (763) |
| Occupancy | 4,112 | 12,126 | 1,001 | – | 6,827 |
| Travel and entertainment | 723 | 1,577 | 332 | – | 867 |
| Professional fees | 2,492 | 4,413 | 1,450 | 12 | 4,650 |
| Prepaid lost interest from curtailments | – | 21 | – | 1,915 | – |

| | | | | | |
|---|---|---|---|---|---|
| Impairment of goodwill | – | 6,358 | 13,337 | – | – |
| Other | 10,095 | 11,235 | 2,262 | 58 | (13,043) |
| Restructuring and other associated costs | 2,549 | 981 | – | – | 9,299 |
| Inter-segment servicing/ processing fees | 453 | (519) | – | 8,139 | (10,613) |
| Total non-interest expense | 82,530 | 107,403 | 36,429 | 10,124 | 31,180 |
| (Loss) income before income taxes | $ (4,566) | $(44,218) | $(9,737) | $(76,007) | $ (44,775) |

| | Consolidated NetBank, Inc. | |
|---|---|---|
| | 2006 | 2005 |
| **Interest income:** | | |
| Loans and leases | $ 184,237 | $ 187,773 |
| Investment securities | 26,599 | 35,085 |
| Short-term investments | 3,913 | 2,140 |
| Inter-segment | – | – |
| Total interest income | 214,749 | 224,998 |
| **Interest expense:** | | |
| Deposits | 96,838 | 70,483 |
| Other borrowed funds | 52,217 | 62,445 |
| Inter-segment | (13,578) | (14,579) |
| Total interest expense | 135,477 | 118,349 |
| Net interest income | 79,272 | 106,649 |
| Provision for credit losses | 8,536 | 11,047 |
| Net interest income after provision for credit losses | 70,736 | 95,602 |
| **Non-interest income:** | | |
| Mortgage servicing fees | 37,649 | 50,414 |
| Amortization of MSRs | (30,104) | (45,389) |
| (Impairment) recovery of MSRs | (8,914) | 14,055 |
| Losses on derivatives | (16,409) | (880) |
| (Loss) gain on sales of investment securities | (13,461) | 4,675 |
| Service charges and fees | 19,970 | 20,570 |
| Gain on sales of loans | 51,356 | 81,458 |
| Loss on sales of MSRs | (30,157) | (622) |
| Other income | 7,697 | 9,891 |
| Intersegment servicing/processing fees | – | – |
| Total non-interest income | 17,627 | 134,172 |
| **Non-interest expense:** | | |
| Salaries and benefits | 109,601 | 104,164 |
| Customer service | 10,756 | 13,632 |
| Marketing costs | 11,336 | 12,260 |

```
Data processing                               17,794        17,435
Depreciation and amortization                 21,199        20,918
Office expenses                               13,871         9,758
Occupancy                                     24,066        19,601
Travel and entertainment                       3,499         4,232
Professional fees                             13,017        16,982
Prepaid lost interest from curtailments        1,936         4,289
Impairment of goodwill                        19,695             -
Other                                         10,607        10,216
Restructuring and other associated costs      12,829             -
Inter-segment servicing/processing fees       (2,540)       (5,355)
                                            ---------     ---------
  Total non-interest expense                 267,666       228,132
                                            ---------     ---------

(Loss) income before income taxes           (179,303)        1,642
Income tax benefit (expense)                  48,749        (1,497)
                                            ---------     ---------

Net (loss) income from
 continuing operations                     $(130,554)    $     145
(Loss) from discontinued operations,
 net of income tax                           (71,437)         (325)
                                            ---------     ---------
Net loss                                   $(201,991)    $    (180)
                                            =========     =========

Net loss per common and potential
 common shares outstanding:
   Basic                                   $   (2.82)    $    0.00
   Basic EPS from discontinued operations  $   (1.54)         (0.00)
                                            ---------     ---------
   Basic EPS                               $   (4.36)    $    0.00
                                            ---------     ---------

   Diluted                                 $   (2.82)    $    0.00
   Diluted EPS from discontinued operations $  (1.54)         (0.00)
                                            ---------     ---------
   Diluted EPS                             $   (4.36)    $    0.00
                                            ---------     ---------

Weighted average common and potential
 common shares outstanding:
   Basic                                      46,343        46,193
   Diluted                                    46,343        46,193
```

NetBank, Inc.
Consolidated Statements of Operations
For the three months ended December 31,
(In 000s except per share data)
(Unaudited)

| | Retail Banking | Financial Intermediary | Transaction Processing | Servicing Asset | Other/ Corporate overhead |
|---|---|---|---|---|---|
| | | | 2006 | | |
| **Interest income:** | | | | | |
| Loans and leases | $27,447 | $ 11,737 | $     21 | $      - | $    114 |
| Investment securities | 3,970 | 1 | - | - | - |
| Short-term investments | 451 | 219 | 1,007 | 1,027 | - |
| Inter-segment | 21,927 | 80 | - | 713 | (22,720) |

| | | | | | |
|---|---:|---:|---:|---:|---:|
| Total interest income | 53,795 | 12,037 | 1,028 | 1,740 | (22,606) |
| **Interest expense:** | | | | | |
| Deposits | 27,271 | – | – | – | – |
| Other borrowed funds | 6,744 | 92 | 588 | 153 | 703 |
| Inter-segment | 3,761 | 14,699 | 89 | 838 | (22,779) |
| Total interest expense | 37,776 | 14,791 | 677 | 991 | (22,076) |
| Net interest income | 16,019 | (2,754) | 351 | 749 | (530) |
| Provision for credit losses | 2,043 | 10 | – | – | – |
| Net interest income after provision for credit losses | 13,976 | (2,764) | 351 | 749 | (530) |
| **Non-interest income:** | | | | | |
| Mortgage servicing fees | 4 | 514 | 2,029 | 2,138 | – |
| Amortization of MSRs | – | (53) | – | (2,539) | – |
| (Impairment) recovery of MSRs | – | – | – | (1,534) | – |
| (Loss) gain on derivatives | 153 | – | – | (743) | – |
| Loss on sales of investment securities | – | – | – | – | – |
| Service charges and fees | 2,560 | (1) | 2,091 | – | – |
| (Loss) gain on sales of loans | (1,857) | 10,618 | – | – | (61) |
| Loss on sales of MSRs | – | (61) | – | – | – |
| Other income | 876 | 472 | 15 | 657 | (281) |
| Intersegment servicing/ processing fees | – | – | 1,270 | – | (1,270) |
| Total non-interest income | 1,736 | 11,489 | 5,405 | (2,021) | (1,612) |
| **Non-interest expense:** | | | | | |
| Salaries and benefits | 4,759 | 10,506 | 2,277 | – | 6,500 |
| Customer service | 2,079 | – | 109 | – | 30 |
| Marketing costs | 1,476 | 863 | 61 | – | 74 |
| Data processing | 2,500 | 575 | 450 | – | 409 |
| Depreciation and amortization | 1,739 | 1,682 | 934 | – | 821 |
| Office expenses | 2,002 | 792 | 505 | – | (121) |

| | | | | | |
|---|---|---|---|---|---|
| Occupancy | 899 | 2,972 | 252 | – | 1,779 |
| Travel and entertainment | 120 | 275 | 49 | – | 210 |
| Professional fees | 604 | 1,570 | 326 | 12 | 1,103 |
| Prepaid lost interest from curtailments | – | 3 | – | 79 | – |
| Impairment of goodwill | – | – | 9,655 | – | – |
| Other | 2,198 | 2,781 | 627 | 12 | (3,346) |
| Restructuring and other associated costs | 2,549 | 981 | – | – | 9,299 |
| Inter-segment servicing/ processing fees | 103 | (44) | – | 882 | (1,270) |
| Total non-interest expense | 21,028 | 22,956 | 15,245 | 985 | 15,488 |
| (Loss) income before income taxes | $(5,316) | $(14,231) | $(9,489) | $(2,257) | $(17,630) |

| | Consolidated NetBank, Inc. | |
|---|---|---|
| | 2006 | 2005 |
| **Interest income:** | | |
| Loans and leases | $ 39,319 | $ 49,096 |
| Investment securities | 3,971 | 8,916 |
| Short-term investments | 2,704 | 583 |
| Inter-segment | – | – |
| Total interest income | 45,994 | 58,595 |
| **Interest expense:** | | |
| Deposits | 27,271 | 21,491 |
| Other borrowed funds | 8,280 | 16,579 |
| Inter-segment | (3,392) | (4,548) |
| Total interest expense | 32,159 | 33,522 |
| Net interest income | 13,835 | 25,073 |
| Provision for credit losses | 2,053 | 3,658 |
| Net interest income after provision for credit losses | 11,782 | 21,415 |
| **Non-interest income:** | | |
| Mortgage servicing fees | 4,685 | 12,337 |
| Amortization of MSRs | (2,592) | (10,516) |
| (Impairment) recovery of MSRs | (1,534) | 10,831 |
| (Loss) gain on derivatives | (590) | (731) |
| Loss on sales of investment securities | – | 493 |
| Service charges and fees | 4,650 | 5,431 |
| (Loss) gain on sales of loans | 8,700 | 24,361 |
| Loss on sales of MSRs | (61) | (174) |
| Other income | 1,739 | 2,135 |

```
Intersegment servicing/processing fees              -              -
-------------------------------------------------  ---------    ---------
  Total non-interest income                       14,997         44,167

Non-interest expense:
Salaries and benefits                             24,042         28,278
Customer service                                   2,218          3,516
Marketing costs                                    2,474          3,360
Data processing                                    3,934          4,429
Depreciation and amortization                      5,176          5,406
Office expenses                                     3,178          2,504
Occupancy                                           5,902          5,233
Travel and entertainment                             654          1,237
Professional fees                                   3,615          4,367
Prepaid lost interest from curtailments               82            944
Impairment of goodwill                              9,655              -
Other                                               2,272          3,107
Restructuring and other associated costs          12,829              -
Inter-segment servicing/processing fees             (329)        (1,419)
-------------------------------------------------  ---------    ---------
  Total non-interest expense                      75,702         60,962
-------------------------------------------------  ---------    ---------
(Loss) income before income taxes                (48,923)         4,620
Income tax benefit (expense)                       3,513         (2,298)
                                                 ---------      ---------
Net (loss) income from continuing
  operations                                  $  (45,410)     $   2,322
Loss from discontinued operations,
  net of income tax                              (40,913)        (1,427)
                                                 ---------      ---------
Net (loss) income                             $  (86,323)     $     895
                                                 =========      =========
Net (loss) income per common and
  potential common shares outstanding:
   Basic                                      $    (0.98)     $    0.05
   Basic EPS from discontinued operations     $    (0.88)     $   (0.03)
                                                 ---------      ---------
   Basic EPS                                   $    (1.86)     $    0.02
                                                 ---------      ---------
   Diluted                                     $    (0.98)     $    0.05
   Diluted EPS from discontinued operations   $    (0.88)     $   (0.03)
                                                 ---------      ---------
Diluted EPS                                    $    (1.86)     $    0.02
                                                 ---------      ---------
Weighted average common and potential
  common shares outstanding:
   Basic                                          46,425         46,168
   Diluted                                        46,425         46,480
```

NetBank, Inc.
Condensed Consolidated Balance Sheet
(In 000s except per share data)
(Unaudited)

```
                              Dec. 31,     Sept. 30,     Dec. 31,
                                2006          2006         2005
                             ----------    ----------    ----------
Assets
Cash and cash equivalents:
   Cash and due from banks   $  607,600   $  347,980    $  126,666
   Cash equivalents and fed funds 22,712      21,995        23,590
                             ----------    ----------    ----------
```

| | | | |
|---|---:|---:|---:|
| Total cash, cash equivalents and fed funds | 630,312 | 369,975 | 150,256 |
| Investment securities available for sale-at fair value | 294,280 | 252,546 | 626,077 |
| Stock of Federal Home Loan Bank of Atlanta-at cost | 36,507 | 36,507 | 67,049 |
| Loans held for sale | 720,715 | 946,475 | 1,233,918 |
| Loan and lease receivables-net of allowance for losses | 1,759,097 | 1,910,770 | 2,224,363 |
| Mortgage servicing rights - net | 35,579 | 39,076 | 201,880 |
| Accrued interest receivable | 12,281 | 16,555 | 16,698 |
| Furniture, equipment and capitalized software - net | 38,962 | 48,261 | 54,420 |
| Goodwill and other intangibles - net | 43,724 | 53,849 | 85,097 |
| Due from servicers and investors | 16,630 | 113,624 | 26,557 |
| Stock subscription receivable | 25,350 | – | – |
| Other assets | 74,016 | 61,770 | 85,304 |
| Total assets | $3,687,453 | $3,849,408 | $4,771,619 |
| | | | |
| Liabilities | | | |
| Deposits | $2,615,636 | $2,728,316 | $2,793,847 |
| Other borrowed funds | 657,515 | 654,033 | 1,348,240 |
| Subordinated debt | 32,477 | 32,477 | 32,477 |
| Accrued interest payable | 33,443 | 24,049 | 17,595 |
| Loans in process | 20,712 | 31,843 | 34,060 |
| Representations and warranties | 14,741 | 21,550 | 20,668 |
| Restructuring-related liabilities | 11,637 | – | – |
| Accounts payable and accrued liabilities | 71,375 | 65,633 | 123,877 |
| Total liabilities | 3,457,536 | 3,557,901 | 4,370,764 |
| | | | |
| Minority interests in affiliates | 910 | 909 | 676 |
| | | | |
| Shareholders' equity | | | |
| Preferred stock, no par | – | – | – |
| Common stock, $.01 par | 528 | 528 | 528 |
| Common stock subscribed | 65 | – | – |
| Additional paid-in capital | 457,905 | 434,303 | 432,140 |
| Retained (deficit) earnings | (165,136) | (78,661) | 39,005 |
| Accumulated other comprehensive loss, net of tax | (2,959) | (3,310) | (7,965) |
| Treasury stock, at cost | (61,396) | (62,262) | (62,276) |
| Unearned compensation | – | – | (1,253) |
| Total shareholders' equity | 229,007 | 290,598 | 400,179 |
| | | | |
| Total liabilities, minority interests and shareholders' equity | $3,687,453 | $3,849,408 | $4,771,619 |

NetBank, Inc. Consolidated
Selected Financial and Operating Data
(In 000s except per share data)
(Unaudited)

Quarter Ended

|                                    | December 31, | September 30, | December 31, |
|------------------------------------|-------------|--------------|--------------|
|                                    | 2006        | 2006         | 2005         |

**Consolidated:**

|                                       |              |              |              |
|---------------------------------------|--------------|--------------|--------------|
| Net (loss) income                     | $ (86,323)   | $ (73,281)   | $ 895        |
| Total assets                          | $ 3,687,453  | $ 3,849,408  | $ 4,771,619  |
| Total equity                          | $ 229,007    | $ 290,598    | $ 400,179    |
| Shares outstanding                    | 52,982       | 46,397       | 46,396       |
| Return on average equity              | (110.42%)    | (86.06%)     | 0.89%        |
| Return on average assets              | (8.55%)      | (7.06%)      | 0.07%        |
| Book value per share                  | $ 4.32       | $ 6.26       | $ 8.63       |
| Tangible book value per share         | $ 3.50       | $ 5.10       | $ 6.79       |

**NetBank, FSB:**

|                                       |              |              |              |
|---------------------------------------|--------------|--------------|--------------|
| Deposits                              | $ 2,620,841  | $ 2,734,080  | $ 2,796,029  |
| Customers                             | 248,229      | 268,769      | 285,669      |
| Estimated Capital Ratios:             |              |              |              |
| Tier 1 core capital ratio             | 4.83%        | 6.38%        | 6.51%        |
| Total risk-based capital ratio        | 9.07%        | 10.13%       | 10.32%       |
| Asset quality numbers:                |              |              |              |
| CMC Lease portfolio                   | $ 25,423     | $ 25,505     | $ 26,054     |
| Non-performing loan and lease receivables | 7,716    | 7,300        | 6,995        |
| Total non-performing loan and lease receivables | 33,139 | 32,805     | 33,049       |
| Non-performing loans held for sale (a) | 91,138      | 50,418       | 49,255       |
| Total non-performing loans and leases | 124,277      | 83,223       | 82,304       |
| Repossessed assets (b)                | 14,285       | 13,357       | 8,200        |
| Total non-performing assets           | $ 138,562    | $ 96,580     | $ 90,504     |
| Allowance for credit losses (ALLL)    | $ 28,042     | $ 26,477     | $ 27,601     |
| Net charge-offs of loan and lease receivables | $ (4,081) | $ (3,301) | $ (2,786)    |
| Asset quality ratios:                 |              |              |              |
| Total non-performing assets/average assets | 3.43%   | 2.33%        | 1.78%        |
| ALLL/total non-performing loan and lease receivables | 84.62% | 80.71% | 83.52%     |
| Net annualized charge-offs/total assets | 0.44%      | 0.34%        | 0.23%        |

**Mortgage Banking:**

|                                       |              |              |              |
|---------------------------------------|--------------|--------------|--------------|
| Production Activity:                   |              |              |              |
| Retail                                | $ 679,055    | $ 779,963    | $ 934,184    |
| Correspondent                         | 506,248      | 833,138      | 904,354      |

```
Wholesale                    265,524        392,350        568,789
RMS                           10,631         21,487         52,185
                          -----------    -----------    -----------
Total Agency-eligible      1,461,458      2,026,938      2,459,512
Non-conforming               173,207        412,716        807,110
                          -----------    -----------    -----------
Total                    $ 1,634,665    $ 2,439,654    $ 3,266,622
                          ===========    ===========    ===========


Sales Activity:
Third party sales        $ 1,773,823    $ 2,419,711    $ 3,302,059
Intercompany sales                 -          8,180         56,449
                          -----------    -----------    -----------
Total sales              $ 1,773,823    $ 2,427,891    $ 3,358,508
                          ===========    ===========    ===========
Pipeline:
Locked conforming mortgage
 loan pipeline           $   520,044    $   610,853    $   929,205

UPB of loans serviced:   $13,665,809    $14,960,710    $17,107,575
```

(a) Held for sale assets are carried at the lower of cost or
    market (LOCOM). LOCOM adjustments, under GAAP, are direct
    reductions of the assets' carrying values and are not considered
    allowances.

(b) Repossessed assets are carried at net realizable value.


CONTACT: NetBank, Inc.
Jim Gross
803-462-8160
jgross@netbank.com
Rich Jeffers
404-759-9153
rjeffers@netbank.com

EXHIBIT O

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|
| **NEW YORK SOUTHERN** | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | 12,201 | 12,945 | 12,422 | 12,321 | 13,937 | 12,783 | | |
| | Terminations | 11,339 | 11,346 | 11,471 | 10,780 | 12,618 | 11,247 | | |
| | Pending | 20,047 | 19,302 | 17,638 | 17,275 | 16,198 | 15,818 | | |
| | % Change in Total Filings — Over Last Year | | -5.8 | | | | | 56 | 5 |
| | % Change in Total Filings — Over Earlier Years | | | -1.8 | -1.0 | -12.5 | -4.6 | 59 | 2 |
| Number of Judgeships | | 28 | 28 | 28 | 28 | 28 | 28 | | |
| Vacant Judgeship Months** | | 2.0 | 6.3 | 8.8 | 33.3 | 15.8 | .0 | | |
| ACTIONS PER JUDGESHIP | FILINGS — Total | 435 | 462 | 444 | 441 | 498 | 457 | 43 | 3 |
| | FILINGS — Civil | 385 | 409 | 388 | 381 | 441 | 420 | 21 | 3 |
| | FILINGS — Criminal Felony | 34 | 40 | 44 | 47 | 48 | 37 | 87 | 6 |
| | FILINGS — Supervised Release Hearings** | 16 | 13 | 12 | 13 | 9 | - | 64 | 5 |
| | Pending Cases | 716 | 689 | 630 | 617 | 579 | 565 | 8 | 2 |
| | Weighted Filings** | 501 | 551 | 527 | 513 | 539 | 560 | 28 | 3 |
| | Terminations | 405 | 405 | 410 | 385 | 451 | 402 | 55 | 3 |
| | Trials Completed | 13 | 15 | 16 | 17 | 15 | 15 | 71 | 3 |
| MEDIAN TIMES (months) | From Filing to Disposition — Criminal Felony | 16.7 | 14.5 | 11.9 | 11.8 | 13.3 | 12.3 | 93 | 6 |
| | From Filing to Disposition — Civil** | 8.3 | 8.8 | 8.1 | 8.4 | 8.3 | 7.2 | 23 | 1 |
| | From Filing to Trial** (Civil Only) | 25.7 | 22.0 | 26.8 | 22.6 | 23.0 | 24.4 | 48 | 1 |
| OTHER | Civil Cases Over 3 Years Old** — Number | 3,107 | 2,652 | 1,656 | 1,312 | 1,230 | 1,585 | | |
| | Civil Cases Over 3 Years Old** — Percentage | 18.4 | 16.7 | 11.6 | 9.2 | 9.2 | 12.1 | 89 | 6 |
| | Average Number of Felony Defendants Filed Per Case | 1.7 | 1.9 | 1.7 | 1.5 | 1.5 | 1.6 | | |
| | Jurors — Avg. Present for Jury Selection | 96.33 | 99.86 | 88.01 | 82.96 | 83.28 | 73.12 | | |

| | | Percent Not Selected or Challenged | 60.4 | 62.0 | 53.1 | 54.8 | 61.9 | 53.2 | | |

**2006 CIVIL AND CRIMINAL FELONY FILINGS BY <u>NATURE OF SUIT AND OFFENSE</u>**

| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
|---------|-------|---|---|---|---|---|---|---|---|---|---|---|---|
| Civil | 10793 | 230 | 767 | 1147 | 88 | 38 | 945 | 2257 | 1622 | 835 | 1374 | 66 | 1424 |
| Criminal* | 943 | 5 | 269 | 170 | 111 | 225 | 29 | 28 | 11 | 24 | 24 | 9 | 38 |

\*   Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See <u>"Explanation of Selected Terms."</u>

EXHIBIT P

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **12-MONTH PERIOD ENDING SEPTEMBER 30** | | | | | | | | |
| **GEORGIA NORTHERN** | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | **Numerical Standing** | | |
| | | | | | | | | U.S. | Circuit |
| **OVERALL CASELOAD STATISTICS** | Filings* | 4,554 | 4,886 | 5,620 | 5,479 | 5,356 | 5,110 | | |
| | Terminations | 4,898 | 5,692 | 5,370 | 5,102 | 5,437 | 4,996 | | |
| | Pending | 3,574 | 3,890 | 4,649 | 4,415 | 4,035 | 4,151 | | |
| | % Change in Total Filings — Over Last Year | -6.8 | | | | | | 60 | 9 |
| | % Change in Total Filings — Over Earlier Years | | -19.0 | -16.9 | -15.0 | -10.9 | | 64 | 6 |
| **Number of Judgeships** | | 11 | 11 | 11 | 11 | 11 | 11 | | |
| **Vacant Judgeship Months**** | | 5.1 | 3.0 | 1.6 | .0 | .0 | .0 | | |
| **ACTIONS PER JUDGESHIP** | FILINGS — Total | 415 | 444 | 511 | 498 | 487 | 465 | 53 | 7 |
| | FILINGS — Civil | 353 | 383 | 438 | 422 | 416 | 403 | 38 | 6 |
| | FILINGS — Criminal Felony | 51 | 47 | 55 | 60 | 56 | 62 | 70 | 9 |
| | FILINGS — Supervised Release Hearings** | 11 | 14 | 18 | 16 | 15 | - | 78 | 8 |
| | Pending Cases | 325 | 354 | 423 | 401 | 367 | 377 | 67 | 9 |
| | Weighted Filings** | 500 | 541 | 625 | 595 | 557 | 540 | 30 | 6 |
| | Terminations | 445 | 517 | 488 | 464 | 494 | 454 | 46 | 7 |
| | Trials Completed | 17 | 16 | 20 | 21 | 21 | 20 | 58 | 8 |
| **MEDIAN TIMES (months)** | From Filing to Disposition — Criminal Felony | 11.0 | 11.5 | 8.8 | 8.2 | 8.1 | 7.7 | 72 | 9 |
| | From Filing to Disposition — Civil** | 9.5 | 10.0 | 9.3 | 9.3 | 9.8 | 9.1 | 48 | 6 |
| | From Filing to Trial** (Civil Only) | 31.0 | 27.0 | 22.0 | 25.5 | 23.5 | 24.0 | 65 | 7 |
| **OTHER** | Civil Cases Over 3 Years Old** — Number | 83 | 83 | 70 | 65 | 64 | 71 | | |
| | Civil Cases Over 3 Years Old** — Percentage | 2.9 | 2.6 | 1.8 | 1.7 | 1.8 | 2.0 | 10 | 2 |
| | Average Number of Felony Defendants Filed Per Case | 1.7 | 1.9 | 1.6 | 1.7 | 1.6 | 1.6 | | |
| | Jurors — Avg. Present for Jury Selection | 45.86 | 45.85 | 38.96 | 36.40 | 37.21 | 43.27 | | |
| | Jurors — Percent Not Selected or Challenged | 37.6 | 37.6 | 32.1 | 31.2 | 32.1 | 40.4 | | |

**2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE**

| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Civil | 3879 | 170 | 126 | 1020 | 85 | 61 | 168 | 483 | 309 | 270 | 757 | 6 | 424 |
| Criminal* | 549 | 3 | 114 | 53 | 127 | 105 | 27 | 31 | 15 | 19 | 20 | 5 | 30 |

\*   Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
** See "Explanation of Selected Terms."

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that, this day, a true and correct copy of the foregoing DECLARATION OF LISA ALBERT was served by filing in the Court's CM/ECF system, which will automatically send email notification of such filing to the following counsel of record:

Kenneth A. Elan                                    *elanfirm@yahoo.com*
Kenneth A. Elan, Esq
217 Broadway
New York, NY 10007

Deborah R. Gross                                  *debbie@bernardmgross.com*
Law Offices of Bernard M. Gross, P.C.
Wanamaker Building
100 Penn Square East
Suite 450
Philadelphia, PA 19107

DATED:  February 11, 2008.

                                        */s Lisa Albert*
                                        Lisa Albert (LA-7264)