## IN THE UNITED STATES DISTRICT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **MATTHEW TOTILO, individually and on behalf of himself and all others similarly, situated,** | : | |
| | : | |
| | : | |
| | : | **CLASS ACTION** |
| **Plaintiff,** | : | **NO. 07-cv-10991** |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **STEVEN F. HERBERT and** | : | |
| **JAMES P. GROSS** | : | |
| | : | |
| **Defendants.** | : | |

## PLAINTIFF'S MEMORANDUM IN
## OPPOSITION TO DEFENDANTS' MOTION
## <u>TO DISMISS FOR FAILURE TO STATE A CLAIM</u>

## <u>TABLE OF CONTENTS</u>

**PAGE**

I.    FACTUAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Plaintiff Has Standing To Bring His Direct Causes Of
        Action Against Steven F. Herbert And James P. Gross . . . . . . . . . . . . . . . . . . . . . 2

    B.    Plaintiff's Cause Of Action For Fraud Is Well Pleaded . . . . . . . . . . . . . . . . . . . . 8

    C.    Plaintiff's Causes of Action For Negligent Misrepresentation
        and Negligence are Well-Pleaded . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    D.    Plaintiff Has Properly Stated A Claim For Violation
        Of New York General Business Law §349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## **TABLE OF AUTHORITIES**

**PAGE**

### **FEDERAL CASES**

*Adato v. Kagan,*
        599 F.2d 111 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Downriver Community Federal Credit Union v. Penn Square Bank,*
        879 F.2d 754 (10th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Dura Pharm., Inc. v. Broudo,*
        544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) . . . . . . . . . . . . . . . . . . . . . . . . 8

*Fin. Sec. Assur., Inc. v. Stephens, Inc.,*
        500 F.3d 1276 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hamid v. Price Waterhouse,*
        51 F.3d 1411 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Koehler v. Bank of Bermuda (New York) Ltd.,*
        209 F.3d 130 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Learning Works, Inc. v. Learning Annex, Inc.,*
        830 F.2d 541 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Micheslen v. Penney,*
        10 F. Supp. 537 (D.N.Y. 1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Mid-State Fertilizer Co. v. Exchange National Bank,*
        877 F.2d 1333 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Next Century Communications Corp.,*
        318 F.3d 1023 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Pareto v. FDIC,*
        139 F.3d 696 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Prime Mgmt. Consulting & Inv. Servs., LLC v. Certain Underwriters at
        Lloyd's London,*
        2007 WL 4592099 (N.D. Ga. Dec. 28, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Sunrise Sec. Litigation*,
    916 F.2d 874 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 6, 7

*Twombly v. Bell Atlantic Corp.*,
    425 F.3d 99 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**STATE CASES**

*Anderson v. Atlanta Comm. for the Olympic Games, Inc.*,
    584 S.E.2d 16  (Ga. Ct. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Goshen v. Mutual Life Insurance Co. of New York*,
    98 N.Y.2d 314, 774 N.E.2d 1190, 746 N.Y.S.2d 858 (2002) . . . . . . . . . . . . . . . . . 15, 16

*Hazelhurst v. Brita Products Co.*,
    295 A.D.2d  240, 744 N.Y.S.2d 31 (1st Dept 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*LaChance v. U.S. Smokeless Tobacco Co.*,
    931 A.2d 571 (N.H. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7 n.3

*Newitt v. First Union Bank*,
    60 S.E.2d 188 (Ga. Ct. App. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
    85 N.Y.2d 20, 647 N.E.2d 741, 623 N.Y.S.2d 529 (1995) . . . . . . . . . . . . . . . . . . . . 16

*Small v. Lorillard Tobacco Co., Inc.*,
    94 N.Y.2d 43, 720 N.E.2d 892, 698 N.Y.S.2d 615 (1999) . . . . . . . . . . . . . . . . . . . . 15

**FEDERAL STATUTES**

12 U.S.C. §1815(e)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

12 U.S.C. §1821(d)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

12 U.S.C. §1823(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## I.    FACTUAL STATEMENT

Defendants, the former principal executive officers of NetBank, FSB, and its parent company ("NetBank"), have moved to dismiss the Complaint.  They argue that plaintiff, a New York resident who had deposited funds in NetBank in excess of FDIC insurance limits, Complaint ¶¶1, 9, and now will not receive the full amount of those deposits as the result of the alleged wrongdoing of defendants, Complaint ¶5, has not stated a claim for fraud, negligent misrepresentation, negligence and violation of New York's consumer protection statute, New York General Business Law §349.  For the reasons set forth herein, the motion is not well-founded in the facts or the law and should be denied in its entirety.[1]

The facts alleged in the Complaint are straight forward and tell a story of defendants' operation of NetBank "in the absence of and contrary to sound, proper and prudent banking business practices and without meeting regulatory capital requirements," Complaint ¶14, and without adequate internal controls, proper loan documentation, underwriting standards and reserves for loan delinquencies and losses.  Complaint ¶1.  Defendants hid their improper actions from plaintiff by making a series of false and misleading statements in NetBank's SEC filings and press releases.  Complaint ¶¶2, 3, 10, 11, 15 and 16(a)-(e).  Defendants' last improper act before the OTS stepped in and took over NetBank on September 28, 2007, consisted of mailing to plaintiff on September 4, 2007, a Notice of Maturity to roll over his deposits in NetBank.  Complaint ¶18.  The Notice of Maturity was not only mailed in violation of an agreement with the OTS which defendants negotiated but also failed to disclose, *inter alia*, that NetBank was not

---

[1] Defendants have filed three separate but related motions with three briefs.  In actuality, it is one motion with three grounds for the relief sought.  Although their filings appear to be an effort to

a going concern and that plaintiff's deposits would not be returned to him on maturity, or at any other time. Complaint ¶¶17,18.

NetBank was the largest internet bank in the U.S., with no offices and all its business transacted over the internet. Complaint ¶1. Defendant Herbert was NetBank's Chief Executive Officer and defendant Gross was NetBank's Chief Financial Officer. Complaint ¶¶2, 3, 10, 11. Together they engaged in negligent and fraudulent conduct by making a series of false and misleading statements particularized in the Complaint and by operating NetBank in an unsound and improper manner particularized in the Complaint, all of which caused plaintiff to deposit his funds with NetBank and roll over those funds, at defendants' behest, only days before the OTS took over the operations of NetBank and NetBank was placed into bankruptcy.

## II.    ARGUMENT

### A.    Plaintiff Has Standing To Bring His Direct Causes Of Action Against Steven F. Herbert And James P. Gross

Plaintiff has sustained a direct injury and defendants are liable to him for his injury. Plaintiff has brought causes of action for fraud, negligent misrepresentation, negligence and violation of New York General Business Law §349. These long-standing common law and statutory causes of action exist to provide plaintiff with the necessary means to obtain relief for his loss of monies at the hands of defendants. Defendants, however, attempt to evade liability by seeking dismissal of the claims, in the absence of any discovery, on grounds that are steeped in the facts and in reliance on cases that are both non-controlling, outdated and readily distinguishable on their facts.

---

end-run the Court's page limitation for briefs, plaintiff is filing this brief and one other which addresses defendants' personal jurisdiction and venue arguments.

Defendants' argument is that plaintiff, who had money on deposit in NetBank in excess of FDIC insurance maximums, cannot sue defendants for fraud, negligent misrepresentation and violation of New York's consumer protection statute because he has been stripped of any direct causes of action by reason of the FDIC's appointment as receiver of Netbank. In an effort to support their theory, defendants cite primarily to the decision in *In re Sunrise Sec. Litig.*, 916 F.2d 874 (3d Cir. 1990) ("*Sunrise*").[2] However, as the court stated in *Sunrise, id.* at 883, the decision in *Sunrise* turned on the "distinct circumstances" of that case. None of the "distinct circumstances" upon which the Sunrise court relied are present in the case *sub judice*.

| *Sunrise* (page citation) | | Case *sub judice* | |
|---|---|---|---|
| 1. | None of the Old Sunrise depositors lost any portion of their Old Sunrise deposits, including those exceeding the insurance limit of $100,000 (p. 876) | 1. | Plaintiff has lost a substantial portion of his deposits in excess of the insurance limit of $100,000 |
| 2. | Plaintiffs sued under RICO which promotes the federal policy of deterrence and the court's holding is based on the elements of a cause of action under RICO (pp 877,881-82, 883) | 2. | Plaintiff sues under common law and the New York state consumer protection statute which promotes the state policy of enabling consumers to sue directly to redress their injuries |
| 3. | The court was concerned with not by-passing equitable and common-sense system of recovery (p. 887) | 3. | Since *Sunrise*, national depositor preference provisions were enacted 12 U.S.C. §1821(d)(11) |
| 4. | The FDIC brought suit against defendants 15 months prior to the plaintiffs' suit and sought to recover more than $589 million in damages to be distributed to plaintiffs and others pursuant to an established distribution scheme (p. 888) | 4. | The FDIC has taken no action to seek recovery from Steven F. Herbert and James P. Gross and the insurance policies applicable to plaintiff's claims. In fact, according to their affidavits, Gross |

---

[2]All of the other cases cited by defendants are referenced in *Sunrise*.

3

|   |   |   |   |
|---|---|---|---|
|   |   |   | remains an employee of NetBank and Herbert voluntarily resigned effective December 31, 2007 |
| 5. | Claim of injury is to institution which affected all depositors generally. (p. 887-88) | 5. | Here, the rollover of plaintiff's CD in violation of OTS agreement directly harmed plaintiff but benefitted Bank by bringing additional funds into bank to add to capital requirements (Complaint ¶¶17, 18) |

NetBank was the largest financial institution to be closed by the FDIC or OTS since the savings and loan crisis more than 14 years ago. As a result of the savings and loan crisis, and the concern with distribution of a failed bank's assets, on August 10, 1993, amendments to the Federal Deposit Insurance Act were enacted which established an order of preference for depositors and creditors. 12 U.S.C. §1821(d)(11). Prior to 1993, the distribution of assets of a failed bank were determined by the laws of the state in which the bank was chartered and such laws varied. Subsequently, the National Depositor Preference statute created a uniform system of distribution mandating the following priorities:

1. Administrative expenses of the receiver.

2. Any deposit liability of the institution.

3. Any other general or senior liabilities of the institution.

4. Any subordinated obligations.

5. Any obligation of commonly controlled depository institutions for cross-guaranty assessments under 12 U.S.C. §1815(e)(2)(C).

6. Any obligations to shareholders or members (including holding companies and their creditors).

Thus, the first payment priority is for the administrative expenses incurred by the FDIC, and then for deposit liabilities. In addition, since 1991, Congress curtailed the FDIC's discretion to extend protection beyond insured deposits because the FDIC cannot increase the loss to the deposit insurance fund. Thus, the FDIC must enter into the "least costly" transaction when dealing with a troubled bank. 12 U.S.C. §1823(c) (the FDIC Improvement Act of 1991) ("FDICIA").

Thus, the law has changed since *Sunrise* and there is no longer any issue of depositors gaining a priority by bringing direct claims because, by federal statute, the depositors are granted priority over all other "creditors." Accordingly, the remaining cases cited by defendants, all of which are cited in *Sunrise*, are equally inapplicable to the case *sub judice*. Additionally, the cases upon which defendants rely often involved claims brought against the FDIC, under RICO or under the general banking laws. None of these situations are present herein.

In *Adato v. Kagan*, 599 F.2d 111 (2d Cir. 1979), plaintiffs brought suit under the federal securities laws and the federal banking laws, none of which are present in the case *sub judice*. The Second Circuit analyzed the allegations of the Complaint in the context of a motion to dismiss in light of the elements of those specific federal statutes. However, on the banking law claims, the Second Circuit ruled that it could not be stated as a matter of law that depositors' claims were derivative in nature. *Id*. at 1117. The Second Circuit further stated that development of the facts was necessary to determine if plaintiffs had stated a claim. *Id*. at 1117-18.

Similarly, *Micheslen v. Penney*, 10 F. Supp. 537,539-40 (D.N.Y. 1934), recognized that "depositors may maintain a suit in equity . . . to press the claims of the failed bank against

directors at fault where the receiver declines to sue" but did not permit the claim to proceed because, as the case was decided before the adoption of Rule 23, F.R.C.P., the defrauded depositors could not bring a class or representative suit. The court specifically found that "allegations of false representations made by the defendants at the bank's solvency . . . is in no sense a derivative one . . . . The bank was not harmed by the defendant's representations." *Id.*

*Hamid v. Price Waterhouse*, 51 F.3d 1411,1420 (9th Cir. 1995), was, like *Sunrise*, brought under RICO, and also the Alien Tort Statute. The court analyzed the elements of those causes of action ("the injury...is not caused proximately by the RICO violations"), making special mention of the allegations of, *inter alia*, international terrorism, narcotics and arms dealing and bribery. *Id.* at 1414. The court, again, like the court in *Sunrise*, focused on the question whether the lawsuit would "disrupt the efforts of FDIC to recover the (bank's) assets." That question is clearly answered in the negative in the case *sub judice*, particularly since defendant Gross still works for NetBank with the approval of the FDIC and defendant Herbert worked for NetBank after the OTS takeover until December 31, 2007, with the approval of the FDIC. The FDIC is not going to sue those persons it permitted to continue to operate the bank after the OTS takeover.

*Downriver Community Federal Credit Union v. Penn Square Bank*, 879 F.2d 754 (10th Cir. 1989), is clearly inapposite as it involved a suit by depositors against the FDIC seeking to establish that the depositors were entitled to a constructive trust over the assets of the bank. In the case *sub judice*, the FDIC is not a party and the assets of NetBank are not involved or at issue. Similarly, in *Pareto v. FDIC*, 139 F.3d 696 (9th Cir., 1998), the stockholders of the bank sued the FDIC, as well as former directors of the bank. The Court found that the stockholder's

6

claim was derivative in nature because he "did not allege injury to a right he possessed as an individual, separate and distinct from the injury to value of the bank's stock and property." *Id.* at 699. The Ninth Circuit did, however, cite as an example of a direct claim, a claim by a shareholder that he was fraudulently induced to buy or sell stock. *Id.* at 700. That direct claim is analogous to plaintiff's claim, *sub judice*, that he was fraudulently induced to deposit monies in excess of insured limits by, *inter alia*, the Notice of Maturity mailed directly to him, and to not withdraw those funds. Finally, in *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333 (7th Cir. 1989), cited by defendants, the cause of action also was brought under RICO, as it was in *Sunrise*, and under the anti-tying provisions of the Bank Holding Company Act. The Seventh Circuit affirmed the dismissal by the District Court which had analyzed the specific claims to determine if they satisfied the requisite elements of each federal statute and found that there was no RICO predicate act and illegal tying. The long quote cited by defendants is also inapposite, as well as *dicta*, because it relates completely to the unique nature of an antitrust claim and the concern that enabling indirect purchasers to recover as well as direct purchasers for the same violation, leads to double counting, an inequitable situation.[3] That situation is not present here where, inter alia, no one else is suing defendants to recover the damages sustained by plaintiff and it would be inequitable to prevent plaintiff from recovering any damage at all.

Under the allegations of the Complaint, plaintiff has standing to bring common law causes of action for fraud and negligent misrepresentation and for violation of New York state's

---

[3]Recently the Supreme Court of New Hampshire held that an indirect purchaser of consumer goods may sue for antitrust violations under a state consumer protection act even where those claims are barred by the state antitrust statute. *LaChance v. U.S. Smokeless Tobacco Co.*, 931 A.2d 571 (N.H. 2007).

consumer protection statute.  In the context of these statutes and the facts and circumstances alleged in the Complaint, plaintiff has a direct cause of action.

**B.    Plaintiff's Cause Of Action For Fraud Is Well Pleaded**

Plaintiff has pleaded all of the requirements for fraud.[4]  Pursuant to Rule 8(a)(2), Fed. R. Civ. P., the complaint contains "a short and plain statement of the claim showing that [plaintiff] is entitled to relief."  Rule 8 is "not meant to impose a great burden upon a plaintiff," *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), and "[t]he complaint thus need not set out in detail the facts upon which the claim is based." *Twombly v. Bell Atlantic Corp.*, 425 F.3d 99, 107 (2d Cir. 2005) (citation omitted).  Plaintiff also has satisfied Rule 9(b), Fed. R. Civ. P., with respect to the fraud cause of action pleaded in Count III of the Complaint by specifying: "(1) those statements the plaintiff thinks were fraudulent, (2) the speaker, (3) where and when they were made, and (4) why plaintiff believes the statements to be fraudulent." *Koehler v. Bank of Bermuda (New York) Ltd.*, 209 F.3d 130, 136 (2d Cir. 2000). Rule 9(b), Fed. R. Civ. P., specifically provides that "intent, knowledge, and other condition of mind of a person may be averred generally."

Plaintiff, in ¶¶2, 3, 10, 11, 15, 16(a)-(e), and 18 of the Complaint, identifies the false and misleading statements made by defendants.  As alleged in ¶¶15, 16 and 18 of the Complaint, the false and misleading statements are contained in NetBank's Form 10-Q for the quarter ended September 30, 2006 filed with the SEC, NetBank's Form 8-K filed with the SEC, NetBank's press releases dated November 8, 2006 (the "supervisory agreement" with the OTS "set forth

---

[4]New York law controls because plaintiff was defrauded in New York, his state of residence, and the false statements made by defendants were delivered into New York, for the purpose of

specific strategies and actions the board will take to improve the bank's performance and to ensure proper practices in critical areas of operation and compliance"), January 8, 2007 ("the additional capital will allow us to maintain optimal capitalization within the bank"), February 21, 2007 ("the worst of the non-conforming loan repurchase program is now behind the company . . . we were able to substantially execute a restructuring plan designed to stabilize the company's operating profile and capital position"), May 1, 2007 ("we have generated significant new tangible capital [that] will prove important in our effort to maintain proper regulatory capital ratio") and May 21, 2007 (the sale of NetBank "will allow the bank to fulfill all of its deposit liabilities"), and in the Notice of Maturity, addressed to plaintiff, dated September 4, 2007, attached to the Complaint.[5]

The SEC Form 10-Q was signed by each of defendants and also contained the false and misleading certifications signed be each of defendants. The certifications are required by law and each, as did the SEC Form 8-K, falsely described the state of controls purportedly in place at NetBank to assure accurate financial reporting. Defendant Herbert is quoted in the false and misleading press releases and those false and misleading statements are quoted in the Complaint.

defrauding plaintiff. This is particularly true with respect to the cause of action for violation of New York General Business Law §349.

[5]These alleged false and misleading statements are not statements of opinion or predictions of future events as defendants erroneously argue. As alleged, and as supported by the findings of the OTS, attached hereto as Exhibit "A," the statements are misrepresentations of current or historical fact. For example, the sworn certifications contained in the SEC filings falsely state that NetBank has, as of the date of each certification, adequate financial controls. Similarly, the false statements quoted in the company's press releases, as alleged in paragraph 16 of the complaint, are misstatements of current or historical fact. For example, defendant Herbert's statement in the May 1, 2007 press release that "we have generated significant new tangible capital..." is a statement of current or historical fact. Defendants also attempt to argue the "merits" of certain of the false statements, at page 18 of their brief. However, in the absence of discovery, that effort is improper on a motion to dismiss.

The Notice of Maturity was false and misleading because it failed to advise plaintiff that NetBank was not a going concern, was considered "undercapitalized" by the OTS and was subject to certain operating restrictions and mailed in violation of the restrictions imposed on NetBank by the OTS.

In ¶¶14-16, 19, and 20 of the Complaint, plaintiff alleges that he believes these statements are false and misleading because defendants knew but did not disclose in their press releases, SEC filings and Notice of Maturity that they:

> operated NetBank in the absence of and contrary to sound, proper and prudent banking business practices and without meeting regulatory capital requirements...[including] failed business strategies, lack of proper controls, poor documentation, and weak underwriting standards and execution. As a result of these inadequacies, Netbank experienced a significant volume of payment defaults on loans made by NetBank which NetBank sold to their parties. NetBank and the Company had inadequate reserves for loan losses and loan payment delinquencies and had inadequate capital to continue as a going concern. Consequently, all of the deposits in Netbank in excess of FDIC insured limits were at great peril of being lost. Complaint, ¶14.

The Complaint also alleges in ¶14 that the OTS, when it shut down NetBank made similar findings. *See* OTS Press Release dated September 28, 2007, attached hereto as Exhibit "A."[6]

Plaintiff also has alleged in the Complaint, ¶¶2-4,15 and 41, that, *inter alia,* defendants were the principal executive officers of NetBank who were responsible for its operations and who operated the company in an improper and deceitful manner, signed and prepared the false and misleading SEC filings and sworn certifications, press releases and Notice of Maturity and acted with the requisite scienter for common law fraud.[7]

---

[6]The Complaint references the OTS action on September 28, 2007 in ¶¶1 and 20.

[7]As defendants acknowledge, scienter is not an element of plaintiff's causes of action for negligence, negligent misrepresentation and violation of New York General Business Law §349.

All of these particularized factual allegations satisfy the Rule 9(b), Fed. R. Civ. P., standard for pleading scienter in a common law fraud claim.    Even defendants' own arguments make it clear that they knew all of the facts which plaintiff alleges they failed to disclose. Defendants argue, however, that those facts either were disclosed or did not need to be disclosed. Defendants cannot seriously take the position that as the CEO and CFO of NetBank, respectively, who made all of the principal operating and financial decisions with respect to the operations of NetBank and who signed all of NetBank's SEC filings, including the statutorily-mandated sworn certifications, and issued and were quoted in NetBank's press releases that they did not know that, *inter alia*:

1.    NetBank was undercapitalized;

2.    Netbank lacked adequate internal controls;

3.    Netbank lacked proper loan documentation;

4.    Netbank lacked adequate underwriting standards;

5.    NetBank failed to take adequate reserves for loan losses and loan delinquencies and record them on NetBank's financial statements; and

6.    The Notice of Maturity was mailed in violation of the agreement defendants entered into with the OTS and failed to disclose NetBank's adverse financial condition as of September 4, 2007.

Defendants may take issue with these facts  but they cannot argue, on a motion to dismiss in the absence of discovery, that plaintiff has not adequately pleaded the basis for defendants' scienter.  For example, plaintiff alleges, Complaint ¶16(a), that NetBank's press release, filed with the SEC in NetBank's Form 10-Q signed by defendant Gross, described the supervisory agreement signed by defendant Herbert with the OTS on November 6, 2006, as setting forth

11

"specific strategies and actions the board will take to improve the bank's performance and to ensure proper practices in critical areas of operation and compliance." Thus, defendants knew, at least as early as of November 6, 2006, that NetBank had the serious problems outlined in items 1-5 above. Defendants further knew on September 4, 2007, when they mailed the Notice of Maturity to plaintiff, that they had not corrected those problems affecting NetBank's "critical areas of operation and compliance." That inference is clear from the fact that only 24 days later, the OTS stepped in and took over NetBank stating in its press release that, *inter alia*, NetBank suffered from:

> weak underwriting, poor documentation, a lack of proper controls, and failed business strategies [and] the actions taken to address these problems were unsuccessful and it became clear that high operating expenses combined with continuing losses were jeopardizing the institution's viability. In response, NetBank's board of directors undertook efforts to complete a private sale of the institution. These efforts were unsuccessful and the institution had no remaining prospects for raising capital and achieving profitability.[8]

Defendants clearly knew all of these facts on September 4, 2007 when they sent plaintiff the false and misleading Notice of Maturity. Defendants also knew these facts prior thereto, having discussed these aspects of NetBank's operations in company press releases, alleged in the Complaint in ¶16:

1.   NetBank's January 8, 2007 press release discusses NetBank's efforts to raise capital and includes defendant Herbert's statement that "[w]e believe the additional capital will allow us to maintain optimal capitalization within the bank;"

2.   NetBank's February 21, 2007 earnings press release discussing efforts to resolve NetBank's nonconforming loan repurchase program and describing NetBank's restructuring plan in which defendant Herbert states that "we were able to substantially execute a restructuring plan designed to stabilize the company's operating profile and capital position;"

---

[8]See Exhibit "A," attached to Gross Declaration, the OTS September 28, 2007 press release.

3.    NetBank's May 1, 2007 press release discussing NetBanks' financial condition in which defendant Herbert states that "we have generated significant new tangible capital;" and

4.    NetBank's May 21, 2007 press release announcing the proposed sale of NetBank.

Plaintiff also has adequately pleaded reliance.    Complaint ¶¶18, 19, 21 and 42. Defendants mischaracterize both the Complaint and the law in an effort to support their argument.    For example, in paragraph 18 of the Complaint, plaintiff pleads the false and misleading Notice of Maturity pursuant to which he rolled over his deposit and attached it to the Complaint as Exhibit "A."    That Notice of Maturity was sent to plaintiff on September 4, 2007, only 24 days before the OTS shut down the operations of NetBank.    The Notice of Maturity was sent to plaintiff after the August 6, 2007 date which defendants argue precludes any reliance by plaintiff.    Plaintiff's reliance on the Notice of Maturity was clearly justifiable, however, as it post-dates August 6, 2007, was sent to plaintiff without any mention of NetBank's impaired capital position and was mailed in violation of the agreement with the OTS.    In addition, the OTS did not take over NetBank on August 6, 2007, and the fact that the OTS permitted NetBank to continue operations under the control of defendants gives the "good housekeeping seal of approval" to the bank's solvency and legitimacy.    Furthermore, Netbank and its parent did not file for bankruptcy until September 28, 2007.    These pleaded facts, alone, rebut defendants' argument that plaintiff's "failure to reduce his deposits with NetBank . . . was unreasonable as a matter of law."    Defendants' brief at page 21.    If one accepted defendants' position that no one should have done business with NetBank after August 6, 2007,  then defendants had no legal basis for keeping NetBank open after that date and holding it out as an operating bank.

13

Furthermore, the cases cited by defendants do not support their argument.  *Newitt v. First Union Bank,* 60 S.E.2d 188, 191 (Ga. Ct. App. 2004), and *Fin. Sec. Assur., Inc. v. Stephens, Inc.,* 500F.3d 1276,1282 (11th Cir. 2007), were not decided on  motions to dismiss but rather on summary judgment with a full factual record.  Here, plaintiff has had no discovery.  In *Learning Works, Inc. v. Learning Annex, Inc.*, 830 F.2d 541, 546 (4th Cir. 1987), plaintiff alleged that it had ceased operating its business pursuant to the agreement at issue between the parties.  The court, however, found that because there was nothing in that agreement that required plaintiff to cease operating its business, more factual allegations were necessary to plead reliance.  In sharp contrast, in the case *sub judice*, plaintiff has pleaded that defendants' Notice of Maturity dated September 4, 2007, was a direct solicitation by defendants to plaintiff and in response thereto plaintiff rolled over his deposits with Netbank.  In *Next Century Communications Corp.*, 318 F.3d 1023, 1029-30 (11th Cir. 2003) and  *Anderson v. Atlanta Comm. for the Olympic Games, Inc.*,  584 S.E.2d 16, n. 21   (Ga. Ct. App. 2003), the courts found that reliance was legally unreasonable where the statements were mere "puffery" or statements of opinion or hope. *Anderson* was also decided on summary judgment.  As discussed above, the statements at issue here are of current or historical fact and upon which plaintiff was entitled to rely.  In *Prime Mgmt. Consulting & Inv. Servs., LLC v. Certain Underwriters at Lloyd's London*, No. 1:07-cv-15787-WSD, 2007 WL 4592099 , at * 23 (N.D. Ga. Dec. 28, 2007), the court found that plaintiff "does not allege any facts showing how it actually relied on the statement or how, had Plaintiff known of the invoice . . ., it could have prevented damage to itself."  Here, plaintiff has pleaded the specific fact, *inter alia*, of the receipt of defendants' Notice of Maturity, dated September 4, 2007, and that pursuant to that Notice of Maturity, he rolled over his deposits at NetBank.  If

14

defendants had not made false and misleading statements in the Notice of Maturity, plaintiff would have withdrawn his deposits before the OTS took over NetBank on September 28, 2007 and avoided injury.

Thus, plaintiff has properly pleaded a cause of action for common law fraud pursuant to Rules 8 and 9(b), Fed. R. Civ. P., and applicable precedent.

### C.    Plaintiff's Causes of Action For Negligent Misrepresentation and Negligence are Well-Pleaded

Counts I and II of the Complaint plead causes of action for Negligent Misrepresentation and Negligence, respectively.  Defendants' arguments that the statements are "opinion or future promises" and are not false are repetitive of their fraud arguments.  For the same reasons argued above, defendants' position is not well-founded and should be rejected.

### D.    Plaintiff Has Properly Stated A Claim For Violation Of New York General Business Law §349

Plaintiff has stated a *prima facie case* under New York General Business Law §349, New York's consumer protection statute.  General Business Law §349 is designed to protect consumers against "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]. " §349(a).  The statute creates a private right of action by "any person who has been injured by reason of any violation of §349."   General Business Law §349(h).

The scope of the statute "is intentionally broad, applying 'to virtually all economic activity.'"  *Goshen v. Mutual Life Ins. Co. of New York*, 98 N.Y.2d 314, 324, 774 N.E.2d 1190, 1195, 746 N.Y.S.2d 858, 863 (2002) (citation omitted).  Plaintiff must allege both a deceptive act or practice directed toward consumers that resulted in actual injury to plaintiff.  *Small v.*

15

*Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 55-56, 720 N.E.2d 892, 897, 698 N.Y.S.2d 615, 620 (1999).

Plaintiff has pleaded a claim for violation of §349. He has pleaded a deceptive act and practice, *i.e.*, soliciting deposits and the roll over of deposits knowing and without disclosing, *inter alia*, that the bank did not have the financial wherewithal to pay back those deposits. Plaintiff has alleged that as the result of those deceptive acts and practices, plaintiff is unable to obtain the full amount of his deposits. *See Goshen v. Mutual Life Ins. Co. of New York*, 98 N.Y.S.2d 314, 774 N.E.2d 1190, 1195, 746 N.Y.S.2d 858, 863 (2002) (plaintiff must show that defendants made falsehoods or omissions that were likely to mislead a reasonable consumer in the plaintiff's circumstances, that s/he was deceived by those false statements or omissions and that, as a result, s/he was caused injury). Reliance is not an element of a §349 claim. *Hazelhurst v. Brita Products Co.*, 295 A.D.2d. 240, 242, 744 N.Y.S.2d 31, 33 (1st Dept 2002). Scienter is not an element of a §349 claim. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26, 647 N.E.2d 741, 744, 623 N.Y.S.2d 529, 532 (1995). §349.

Defendants do not seriously contend that plaintiff has not made out a claim under §349. Rather, they argue, as they did in response to plaintiff's fraud claim, that plaintiff has not alleged a false statement and that plaintiff did not act reasonably. As discussed above, those arguments are factually incorrect, particularly on a motion to dismiss in the absence of discovery.

Accordingly, plaintiff has stated a claim under §349.

## III.    CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the Complaint should be denied

in its entirety.

Date:   February 26, 2008

**LAW OFFICES OF KENNETH  ELAN**
**BY:**

/s/ Kenneth Elan – KAE-1729
 **KENNETH ELAN (KAE-1729)**
217 Broadway, Suite 606
New York, NY 10007
Telephone: 212-619-0261
Fax: 212-385-2707


**LAW OFFICES BERNARD M. GROSS, P.C.**
**DEBORAH R. GROSS**
**ROBERT P. FRUTKIN**
Suite 450, The Wanamaker Bldg.
100 Penn Square East
Philadelphia, PA 19107
Telephone:  215-561-3600
Fax: 215-561-3000

Attorney for Plaintiff

# Office of Thrift Supervision

FOR RELEASE at 3:00 P.M. EDT

Friday, September 28, 2007

OTS 07-71

For further information

Contact: Kevin Petrasic

202/906-6677

# OTS Appoints FDIC Receiver of NetBank

Washington, D.C. — The Office of Thrift Supervision (OTS) announced today that it closed $2.5 billion NetBank, headquartered in Alpharetta, Georgia, and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver.

NetBank sustained significant losses in 2006 primarily due to early payment defaults on loans sold, weak underwriting, poor documentation, a lack of proper controls, and failed business strategies. As a result, the OTS executed a formal enforcement action with NetBank in 2006 directing the institution to correct its operating deficiencies and enhance its capital position. While the institution continued to operate in excess of minimum capital standards, the actions taken to address these problems were unsuccessful and it became clear that high operating expenses combined with continuing losses were jeopardizing the institution's viability.

In response, NetBank's board of directors undertook efforts to complete a private sale of the institution. These efforts were unsuccessful and the institution had no remaining prospects for raising capital and achieving profitability. Accordingly, the OTS exercised its authority under the Home Owners' Loan Act to appoint the FDIC as receiver of the institution.

Depositors' accounts at NetBank are insured by the FDIC's Deposit Insurance Fund up to the statutory limits. Customer questions regarding the institution, including questions about federal deposit insurance coverage, should be directed to the FDIC at 1-888-256-6932.

###

The Office of Thrift Supervision, an office of the Department of the Treasury, regulates and supervises the nation's thrift industry. OTS's mission is to ensure the safety and soundness of, and compliance with consumer protection laws by, thrift institutions, and to support their role as home mortgage lenders and providers of other community credit and financial services. OTS also oversees the activities and operations of thrift holding companies that own or control thrift institutions. Copies of OTS news releases and other documents are available at the OTS web page at www.ots.treas.gov.

*Created: Friday, 9/28/2007*