# IN THE UNITED STATES DISTRICT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **MATTHEW TOTILO, individually and on behalf of himself and all others similarly, situated,** | : : : | |
| Plaintiff, | : : | **CLASS ACTION**<br>**NO. 07-cv-10991** |
| v. | : : : | |
| **STEVEN F. HERBERT and JAMES P. GROSS** | : : : | |
| Defendants. | : : | |

## DECLARATION OF DEBORAH R. GROSS

Deborah R. Gross hereby declares as follows:

1.     I am with the firm of Law Offices Bernard M. Gross, P.C. and am one of the attorneys for the plaintiff Matthew Totilo.   I make this declaration in support of Plaintiff's Opposition to Defendants' Motions to Dismiss for Failure to State a Claim, Lack of Personal Jurisdiction and Improper Venue and for Transfer of Venue.

2.     Attached hereto as Exhibit A is a true and correct copy of Resource America, Inc.'s SEC Form 8-K dated October 25, 2007.

3.     Attached hereto as Exhibit B is a true and correct copy of Bloomberg.com news article entitled "NetBank Files for Bankruptcy After Regulators Take Over Unit," dated September 29, 2007.

4.     Attached hereto as Exhibit C is a true and correct copy of the Declaration of Matthew Totilo.

5.    Attached hereto as Exhibit D is a true and correct copy of NetBank, Inc.'s SEC Form 8-K filed January 8, 2007.

6.    Attached hereto as Exhibit E is a true and correct copy of the Complaint filed in *NetBank v. Mortgage Center, Inc. et al.*, Civ. No. 05-cv-03955 (ERK) (E.D.N.Y.), on August 18, 2005.

7.    Attached hereto as Exhibit F is a true and correct copy of the Order filed *The Provident Bank v. Community Home Mortgage Corp.*, Civ. No. 02-cv-5219 (JFB) (E.D.N.Y.) dated May 7, 2007.

8    Attached hereto as Exhibit G is a true and correct copy of the Complaint filed in *DLJ Mortgage Capital, Inc. v. NetBank, Inc., et al.*, Civ. No. 06-cv-15211 (S.D.N.Y.), dated December 17, 2007.

9.    Attached hereto as Exhibit H is a true and correct copy of NetBank, Inc.'s SEC Form 8-K/A dated January 4, 2007.

10.    Attached hereto as Exhibit I is a true and correct copy of NetBank, Inc.'s Voluntary Petition for Bankruptcy, Case No. 07-bk-04295-JAF (M.D. Fla), filed September 28, 2007.

11.    Attached hereto as Exhibit J is a true and correct copy of NetBank, Inc.'s Summary of Schedules re: Assets and Liabilities, Case No. 07-bk-04295-JAF (M.D. Fla), filed October 9, 2007.

I declare under penalty of perjury that the foregoing is true and correct.   Executed on February 25, 2008.


/s/ Deborah R. Gross
**DEBORAH R. GROSS**

# EXHIBIT "A"

*This is an EDGAR HTML document rendered as filed. [ Alternative Formats ]*

---

rai8kleafacqnetbank.htm

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

## FORM 8-K
### CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): October 25, 2007

# RESOURCE AMERICA, INC.
(Exact name of registrant as specified in its charter)

| Delaware | 0-04408 | 72-0654145 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

One Crescent Drive, Suite 203, Philadelphia, Pennsylvania  19112
(Address of principal executive offices) (Zip Code)

Registrant's telephone number, including area code: (215) 546-5005

N/A
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01 Entry into a Material Definitive Agreement.**

On October 25, 2007 LEAF Funding, LLC, an indirect subsidiary of ours, entered into a Loan Sale Agreement with the Federal Deposit Insurance Corporation as Receiver of NetBank, Alpharetta, Georgia, to acquire substantially all of the assets of NetBank Business Finance, the equipment leasing division of NetBank.  The purchase price is approximately $410 million.  We expect that financing for the acquisition will be provided through Morgan Stanley Bank.  The acquisition is required to close on or before November 7, 2007.

The Registrant's press release dated October 29, 2007 announcing entry into the Loan Sale Agreement is attached hereto as Exhibit 99.1.

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

Exhibit No.                          Description


99.1                          Press Release dated October 29, 2007

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

RESOURCE AMERICA, INC.

Date: October 31, 2007

By:/s/ Steven J. Kessler

    Name: Steven J. Kessler
    Title: Executive Vice President and Chief
    Financial Officer

EXHIBIT INDEX

Exhibit No.                          Description

99.1                    Press Release dated October 29, 2007

*This is an EDGAR HTML document rendered as filed.  [ Alternative Formats ]*

prleafacqleasingportf.htm

Exhibit 99.1



**Resource America, Inc.**

## FOR IMMEDIATE RELEASE

Contact:    Pamela Schreiber
Investor Relations
Resource America, Inc.
1845 Walnut Street, 10th Floor
Philadelphia, PA 19103
(215) 546-5005

### Resource America's LEAF Financial Corporation to
### Acquire $430 million Leasing Portfolio from the FDIC

**Philadelphia, PA - October 29, 2007 - Resource America, Inc. (NASDAQ:REXI)** announces today that its commercial finance subsidiary, LEAF Financial Corporation *("LEAF"),* has been selected by the FDIC as the purchaser of the approximately $430 million leasing portfolio of NetBank Business Finance, the equipment leasing division of NetBank, based out of Columbia, South Carolina.  NetBank is currently being operated in receivership by the FDIC.  LEAF will acquire the portfolio on behalf of investment partnerships that it manages at a discount.  Financing for this acquisition will be provided by Morgan Stanley Bank.

LEAF has entered into a definitive agreement with the FDIC to acquire the portfolio and leasing business and expects to close the transaction in early November 2007.  The portfolio will include over 10,000 leases and loans to small businesses throughout the United States.  In addition, LEAF intends to continue the lease origination and management platform in Columbia and to retain what is one of the industry's most experienced small ticket leasing teams, which will maintain its relationships with over 200 third party originators.  After this acquisition, LEAF will manage over $1.6 billion of commercial leases and finance assets for its own account, individual and institutional investors.  With this acquisition, LEAF anticipates that it will have the ability to originate over $1 billion of leasing and loan assets next year.

Jonathan Cohen, President and Chief Executive Officer of Resource America, Inc. commented, *"Resource America is excited to be taking advantage of the dislocation in the credit markets and lack of liquidity by other players.  Resource is built on being an opportunistic investor and creating value; this investment will allow LEAF to rise to the next level by adding quality assets
and people.  The acquisition reflects Resource's recognition that during the current turbulence in financial and credit markets, there are opportunities to obtain high quality assets in distress situations, thus creating excellent value for its own account and for its investors.  LEAF's scope and scale will allow it to operate more profitably."*

LEAF Financial Corporation is a commercial finance and asset management company headquartered in Philadelphia, PA.  LEAF's business model is to originate small to middle ticket equipment leases and loans in a variety of asset classes through five strategic business units. After origination, LEAF manages the leases for its own account, institutions, and individual investors through investment partnerships and other investment vehicles. LEAF Financial Corporation is a

subsidiary of Resource America, Inc. (NASDAQ:REXI).

Resource America is a specialized asset management company that uses industry specific expertise to generate and administer investment opportunities for its own account and for outside investors in the financial fund management, real estate and commercial finance sectors. For more information please visit our website at www.resourceamerica.com or contact Investor Relations at pschreiber@resourceamerica.com.

*Certain matters discussed within this press release are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Although Resource America, Inc. believes the expectations reflected in such forward-looking statements are based on reasonable assumptions, it can give no assurance that its expectations will be attained. Factors that could cause actual results to differ materially from expectations include financial performance, regulatory changes, changes in local or national economic conditions and other risks detailed from time to time in the Company's reports filed with the SEC, including quarterly reports on Form 10Q, reports on Form 8-K and annual reports on Form 10-K.*

# EXHIBIT "B"

**Bloomberg.com**



## NetBank Files for Bankruptcy After Regulators Take Over Unit

By Bill Rochelle

Sept. 29 (Bloomberg) -- The parent of NetBank, a pioneer in Internet banking, filed for bankruptcy protection after the savings-and-loan became the first in three years to fail.

The filing in U.S. Bankruptcy Court by NetBank Inc. in Jacksonville, Florida listed assets of $87.2 million and debt totaling $42.4 million.

The bankrupt holding company plans to sell real estate it owns in Columbia, South Carolina and its captive reinsurance subsidiary M.G. Reinsurance Inc. The Chapter 11 filing occurred after a sale of the savings-and-loan fell through and it was taken over by the Federal Deposit Insurance Corp. following a shutdown of the unit by U.S. regulators.

Federal law prohibits the savings-and-loan subsidiary from filing for bankruptcy protection from creditors like its parent. Federally chartered banks cannot be reorganized and must be liquidated by the FDIC.

NetBank was founded in 1996 and went public in 1997. The bank had 286,000 customers and $4.8 billion in assets in 2005 before online competition from national and regional banks eroded the business.

The bank's failure this year was the result of margin compression from an inverted yield curve, fewer mortgage originations, and demands to repurchase delinquent loans, according to a bankruptcy court filing.

As part of the FDIC takeover, ING Bank announced it is assuming $1.4 billion of the failed bank's deposits and 104,000 of its customers while EverBank Inc. acquired $700 million of NetBank's mortgage assets.

The savings-and-loan subsidiary had $2.5 billion in assets and $2.3 billion in total deposits as of June 30, according to the FDIC.

NetBank said in filings with the Securities and Exchange Commission that its executive offices are in Alphafretta, Georgia while the bankruptcy petition listed Jacksonville as the main office.

NetBank's stock closed Sept. 28 at 7 cents a share, down 1 cent in over-the-counter trading.

The case is In re NetBank Inc., No. 07-04295, U.S. Bankruptcy Court, Middle District Florida (Jacksonville).

To contact the reporter on this story: Bill Rochelle in New York at **wrochelle@bloomberg.net** .

*Last Updated: September 29, 2007 16:06 EDT*



©2008 BLOOMBERG L.P. ALL RIGHTS RESERVED. Terms of Service | Privacy Policy | Trademarks

# EXHIBIT "C"

IN THE UNITED STATES DISTRICT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MATTHEW TOTILO, individually and on
behalf of himself and all others similarly,
situated,

:
:
:
:                    CLASS ACTION
Plaintiff,              :        NO. 07-cv-10991
:
v.                                :
:
:
STEVEN F. HERBERT and            :
JAMES P. GROSS                     :
:
Defendants.              :

## DECLARATION OF MATTHEW TOTILO

1.    My name is Matthew Totilo.  I am over eighteen years of age and am competent to make the following declaration.

2.    I currently reside at 4 Rock Hill Drive, Courtlandt Manor, New York, and I have been a resident of the State of New York since 1944.

3.    I have never been to NetBank's offices in Georgia.

4.    I have been a customer of NetBank since 2002.

5.    While I do not presently recall the format (e.g., computer or mail), I received a solicitation in New York to open an account at Netbank.

6.    I applied to open an account by filling out a Netbank application and returned same by mail. I made additional deposits to my account via mail.

7.    I called Netbank's telephone number from time to time to inquire about then-current rates of certificates of deposit. I sent notices to Netbank via facsimile when I

wanted to change the terms of my certificates of deposit that were about to mature.

8.    I also viewed Netbank's website to see information pertaining to interest rates.

9.    A maturity notice dated September 4, 2007, was mailed to me at my residence informing me that my 12-month certificate of deposit was scheduled to mature on September 24, 2007 and that unless I indicated otherwise, my CD would automatically renew on the date of maturity for the same terms as the original CD. A true and correct copy of the NetBank Certificate of Deposit Maturity Notice dated 9/4/2007, is attached as Exhibit A to the Complaint. In reliance on the notice of maturity, I took no action and the CD was renewed.

10.    On September 28, 2007, I had funds in excess of $100,000.00 on deposit with NetBank.

11.    Pursuant to 28 U.S.C. ' 1746, I declare under penalty of perjury that the foregoing is true and correct.


This 22 February, 2008.


Matthew Totilo

EXHIBIT "D"

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 OR 15(d) of The Securities Exchange Act of 1934

Date of Report (Date of earliest event reported):  **December 29, 2006**

# NETBANK, INC.
### (Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Georgia** | **0-22361** | **58-2224352** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| | |
|---|---|
| **1015 Windward Ridge Parkway, Alpharetta, GA** | **30005** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code  **770-343-6006**

**N/A**
(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 3.02**       **Unregistered Sale of Equity Securities.**

On January 5, 2007, NetBank, Inc. (the "Company") completed a private placement and sold 6,500,000 shares of its common stock (the "Shares") to seven institutional investors (collectively, the "Purchasers," and each, a "Purchaser"), at $3.90 per share, resulting in an aggregate offering price of approximately $25.3 million, (hereinafter, the "Private Placement"). The Company will pay approximately $1.4 million in aggregate commissions to JMP Securities LLC, the private placement agent, and intends to use the net proceeds from the Private Placement for general corporate purposes. In connection with the Private Placement, the Company and each of the Purchasers entered into a purchase agreement, dated December 29, 2006 (the "Purchase Agreements").

The Shares offered and sold to the Purchasers in the Private Placement were not registered under the Securities Act of 1933, as amended (the "Securities Act"), and were issued and sold in reliance upon an exemption from registration provided by Section 4 (2) of the Securities Act and Rule 506 of Regulation D promulgated thereunder, and in reliance on similar exemptions under applicable state laws. The Shares may not be offered or sold in the United States absent registration or exemption from the registration requirements under the Securities Act.

Pursuant to the Purchase Agreements, the Company has agreed to (1) file a Registration Statement to register the resale of the Shares with the Securities and Exchange Commission (the "Commission") as soon as practicable after filing with the Commission the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2006, and (2) use its best efforts to have the Registration Statement declared effective within 150 days after January 5, 2007 (the "Closing Date"). If the Registration Statement is not filed with the Commission and declared effective within 150 days of the Closing Date, then, subject to the aggregate limit on liquidated damages described below, the Company has agreed to pay each Purchaser, until the Registration Statement is declared effective, liquidated damages in an amount equal to 0.75% per month for the first two months after the 150 th day after the Closing Date, and thereafter 1.00% per month, of the purchase price paid by each such Purchaser in the Private Placement for any Shares then held by such Purchaser. Past due liquidated damages shall bear interest at a rate of 1.50% per month. Under the Purchase Agreement, the maximum aggregate amount of liquidated damages, and interest thereon, payable to any Purchaser is limited to 12% of the purchase price paid by such Purchaser in the Private Placement for any Shares then held by such Purchaser.

In addition, the Company has agreed to keep the Registration Statement effective until the earlier of (1) two years after the initial effective date of the Registration Statement, (2) such time as all Shares have been sold pursuant to the Registration Statement, or (3) such time as the Shares may be resold pursuant to Rule 144(k) under the Securities Act. If, after the Registration Statement is declared effective, the Company suspends the use of the Registration Statement for the resale of the Shares for more than 60 consecutive days or more than 90 days in any 12-month period, then, subject to the aggregate limit on liquidated damages described above, the Company has agreed to pay each Purchaser, during such extended period, liquidated damages in an amount equal to 0.75% per month for the first two months, and thereafter 1.00% per month, of the purchase price paid by each such Purchaser in the Private Placement for any Shares then held by such Purchaser.

The foregoing description of the Private Placement and Purchase Agreements does not purport to be complete and is qualified in its entirety by the form of Purchase Agreement attached hereto as Exhibit 10.1 and incorporated by reference herein.

2

**Item 8.01 Other Events.**

A press release dated January 8, 2007, announcing the completion of the Private Placement is attached hereto as Exhibit 99.1 and is incorporated by reference herein.

**Item 9.01. Financial Statements and Exhibits**

(d) Exhibits.

| Exhibit Number | Description of Exhibit |
| --- | --- |
| 10.1 | Form of Purchase Agreement, dated December 29, 2006, between NetBank, Inc. and the purchasers |
| 99.1 | Press Release, dated January 8, 2007, announcing the completion of the Private Placement |

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

NETBANK, INC.

Date: January 8, 2007

By:  /s/ James P. Gross

James P. Gross

Chief Finance Executive

3

Exhibit 10.1

### PURCHASE AGREEMENT

THIS AGREEMENT is made as of the 29 th day of December, 2006, by and between NetBank, Inc. (the " Company "), a corporation organized under the laws of the State of Georgia, with its principal offices at 1015 Windward Ridge Parkway, Alpharetta, Georgia 30005 and the purchaser whose name and address is set forth on the signature page hereof (the " Purchaser ").

IN CONSIDERATION of the mutual covenants contained in this Agreement, the Company and the Purchaser agree as follows:

SECTION 1.    Authorization of Sale of the Shares . Subject to the terms and conditions of this Agreement, the Company has authorized the issuance and sale of up to 6,800,000 shares (the " Shares ") of common stock, par value $0.01 per share (the " Common Stock "), of the Company.

SECTION 2.    Agreement to Sell and Purchase the Shares . At the Closing (as defined in Section 3), the Company will, subject to the terms of this Agreement, issue and sell to the Purchaser and the Purchaser will buy from the Company, upon the terms and conditions hereinafter set forth, the number of Shares (at the purchase price) shown below:

| Number of Shares to Be Purchased | Price Per Share In Dollars | Aggregate Price |
|---|---|---|
| | $    3.90 | $ |

The Company proposes to enter into this same form of purchase agreement with certain other investors (the " Other Purchasers ") and expects to complete sales of the shares of Common Stock to them.  The Purchaser and the Other Purchasers are hereinafter sometimes collectively referred to as the " Purchasers ," and this Agreement and the purchase agreements executed by the Other Purchasers are hereinafter sometimes collectively referred to as the " Agreements ."  The term " Placement Agent " shall mean JMP Securities LLC.

SECTION 3.    Delivery of the Shares at the Closing . The completion of the purchase and sale of the Shares (the " Closing ") shall occur at the offices of Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York  10104 as soon as practicable and as agreed to by the parties hereto, within three business days following the execution of the Agreements, or on such later date or at such different location as the parties shall agree in writing, but not prior to the date that the conditions for Closing set forth below have been satisfied or waived by the appropriate party (the " Closing Date ").

At the Closing, the Purchaser shall deliver, in immediately available funds, the full amount of the purchase price for the Shares being purchased hereunder by wire transfer to an account designated by the Company and the Company shall deliver to the Purchaser one or more stock certificates registered in the name of the Purchaser, or in such nominee name(s) as designated by the Purchaser in writing, representing the number of Shares set forth in Section 2 above and bearing an appropriate legend referring to the fact that the Shares were sold in reliance upon the exemption from registration under the Securities Act of 1933, as amended (the " Securities Act "), provided by Section 4(2) thereof and Rule 506 thereunder. At such time as Shares are sold pursuant to the Registration Statement (as defined below) after it has become effective, the Company will promptly substitute one or more replacement certificates without a legend with respect to such Shares. The name(s) in which the stock certificates are to be registered are set forth in the Stock Certificate Questionnaire attached hereto as part of Appendix I .

The Company's obligation to complete the purchase and sale of the Shares and deliver such stock certificate(s) to the Purchaser at the Closing shall be subject to the following conditions, any one or more of which may be waived by the Company: (a) receipt by the Company of immediately available funds in the full amount of the purchase price for the Shares being purchased hereunder; (b) completion of the purchases and sales under the Agreements with the Other Purchasers; and (c) the accuracy of the representations and warranties made by the Purchasers and the fulfillment of those undertakings of the Purchasers to be fulfilled prior to the Closing. The Purchaser's obligation to accept delivery of such stock certificate(s) and to pay for the Shares evidenced thereby shall be subject to the following conditions: (a) each of the representations and warranties of the Company made herein shall be true and correct in all material respects as of the Closing Date; (b) the delivery to the Purchaser by counsel to the Company and in-house counsel to the Company of legal opinions in forms reasonably satisfactory to counsel to the Placement Agent; (c) receipt by the Purchaser of a certificate executed by the chief executive officer and the chief financial or accounting officer of the Company, dated as of the Closing Date, to the effect that the representations and warranties of the Company set forth herein are true and correct in all material respects as of the Closing Date and that the Company has complied in all material respects with all the agreements and satisfied in all material respects all the conditions herein on its part to be performed or satisfied on or prior to such Closing Date; (d) the fulfillment in all material respects of those undertakings of the Company to be fulfilled prior to the Closing; and (e) the Company shall have sold Shares at the Closing for an aggregate minimum of $20 million in gross proceeds. The Purchaser's obligations hereunder are expressly not conditioned on the purchase by any or all of the Other Purchasers of the Shares that they have agreed to purchase from the Company.

SECTION 4.    Representations, Warranties and Covenants of the Company.   The Company hereby represents and warrants to, and covenants with, the Purchaser as follows:

4.1    Organization and Qualification . The Company is a corporation duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation and the Company is qualified to do business as a foreign corporation in each jurisdiction in which qualification is required, except where failure to so qualify would not have a Material Adverse Effect (as defined herein). The Company's subsidiaries (each a " Subsidiary "

2

and collectively the "Subsidiaries") are listed on Exhibit A to this Agreement. Each "Significant Subsidiary" of the Company, as that term is defined in Rule 1-02 of Regulation S-X under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is listed on Exhibit A to this Agreement. Each Significant Subsidiary is a direct or indirect wholly owned subsidiary of the Company. Each Significant Subsidiary is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation and is qualified to do business as a foreign corporation in each jurisdiction in which qualification is required, except where failure to so qualify would not have a Material Adverse Effect.

        4.2        Reporting Company; Form S-1. The Company is not an "ineligible issuer" (as defined in Rule 405 promulgated under the Securities Act) and is eligible to register the Shares for resale by the Purchaser on a registration statement on Form S-1 under the Securities Act. The Company is subject to the reporting requirements of the Exchange Act, and has filed all reports required thereby.

        4.3        Authorized Capital Stock. The authorized, issued and outstanding capital stock of the Company as of September 30, 2006 is set forth under the heading "Capitalization" in the confidential Private Placement Memorandum dated December 19, 2006 prepared by the Company (including all exhibits, supplements and amendments thereto, the "Private Placement Memorandum"); the issued and outstanding shares of Common Stock have been duly authorized and validly issued, are fully paid and nonassessable, have been issued in compliance with all federal and state securities laws, and were not issued in violation of or subject to any preemptive rights or other rights to subscribe for or purchase securities. Except as disclosed in documents or reports (the "Exchange Act Reports") filed by the Company with the Securities and Exchange Commission (the "Commission") pursuant to the Exchange Act and the rules and regulations of the Commission promulgated thereunder (the "1934 Act Rules and Regulations"), the Company does not have outstanding any options to purchase, or any preemptive rights or other rights to subscribe for or to purchase, any securities or obligations convertible into, or any contracts or commitments to issue or sell, shares of its capital stock or any such options, rights, convertible securities or obligations. With respect to each of the Significant Subsidiaries (i) all the issued and outstanding shares of such Subsidiary's capital stock have been duly authorized and validly issued, are fully paid and nonassessable, have been issued in compliance with all federal and state securities laws, were not issued in violation of or subject to any preemptive rights or other rights to subscribe for or purchase securities, and (ii) there are no outstanding options to purchase, or any preemptive rights or other rights to subscribe for or to purchase, any securities or obligations convertible into, or any contracts or commitments to issue or sell, shares of such Subsidiary's capital stock or any such options, rights, convertible securities or obligations.

        4.4        Issuance, Sale and Delivery of the Shares. The Shares have been duly authorized and, when issued, delivered and paid for in the manner set forth in this Agreement, will be validly issued, fully paid and nonassessable. No preemptive rights or other rights to subscribe for or purchase any shares of Common Stock of the Company exist with respect to the issuance and sale of the Shares by the Company pursuant to this Agreement. No stockholder of the Company has any right (which has not been waived or has not expired by reason of lapse of time following notification of the Company's intention to file the Registration Statement (as hereinafter defined)) to require the Company to register the sale of any capital

3

stock owned by such stockholder under the Registration Statement. The issuance and sale of the Shares will not obligate the Company to issue shares of Common Stock or other securities to any person (other than the Purchasers) and will not result in a right of any holder of the Company's securities to obligate the Company to repurchase the securities held by such holder or to adjust the exercise, conversion, exchange or reset price under such securities. No further approval or authority of the stockholders or the Board of Directors of the Company will be required for the issuance and sale of the Shares to be sold by the Company as contemplated herein.

        4.5       <u>Due Execution, Delivery and Performance of the Agreements</u> . The Company has full legal right, corporate power and authority to enter into this Agreement and perform the transactions contemplated hereby. This Agreement has been duly authorized, executed and delivered by the Company. This Agreement constitutes a legal, valid and binding agreement of the Company, enforceable against the Company in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application relating to or affecting the enforcement of creditors' rights and the application of equitable principles relating to the availability of remedies, and except as rights to indemnity or contribution, including but not limited to, indemnification provisions set forth in Section 7.3 of this Agreement may be limited by federal or state securities law or the public policy underlying such laws. The execution and performance of this Agreement by the Company and the consummation of the transactions herein contemplated will not violate (i) any provision of the certificate of incorporation or bylaws of the Company or the organizational documents of any Subsidiary, or (ii) any statute or any authorization, judgment, decree, order, rule or regulation of any court or any regulatory body, administrative agency or other governmental agency or body applicable to the Company or any Significant Subsidiary or any of their respective properties. No consent, approval, authorization or other order of any court, regulatory body, administrative agency or other governmental agency or body is required for the execution and delivery of this Agreement or the consummation of the transactions contemplated by this Agreement, except for compliance with the Blue Sky laws and federal securities laws applicable to the offering of the Shares. For the purposes of this Agreement the term " <u>Material Adverse Effect</u> " shall mean a material adverse effect on the condition (financial or otherwise), properties, business, prospects or results of operations of the Company and its Subsidiaries, taken as a whole.

        4.6       <u>Accountants</u> . Ernst & Young LLP, who has expressed its opinion with respect to the consolidated financial statements contained in the Company's Annual Report on Form 10-K for the year ended December 31, 2005, which Form 10-K is attached as an exhibit to, and made a part of the Private Placement Memorandum, were, as of the date such Form 10-K was filed with the Commission, registered independent public accountants as required by the Securities Act and the rules and regulations promulgated thereunder (the " <u>1933 Act Rules and Regulations</u> ") and by the rules of the Public Accounting Oversight Board.

        4.7       <u>No Defaults or Consents</u> . Neither the execution, delivery and performance of this Agreement by the Company nor the consummation of any of the transactions contemplated hereby (including, without limitation, the issuance and sale by the Company of the Shares) will give rise to a right to terminate or accelerate the due date of any payment due under, or conflict with or result in the breach of any term or provision of, or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, except such

4

defaults that individually or in the aggregate would not cause a Material Adverse Effect, or require any consent or waiver under, or result in the execution or imposition of any lien, charge or encumbrance upon any properties or assets of the Company or its Significant Subsidiaries pursuant to the terms of, any indenture, mortgage, deed of trust or other agreement or instrument to which the Company or any of its Significant Subsidiaries is a party or by which either the Company or its Significant Subsidiaries or any of their properties or businesses is bound, or any franchise, license, permit, judgment, decree, order, statute, rule or regulation applicable to the Company or any Significant Subsidiary or violate any provision of the charter or by-laws of the Company or any Significant Subsidiary, except for such consents or waivers which have already been obtained and are in full force and effect.

4.8    Contracts .  The material contracts to which the Company is a party have been duly and validly authorized, executed and delivered by the Company and constitute the legal, valid and binding agreements of the Company, enforceable by and against it in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws relating to enforcement of creditors' rights generally, and general equitable principles relating to the availability of remedies, and except as rights to indemnity or contribution may be limited by federal or state securities laws and the public policy underlying such laws.

4.9    No Actions .  Except as otherwise set forth in the Exchange Act Reports, there are no legal or governmental actions, suits or proceedings pending or, to the Company's knowledge, threatened against the Company or any Subsidiary before or by any court, regulatory body or administrative agency or any other governmental agency or body, domestic, or foreign, which actions, suits or proceedings, individually or in the aggregate, might reasonably be expected to have a Material Adverse Effect; and no labor disturbance by the employees of the Company exists or, to the Company's knowledge, is imminent, that might reasonably be expected to have a Material Adverse Effect.  Neither the Company nor any Subsidiary is a party to or subject to the provisions of any injunction, judgment, decree or order of any court, regulatory body, administrative agency or other governmental agency or body that might have a Material Adverse Effect.

4.10    Properties .  The Company and each Significant Subsidiary has good and marketable title to all the properties and assets described as owned by it in the consolidated financial statements included in the Exchange Act Reports, free and clear of all liens, mortgages, pledges, or encumbrances of any kind except (i) those, if any, reflected in such consolidated financial statements, or (ii) those that are not material in amount and do not adversely affect the use made and proposed to be made of such property by the Company or its Significant Subsidiaries, considered as one entity.  The Company and each Subsidiary holds its leased properties under valid and binding leases, with such exceptions as are not materially significant in relation to the business of the Company and its Significant Subsidiaries, considered as one entity.  The Company and any Significant Subsidiary owns or leases all such properties as are necessary to its operations as now conducted.

4.11    No Material Adverse Change .  Subsequent to the dates as of which information is given in the Private Placement Memorandum, and except as set forth in the Exchange Act Reports, (i) the Company and its Significant Subsidiaries have not incurred any

5

material liabilities or obligations, indirect, or contingent, or entered into any material agreement or other transaction that is not in the ordinary course of business or that could reasonably be expected to result in a material reduction in the future earnings of the Company; (ii) the Company and its Significant Subsidiaries have not sustained any material loss or interference with their businesses or properties from fire, flood, windstorm, accident or other calamity not covered by insurance; (iii) the Company and its Significant Subsidiaries have not paid or declared any dividends or other distributions with respect to their capital stock and none of the Company or any Significant Subsidiary is in default in the payment of principal or interest on any outstanding debt obligations; (iv) there has not been any change in the capital stock of the Company or its Significant Subsidiaries other than the sale of the Shares hereunder and shares or options issued pursuant to employee equity incentive plans or purchase plans approved by the Company's Board of Directors, or indebtedness material to the Company or its Significant Subsidiaries (other than in the ordinary course of business and any required scheduled payments); and (v) there has not occurred any event that has caused or could reasonably be expected to cause a Material Adverse Effect.

4.12     Intellectual Property .  The Company and its Significant Subsidiaries own, are licensed or otherwise possess sufficient rights to use, all patents, patent rights, inventions, know-how (including trade secrets and other unpatented or unpatentable or confidential information, systems, or procedures), trademarks, service marks, trade names, copyrights and other intellectual property rights (collectively, the " Intellectual Property ") necessary for the conduct of their business as described in the Private Placement Memorandum.  To the Company's knowledge, no claims have been asserted against the Company or any Significant Subsidiary by any person with respect to the use of any such Intellectual Property or challenging or questioning the validity or effectiveness of any such Intellectual Property.

4.13     Compliance .  None of the Company nor its Subsidiaries has been advised, nor do any of them have any reason to believe, that it is not conducting business in compliance with all applicable laws, rules and regulations of the jurisdictions in which it is conducting business, including, without limitation, all applicable local, state and federal environmental laws and regulations, except where failure to be so in compliance would not have a Material Adverse Effect.

4.14     Taxes .  The Company and its Significant Subsidiaries have filed on a timely basis (giving effect to extensions) all required material federal, state and foreign income and franchise tax returns and have paid or accrued all taxes shown as due thereon, and the Company has no knowledge of any material tax deficiency that has been or might be asserted or threatened against it that could have a Material Adverse Effect.  All tax liabilities accrued through the date hereof have been adequately provided for on the books of the Company.

4.15     Transfer Taxes .  On the Closing Date, all stock transfer or other taxes (other than income taxes) that are required to be paid in connection with the sale and transfer of the Shares to be sold to the Purchaser hereunder will have been, fully paid or provided for by the Company and all laws imposing such taxes will have been fully complied with.

4.16     Investment Company .  The Company is not an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for an

6

investment company, within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations of the Commission promulgated thereunder.

4.17    Offering Materials . Each of the Company, its directors and officers has not distributed and will not distribute prior to the Closing Date any offering material, including any "free writing prospectus" (as defined in Rule 405 promulgated under the Securities Act), in connection with the offering and sale of the Shares other than the Private Placement Memorandum and associated slide presentation, or any amendment or supplement with respect to such offering material. The Company has not in the past nor will it hereafter take any action independent of the Placement Agent to sell, offer for sale or solicit offers to buy any securities of the Company that could result in the initial sale of the Shares not being exempt from the registration requirements of Section 5 of the Securities Act.

4.18    Insurance . The Company maintains insurance underwritten by insurers of recognized financial responsibility, or self-insurers, of the types and in the amounts that the Company reasonably believes is adequate for its business, including, but not limited to, insurance covering all real and personal property owned or leased by the Company against theft, damage, destruction, acts of vandalism and all other risks customarily insured against, with such deductibles as are customary for companies in the same or similar business, all of which insurance is in full force and effect.

4.19    Additional Information . The information contained in the following documents, which the Placement Agent has furnished to the Purchaser, or will furnish prior to the Closing, as of the dates thereof, did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein in light of the circumstances in which they were made not misleading:

(a)    the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2005;

(b)    the Company's Definitive Proxy Statement for Annual Meeting of stockholders held on May 2, 2006;

(c)    the Company's Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2006, June 30, 2006 and September 30, 2006;

(d)    the Company's Current Reports on Form 8-K or Form 8-K/A filed with the Commission on March 28, 2006, October 5, 2006, October 16, 2006 (two Form 8-Ks filed), October 26, 2006, November 8, 2006, November 9, 2006, November 20, 2006 and December 18, 2006;

(e)    the Private Placement Memorandum, including all addenda and exhibits thereto, other than this Agreement and appendices and exhibits hereto; and

(f)    all other documents, if any, filed by the Company with the Commission since December 31, 2005 pursuant to the reporting requirements of the Exchange Act.

7

Case 1:07-cv-10991-LAK    Document 21-5    Filed 02/26/2008    Page 12 of 32

The documents incorporated by reference in the Private Placement Memorandum or attached as exhibits thereto, at the time they became effective or were filed with the Commission, as the case may be, complied in all material respects with the requirements of the Exchange Act, as applicable, and the 1934 Act Rules and Regulations (together with the 1933 Act Rule and Regulations, the "Rules and Regulations"). Since December 1, 2005, the Company has filed all documents required to be filed by it prior to the date hereof with the Commission pursuant to the reporting requirements of the Exchange Act.

      4.20    <u>Price of Common Stock</u> . The Company has not taken, and will not take, directly or indirectly, any action designed to cause or result in, or that has constituted or that might reasonably be expected to constitute, the stabilization or manipulation of the price of the shares of the Common Stock to facilitate the sale or resale of the Shares.

      4.21    <u>Use of Proceeds</u> . The Company shall use the proceeds from the sale of the Shares as described under "Use of Proceeds" in the Private Placement Memorandum.

      4.22    <u>Non-Public Information</u> . The Company has not disclosed to the Purchaser, whether in the Private Placement Memorandum or otherwise, information that would constitute material non-public information as of the Closing Date other than the existence of the transaction contemplated hereby.

      4.23    <u>Use of Purchaser Name</u> . Except as otherwise required by applicable law or regulation the Company shall not use the Purchaser's name or the name of any of its affiliates in any advertisement, announcement, press release or other similar public communication unless it has received the prior written consent of the Purchaser for the specific use contemplated which consent shall not be unreasonably withheld.

      4.24    <u>Related Party Transactions</u> . No transaction has occurred between or among the Company, on the one hand, and its affiliates, officers or directors on the other hand, that is required to have been described under applicable securities laws in its Exchange Act filings and is not so described, as required, in such filings.

      4.25    <u>Off-Balance Sheet Arrangements</u> . There is no transaction, arrangement or other relationship between the Company and an unconsolidated or other off-balance sheet entity that is required to be disclosed by the Company in its Exchange Act filings and is not so disclosed, as required or that otherwise would be reasonably likely to have a Material Adverse Effect. There are no other material off-balance sheet transactions, arrangements or other relationships involving the Company that may create contingencies or liabilities that are not otherwise disclosed by the Company in its Exchange Act filings.

      4.26    <u>Governmental Permits, Etc</u> . The Company and each Subsidiary has all franchises, licenses, certificates and other authorizations from such federal, state or local government or governmental agency, department or body that are currently necessary for the operation of the business of the Company as currently conducted, except where the failure to posses currently such franchises, licenses, certificates and other authorizations is not reasonably expected to have a Material Adverse Effect. Except as otherwise set forth in the Exchange Act Reports, neither the Company nor any Subsidiary has received any notice of proceedings relating

8

Case 1:07-cv-10991-LAK    Document 21-5    Filed 02/26/2008    Page 13 of 32

to the revocation or modification of any such franchises, licenses, certificates and other authorizations that, if the subject of an unfavorable decision, ruling or finding, could reasonably be expected to have a Material Adverse Effect.

        4.27      <u>Financial Statements</u> .  The consolidated financial statements of the Company and the related notes and schedules thereto included in its Exchange Act filings fairly present the financial position, results of operations, stockholders' equity and cash flows of the Company and its consolidated Subsidiaries at the dates and for the periods specified therein.  Such financial statements and the related notes and schedules thereto have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods involved (except as otherwise noted therein) and all adjustments necessary for a fair presentation of results for such periods have been made, and comply as to form in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing; provided, however, that the unaudited financial statements are subject to normal year-end audit adjustments (which are not expected to be material) and do not contain all footnotes required under generally accepted accounting principles.

        4.28      <u>Listing Compliance</u> .  The Company is in compliance with the requirements of the Nasdaq Global Market for continued quotation of the Common Stock thereon.  Except as otherwise set forth in the Exchange Act Reports and the Private Placement Memorandum, the Company has taken no action designed to, or likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act or the quotation of the Common Stock on the Nasdaq Global Market, nor has the Company received any notification that the Commission or the Nasdaq Global Market is contemplating terminating such registration or quotation.  The transactions contemplated by this Agreement will not contravene the rules and regulations of the Nasdaq Global Market.  Subject to the Company's ability to timely file with the Commission the Company's upcoming Annual Report on Form 10-K for the year ended December 31, 2006 and Quarterly Report on Form 10-Q for the quarter ended March 31, 2007, the Company will comply with all requirements of the Nasdaq Global Market with respect to the issuance of the Shares and shall cause the Shares to be quoted on the Nasdaq Global Market and listed on any other exchange on which the Company's common stock is listed on or before the Closing Date.

        4.29      <u>Internal Accounting Controls</u> .  The Company maintains a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences.  The Company has disclosure controls and procedures (as defined in Rules 13a–14 and 15d–14 under the Exchange Act) that are designed to ensure that material information relating to the Company is made known to the Company's principal executive officer and the Company's principal financial officer or persons performing similar functions.  The Company is otherwise in

compliance in all material respects with all applicable provisions of the Sarbanes-Oxley Act of 2002, as amended and the rules and regulations promulgated thereunder.

    4.30  Foreign Corrupt Practices . Neither the Company, nor any Significant Subsidiary, nor, to the knowledge of the Company, any director, officer, agent, employee or other Person acting on behalf of the Company or any Significant Subsidiary has, in the course of its actions for, or on behalf of, the Company, in any manner that would reasonably be expected to have a Material Adverse Effect, (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

    4.31  Employee Relations . Neither the Company nor any Significant Subsidiary is a party to any collective bargaining agreement or employs any member of a union. The Company and each Significant Subsidiary believe that their relations with their employees are good. Except for the Company's Chief Risk Executive, Chief Capital Markets Executive and Chief Strategic Initiatives Executive (i) no executive officer of the Company (as defined in Rule 501(f) promulgated under the Securities Act) has notified the Company that such officer intends to leave the Company or otherwise terminate such officer's employment with the Company, and (ii) no executive officer of the Company is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement, non-competition agreement, or any other agreement or any restrictive covenant, and the continued employment of each such executive officer does not subject the Company or any Significant Subsidiary to any liability with respect to any of the foregoing matters.

    4.32  ERISA . The Company is in compliance in all material respects with all presently applicable provisions of the Employee Retirement Income Security Act of 1974, as amended, including the regulations and published interpretations thereunder (herein called " ERISA "); no "reportable event" (as defined in ERISA) has occurred with respect to any "pension plan" (as defined in ERISA) for which the Company would have any liability; the Company has not incurred and does not expect to incur liability under (i) Title IV of ERISA with respect to termination of, or withdrawal from, any "pension plan"; or (ii) Sections 412 or 4971 of the Internal Revenue Code of 1986, as amended, including the regulations and published interpretations thereunder (the " Code "); and each "Pension Plan" for which the Company would have liability that is intended to be qualified under Section 401(a) of the Code is so qualified in all material respects and nothing has occurred, whether by action or by failure to act, which would reasonably be expected to cause the loss of such qualification.

    4.33  Environmental Matters . Except as would not result in a Material Adverse Effect, and to the knowledge of the senior executive officers of the Company or any Significant Subsidiary, there has been no storage, disposal, generation, manufacture, transportation, handling or treatment of toxic wastes, hazardous wastes or hazardous substances (collectively, "Hazardous Substances," as defined by the Comprehensive Environmental Response Compensation Liability Act ("CERCLA"), 42 U.S.C. 9601(14)) by the Company or

10

any Significant Subsidiary (or any of their predecessors in interest) at, upon or from any of the property now or previously owned or leased by the Company or any Significant Subsidiary in violation of any applicable law, ordinance, rule, regulation, order, judgment, decree or permit or that would require remedial action under any applicable law, ordinance, rule, regulation, order, judgment, decree or permit; and there has been no material spill, discharge, leak, emission, injection, escape, dumping or release of any kind into such property or into the environment surrounding such property of any Hazardous Substances due to or caused by the Company or any Significant Subsidiary.

4.34    Integration; Other Issuances of Shares . Neither the Company nor its Subsidiaries or any affiliates, nor any Person acting on its or their behalf, has issued any shares of Common Stock or shares of any series of preferred stock or other securities or instruments convertible into, exchangeable for or otherwise entitling the holder thereof to acquire shares of Common Stock which would be integrated with the sale of the Shares to such Purchaser for purposes of the Securities Act or of any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of any exchange or automated quotation system on which any of the securities of the Company are listed or designated, nor will the Company or its Subsidiaries or affiliates take any action or steps that would require registration of any of the Shares under the Securities Act or cause the offering of the Shares to be integrated with other offerings. Assuming the accuracy of the representations and warranties of the Purchasers, the offer and sale of the Shares by the Company to the Purchasers pursuant to this Agreement will be exempt from the registration requirements of the Securities Act.

SECTION 5.    Representations, Warranties and Covenants of the Purchaser . The Purchaser represents and warrants to, and covenants with, the Company that:

5.1    Experience . (i) The Purchaser is knowledgeable, sophisticated and experienced in financial and business maters, in making, and is qualified to make, decisions with respect to investments in shares representing an investment decision like that involved in the purchase of the Shares, including investments in securities issued by the Company and comparable entities, has the ability to bear the economic risks of an investment in the Shares, including a complete loss of its investment, and has reviewed carefully the Private Placement Memorandum, including exhibits thereto, and has requested, received, reviewed and considered all information it deems relevant in making an informed decision to purchase the Shares; (ii) the Purchaser is acquiring the number of Shares set forth in Section 2 above in the ordinary course of its business and for its own account with no present intention of distributing any of such Shares or any arrangement or understanding with any other persons regarding the distribution of such Shares (this representation and warranty not limiting the Purchaser's right to sell pursuant to the Registration Statement (hereinafter defined) or in compliance with the Securities Act and the Rules and Regulations, or, other than with respect to any claims arising out of a breach of this representation and warranty, the Purchaser's right to indemnification under Section 7.3); (iii) the Purchaser will not, directly or indirectly, offer, sell, pledge, transfer or otherwise dispose of (or solicit any offers to buy, purchase or otherwise acquire or take a pledge of) any of the Shares, nor will the Purchaser engage in any short sale that results in a disposition of any of the Shares by the Purchaser, except in compliance with the Securities Act, Exchange Act and the Rules and Regulations and any applicable state securities laws; (iv) the Purchaser has completed or caused

11

to be completed the Registration Statement Questionnaire attached hereto as part of <u>Appendix I</u>, for use in preparation of the Registration Statement, and the answers thereto are true and correct as of the date hereof and will be true and correct as of the effective date of the Registration Statement and the Purchaser will notify the Company immediately of any material change in any such information provided in the Registration Statement Questionnaire until such time as the Purchaser has sold all of its Shares or until the Company is no longer required to keep the Registration Statement effective; (v) the Purchaser has, in connection with its decision to purchase the number of Shares set forth in Section 2 above, relied solely upon the Private Placement Memorandum and the documents included or incorporated by reference therein and the representations and warranties of the Company contained herein; (vi) the Purchaser has had an opportunity to discuss this investment with representatives of the Company and ask questions of them and (vii) the Purchaser is an "accredited investor" within the meaning of Rule 501(a)(1),(2),(3) or (7) of Regulation D promulgated under the Securities Act.

      5.2      <u>Reliance on Exemptions</u>.  The Purchaser understands that the Shares are being offered and sold to it in reliance upon specific exemptions from the registration requirements of the Securities Act, the Rules and Regulations and state securities laws and that the Company is relying upon the truth and accuracy of, and the Purchaser's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Purchaser set forth herein in order to determine the availability of such exemptions and the eligibility of the Purchaser to acquire the Shares.

      5.3      <u>Confidentiality</u>.  For the benefit of the Company, the Purchaser previously agreed orally with the Placement Agent for the benefit of the Company and the Placement Agent to keep confidential all information concerning this private placement.  The Purchaser understands that the information contained in the Private Placement Memorandum is strictly confidential and proprietary to the Company and has been prepared from the Company's publicly available documents and other information and is being submitted to the Purchaser solely for such Purchaser's confidential use.  The Purchaser agrees to use the information contained in the Private Placement Memorandum for the sole purpose of evaluating a possible investment in the Shares and the Purchaser acknowledges that it is prohibited from reproducing or distributing the Private Placement Memorandum, this Agreement, or any other offering materials or other information provided by the Company in connection with the Purchaser's consideration of its investment in the Company, in whole or in part, or divulging or discussing any of their contents, except to its financial, investment or legal advisors in connection with its proposed investment in the Shares, each of whom shall be advised of, and agree to abide by, the confidentiality restrictions contained in this Agreement.  Further, the Purchaser understands that the existence and nature of all conversations and presentations, if any, regarding the Company and this offering must be kept strictly confidential.  The Purchaser understands that the federal securities laws may impose restrictions on trading based on information regarding this offering.  In addition, the Purchaser hereby acknowledges that unauthorized disclosure of information regarding this offering may result in a violation of Regulation FD.  The obligations under this Section 5.3 will terminate upon the filing by the Company of a Current Report on Form 8-K or a press release or press releases describing this offering.  In addition to the above, the Purchaser shall maintain in confidence the receipt and content of any notice of a Suspension (as defined in Section 5.8 below); provided, however, that the receipt of such notice of Suspension shall not in and of itself restrict the Purchaser from engaging in transactions in the Company's securities in

12

which the Purchaser would otherwise be entitled to engage in, including without limitation sales pursuant to Rule 144 under the Securities Act. The foregoing agreements shall not apply to any information that is or becomes publicly available through no fault of the Purchaser, or that the Purchaser is legally required to disclose; provided, however, that i f the Purchaser is requested or ordered to disclose any such information pursuant to any court or other government order or any other applicable legal procedure, it shall provide the Company with prompt notice of any such request or order in time sufficient to enable the Company to seek an appropriate protective order.

5.4     Investment Decision . The Purchaser understands that nothing in the Agreement or any other materials presented to the Purchaser in connection with the purchase and sale of the Shares constitutes legal, tax or investment advice. The Purchaser has consulted such legal, tax and investment advisors as it, in its sole discretion, has deemed necessary or appropriate in connection with its purchase of the Shares.

5.5     Risk of Loss . The Purchaser understands that its investment in the Shares involves a significant degree of risk, including a risk of total loss of the Purchaser's investment, and the Purchaser has full cognizance of and understands all of the risk factors related to the Purchaser's purchase of the Shares, including, but not limited to, those set forth, or referred to, under the caption "Risk Factors" in the Private Placement Memorandum and the Exchange Act Reports. The Purchaser understands that the market price of the Common Stock has been volatile and that no representation is being made as to the future value or trading volume of the Common Stock. The Purchaser has the ability to bear the economic risks of an investment in the Shares.

5.6     Legend . The Purchaser understands that, until such time as (i) the Registration Statement has been declared effective and the Shares have been sold pursuant to such Registration Statement or (ii) the Shares may be sold pursuant to Rule 144 under the Securities Act without any restriction as to the number of securities as of a particular date that can then be immediately sold, the Shares will bear a restrictive legend in substantially the following form:

> "THE SHARES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE " SECURITIES ACT ") OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. THE SHARES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, OR DISPOSED OF EXCEPT (1) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OR (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE STATE SECURITIES LAWS AND THE SECURITIES LAWS OF OTHER JURISDICTIONS, AND IN THE CASE OF A TRANSACTION EXEMPT FROM REGISTRATION, UNLESS THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT

13

SUCH TRANSACTION DOES NOT REQUIRE
REGISTRATION UNDER THE SECURITIES ACT AND SUCH
OTHER APPLICABLE LAWS.  NOTWITHSTANDING THE
FOREGOING, THE SHARES MAY BE PLEDGED IN
CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR
OTHER LOAN OR FINANCING ARRANGEMENT SECURED
BY THE SHARES."

At such time as Shares are sold pursuant to the Registration Statement (as defined below) after it has become effective, the Company will promptly substitute one or more replacement certificates without a legend with respect to such Shares.

5.7    Residency .  The Purchaser's principal executive offices are in the jurisdiction set forth immediately below the Purchaser's name on the signature pages hereto.

5.8    Public Sale or Distribution .  The Purchaser hereby covenants with the Company not to make any sale of the Shares under the Registration Statement without complying with the provisions of this Agreement and without effectively causing the prospectus delivery requirements under the Securities Act to be satisfied (whether physically or through compliance with Rule 172 under the Securities Act or any similar rule).  The Purchaser also hereby covenants with the Company that it shall be deemed to have represented at such time that it presents a certificate to the Company's transfer agent representing those Shares presented to the transfer agent for resale that such resale was made pursuant to the Registration Statement and in compliance with the prospectus delivery requirements under the Securities Act.  The Purchaser acknowledges that there may occasionally be times when the Company must suspend the use of the prospectus (the "Prospectus") forming a part of the Registration Statement (a "Suspension") until such time as an amendment to the Registration Statement has been filed by the Company and declared effective by the Commission, or until such time as the Company has filed an appropriate report with the Commission pursuant to the Exchange Act.  Without the Company's prior written consent, which consent shall not unreasonably be withheld or delayed, the Purchaser shall not use any written materials to offer the Shares for resale other than the Prospectus, including any "free writing prospectus" as defined in Rule 405 under the Securities Act.  The Purchaser covenants that it will not sell any Shares pursuant to said Prospectus during the period commencing at the time when Company gives the Purchaser written notice of the suspension of the use of said Prospectus (which notice shall contain solely the fact that there has been a suspension and shall not contain any facts and circumstances regarding the suspension) and ending at the time when the Company gives the Purchaser written notice that the Purchaser may thereafter effect sales pursuant to said Prospectus. Notwithstanding the foregoing, the Company agrees that no Suspension shall be for a period of longer than 60 consecutive days, and no Suspension shall be for a period longer than 90 days in the aggregate in any 365 day period.  The Purchaser further covenants to notify the Company promptly of the sale of all of its Shares.

5.9    Organization; Validity; Enforcements .  The Purchaser further represents and warrants to, and covenants with, the Company that (i) the Purchaser has full right, power, authority and capacity to enter into this Agreement and to consummate the transactions contemplated hereby and has taken all necessary action to authorize the execution, delivery and performance of this Agreement, (ii) the making and performance of this Agreement by the

14

Purchaser and the consummation of the transactions herein contemplated will not violate any provision of the organizational documents of the Purchaser or conflict with, result in the breach or violation of, or constitute, either by itself or upon notice or the passage of time or both, a default under any material agreement, mortgage, deed of trust, lease, franchise, license, indenture, permit or other instrument to which the Purchaser is a party or, any statute or any authorization, judgment, decree, order, rule or regulation of any court or any regulatory body, administrative agency or other governmental agency or body applicable to the Purchaser, (iii) no consent, approval, authorization or other order of any court, regulatory body, administrative agency or other governmental agency or body is required on the part of the Purchaser for the execution and delivery of this Agreement or the consummation of the transactions contemplated by this Agreement, (iv) upon the execution and delivery of this Agreement, this Agreement shall constitute a legal, valid and binding obligation of the Purchaser, enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application relating to or the enforcement of creditor's rights and the application of equitable principles relating to the availability of remedies, and except as rights to indemnity or contribution, including, but not limited to, the indemnification provisions set forth in Section 7.3 of this Agreement, may be limited by federal or state securities laws or the public policy underlying such laws and (v) there is not in effect any order enjoining or restraining the Purchaser from entering into or engaging in any of the transactions contemplated by this Agreement.

5.10     Short Sales . Prior to the date hereof, the Purchaser has not taken, and prior to the public announcement of the transaction after the Closing the Purchaser shall not take, any action that has caused or will cause the Purchaser to have, directly or indirectly, sold or agreed to sell any shares of Common Stock, effected any short sale, whether or not against the box, established any "put equivalent position" (as defined in Rule 16a-1(h) under the Exchange Act with respect to the Common Stock, granted any other right (including, without limitation, any put or call option) with respect to the Common Stock or with respect to any security that includes, relates to or derived any significant part of its value from the Common Stock.

SECTION 6.     Survival of Agreements; Non-Survival of Company Representations and Warranties.  Notwithstanding any investigation made by any party to this Agreement or by the Placement Agent, all covenants and agreements made by the Company and the Purchaser herein and in the certificates for the Shares delivered pursuant hereto shall survive the execution of this Agreement, the delivery to the Purchaser of the Shares being purchased and the payment therefor.  All representations and warranties, made by the Company and the Purchaser herein and in the certificates for the Shares delivered pursuant hereto shall survive for a period of two years following the later of the execution of this Agreement, the delivery to the Purchaser of the Shares being purchased and the payment therefor.

15

SECTION 7.    Registration of the Shares; Compliance with the Securities Act .

7.1    Registration Procedures and Expenses .  The Company shall:

(a)    as soon as practicable prepare and, as soon as practicable after filing with the Commission the Company's Annual Report on Form 10-K for the year ending December 31, 2006, file with the Commission a registration statement (the "Registration Statement") initially on Form S-1 relating to the resale of the Shares by the Purchaser and the Other Purchasers from time to time on the Nasdaq Global Market, or the facilities of any national securities exchange or inter-dealer quotation system, including OTCBB, on which the Common Stock is then traded or quoted in privately-negotiated transactions;

(b)    use its best efforts, subject to receipt of necessary information from the Purchasers, to cause the Commission to declare the Registration Statement effective within 150 days after the Closing Date (whether the Registration Statement is selected for review by the Commission or not);

(c)    promptly prepare and file with the Commission such amendments and supplements to the Registration Statement and the prospectus used in connection therewith as may be necessary to keep the Registration Statement effective until the earliest of (i) two years after the effective date of the Registration Statement, (ii) such time as all of the Shares have been sold pursuant to the Registration Statement, or (iii) such time as the Shares become eligible for resale by non-affiliates pursuant to Rule 144(k) under the Securities Act or any successor rule then in effect;

(d)    so long as the Registration Statement is effective covering the resale of Shares owned by the Purchaser, furnish to the Purchaser with respect to the Shares registered under the Registration Statement (and to each underwriter, if any, of such Shares) such number of copies of prospectuses, each amendment and supplement thereto and such other documents as the Purchaser may reasonably request, in order to facilitate the public sale or other disposition of all or any of the Shares by the Purchaser;

(e)    file documents required of the Company for normal Blue Sky clearance in states specified in writing by the Purchaser; provided , however , that the Company shall not be required to qualify to do business or consent to service of process in any jurisdiction in which it is not now so qualified or has not so consented;

(f)    bear all expenses in connection with the procedures in paragraphs (a) through (e) of this Section 7.1 and the registration of the Shares pursuant to the Registration Statement, other than fees and expenses, if any, of counsel or other advisers to the Purchaser or the Other Purchasers or underwriting discounts, brokerage fees and commissions incurred by the Purchaser or the Other Purchasers, if any in connection with the offering of the Shares pursuant to the Registration Statement;

(g)    notify the Purchaser at any time when a prospectus relating to the Shares is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in the Registration Statement contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading and, subject to Section 7.6, prepare a supplement or amendment to such prospectus, so that, as thereafter delivered to the Purchaser of such Shares, such prospectus will not contain any untrue statement

16

of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(h)    advise the Purchaser promptly after receiving notice or obtaining knowledge of the existence of any stop order by the Commission delaying or suspending the effectiveness of the Registration Statement or of the initiation or threat in writing of any proceeding for that purpose, use its commercially reasonable efforts to obtain the withdrawal of any order suspending the effectiveness of the Registration Statement at the earliest possible time, and promptly notify the Purchaser of the lifting or withdrawal of any such order;

(i)    file a Form D with respect to the Shares as required under Regulation D and to provide a copy thereof to the Purchaser promptly after filing;

(j)    issue a press release or file a Current Report on Form 8-K describing the transactions contemplated by this Agreement on or before 9:00 a.m., New York City time, on or before the second business day following the date hereof; and

(k)    in order to enable the Purchasers to sell the Shares under Rule 144 to the Securities Act, for a period of two years from Closing, use its commercially reasonable efforts to comply with the requirements of Rule 144, including without limitation, use its commercially reasonable efforts to comply with the requirements of Rule 144(c) with respect to public information about the Company and to timely file all reports required to be filed by the Company under the Exchange Act, except for the Company's upcoming Annual Report on Form 10-K for the year ended December 31, 2006 and Quarterly Report on Form 10-Q for the quarter ended March 31, 2007, which the Company will file as soon as practicable after the completion of the audit of the Company's financial statements for the year ended December 31, 2006.

After such time as the Company becomes eligible to file a registration statement on Form S-3, the Company will file a post-effective amendment to the Registration Statement to provide for the automatic incorporation by reference of the Company's reports subsequently filed pursuant to the Exchange Act.

The Company understands that the Purchaser disclaims being an underwriter, but the Purchaser being deemed an underwriter shall not relieve the Company of any obligations it has hereunder. A draft of the proposed form of the questionnaire related to the Registration Statement to be completed by the Purchaser is attached hereto as Appendix I.

7.2    Transfer of Shares After Registration. The Purchaser agrees that it will not effect any disposition of the Shares or its right to purchase the Shares that would constitute a sale within the meaning of the Securities Act or pursuant to any applicable state securities laws, except as contemplated in the Registration Statement referred to in Section 7.1 or as otherwise permitted by law, and that it will promptly notify the Company of any changes in the information set forth in the Registration Statement regarding the Purchaser or its plan of distribution.

17

   7.3   <u>Indemnification</u> . For the purpose of this Section 7.3:

    (i) the term " <u>Purchaser/Affiliate</u> " shall mean any affiliate of the Purchaser, including a transferee who is an affiliate of the Purchaser, and any person who controls the Purchaser or any affiliate of the Purchaser within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act; and

    (ii) the term " <u>Registration Statement</u> " shall include any preliminary prospectus and final prospectus included in the Registration Statement referred to in Section 7.1 and any supplement or amendment thereto and any issuer free writing prospectus as defined in Rule 405 under the Securities Act relating to the Shares.

   (a)   The Company agrees to indemnify and hold harmless the Purchaser and each Purchaser/Affiliate, against any losses, claims, damages, liabilities or expenses, joint or several, to which the Purchaser or Purchaser/Affiliates may become subject, under the Securities Act, the Exchange Act, or any other federal or state statutory law or regulation, or at common law or otherwise (including in settlement of any litigation, if such settlement is effected with the written consent of the Company), insofar as such losses, claims, damages, liabilities or expenses (or actions in respect thereof as contemplated below) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement, including the Prospectus, financial statements and schedules, and all other documents filed as a part thereof, as amended at the time of effectiveness of the Registration Statement, including any information deemed to be a part thereof as of the time of effectiveness pursuant to paragraph (b) of Rule 430A, or pursuant to Rules 430B, 430C or 434, of the Rules and Regulations, or the Prospectus, in the form first filed with the Commission pursuant to Rule 424(b) of the Regulations, or filed as part of the Registration Statement at the time of effectiveness if no Rule 424(b) filing is required or any amendment or supplement thereto, or arise out of or are based upon the omission or alleged omission to state in any of them a material fact required to be stated therein or necessary to make the statements in the Registration Statement or any amendment or supplement thereto not misleading or in the Prospectus or any amendment or supplement thereto not misleading in light of the circumstances under which they were made, or arise out of or are based in whole or in part on any inaccuracy in the representations or warranties of the Company contained in this Agreement, or any failure of the Company to perform its obligations hereunder or under law, and will promptly reimburse the Purchaser and each Purchaser/Affiliate for any legal and other expenses as such expenses are reasonably incurred by such Purchaser or such Purchaser/Affiliate in connection with investigating, defending or preparing to defend, settling, compromising or paying any such loss, claim, damage, liability, expense or action; <u>provided</u> , <u>however</u> , that the Company will not be liable for amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Company, which consent shall not be unreasonably withheld, and the Company will not be liable in any such case to the extent that any such loss, claim, damage, liability or expense arises out of or is based upon (i) an untrue statement or alleged untrue statement or omission or alleged omission made in the Registration Statement, the Prospectus or any amendment or supplement thereto in reliance upon and in conformity with written information furnished to the Company by or on behalf of the Purchaser expressly for use therein, or (ii) the failure of such Purchaser to comply with the covenants and

18

agreements contained in Sections 5.9 or 7.2 hereof respecting the sale of the Shares, or (iii) the inaccuracy of any representation or warranty made by such Purchaser herein or (iv) any statement or omission in any Prospectus that is corrected in any subsequent Prospectus that was filed with the Commission prior to the pertinent sale or sales by the Purchaser.

(b)     Each Purchaser will severally, but not jointly, indemnify and hold harmless the Company, each of its directors, each of its officers who signed the Registration Statement and each person, if any, who controls the Company within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, against any losses, claims, damages, liabilities or expenses to which the Company, each of its directors, each of its officers who signed the Registration Statement or controlling person may become subject, under the Securities Act, the Exchange Act, or any other federal or state statutory law or regulation, or at common law or otherwise (including in settlement of any litigation, but only if such settlement is effected with the written consent of such Purchaser, which consent shall not be unreasonably withheld) insofar as such losses, claims, damages, liabilities or expenses (or actions in respect thereof as contemplated below) arise out of or are based upon (i) any failure to comply with the covenants and agreements contained in Sections 5.9 or 7.2 hereof respecting the sale of the Shares or (ii) the inaccuracy of any representation or warranty made by such Purchaser herein or (iii) any untrue or alleged untrue statement of any material fact contained in the Registration Statement, the Prospectus, or any amendment or supplement thereto, or arising out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements in the Registration Statement or any amendment or supplement thereto not misleading or in the Prospectus or any amendment or supplement thereto not misleading in the light of the circumstances under which they were made, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in the Registration Statement, the Prospectus, or any amendment or supplement thereto, in reliance upon and in conformity with written information furnished to the Company by or on behalf of any Purchaser expressly for use therein; and will reimburse the Company, each of its directors, each of its officers who signed the Registration Statement or controlling person for any legal and other expense reasonably incurred by the Company, each of its directors, each of its officers who signed the Registration Statement or controlling person in connection with investigating, defending, settling, compromising or paying any such loss, claim, damage, liability, expense or action; provided, however, that each Purchaser's aggregate liability under this Section 7 shall not exceed the amount of net proceeds received by such Purchaser on the sale of the Shares pursuant to the Registration Statement.

(c)     Promptly after receipt by an indemnified party under this Section 7.3 of notice of the threat or commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against an indemnifying party under this Section 7.3 promptly notify the indemnifying party in writing thereof, but the omission to notify the indemnifying party will not relieve it from any liability that it may have to any indemnified party for contribution or otherwise under the indemnity agreement contained in this Section 7.3 to the extent it is not prejudiced as a result of such failure.  In case any such action is brought against any indemnified party and such indemnified party seeks or intends to seek indemnity from an indemnifying party, the indemnifying party will be entitled to participate in, and, to the extent that it may wish, jointly with all other indemnifying parties similarly notified, to assume the defense thereof with counsel reasonably satisfactory to such indemnified party; provided ,

19

however , if the defendants in any such action include both the indemnified party, and the indemnifying party and the indemnified party shall have reasonably concluded, based on an opinion of counsel reasonably satisfactory to the indemnifying party, that there may be a conflict of interest between the positions of the indemnifying party and the indemnified party in conducting the defense of any such action or that there may be legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assume such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties. Upon receipt of notice from the indemnifying party to such indemnified party of its election to assume the defense of such action and approval by the indemnified party of counsel, the indemnifying party will not be liable to such indemnified party under this Section 7.3 for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof unless (i) the indemnified party shall have employed such counsel in connection with the assumption of legal defenses in accordance with the proviso to the preceding sentence (it being understood, however, that the indemnifying party shall not be liable for the expenses of more than one separate counsel, reasonably satisfactory to such indemnifying party, representing all of the indemnified parties who are parties to such action) or (ii) the indemnifying party shall not have employed counsel reasonably satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of commencement of action, in each of which cases the reasonable fees and expenses of counsel shall be at the expense of the indemnifying party. The indemnifying party shall not be liable for any settlement of any action without its written consent. In no event shall any indemnifying party be liable in respect of any amounts paid in settlement of any action unless the indemnifying party shall have approved in writing the terms of such settlement; provided that such consent shall not be unreasonably withheld. No indemnifying party shall, without the prior written consent of the indemnified party (which consent shall not be unreasonably withheld), effect any settlement of any pending or threatened proceeding in respect of which any indemnified party is or could have been a party and indemnification could have been sought hereunder by such indemnified party from all liability on claims that are the subject matter of such proceeding.

(d)  If the indemnification provided for in this Section 7.3 is required by its terms but is for any reason held to be unavailable to or otherwise insufficient to hold harmless an indemnified party under paragraphs (a), (b) or (c) of this Section 7.3 in respect to any losses, claims, damages, liabilities or expenses referred to herein, then each applicable indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of any losses, claims, damages, liabilities or expenses referred to herein (i) in such proportion as is appropriate to reflect the relative benefits received by the Company and the Purchaser from the private placement of Common Stock hereunder or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but the relative fault of the Company and the Purchaser in connection with the statements or omissions or inaccuracies in the representations and warranties in this Agreement and/or the Registration Statement that resulted in such losses, claims, damages, liabilities or expenses, as well as any other relevant equitable considerations. The relative benefits received by the Company on the one hand and each Purchaser on the other shall be deemed to be in the same proportion as the amount paid by such Purchaser to the Company pursuant to this Agreement for the Shares

20

purchased by such Purchaser that were sold pursuant to the Registration Statement bears to the difference (the " Difference ") between the amount such Purchaser paid for the Shares that were sold pursuant to the Registration Statement and the amount received by such Purchaser from such sale. The relative fault of the Company on the one hand and each Purchaser on the other shall be determined by reference to, among other things, whether the untrue or alleged statement of a material fact or the omission or alleged omission to state a material fact or the inaccurate or the alleged inaccurate representation and/or warranty relates to information supplied by the Company or by such Purchaser and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The amount paid or payable by a party as a result of the losses, claims, damages, liabilities and expenses referred to above shall be deemed to include, subject to the limitations set forth in paragraph (c) of this Section 7.3, any legal or other fees or expenses reasonably incurred by such party in connection with investigating or defending any action or claim. The provisions set forth in paragraph (c) of this Section 7.3 with respect to the notice of the threat or commencement of any threat or action shall apply if a claim for contribution is to be made under this paragraph (d); provided , however , that no additional notice shall be required with respect to any threat or action for which notice has been given under paragraph (c) for purposes of indemnification. The Company and the Purchaser agree that it would not be just and equitable if contribution pursuant to this Section 7.3 were determined solely by pro rata allocation (even if all of the Purchasers were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in this paragraph. Notwithstanding the provisions of this Section 7.3, no Purchaser shall be required to contribute any amount in excess of the amount by which the Difference exceeds the amount of any damages that such Purchaser has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Purchasers' obligations to contribute pursuant to this Section 7.3 are several and not joint.

       7.4      <u>Termination of Conditions and Obligations</u> . The restrictions imposed by Section 5.9 or Section 7.2 upon the transferability of the Shares shall cease and terminate as to any particular number of the Shares upon the earlier of (i) the passage of two years from the effective date of the Registration Statement covering such Shares and (ii) at such time as an opinion of counsel satisfactory in form and substance to the Company shall have been rendered to the effect that such conditions are not necessary in order to comply with the Securities Act.

       7.5      <u>Information Available</u> . The Company, upon the reasonable request of the Purchaser, shall make available for inspection by each Purchaser, any underwriter participating in any disposition pursuant to the Registration Statement and any attorney, accountant or other agent retained by the Purchaser or any such underwriter, all financial and other records, pertinent corporate documents and properties of the Company, and cause the Company's officers, employees and independent accountants to supply all information reasonably requested by the Purchaser or any such underwriter, attorney, accountant or agent in connection with the Registration Statement.

21

7.6    Delay in Filing and Effectiveness of Registration Statement . In the event the Registration Statement is not filed and declared effective within 150 days of the Closing Date (whether the Registration Statement is selected for review by the Commission or not), after the 150 th day after the Closing Date until such time as the Registration Statement is declared effective, the Company shall pay to the Purchaser an amount, as liquidated damages and not as a penalty, equal to 0.75% per month for the first two months after the 150 th day after the Closing Date, and thereafter, 1.00% per month, of the aggregate purchase price paid by such Purchaser pursuant to this Agreement for any Shares then held by such Purchaser (pro rata on a 30-day basis for any portion of a calendar month). If the Purchaser shall be prohibited from selling Shares under the Registration Statement as a result of a Suspension of more than 60 consecutive days or Suspensions of more than 90 days in the aggregate in any 12-month period, then for each day on which a Suspension is in effect that exceeds the maximum allowed period for a Suspension or Suspensions, but not including any day on which a Suspension is lifted, the Company shall pay the Purchaser, as liquidated damages and not as a penalty, an amount equal to 0.75% for the first two months, and thereafter, 1.00% per month, of the purchase price paid by such Purchaser for its Shares pursuant to this Agreement for any Shares then held by such Purchaser (pro rata on a 30-day basis for any portion of a calendar month). For purposes of this Section 7.6, a Suspension shall be deemed lifted on the date that notice that the Suspension has been lifted is delivered to the Purchaser pursuant to Section 10 of this Agreement. All liquidated damages under this Section 7.6 shall be payable monthly in cash, in arrears and shall be due within five business days after the end of each calendar month, and any unpaid liquidated damages under this Section 7.6 shall bear interest at 1.50% per month. In no event shall the aggregate amount of such liquidated damages or interest thereon exceed 12.0% of the aggregate purchase price paid by the Purchaser pursuant to this Agreement for any Shares then held by such Purchaser. Such damages described in this Section 7.6 shall not be the exclusive remedy for the failure of the Registration Statement to be filed and declared effective or to maintain the effectiveness of the Registration Statement. Notwithstanding anything to the contrary in this Section 7.6, in no event shall a Suspension be deemed to have occurred under this Section 7.6 where such suspension is the result of any misstatement or omission of information regarding the Purchaser in the Registration Statement or any amendment or supplement thereto.

SECTION 8.    Broker's Fee . The Purchaser acknowledges that the Company intends to pay to the Placement Agent a fee in respect of the sale of the Shares to the Purchaser. The Purchaser and the Company agree that the Purchaser shall not be responsible for such fee and that the Company will indemnify and hold harmless the Purchaser and each Purchaser/Affiliate against any losses, claims, damages, liabilities or expenses, joint or several, to which such Purchaser or Purchaser/Affiliate may become subject with respect to such fee. Each of the parties hereto represents that, on the basis of any actions and agreements by it, there are no other brokers or finders entitled to compensation in connection with the sale of the Shares to the Purchaser.

SECTION 9.    Independent Nature of Purchasers' Obligations and Rights . The obligations of the Purchaser under this Agreement are several and not joint with the obligations of any Other Purchaser, and no Purchaser shall be responsible in any way for the performance of the obligations of any Other Purchaser under the Agreements. The decision of each Purchaser to purchase the Shares pursuant to the Agreements has been made by such Purchaser independently of any other Purchaser. Nothing contained in the Agreements, and no

22

action taken by any Purchaser pursuant thereto, shall be deemed to constitute the Purchasers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Purchasers are in any way acting in concert or as a group with respect to such obligations or with respect to the acquisition, disposition or voting of the Shares or the transactions contemplated by the Agreements. Each Purchaser acknowledges that no other Purchaser has acted as agent for such Purchaser in connection with making its investment hereunder and that no Purchaser will be acting as agent of such Purchaser in connection with monitoring its investment in the Shares or enforcing its rights under this Agreement. Each Purchaser shall be entitled to independently protect and enforce its rights, including without limitation the rights arising out of this Agreement, and it shall not be necessary for any other Purchaser to be joined as an additional party in any proceeding for such purpose. No consideration shall be offered or paid to any person to amend or consent to a waiver or modification of any provision of the Agreements unless the same consideration is also offered to all of the parties to the Agreements.

SECTION 10.    Notices . All notices, requests, consents and other communications hereunder shall be in writing, shall be mailed by first-class registered or certified airmail, e-mail, confirmed facsimile or nationally recognized overnight express courier postage prepaid, and shall be deemed given when so mailed and shall be delivered as addressed as follows:

(a)    if to the Company, to:

NetBank, Inc.
1015 Windward Ridge Parkway
Alpharetta, GA 30005
Attention: Stephen F. Herbert
Facsimile: 803-462-7623
E-mail: sherbert@netbank.com

with a copy to:

Holland & Knight LLP
50 North Laura Street, Suite 3900
Jacksonville, FL 32202
Attention: Ivan A. Colao
Facsimile: 904-358-1872
E-mail: ivan.colao@hklaw.com

or to such other person at such other place as the Company shall designate to the Purchaser in writing; and

(b)    if to the Purchaser, at its address as set forth at the end of this Agreement, or at such other address or addresses as may have been furnished to the Company in writing.

SECTION 11.    Changes . This Agreement may not be modified or amended except pursuant to an instrument in writing signed by the Company and the Purchaser.

23

Any amendment or waiver effected in accordance with this Section 11 shall be binding upon each holder of any securities purchased under this Agreement at the time outstanding, each future holder of all such securities, and the Company.

SECTION 12.    Headings .  The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be part of this Agreement.

SECTION 13.    Severability .  In case any provision contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

SECTION 14.    Governing Law; Venue .  This Agreement is to be construed in accordance with and governed by the federal law of the United States of America and the internal laws of the State of New York without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of New York to the rights and duties of the parties.  Each of the Company and the Purchaser submits to the nonexclusive jurisdiction of the United States District Court for the Southern District of New York and of any New York State court sitting in New York City for purposes of all legal proceedings arising out of or relating to this Agreement and the transactions contemplated hereby.  Each of the Company and the Purchaser irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.

SECTION 15.    Counterparts .  This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument, and shall become effective when one or more counterparts have been signed by each party hereto and delivered to the other parties.  Facsimile signatures shall be deemed original signatures.

SECTION 16.    Entire Agreement .  This Agreement and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor the Purchaser makes any representation, warranty, covenant or undertaking with respect to such matters.  Each party expressly represents and warrants that it is not relying on any oral or written representations, warranties, covenants or agreements outside of this Agreement.

SECTION 17.    Fees and Expenses .  Except as set forth herein, each of the Company and the Purchaser shall pay its respective fees and expenses related to the transactions contemplated by this Agreement.

SECTION 18.    Parties .  This Agreement is made solely for the benefit of and is binding upon the Purchaser and the Company and to the extent provided in Section 7.3, any person controlling the Company or the Purchaser, the officers and directors of the Company, and their respective executors, administrators, successors and assigns and subject to the

24

provisions of Section 7.3, no other person shall acquire or have any right under or by virtue of this Agreement. The term "successors and assigns" shall not include any subsequent purchaser, as such purchaser, of the Shares sold to the Purchaser pursuant to this Agreement.

SECTION 19.    Further Assurances .  Each party agrees to cooperate fully with the other party and to execute such further instruments, documents and agreements and to give such further written assurance as may be reasonably requested by any other party to evidence and reflect the transactions described herein and contemplated hereby and to carry into effect the intents and purposes of this Agreement.

[Remainder of Page Left Intentionally Blank]

25

      IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

NET BANK, INC.

By: _____
      Name:
      Title:

Print or Type:

_____
Name of Purchaser
(Individual or Institution)

_____
Jurisdiction of Purchaser's Executive Offices

_____
Name of Individual representing
Purchaser (if an Institution)

_____
Title of Individual representing
Purchaser (if an Institution)

_____
Number of Shares to be purchased

Signature by:

      Individual Purchaser or Individual
      representing Purchaser:

      _____

      Address:    _____

      Telephone:  _____

      Facsimile:  _____
      E-mail:    _____

**EXHIBIT 99.1**

FOR IMMEDIATE RELEASE

**Contact:**
Matthew Shepherd
678-942-2683
mshepherd@netbank.com

### NetBank, Inc. Closes Private Placement of Common Stock

*Additional Capital Supports Company's Strategic Reorganization;*
*Dilution to Shareholders Kept to a Minimum*

ATLANTA — (January 8, 2007) — NetBank, Inc. (NASDAQ: NTBK) completed a private placement of 6.5 million shares of its common stock on Friday, January 5. The private placement was fully subscribed. Seven institutional investors purchased the shares at a price of $3.90 per share, with more than three-fourths of the offering being acquired by two of the investors. The sale generated approximately $23.7 million in new capital for the company, net of private placement commissions and expenses to JMP Securities LLC, the sole placement agent in the transaction.

"We are pleased with the transaction and believe it serves the best interest of long-term shareholders," said Steven F. Herbert, chief executive officer. "We are in the final phase of the corporate restructuring plan we started three months ago. The plan centers on returning the company to profitability as quickly as possible by exiting underperforming businesses and refocusing attention on our core retail and small business banking operations as well as our prime mortgage businesses. We believe the additional capital will allow us to maintain optimal capitalization within the bank; support new asset and deposit growth; and potentially invest in other key initiatives.

"We were deliberate in balancing the benefit of additional capital with the dilution to existing shareholders that this transaction represents," Herbert continued. "By limiting the issuance to a relatively small number of shares, we were able to keep the dilution to approximately $0.10 per share based on a closing market price of $4.64 the day that we priced the deal."

The shares of common stock issued in the private placement have not been registered under the Securities Act of 1933, as amended, and may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements. The company plans to file a registration statement with the Securities and Exchange Commission ("SEC") for the resale of the common stock as soon as practicable. This communication shall not constitute an offer to sell or a solicitation of an offer to buy, nor shall there be any sale of these securities in any state or other jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such state.

The company first disclosed the private placement soon after the transaction priced on December 29, 2006, through a general press release and Form 8-K filing with the SEC. Both documents are available on the company's corporate Web site at www.netbankinc.com.

**About NetBank, Inc.**

NetBank, Inc. (NASDAQ: NTBK) is a financial holding company that operates a family of businesses focused primarily on consumer and small business banking as well as conforming mortgage lending. The company's businesses have a shared value proposition of providing consumers in select markets an attractive combination of price, service and experience through skilled associates and advanced technology systems. Retail brands include NetBank and Market Street Mortgage. For more information, please visit www.netbankinc.com.

###

*Forward-Looking Statements: NetBank, Inc.'s statements in this press release that are not historical fact and that relate to future plans or events are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements include our expectation of registering the shares in a timely manner and the intended use of the proceeds. In addition, our business is subject to the risks and uncertainties described in our filings with the Securities and Exchange Commission.*

# EXHIBIT "E"

CV 05 3955

KORMAN, CH. J.

LEVY, M.J.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

AUG 1 8 2005

★ BROOKLYN OFFICE ★

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Plaintiff*
Andrew N. Krinsky (AK-0997)
Debra Bodian Bernstein (DB-2620)
470 Park Avenue South, 14th Floor
New York, New York 10016
(212) 481-8585

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

NETBANK,

                    Plaintiff,

        -against-

THE MORTGAGE CENTER, INC. a/k/a
MIDATLANTIC MORTGAGE GROUP, THEODORE
WELZ a/k/a TEDDY WELZ, BENZION FRANKEL,
JOSEPH TREFF, NU DAY APPRAISALS, GORDON
A. POWELL, JR., MICHAEL J. GILBERT
ENTERPRISES, INC., MICHAEL J. GILBERT,
JEFFERY S. RICHARDSON, 1741 PROPERTIES
CORP., CARVOL STREET REALTY, INC., MARTIN
HANDLER, ARON WETTENSTEIN a/k/a ARI
WETTENSTEIN, CHAIM DIRECTOR, LEONARD
LEDEREICH, 1751 PROPERTIES CORP., DELBERT
BAPTISTE, PHOLY 0227 CORP., SAMUEL B. NOE,
1916 PROSPECT PL. REALTY CORP., AZ&Z
REALTY CORP., RAUL BONANO, ESTHER ESSES
f/k/a ESTHER GRUENBERG, RODNEY J.
STRICKLAND, ELIYAHU M. LANGSAM a/k/a
ELIYAHU LANGSMAN, DAVID KRESCH, VENITA
GILKES, JACQUELINE WASHINGTON and
SHOSHANA L. APPLEGRAD,

                    Defendants.

------------------------------------------------------------x

Case No.:

**COMPLAINT**

**PLAINTIFF DEMANDS
TRIAL BY JURY**

        Plaintiff, NetBank, by its attorneys, Tarter Krinsky & Drogin LLP, as and for its

complaint against defendants, alleges and says:

1

{G:\WDox\CLIENT\001589\I482\00023769.DOC;1}

### Nature of the Action

1.      NetBank, a federal savings bank, brings this action for damages resulting from defendants' civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961, et seq. and various common law wrongs, including but not limited to fraud, negligent misrepresentation, breach of contract and breach of fiduciary duties. All claims arise out of a massive mortgage fraud scheme organized and perpetrated by the defendants to induce NetBank to fund mortgage loans with respect to several parcels of real property located in Kings County, New York. Plaintiff seeks to recover statutory, compensatory and punitive damages sustained as a result of defendants' conduct, together with interest and reasonable attorneys' fees.

2.      In reliance on representations made and documents provided by the defendants, including wildly and deliberately inflated property appraisals, NetBank approved and funded mortgage loans, in most cases for amounts far in excess of the properties' fair market value. The borrowers, who were straw purchasers solicited and recruited by various other defendants, were promised proceeds of the mortgage loans for participating in the scheme, and had no intention of repaying the loans. The loans all fell into default and NetBank has been left with no, or inadequate, security. Upon information and belief, the proceeds of these loans were distributed among participants in the scheme (as well as to strangers to the transactions) and were used to further perpetrate the scheme.

### Jurisdiction and Venue

3.      This Court has subject matter jurisdiction over this case under 28 U.S.C. §1331 and 18 U.S.C. §1964(c), as this action arises under federal law. In addition, this Court has

2

subject matter jurisdiction over this case under 28 U.S.C. §1332, as the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs, and there is complete diversity of citizenship between the plaintiff and the defendants.

4.     This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. §1367.

5.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because (1) all defendants reside in New York State and multiple defendants reside in this district, and (2) a substantial part of the events giving rise to this action occurred in this district, and the underlying properties subject to the mortgages at issue are located in this district.

### The Parties

6.     Plaintiff NetBank is a federal savings bank and is a subsidiary of NetBank, Inc., a Georgia corporation. NetBank has its principal place of business in Columbia, South Carolina and regularly transacts business in New York. NetBank is the successor-in-interest to RBMG, Inc. (For purposes of this complaint, all references to NetBank include RBMG, Inc.). At all relevant times, NetBank's deposits were and are insured by the Federal Deposit Insurance Corporation ("FDIC").

7.     Upon information and belief, at all relevant times, defendant The Mortgage Center Inc. a/k/a MidAtlantic Mortgage Group ("The Mortgage Center") was and currently is a corporation, partnership, limited liability corporation, limited liability partnership, sole proprietorship or other legal entity organized and existing under the laws of the State of New York, with its principal place of business in Roslyn Heights, New York.

8.     Upon information and belief, at all relevant times, defendant Theodore Welz a/k/a Teddy Welz ("Welz") was and currently is a citizen of the State of New York, residing in

3

Brooklyn, New York. At all relevant times, Welz was employed as a mortgage broker by The
Mortgage Center.

9.      Upon information and belief, at all relevant times, defendant Benzion Frankel
("Frankel") was and currently is a citizen of the State of New York, residing in Brooklyn, New
York, and an attorney duly licensed to practice law in the State of New York, maintaining an
office for the practice of his profession in Brooklyn, New York.

10.     Upon information and belief, at all relevant times, defendant Joseph Treff
("Treff") was and currently is a citizen of the State of New York, residing in New York, and an
attorney duly licensed to practice law in the State of New York, maintaining an office for the
practice of his profession in Brooklyn, New York.

11.     Upon information and belief, at all relevant times, defendant Nu Day
Appraisals was and currently is a corporation, partnership, limited liability corporation, limited
liability partnership, sole proprietorship or other legal entity organized and existing under the
laws of the State of New York, with its principal place of business in West Hempstead, New
York.

12.     Upon information and belief, at all relevant times, defendant Gordon A.
Powell, Jr. was and currently is a citizen of the State of New York, and a principal of defendant
Nu Day Appraisals. (Nu Day Appraisals and Gordon A. Powell, Jr. are collectively referred to
herein as "Powell").

13.     Upon information and belief, at all relevant times, defendant Michael J. Gilbert
Enterprises, Inc. was and currently is a corporation organized and existing under the laws of the
State of New York, with its principal place of business in Brooklyn, New York.

4

{G:\WDox\CLIENT\001589\I482\00023769.DOC;1}

14.      Upon information and belief, at all relevant times, defendant Michael J. Gilbert was and currently is a citizen of the State of New York and a principal of defendant Michael J. Gilbert Enterprises, Inc.   (Michael J. Gilbert Enterprises, Inc. and Michael J. Gilbert are collectively referred to herein as "Gilbert").

15.      Upon information and belief, at all relevant times, defendant Jeffery S. Richardson ("Richardson") was and currently is a citizen of the State of New York, residing in Brooklyn, New York.

16.      Upon information and belief, at all relevant times, defendant 1741 Properties Corp. ("1741 Properties") was and currently is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Brooklyn, New York.

17.      Upon information and belief, at all relevant times, defendant Carvol Street Realty, Inc. ("Carvol Street Realty") was and currently is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Brooklyn, New York.

18.      Upon information and belief, at all relevant times, defendant Martin Handler ("Handler") was and currently is a citizen of the State of New York, residing in Brooklyn, New York, and a principal of defendants 1741 Properties and Carvol Street Realty.

19.      Upon information and belief, at all relevant times, defendant Aron Wettenstein a/k/a Ari Wettenstein ("Wettenstein") was and currently is a citizen of the State of New York, residing in Brooklyn, New York, and a principal of defendants 1741 Properties and Carvol Street Realty.

5

20.     Upon information and belief, at all relevant times, defendant Chaim Director ("Director") was and currently is a citizen of the State of New York, residing in Brooklyn, New York, and a principal of defendant 1741 Properties.

21.     Upon information and belief, at all relevant times, defendant Leonard Ledereich ("Ledereich") was and currently is a citizen of the State of New York, residing in Brooklyn, New York, and an attorney duly licensed to practice law in the State of New York, maintaining an office for the practice of his profession in Brooklyn, New York. Upon information and belief, Ledereich acted as agent and/or attorney for defendants 1741 Properties, Carvol Street Realty, Handler, Wettenstein and/or Director.

22.     Upon information and belief, at all relevant times, defendant 1751 Properties Corp. ("1751 Properties") was and currently is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Brooklyn, New York.

23.     Upon information and belief, at all relevant times, defendant Delbert Baptiste ("Baptiste") was and currently is a citizen of the State of New York, residing in Brooklyn, New York, and a principal of defendant 1751 Properties.

24.     Upon information and belief, at all relevant times, defendant Pholy 0227 Corp. ("Pholy 0227") was and currently is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Brooklyn, New York.

25.     Upon information and belief, at all relevant times, defendant Samuel B. Noe ("Noe") was and currently is a citizen of the State of New York, residing in Brooklyn, New York, and a principal of defendant Pholy 0227.

6

26.     Upon information and belief, at all relevant times, defendant 1916 Prospect Pl. Realty Corp. ("1916 Prospect") was and currently is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Brooklyn, New York.

27.     Upon information and belief, at all relevant times, defendant AZ&Z Realty Corp. ("AZ&Z Realty") was and currently is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Brooklyn, New York.

28.     Upon information and belief, at all relevant times, defendant Raul Bonano ("Bonano") was and currently is a citizen of the State of New York.

29.     Upon information and belief, at all relevant times, defendant Esther Esses f/k/a Esther Gruenberg ("Gruenberg") was and currently is a citizen of the State of New York.

30.     Upon information and belief, at all relevant times, defendant Rodney J. Strickland ("Strickland") was and currently is a citizen of the State of New York, residing in Brooklyn, New York.

31.     Upon information and belief, at all relevant times, defendant Eliyahu M. Langsam a/k/a Eliyahu Langsman ("Langsam") was and currently is a citizen of the State of New York, residing in Brooklyn, New York.

32.     Upon information and belief, at all relevant times, defendant David Kresch ("Kresch") was and currently is a citizen of the State of New York, residing in Brooklyn, New York.

33.     Upon information and belief, at all relevant times, defendant Venita Gilkes ("Gilkes") was and currently is a citizen of the State of New York, residing in Brooklyn, New York.

7

{G:\WDox\CLIENT\001589\1482\00023769.DOC;1}

34.     Upon information and belief, at all relevant times, defendant Jacqueline Washington ("Washington") was and currently is a citizen of the State of New York, residing in Brooklyn, New York.

35.     Upon information and belief, at all relevant times, defendant Shoshanna L. Applegrad ("Applegrad") was and currently is a citizen of the State of New York, residing in Brooklyn, New York.

36.     Defendants 1741 Properties, Carvol Street Realty, Handler, Wettenstein, Director, Ledereich, 1751 Properties, Baptiste, Pholy 0227, Noe, 1916 Prospect and AZ&Z Realty are collectively referred to herein as the "Sellers," and defendants Bonano, Gruenberg, Strickland, Langsam, Kresch, Gilkes and Washington are collectively referred to herein as the "Borrowers."

### General Factual Allegations

37.     NetBank is, among other things, a national wholesale mortgage lender that provides mortgage loans for the residential real estate market and purchases mortgage loans originated by various mortgage brokers throughout the United States.

38.     In or about September 2000, NetBank entered into a Broker Agreement (the "Broker Agreement") with The Mortgage Center, in which NetBank and The Mortgage Center agreed to a non-exclusive arrangement under which The Mortgage Center would solicit prospective borrowers for mortgage loans and would prepare, assemble and submit loan application packages, including loan applications and property appraisals, to NetBank with respect to those loans.  NetBank, in reliance upon the information provided by The Mortgage Center, would underwrite and fund mortgage loans originated by The Mortgage Center.

8

39.     During the period from December 2002 through July 2003, as part of the scheme to defraud NetBank, The Mortgage Center and its employee Welz submitted to NetBank loan application packages for numerous residential properties located in Brooklyn, New York, including the following: 513 Chauncey Street; 288 14th Street; 1214 Schenectady Avenue; 104 Macon Street; 11 Van Buren Street; 111 Vernon Avenue; 1916 Prospect Place; and 628 Marcy Avenue.  Based on the information furnished to NetBank, NetBank provided underwriting and funding for mortgage loans secured by these properties (the "Loans").

40.     The Loans were originated by The Mortgage Center and Welz pursuant to a multi-faceted scheme, in which each of the defendants played specific roles, to defraud NetBank. The defendants participated as mortgage brokers, appraisers, closing agents, attorneys, notaries, borrowers, and direct or indirect sellers of property in the loan transactions.  In most instances, the scheme was accomplished by the defendants by (a) inducing NetBank to provide funds, based upon (i) highly inflated and otherwise false and misleading appraisals of the properties made by defendants Powell, Gilbert and/or Richardson (collectively, the "Appraisers"), (ii) improper, false and/or fraudulent information regarding the prospective borrowers, and/or (iii) improper, false and/or fraudulent loan and closing documentation, and (b) thereafter disbursing loan proceeds to improper and unauthorized individuals and entities.

41.     Upon information and belief, the scheme involved the use of intermediary sellers, which for many of the transactions were entities controlled by defendants Handler, Wettenstein and/or Director, and the use of non-bona fide purchasers, who were individuals that had been promised a payment in return for agreeing to be the nominal loan applicant and purchaser of property, and who at no time had any intention of repaying the loans.  Upon information and belief, many of the Loans resulted from a "flip" of the property in which the

9

seller, after purchasing the property at a "distressed" price, would then sell the same property to a straw purchaser for a much greater amount, without making any substantial improvement to the property. The excess funds after reimbursing the seller for its purchase price were then paid out at closing from the loan proceeds to various individuals and entities.

42.    Upon information and belief, as part of the scheme, the Borrowers put none of their own money at risk, even though HUD-1 Settlement Statements were prepared and signed to the contrary. The HUD-1 Settlement Statements falsely indicated that the Borrowers provided down-payments when, in fact, they did not provide their own funds.

43.    Upon information and belief, Richardson (and possibly other Appraisers) did not have an appraiser's license at the time that the appraisals were performed. Richardson signed the appraisals for 11 Van Buren Street and 111 Vernon Avenue using the New York State Division of Licensing Services certification number 45000033648, which belongs not to Richardson, but to an Antonio Duval, Jr., a licensed appraiser at the time. Richardson's actual certification number, 48000039126, demonstrates that Richardson was an appraiser's assistant, and therefore not authorized by law to sign an appraisal without also obtaining a supervisory appraiser's signature. Upon information and belief, neither Richardson nor Duval currently holds a valid appraiser's license, and Duval has been indicted for his role in various real estate frauds, which he assisted through the creation of deliberately false and misleading appraisals.

44.    All of the Loans have gone into default. Foreclosure actions have been filed, and in some instances completed, with respect to a number of the Loans. NetBank has sustained losses and has been substantially injured and defrauded as a result of underwriting and funding the Loans.

10

45.    A description of each Loan, and the individual defendants involved in each transaction, are set forth below. All of the Loans were originated by The Mortgage Center, through its employee Welz.

### 513 Chauncey Street

46.    The 513 Chauncey Street loan was made by NetBank to defendant Bonano on December 9, 2002 in the amount of $384,900, based on an artificially inflated appraisal of $460,000. The appraiser was Powell, and the closing agent/attorney was Frankel. The seller was AZ&Z Realty. AZ&Z Realty purchased the property at a foreclosure sale for $238,100, and purportedly sold it to Bonano the same day for $406,000.

### 288 14th Street

47.    The 288 14th Street loan was made by NetBank to defendant Gruenberg on March 19, 2003 in the amount of $647,500, based on an artificially inflated appraisal of $950,000. The appraiser was Powell, and the closing agent/attorney was Frankel. The seller was Carvol Street Realty. Carvol Street Realty acquired the property from the Estate of Dorothy Marie Goodwin (according to the Real Property Transfer Report that was filed, the purchase price was $0), and shortly thereafter purportedly sold it to Gruenberg for $925,000.

### 1214 Schenectady Avenue

48.    The 1214 Schenectady Avenue loan was made by NetBank to defendant Strickland on March 25, 2003 in the amount of $370,500. The appraiser was Powell, and the closing agent/attorney was Frankel. The seller was an entity known as KNS Development, Inc. While this transaction apparently does not involve a fraudulent appraisal, it does involve fraud in the application process concerning, among other things, the occupancy status of the property and the borrower's income.

11

### 104 Macon Street

49.     The 104 Macon Street loan was made by NetBank to defendant Langsam on April 1, 2003 in the amount of $581,250, based on an artificially inflated appraisal of $775,000. The appraiser was Powell, and the closing agent/attorney was Frankel. The seller was 1741 Properties. 1741 Properties purportedly purchased the property for $315,000, and purportedly sold it to Langsam the same day for $775,000.

### 11 Van Buren Street

50.     The 11 Van Buren Street loan was made by NetBank to defendant Kresch on April 15, 2003 in the amount of $492,000, based on an artificially inflated appraisal of $615,000. The appraiser was Richardson, and the closing agent/attorney was Frankel. The seller was 1741 Properties. 1741 Properties purportedly purchased the property for $230,000, and purportedly sold it to Kresch the same day for $615,000.

### 111 Vernon Avenue

51.     The 111 Vernon Avenue loan was made by NetBank to an individual named Devora Weisberger on April 28, 2003 in the amount of $584,000, based on an artificially inflated appraisal of $730,000. The appraiser was Richardson, and the closing agent/attorney was Frankel. The seller was 1741 Properties. 1741 Properties purportedly purchased the property for approximately $320,000, and purportedly sold it to Devora Weisberger the same day for $750,000. This transaction was the subject of a lawsuit commenced in the United States District Court for the Eastern District of New York in 2003 by Ella Mae LeBrew and Alberta LeBrew, former owners of the property, which action has now been settled and discontinued (Ella Mae LeBrew and Alberta LeBrew v. Alexander Reich, et al., CV 03-1832 (JG)). A copy of the Third Amended Complaint in that action, which sets forth a scheme to defraud by, among others,

12

several of the defendants in this action, is annexed hereto as Exhibit A. As part of the settlement in that lawsuit, NetBank has released, among others, defendants 1741 Properties Corp., Chaim Director, Martin Handler and Aron Wettenstein, as well as the borrower, from all claims relating to the 111 Vernon Avenue transaction.

### 1916 Prospect Place

52.     The 1916 Prospect Place loan was made by NetBank to defendant Gilkes on June 4, 2003 in the amount of $405,000, based on an artificially inflated appraisal of $540,000. The appraiser was Gilbert, and the closing agent/attorney was Frankel. The seller was Pholy 0227 and/or 1916 Prospect. Pholy 0227 purchased the property at a foreclosure sale for $235,000, and the property was purportedly sold to Gilkes the same day for $540,000. In a foreclosure action commenced by NetBank against Gilkes, Gilkes has claimed that she did not knowingly execute any loan documents in connection with the property. Defendant Applegrad was the notary with respect to the mortgage.

### 628 Marcy Avenue

53.     The 628 Marcy Avenue loan was made by NetBank to defendant Washington on July 10, 2003 in the amount of $495,000, based on an artificially inflated appraisal of $550,000. The appraiser was Gilbert, and the closing agent/attorney was Treff. The seller was 1751 Properties. 1751 Properties purportedly purchased the property for approximately $300,000, and purportedly sold it to Washington the same day for $550,000.

### COUNT I
### (Violation of RICO Sec. 1962(c) – against all defendants)

54.     Plaintiff repeats, restates, and realleges the allegations contained in paragraphs 1 through 53 above, as if set forth herein again in full.

13

55.    At all relevant times, the defendants were and are "persons" as that term is defined in 18 U.S.C. § 1961(3).

56.    At all relevant times, in violation of 18 U.S.C. § 1962(c), the defendants each conducted, managed, facilitated and/or permitted to be conducted the affairs of the Fraud Enterprise identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.

## THE FRAUD ENTERPRISE

57.    In accordance with 18 U.S.C. § 1961(4), the RICO "enterprise" described in this complaint, referred to as the "Fraud Enterprise," is an association-in-fact consisting of defendants The Mortgage Center, Welz, the Appraisers, Frankel, Treff, Applegrad, the Sellers and the Buyers for the purpose of inducing NetBank to disburse funds, ostensibly as regular mortgage loans.  Defendants, working in concert with each other, misappropriated funds from NetBank by (a) using, assisting or acting as intermediary companies to purchase properties at "distressed" prices, (b) preparing and submitting outrageously inflated appraisals of the values of those properties, in some cases prepared by an unlicensed appraiser, and/or submitting false information in the loan applications including with respect to the creditworthiness of the borrowers, in order to induce NetBank to fund loans for the purchase of the properties, (c) recruiting, assisting or acting as straw purchasers for the purchase of the properties from the intermediaries, (d) allowing and/or abetting the closing of the loan transactions based on false, misleading and missing documentation, and (e) converting the funds.  Upon information and belief, the Fraud Enterprise is an ongoing and continuing organization.

58.    Upon information and belief, the common or shared purpose of the Fraud Enterprise is to financially enrich the defendants by misleading lenders, such as NetBank, to

14

grant mortgage loans that exceed normal and customary lending practices, induced by false and misleading documents and information whereby the value of the collateral property is falsely inflated and/or the financial ability of the borrowers to repay the loans is falsely and materially overstated, and the borrowers in fact have no intention to repay the loans.

59.    Defendants Welz, the Appraisers, Frankel, Treff, Applegrad, the Sellers and the Buyers are alleged to be members of the Fraud Enterprise because they were integral participants in the scheme and necessary to the scheme, and acted with knowledge of the scheme and with intention to defraud and/or to commit crimes. The Mortgage Center is alleged to be a member of the Fraud Enterprise because it facilitated the scheme and permitted it to occur, should have known about the activities of the other defendants, failed to properly supervise its employees and/or agents, constituted part of the mechanism necessary to effectuate the fraud and obtained benefits from the transactions.

60.    The defendants operated collectively, pursuant to a conspiratorial agreement, a common purpose and as a continuing unit, to perpetrate the predicate acts described herein.

61.    Upon information and belief, the Borrowers were also associated with the Fraud Enterprise by accepting financial inducements in return for agreeing to have loans issued in their names, providing incomplete, false and/or fraudulent information concerning, among other things, their true intentions regarding the occupancy or use of the properties and their ability to repay the loans, entering into mortgage agreements, signing promissory notes and other documentation, and otherwise participating in loan transactions with respect to which loans they had no intention of repaying, and/or by signing HUD-1 Settlement Statements containing false information.

62.    At all relevant times, the activities of the Fraud Enterprise affected interstate

15



commerce. In particular, the predicate acts described herein were performed in New York and South Carolina, and possibly other states. Moreover, the loans that are funded by NetBank are customarily sold in the secondary market for mortgage backed securities, which securities are sold throughout the United States. The Loans at issue were, in fact, for such purposes.

## PREDICATE ACTS AND PATTERN OF RACKETEERING ACTIVITY

63.    The defendants have committed, conducted, actively participated in, and facilitated the operation, management and affairs of the Fraud Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1344 (bank fraud), and 18 U.S.C. § 1014 (filing of a false loan application).

64.    Although additional information evidencing the defendants' illegal conduct is within the defendants' possession, in the course of this pattern of racketeering, the defendants, among other things: (a) violated 18 U.S.C. § 1343 by using interstate telephone facsimile transmissions and interstate telephone lines to transmit false or misleading documents or other false and misleading information in connection with the application and origination of the loan transactions described herein; (b) violated 18 U.S.C. § 1341 by using the United States mail to transmit false or misleading documents or other false and misleading information in connection with the application and origination of the loan transactions described herein; (c) violated 18 U.S.C. § 1344 by knowingly and willfully devising and executing a scheme to defraud NetBank and other financial institutions, and/or by knowingly and willfully devising and executing a scheme to obtain moneys of NetBank and other financial institutions by means of false or fraudulent pretenses, representations or promises; and (d) violated 18 U.S.C. § 1014 by knowingly making or causing to be made false statements in loan applications to NetBank and

16

other financial institutions whose deposits were insured by the FDIC and/or by knowingly overvaluing properties, for the purpose of influencing NetBank and other financial institutions whose deposits were insured by the FDIC to fund mortgage loans. These acts are collectively referred to as the "Predicate Acts."

65.    The Predicate Acts constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, the Predicate Acts constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

66.    The defendants' scheme of racketeering practices occurred over a considerable course of time, in excess of one year. During such period of time, the defendants repeatedly committed the Predicate Acts.

67.    Based on the nature of this illegal scheme and the natural tendency of the participants to conceal evidence thereof, many of the details of the defendants' wrongdoing are exclusively within the possession of the defendants, preventing plaintiff from pleading certain acts with greater precision.

68.    NetBank has been injured in its business or property by the foregoing violations of 18 U.S.C. § 1962(c) through, among other things, having been fraudulently induced to fund loans in amounts grossly in excess of the value of the collateral available to secure them and in excess of the Borrowers' ability to repay the loans in the event of a default, and having incurred substantial fees and costs, including attorneys' fees.

69.    As a direct and proximate result of the above pattern of racketeering, NetBank has suffered damages in an amount to be determined at trial, but in excess of $1,000,000.

{G:\WDox\CLIENT\001589\I482\00023769.DOC;1}

## COUNT II
### (Violation of RICO Sec. 1962(a) -- against all defendants)

70.    Plaintiff repeats, restates, and realleges the allegations contained in paragraphs 1 through 69 above, as if set forth herein again in full.

71.    The defendants derived profits from their racketeering activities.

72.    Upon information and belief, the defendants used profits derived from their racketeering activities to fund and operate the Fraud Enterprise, in violation of 18 U.S.C. § 1962(a).

73.    As a direct and proximate result of the defendants' use and investment of racketeering income, NetBank has suffered damages in an amount to be determined at trial, but in excess of $1,000,000.

## COUNT III
### (Violation of RICO Sec. 1962(d) -- against all defendants)

74.    Plaintiff repeats, restates, and realleges the allegations contained in paragraphs 1 through 73 above, as if set forth herein again in full.

75.    Pursuant to the defendants' scheme, the defendants aided and abetted one another and conspired among themselves and with others to violate 18 U.S.C. §1962(c) by committing and agreeing to commit at least two Predicate Acts in furtherance thereof, in violation of 18 U.S.C. § 1962(d).

76.    Pursuant to the defendants' scheme, the defendants aided and abetted one another and conspired among themselves and with others to violate 18 U.S.C. §1962(a) by using and agreeing to use profits derived from their racketeering activities to fund and operate the Fraud Enterprise, in violation of 18 U.S.C. § 1962(d).

18

77.     The defendants had knowledge that the acts were part of a RICO pattern of activity.  The defendants understood the scope of the Fraud Enterprise, and they knowingly agreed to further their scheme through the Predicate Acts and through the investment of racketeering income into the Fraud Enterprise.

78.     NetBank has been injured in its business or property by the foregoing violations of 18 U.S.C. § 1962(d) through having been fraudulently induced to fund loans in amounts grossly in excess of the value of the collateral available to secure them and in excess of the Borrowers' ability to repay the loans in the event of a default, and having incurred substantial fees and costs, including attorneys' fees.

79.     As a direct and proximate result of the defendants' conspiracy to violate 18 U.S.C. § 1962(c), NetBank has suffered damages in an amount to be determined at trial, but in excess of $1,000,000.

## COUNT IV
### (Fraud -- against all defendants)

80.     Plaintiff repeats, restates, and realleges the allegations contained in paragraphs 1 through 69 above, as if set forth herein again in full.

81.     In preparing and submitting the fraudulent loan applications and the knowingly inflated appraisals, defendants The Mortgage Center, Welz and the Appraisers misrepresented and/or omitted material facts concerning the value of the properties and/or concerning the creditworthiness of the applicants, in order to induce NetBank to underwrite and fund the Loans.

82.     At the time that The Mortgage Center, Welz and the Appraisers prepared and submitted the loan applications and the appraisals, they intended that NetBank would rely on the information provided to it, knew of the falsity of their misrepresentations and/or the omissions,

19

and made the misrepresentations and/or omissions with the intent to deceive NetBank and to induce it to approve and fund the Loans.

83.     Frankel and Treff, in acting as NetBank's closing agents, and the Borrowers, misrepresented and/or omitted material facts in the HUD-1 Settlement Statements concerning the receipts and/or disbursements in the transactions.

84.     Frankel, Treff and the Borrowers knew that NetBank would rely on their misrepresentations and/or omissions of material fact, knew of the falsity of their misrepresentations and/or the omissions, and made the misrepresentations and/or omissions with the intent to deceive NetBank.

85.     Applegrad participated in and facilitated the fraudulent scheme by purporting to notarize the signature of defendant Gilkes in connection with the mortgage for the 1916 Prospect Place loan, while aware that Gilkes was not the person signing the mortgage.

86.     Applegrad knew that NetBank would rely on her misrepresentations and/or omissions of material fact concerning the execution of the mortgage, knew of the falsity of her misrepresentations and/or the omissions, and made the misrepresentations and/or omissions with the intent to deceive NetBank.

87.     The Sellers participated in and facilitated the fraudulent scheme by misrepresenting the bona fides of the transactions and by preparing fraudulent documentation, in order to induce NetBank to fund the Loans.

88.     The Sellers knew that NetBank would rely on their misrepresentations and/or omissions of material fact, knew of the falsity of their misrepresentations and/or the omissions, and made the misrepresentations and/or omissions with the intent to deceive NetBank.

{G:\WDox\CLIENT\001589\482\00023769.DOC;1}

89.     Based on the misrepresentations and/or omissions of material facts, including but not limited to inaccurate, improper, incomplete, false and/or fraudulent appraisals, loan applications, loan documentation and HUD-1 Settlement Statements, NetBank extended Loans to borrowers who lack the ability to repay the Loans, and secured by collateral that is worth significantly less than the values upon which the Loans were made.

90.     Accordingly, based on the misrepresentations and/or omissions of material facts by defendants, NetBank agreed to, and in fact did, underwrite and fund the loans.

91.     NetBank was ignorant of the falsity of the misrepresentations of material fact and/or the omissions of material fact, but believed them to be true and complete and reasonably relied upon them to its detriment.

92.     As a result of the foregoing, NetBank has been damaged in an amount to be determined at trial, but in excess of $1,000,000.

## COUNT V
### (Negligent and/or Intentional Misrepresentation -- against all defendants)

93.     Plaintiff repeats, restates, and realleges the allegations contained in paragraphs 1 through 69 and 81 through 92 above, as if set forth herein again in full.

94.     Defendants' conduct as aforesaid was willful and wanton and without regard to the truth and constitutes intentional and/or negligent misrepresentation.

95.     Based on the aforesaid misrepresentations and/or omissions of material facts by defendants, NetBank agreed to, and in fact did, underwrite and fund the Loans.

96.     NetBank was ignorant of the falsity of the misrepresentations and omissions of material fact, but believed them to be true and reasonably relied upon them to its detriment.

97.     As a result of the foregoing, NetBank has been damaged in an amount to be determined at trial, but in excess of $1,000,000.

21

{G:\WDox\CLIENT\001589\1482\00023769.DOC;1}

## COUNT VI
### (Breach of Contract/Warranty -- against The Mortgage Center)

98.     Plaintiff repeats, restates, and realleges the allegations contained in paragraphs 1 through 53 above, as if set forth herein again in full.

99.     The Broker Agreement between NetBank and The Mortgage Center, together with NetBank's Wholesale Broker Manual, the terms of which are incorporated by reference into the Broker Agreement, sets forth The Mortgage Center's obligations and responsibilities when submitting loans to NetBank for underwriting or funding.

100.    The Broker Agreement requires, among other things, that The Mortgage Center represent and warrant that all statements, documents and reports provided by The Mortgage Center to NetBank with any loan application package are valid and genuine and contain no untrue statement of material fact or omit to state a material fact necessary to make the statements contained therein not misleading.

101.    The Broker Agreement further requires, among other things, that The Mortgage Center represent and warrant that neither The Mortgage Center, any loan applicant, nor any other person or entity engaged by The Mortgage Center, its officers, employees or agents in connection with any loan (including any appraiser) has made any false representation or any untrue statement of material fact or has failed to provide true, complete and accurate information that is necessary for NetBank to make a reasonable underwriting decision with respect to such loan.

102.    As a result of the foregoing, The Mortgage Center breached the terms of the Broker Agreement by, among other things, (a) submitting to NetBank appraisals for certain properties which provided inaccurate, false and misleading information as it related to the true

22

value of the properties, and (b) submitting to NetBank inaccurate, false and misleading information concerning loan applicants.

103.    As a result of The Mortgage Center's breach of the Broker Agreement, NetBank has been damaged in an amount to be determined at trial, but in excess of $1,000,000.

## COUNT VII
### (Negligence and/or Intentional Wrongdoing –
### against The Mortgage Center, Welz, and the Appraisers)

104.    Plaintiff repeats, restates, and realleges the allegations contained in paragraphs 1 through 53 above, as if set forth herein again in full.

105.    The Mortgage Center, Welz and the Appraisers owed a duty to NetBank to prepare and submit complete and accurate loan applications and/or accurate appraisals reflecting the true value of the properties.

106.    The Mortgage Center, Welz and the Appraisers breached their duty of care to NetBank and performed negligently and/or intentionally in preparing and submitting loan applications that were inaccurate, incomplete, false and/or misleading as to the creditworthiness of the applicants and/or appraisals that were inaccurate, incomplete, false and/or misleading as to the value of the properties.

107.    As a result of the negligence and/or intentional acts of The Mortgage Center, Welz and the Appraisers, they failed to protect the rights of NetBank, and NetBank otherwise would not have disbursed funds to the Borrowers.

108.    The acts and/or omissions of The Mortgage Center, Welz and the Appraisers were a proximate and/or contributing cause of the loss suffered by NetBank.

109.    As a result of the foregoing, NetBank has been damaged in an amount to be determined at trial, but in excess of $1,000,000.

23

## COUNT VIII
**(Negligence and/or Intentional Wrongdoing -- against Frankel and Treff)**

110.     Plaintiff repeats, restates, and realleges the allegations contained in paragraphs 1 through 53 above, as if set forth herein again in full.

111.     Frankel acted as NetBank's closing agent in connection with most of the transactions at issue. As such, Frankel owed NetBank a duty of care.

112.     Treff acted as NetBank's closing agent in connection with the 628 Marcy Avenue loan. As such, Treff owed NetBank a duty of care.

113.     Frankel signed Closing Agent's Certifications in connection with the Loans, in which he represented, among other things, that all of the requisite information was obtained and verified by him at the closing of each Loan, that the funds from the Loans were disbursed according to the instructions of NetBank, and that all requirements of NetBank's closing instructions have been satisfied.

114.     Frankel breached his duty of care to NetBank and performed negligently and/or intentionally and in an unprofessional manner because, among other things: (a) he prepared the HUD-1 Settlement Statements for the Loans while he was aware or should have been aware that they were irregular and not a true and accurate statement of all receipts and disbursements made on his account or by him in the transactions; (b) he condoned improper disbursements and prepared the HUD-1 Settlement Statements while he was aware or should have been aware that he did not cause or was not causing the funds to be disbursed in accordance with the HUD-1 Settlement Statements; and (c) he proceeded to close the Loans without obtaining and/or confirming the validity of appraisers' licenses, in contravention of NetBank's closing instructions.

24

115.    Treff breached his duty of care to NetBank and performed negligently and/or intentionally and in an unprofessional manner because, among other things: (a) he prepared and signed the HUD-1 Settlement Statement for the 628 Marcy Street loan while he was aware or should have been aware that it was irregular and not a true and accurate statement of all receipts and disbursements made on his account or by him in the transactions; and (b) he condoned improper disbursements and prepared and signed the HUD-1 Settlement Statement for the 628 Marcy Street loan while he was aware or should have been aware that he did not cause or was not causing the funds to be disbursed in accordance with the HUD-1 Settlement Statement.

116.    As a result of the Frankel and Treff's negligence and/or intentional acts, Frankel and Treff each failed to protect the rights of NetBank, and NetBank otherwise would not have disbursed funds to the Borrowers.

117.    Frankel and Treff's acts and/or omissions were a proximate and/or contributing cause of the loss suffered by NetBank.

118.    As a result of the foregoing, NetBank has been damaged in an amount to be determined at trial, but in excess of $1,000,000.

## COUNT IX
### (Breach of Fiduciary Duty -- against Frankel and Treff)

119.    Plaintiff repeats, restates, and realleges the allegations contained in paragraphs 1 through 53 and 111 through 118 above, as if set forth herein again in full.

120.    Frankel, as attorney and agent for NetBank, owed a fiduciary duty to NetBank of honesty, good faith, confidence and trust.

121.    Treff, as attorney and agent for NetBank, owed a fiduciary duty to NetBank of honesty, good faith, confidence and trust.

25

122.    Frankel breached his fiduciary duty to NetBank by, among other things, (a) preparing HUD-1 Settlement Statements for the Loans while he was aware or should have been aware that they were irregular and not a true and accurate statement of all receipts and disbursements made on his account or by him in the transactions and/or while he was aware or should have been aware that he did not cause or was not causing the funds to be disbursed in accordance with the HUD-1 Settlement Statements, and (b) allowing the Loans to close without the production of valid appraisers' licenses.

123.    Treff breached his fiduciary duty to NetBank by, among other things, preparing and signing a HUD-1 Settlement Statement for the 628 Marcy Avenue loan while he was aware or should have been aware that it was irregular and not a true and accurate statement of all receipts and disbursements made on his account or by him in the transaction and/or while he was aware or should have been aware that he did not cause or was not causing the funds to be disbursed in accordance with the HUD-1 Settlement Statement.

124.    As a result of the foregoing, NetBank has been damaged in an amount to be determined at trial, but in excess of $1,000,000.

## COUNT X
### (Legal Malpractice -- against Frankel and Treff)

125.    Plaintiff repeats, restates, and realleges the allegations contained in paragraphs 1 through 53 and 111 through 124 above, as if set forth herein again in full.

126.    By committing the acts set forth above in breach of their fiduciary duties to plaintiff, Frankel and Treff also committed legal malpractice.

127.    Plaintiff justifiably relief on Frankel and Treff to perform legal services on its behalf in a reasonably competent, professional and skilled manner, which, under similar

26

circumstances, would be exercised by members of the legal profession in good standing in New York.

128.    Plaintiff suffered injury as the proximate result of its reliance on Frankel and Treff.

129.    As a result of the foregoing, NetBank has been damaged in an amount to be determined at trial, but in excess of $1,000,000.

## COUNT XI
### (Violation of New York Executive Law § 135 -- against Applegrad)

130.    Plaintiff repeats, restates and realleges the allegations contained in paragraphs 1 through 53 above, as if set forth herein again in full.

131.    Upon information and belief, at all times relevant hereto, Applegrad was a Notary Public duly commissioned by the State of New York, and qualified in Kings County, and pursuant to said commission Applegrad duly took and subscribed the oath of office prescribed by law.

132.    Applegrad witnessed the execution of the mortgage with respect to 1916 Prospect Place, and as such notary public subscribed and executed the Certificate of Acknowledgement attached thereto.    In such Certificate of Acknowledgement, Applegrad certified that on June 4, 2003, Gilkes was known to her and known to her to be the individual described in and who executed the said mortgage and that the said Gilkes appeared personally before her on June 4, 2003, and acknowledged the execution of the same.    By subscribing the Certificate of Acknowledgement, Applegrad represented that the mortgage was actually validly executed by Gilkes on June 4, 2003.

133.    Such Certificate of Acknowledgement was wholly false and untrue and Applegrad assumed and intended to and did convey the impression that she had actual

27

knowledge of the matter as stated and certified in such Certification of Acknowledgement when Applegrad was at the time conscious that she had no such knowledge.

134.    Neither on June 4, 2003, nor any time thereafter, did Gilkes acknowledge the said execution of the mortgage before Applegrad, as such notary public or otherwise, and was then wholly unknown to Applegrad.

135.    Applegrad received compensation for subscribing said Certificate of Acknowledgement.

136.    Applegrad had a duty to take reasonable measures to ensure that Gilkes was in fact the person executing said mortgage, and breached that duty.

137.    Applegrad knew and intended that others, including NetBank, would rely upon and/or would be asked to rely upon the mortgage and aforesaid Certificate of Acknowledge that she had subscribed.

138.    It was reasonably foreseeable that others would rely upon the aforesaid Certificate of Acknowledgement subscribed by Applegrad.

139.    By reason of the foregoing, Applegrad violated New York Executive Law §135, and is liable to NetBank for injuries sustained as a result of her misconduct.

140.    As a result of the foregoing, NetBank has been damaged in an amount to be determined at trial, but in excess of $500,000.

## COUNT XII
### (Negligence -- against Applegrad)

141.    Plaintiff repeats, restates and realleges the allegations contained in paragraphs 1 through 53 and 131 through 140 above, as if set forth herein again in full.

142.    The foregoing also constitutes a cause of action against defendant Applegrad for negligence.

{G:\WDox\CLIENT\001589\l482\00023769.DOC;1}

143.    As a result of the foregoing, NetBank has been damaged in an amount to be determined at trial, but in excess of $500,000.

### COUNT XIII
### (Unjust Enrichment -- against all defendants)

144.    Plaintiff repeats, restates, and realleges the allegations contained in paragraphs 1 through 143 above, as if set forth herein again in full.

145.    By reason of the foregoing, defendants have been unjustly enriched at plaintiff's expense.

146.    Plaintiff has no adequate remedy at law.

147.    By reason of the foregoing, plaintiff has been damaged in an amount to be determined at trial, but in excess of $1,000,000.

### COUNT XIV
### (Money Had and Received -- against all defendants)

148.    Plaintiff repeats, restates, and realleges the allegations contained in paragraphs 1 through 143 above, as if set forth herein again in full.

149.    By reason of the foregoing, defendants received and retained money belonging to plaintiff.

150.    By reason of the foregoing, plaintiff has been damaged in an amount to be determined at trial, but in excess of $1,000,000.

### COUNT XV
### (Conversion -- against all defendants)

151.    Plaintiff repeats, restates, and realleges the allegations contained in paragraphs 1 through 143 above, as if set forth herein again in full.

152.    By reason of the foregoing, defendants have wrongfully and willfully converted funds and property belonging to plaintiff.

29

153.    By reason of the foregoing, plaintiff has been damaged in an amount to be determined at trial, but in excess of $1,000,000.

**WHEREFORE**, NetBank respectfully requests judgment in its favor against defendants as follows:

(a)    Awarding plaintiff compensatory and/or consequential damages in an amount to be determined at trial, but in excess of the sum of $1,000,000, together with interest;

(b)    Awarding plaintiff treble damages as provided by statute, 18 U.S.C. § 1964;

(c)    Awarding plaintiff punitive damages in an amount to be determined at trial, but in excess of the sum of $1,000,000; and

awarding plaintiff its costs, disbursements and reasonable attorneys' fees, and granting such other and further legal and equitable relief as this Court may deem just and proper.

Dated: New York, New York
       August 18, 2005

                          **TARTER KRINSKY & DROGIN LLP**
                          *Attorneys for Plaintiff*


                          By:    _____
                                 Andrew N. Krinsky (AK-0997)
                                 Debra Bodian Bernstein (DB-2620)
                                 470 Park Avenue South, 14th Floor
                                 New York, New York 10016
                                 (212) 481-8585

30

{G:\WDox\CLIENT\001589\l482\00023769.DOC;1}

# EXHIBIT "F"

Simmons, Jannace & Stagg, L.L.P.
75 Jackson Avenue
Syosset, New York 11791
(516) 357-8100
By: Thomas E. Stagg (ts-0663)
Attorneys for Intervenor
Plaintiff NetBank

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X

THE PROVIDENT BANK,

      Plaintiff, and

FIRST SAVINGS BANK, FSB,
      Intervenor Plaintiff, and

WAREHOUSEONE ACCEPTANCE COMPANY
IV, LLC
      Intervenor Plaintiff,

NETBANK,

      Intervenor Plaintiff,

    -against-

COMMUNITY HOME MORTGAGE CORP.,
COMMUNITY HOME FUNDING GROUP, LTD.
and IRA SILVERMAN,

      Defendants.
------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG 1 4 2007 ★

LONG ISLAND OFFICE

Civil Action No.
CV 02-5219(JFB)

**JUDGMENT**

Bianco, J
Tomlinson, M.J.

**WHEREAS**, on or about August 8, 2005, Intervenor Plaintiff, NetBank, Inc. ("NetBank") filed an Intervenor Complaint seeking a declaratory judgment determining that nine mortgage loans, Brockman (NetBank Loan 2000211246), Duhigg (NetBank Loan 2000191325), Kassorla (NetBank Loan 2000217787), Martinez (NetBank Loan 2000213574), Matterson (NetBank Loan 2000221384), McDuffie (NetBank Loan 2000204264), Nienstedt (NetBank Loan 2000208141), Ladiory (NetBank Loan 2000215862) and Musgrove (NetBank Loan

2000199861) (collectively "the Mortgage Loans"), including but not limited to the mortgages and notes and all prior and future payments on the Mortgage Loans, are the property of NetBank, and that any interest Southwest Savings Bank f/k/a First Savings Bank, FSB ("Southwest") may have in the Mortgage Loans is subordinate and subject to NetBank's interest in them; and

WHEREAS, on or about November 7, 2005, Southwest served its Answer with Counterclaim against NetBank for conversion, unjust enrichment, constructive trust, and a declaratory judgment that its interest in the Mortgage Loans is superior to NetBank's; and

WHEREAS, on or about August 23, 2006, Southwest moved for Partial Summary Judgment on its conversion and unjust enrichment, and for a declaratory judgment determining that Southwest holds a priority interest in five of the nine Mortgage Loans; and

WHEREAS, on or about September 13, 2006, NetBank cross-moved for summary judgment on its declaratory judgment claim on all Mortgage Loans; and

WHEREAS, by Order dated May 7, 2007, the Honorable Joseph F. Bianco granted NetBank's Motion for Summary Judgment in its entirety and denied Southwest's Motion for Partial Summary Judgment (the "Order") (Docket No. 327), which Order is incorporated by reference; and

WHEREAS, on _Aug 7, 2007_, the Court so ordered a Stipulation and Order certifying the Order as final and directing that judgment be entered in favor of NetBank;

IT IS HEREBY ADJUDGED that: the Mortgage Loans, including, but not limited to, the mortgages and notes, and all prior and future payments on the Mortgage Loans, are NetBank's property, and that any interest Southwest, First Savings Bank or Community Home Mortgage may have in the Mortgage Loans is subordinate and subject to NetBank's interest in them; and it is further

2

ADJUDGED that all relief requested in this case by Southwest against NetBank shall be denied; and it is further

ADJUDGED that this judgment finally disposes of all claims in this action between NetBank and Southwest.

Central Islip, NY
Dated: August 14, 2007

SO ORDERED:

ROBERT C. HEINEMANN

Clerk of the Court

By: _Cynthia L. Mahon_
Deputy Clerk

Judgnt

SO ORDERED

Joseph F. Bianco
USDJ
Date: August 14 20 07
Central Islip, N.Y.

3

# EXHIBIT "G"

STEVEN L. BLAUSTEIN, ESQ. - SB9016
STERN, LAVINTHAL, FRANKENBERG & NORGAARD, LLC
293 Eisenhower Parkway, Suite 300
Livingston, New Jersey 07039-1660
(973) 740-0700
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DLJ MORTGAGE CAPITAL, INC. | : | **Case No.** 06-cv-15211 |
| Plaintiff, | : | **COMPLAINT FOR DAMAGES** |
| v. | : | |
| NETBANK, INC., MARKET STREET MORTGAGE CORPORATION, and MERITAGE MORTGAGE CORPORATION, | : | |
| Defendants. | : | |

Plaintiff, DLJ Mortgage Capital, Inc. ("DLJMC"), by way of complaint against the Defendants, NetBank, Inc. ("NetBank"), Market Street Mortgage Corporation ("Market Street"), and Meritage Mortgage Corporation ("Meritage"), says that:

## PRELIMINARY STATEMENT

1.    This case involves the failure of NetBank, its subsidiary corporations, Market Street and Meritage (hereinafter collectively referred to as the "NetBank Group", "Defendants" or "All Defendants") to provide services, funds, and information as required by several servicing origination and pooling agreements (the "several agreements") between the NetBank Group and DLJMC.

2.  DLJMC's claims can be broadly categorized as follows:

    a)  NetBank's failure to forward funds collected on behalf of DLJMC or its clients to DLJMC or to DLJMC's elected agent;

    b)  NetBank's failure to provide and produce information relating to proof that services and/or payments made and charged to DLJMC or its clients had actually been acquired or applied as required under the contracts;

    c)  NetBank's failure to provide information and to provide support to DLJMC as required by its contracts;

    d)  NetBank's failure to cooperate in litigation relating to the NetBank Group's servicing of loans; and

    e)  NetBank's failure to cooperate at DLJMC's efforts to investigate the failures of the NetBank Group.

3.  DLJMC seeks damages of approximately $4 million because of the actions (and failures to act) of the NetBank Group.

## JURISDICTION AND VENUE

4.  Jurisdiction of the parties and this Complaint is properly in this Court under the diversity of jurisdictions provisions of 28 U.S.C. §1332(a)(1) and (b).

5.  There is complete diversity between the parties. Every issue of law and fact in this action is wholly between citizen corporations of different states. The amount in controversy exceeds $75,000.00.

6.  Venue is proper as to these Defendants pursuant to 28 U.S.C. §1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

7.  Venue is also proper in this district pursuant to the provisions of 28 U.S.C. §1391(c) because Defendants are subject to personal jurisdiction in this district and are deemed to reside within it for purposes of 28 U.S.C. §1391(a)(1).

## PARTIES

8.  DLJMC is and was at all times mentioned below, a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business at 11 Madison Avenue, New York, New York, 10010.

9.  Defendant NetBank is a corporation duly organized and existing under the laws of the State of Georgia, with its principal place of business at 1015 Windward Ridge Parkway, Alpharetta, Georgia 30005.

10. NetBank is an internet bank supervised by the Office of Thrift Supervision ("OTS") and the Federal Deposit Insurance Corporation ("FDIC").  It operates in a number of different financial arenas, offering conventional and unconventional financing and mortgage options.  Additionally, NetBank offers servicing operations for investors in mortgages.

11. To effectuate these financial services, NetBank has a number of operations, divisions, and wholly owned corporate subsidiaries that operate under the NetBank "umbrella."  These corporations, divisions, and operations are solely controlled by NetBank, Inc., which is a holding corporation for these various financial institutions.

12. Meritage Mortgage Corporation ("Meritage") is a wholly owned subsidiary of NetBank incorporated under the laws of the State of Oregon with its principal place of business located at 9300 SW Gemini, #100, Beaverton, OR 97008.  At all times during the events set forth in the Complaint below, Meritage was a wholly owned subsidiary of NetBank. Meritage sells and

3

services sub-prime mortgages; that is mortgages designed for borrowers who have difficulty getting conventional mortgages.

13. Market Street Mortgage Corporation ("Market Street") is a seller and servicer of conventional mortgages. It is a wholly owned subsidiary corporation of NetBank and is a Florida corporation with its principal place of business at 2650 McCormick Drive, Suite 200, Clearwater, Florida 34619-1035.

## STATEMENT OF FACTS

### A.  CONTRACTS BETWEEN THE PARTIES

14. DLJMC entered into several agreements with the NetBank Group.

15. Pursuant to the terms of some of the agreements, entities in the NetBank Group were to provide all aspects of loan servicing for mortgage loans. These mortgage loans were comprised of individual mortgage loans as well as mortgage loans that had been "pooled" and were serviced as a group.

16. Services to be provided included, but were not limited to: collection and forwarding of payments from borrowers (both monthly payments and those designed to pay the loans in full); and ensuring that all contractual terms of the loan were met, such as ensuring that mortgage insurance was in place and that monthly premiums were paid.

17. Some of the loans serviced by the NetBank Group were purchased from the NetBank Group. Pursuant to these agreements, the NetBank Group originated the mortgage loans, sold them to DLJMC, and then serviced the loans for DLJMC. The service aspect of these agreements is similar to those agreements that were limited solely to servicing.

18. Pursuant to the terms of the origination and sales agreements, DLJMC was contractually authorized to take certain actions, and NetBank Group was obligated to take certain

actions. By way of example, and not by way of limitation, the origination portion of these agreements authorized DLJMC to "put-back" loans that were deemed deficient once reviewed, and the NetBank Group was thereby obligated to repurchase loans that did not meet certain performance criteria.

19. Similarly, these agreements placed positive requirements on the NetBank Group to obtain certain services at the time the loan. Thus, by way of example and not by way of limitation, the NetBank Group was required to obtain and pay for mortgage insurance at the time the loan originated.

## NET BANK CONTRACTS

20. DLJMC entered into servicing agreements with RBMG, Inc. ("RBMG"). RBMG was a loan servicing corporation and a wholly owned subsidiary of NetBank. In 2004, RBMG was merged with NetBank and "rebranded" as a division of NetBank. NetBank assumed all liabilities and obligations of RBMG.

21. On or about July 1, 2001, DLJMC and RBMG entered into an initial servicing agreement for RBMG to service loans for DLJMC ("Initial RBMG Servicing Agreement").

22. As stated in the preamble of the contract, DLJMC from time to time purchased mortgage loans pursuant to the terms of certain mortgage loan purchase agreements between DLJMC and certain third-party sellers on a servicing-released basis.

23. The contract further provided that, "RBMG and DLJMC have agreed that [RBMG] shall service certain of such mortgage loans on behalf of DLJMC... and the parties hereto desire to provide the mechanics of such servicing by RBMG."

24. On or about December 1, 2001, DLJMC and RBMG, along with others, entered into a Pooling and Servicing Agreement for Mortgage-Backed Pass-Through Certificates Series 2001-33 (the "P&A Agreement"). The primary purpose of the P&A Agreement was to provide for the servicing of loans that were placed into a Pooling Security with Bank One, National Association as the trustee.

25. Pursuant to the terms of the P&A Agreement, DLJMC as a seller conveyed its security interest to the Series Trust, agreed to insure that payments on the various mortgages were forwarded to the trust as required under its agreement with the trust. It also agreed to ensure that the requirements of the other mortgages such as insurance, payment of taxes, etc. were kept current.

26. RBMG was a party to the P&A Agreement and agreed to service the loans designated for it by DLJMC. In order to clarify the full scope of RBMG's servicing responsibility, the parties entered into an additional agreement on December 28, 2001, (the "Additional Agreement"). The Additional Agreement also made clear that RBMG was acting as the servicer for DLJMC with reference to the Pooling and Servicing Agreement loans.

27. The initial RBMG Servicing Agreement, Additional Agreement, and P&A Agreement (collectively "RBMG Servicing Agreements") are governed and interpreted by New York law.

28. As RBMG is a division of NetBank, NetBank has assumed all liabilities and obligations of RBMG under the RBMG Servicing Agreements.

## MARKET STREET CONTRACTS

29. On or about February 1, 2000, DLJMC entered into a Purchase, Warranties, and Interim Servicing Agreement with Market Street (the "PWIS Agreement"). Under the PWIS Agreement, Market Street was a seller and servicer of loans. Put simply, Market Street would originate the loans, sell the mortgages to DLJMC, and then service the loans on behalf of DLJMC. The PWIS

Agreement set forth the terms and conditions of the sale, as well as the servicing terms. (PWIS, Article 2).

30. On or about October 1, 2004, these parties entered into another agreement for DLJMC to purchase mortgage loans from Market Street. Again, after origination, Market Street would act as servicer for the various mortgage loans.

## MERITAGE CONTRACTS

31. On or about June 1, 2002, DLJMC entered into a mortgage loan purchasing and interim servicing agreement with Meritage. Pursuant to the terms of that agreement, DLJMC agreed to purchase loans from Meritage and Meritage agreed to service the loans.

32. Meritage is closing operations on December 31, 2006. Its personnel have been reassigned to a new lender. Upon information and belief, those operations will be merged into NetBank.

## B.  FACTS RELATING TO THE NETBANK GROUP'S SERVICING AND ORIGINATION OF MORTGAGE LOANS

33. Market Street and Meritage originated mortgage loans pursuant to the above-described origination and servicing agreements, and DLJMC purchased these loans. Subsequent to the sales, Meritage and Market Street serviced the loans. Upon information and belief, Market Street and Meritage collected principal, interest, mortgage insurance, taxes and insurance for these loans. Market Street and Meritage have failed to forward funds, principal and interest, to DLJMC as more particularly alleged below. Further, they failed to ensure that PMI was in place for the mortgage loans.

34. RBMG serviced loans for DLJMC under the RMBG Servicing Agreements. Upon information and belief, RBMG collected principal, interest, mortgage insurance, taxes, and

insurance for those loans. It failed to forward funds to DLJMC in its former existence as RBMG and in its current existence as NetBank, as is more particularly alleged below.

### FIRST COUNT
### (BREACH OF CONTRACT – NETBANK)

35. Paragraphs 1 - 34 of this Complaint are incorporated herein by reference.

36. Defendant NetBank failed to wire to Plaintiff or its designated representative payment it collected as servicer for the P&A Agreement in an amount exceeding $1.2 million dollars.

37. Despite repeated requests for performance of the terms of the P&A Agreement and the wiring of the funds pursuant to the terms of the contract, Defendant failed to forward or to account for the funds it collected.

38. As a result of NetBank's failure to forward or to account for these funds, Plaintiff has been damaged in an amount in excess of $1.2 million dollars.

**WHEREFORE**, Plaintiff DLJMC respectfully requests that judgment issue:

a) against Defendant NetBank in an amount in excess of $1.2 million dollars in an amount to be proven at trial;

b) requiring NetBank to pay all fees and costs incurred by Plaintiff DLJMC in initiating and pursuing this litigation; and

c) for any and all such relief to which Plaintiff DLJMC is entitled at law or at equity.

### SECOND COUNT
### (BREACH OF CONTRACT – NETBANK)

39. Paragraphs 1 - 38 of this Complaint are incorporated herein by reference.

40. Under the terms of the P&A Agreement, NetBank was required to forward principal and interest payments received from borrowers to DLJMC or its designated representative.

8

41. Defendant NetBank failed to forward payments under the P&A Agreement in excess of $137,000.

42. Despite DLJMC's demand for these amounts, Defendant NetBank has failed to forward or account for these funds.

43. As a result of Defendant NetBank's failures, Plaintiff has been damaged in an amount exceeding $137,000.

**WHEREFORE**, Plaintiff DLJMC respectfully requests that judgment issue:

a)  against Defendant NetBank in an amount in excess of $137,000 in an amount to be proven at trial;

b)  requiring NetBank to pay all fees and costs incurred by Plaintiff DLJMC in initiating and pursuing this litigation; and

c). for any and all such relief to which Plaintiff DLJMC is entitled at law or at equity.

### THIRD COUNT
### (BREACH OF CONTRACT – NETBANK)

44. Paragraphs 1 - 43 of this Complaint are incorporated herein by reference.

45. Under the terms of the three different RBMG Servicing Agreements between Defendant NetBank and Plaintiff DLJMC, Defendant NetBank was required to make payment for RMIC – commonly referred to as PMI – for each mortgage loan.

46. Despite demand by Plaintiff, Defendant NetBank has failed to forward or account for RMIC in an amount in excess of $54,000.

47. As a result of Defendant NetBank's failure to forward or account for these funds, Plaintiff DLJMC has been damaged in an amount in excess of $54,000.

**WHEREFORE**, Plaintiff DLJMC respectfully requests that judgment issue:

9

a) against Defendant NetBank in an amount in excess of $54,000 in an amount to be proven at trial;

b) requiring NetBank to pay all fees and costs incurred by Plaintiff DLJMC in initiating and pursuing this litigation; and

c) for any and all such relief to which Plaintiff DLJMC is entitled at law or at equity.

## FOURTH COUNT
### (BREACH OF CONTRACT – NETBANK)

48. Paragraphs 1 - 47 of this Complaint are incorporated herein by reference.

49. Plaintiff DLJMC has made numerous requests for information relating to the unpaid wires, principal and interest payments, and RMIC due under the three RBMG Servicing Agreements with Defendant NetBank.

50. Under the terms of the three RBMG Servicing Agreements, NetBank has an obligation and a duty to provide and produce to DLJMC documents, records and information relating to all aspects of its servicing of loans, including but not limited missing wires, principal and interest payments, and RMIC. Defendant NetBank failed and refused to cooperate and provide the documents, records and information.

51. Based upon Defendant NetBank's failure to produce documents and/or information as required by the contract, the servicing agreement, Plaintiff DLJMC has been damaged in an amount in excess of $1.4 million dollars.

**WHEREFORE**, Plaintiff DLJMC respectfully requests that judgment issue:

a) against Defendant NetBank in an amount in excess of $1.4 million dollars in an amount to be proven at trial;

b) requiring NetBank to pay all fees and costs incurred by Plaintiff DLJMC in initiating and pursuing this litigation; and

c) for any and all such relief to which Plaintiff DLJMC is entitled at law or at equity.

## FIFTH COUNT
### (BREACH OF CONTRACT – MERITAGE)

52. Paragraphs 1 - 51 of this Complaint are incorporated herein by reference.

53. Under the provisions of the Meritage Agreements, Meritage was required to forward to Plaintiff DLJMC or its designated representative all principal and interest payments made by borrowers on their mortgages.

54. Despite Plaintiff's request and demand, Meritage has failed to forward or account for principal and interest payments received by it in an amount in excess of $4,700.

**WHEREFORE**, Plaintiff DLJMC respectfully requests that judgment issue:

a) against Defendant NetBank in an amount in excess of $4,700 in an amount to be proven at trial;

b) requiring NetBank to pay all fees and costs incurred by Plaintiff DLJMC in initiating and pursuing this litigation; and

c) for any and all such relief to which Plaintiff DLJMC is entitled at law or at equity.

## SIXTH COUNT
### (BREACH OF CONTRACT – ALL DEFENDANTS)

55. Paragraphs 1 - 54 of this Complaint are incorporated herein by reference.

56. Under the terms of the several agreements between Plaintiffs and the NetBank Group, each Defendant is required to forward to Plaintiff DLJMC monthly principal and interest payments made by mortgage borrowers on loans that are serviced by the NetBank Group.

57. Despite demand from Plaintiff DLJMC, the NetBank Group failed to forward or account for monthly principal and interest payments in excess of $250,000.

58. As a result of Defendants' failure to account for or forward these principal and interest payments, Plaintiff DLJMC has been injured in an amount exceeding $250,000.

**WHEREFORE**, Plaintiff DLJMC respectfully requests that judgment issue:

a) against the Defendants in an amount in excess of $250,000 in an amount to be proven at trial;

b) requiring the Defendants to pay all fees and costs incurred by Plaintiff DLJMC in initiating and pursuing this litigation; and

c) for any and all such relief to which Plaintiff DLJMC is entitled at law or at equity.

<u>**SEVENTH COUNT**</u>
**(BREACH OF CONTRACT – ALL DEFENDANTS)**

59. Paragraphs 1 - 58 of this Complaint are incorporated herein by reference.

60. Under the terms of the several agreements between Plaintiff and the NetBank Group, each Defendant is required to forward to Plaintiff DLJMC or its designated representative all monthly principal and interest payments made by mortgage borrowers on the loans that are serviced by the NetBank Group.

61. Despite demand from Plaintiff DLJMC, the NetBank Group has failed to forward or account for monthly principal and interest payments in excess of $420,000.

62. As a result of Defendants' failure to account for or forward these principal and interest payments, Plaintiff DLJMC has been injured in an amount exceeding $420,000.

**WHEREFORE**, Plaintiff DLJMC respectfully requests that judgment issue:

a) against the Defendants in an amount in excess of $420,000 in an amount to be proven at trial;

b) requiring the Defendants to pay all fees and costs incurred by Plaintiff DLJMC in initiating and pursuing this litigation; and

c) for any and all such relief to which Plaintiff DLJMC is entitled at law or at equity.

## EIGHTH COUNT
### (BREACH OF CONTRACT – ALL DEFENDANTS)

63. Paragraphs 1 - 62 of this Complaint are incorporated herein by reference.

64. Under the terms of the several agreements between Plaintiff and the NetBank Group, the NetBank Group is required to forward to Plaintiff DLJMC or its designated representative all funds paid by borrowers to pay-off their mortgage loans.

65. Despite repeated demands and requests from Plaintiff, DLJMC, the NetBank Group has failed to forward or account for pay-off funds in excess of $865,000.

66. As a result of the NetBank Group's failure to account for or forward these funds, Plaintiff DLJMC has been damaged in an amount in excess of $865,000.

**WHEREFORE**, Plaintiff DLJMC respectfully requests that judgment issue:

a) against the Defendants in an amount in excess of $865,000 in an amount to be proven at trial;

b) requiring the Defendants to pay all fees and costs incurred by Plaintiff DLJMC in initiating and pursuing this litigation; and

c) for any and all such relief to which Plaintiff DLJMC is entitled at law or at equity.

## NINTH COUNT
### (BREACH OF CONTRACT – ALL DEFENDANTS)

67. Paragraphs 1 - 66 of this Complaint are incorporated herein by reference.

68. Under the terms of the several agreements between Plaintiff and the NetBank Group, the NetBank Group is required to ensure that PMI has been obtained for a number of mortgage loans originated or serviced by them.

69. Despite repeated demands and requests, the NetBank Group has failed to provide proof

that PMI was obtained on a number of mortgage loans. Moreover, the NetBank Group failed to maintain PMI by failing to make the required premium payments on a number of mortgage loans.

70. As a result of the NetBank Group's failure to provide information and its failure to maintain PMI, Plaintiff DLJMC has been damaged in an amount in excess $433,000.

**WHEREFORE**, Plaintiff DLJMC respectfully requests that judgment issue:

a) against the Defendants in an amount in excess of $433,000 in an amount to be proven at trial;

b) requiring the Defendants to pay all attorneys' fees and costs incurred by Plaintiff DLJMC in initiating and pursuing this litigation; and

c) for any and all such relief to which Plaintiff DLJMC is entitled at law or at equity.

## TENTH COUNT
### (BREACH OF CONTRACT – ALL DEFENDANTS)

71. Paragraphs 1 - 70 of this Complaint are incorporated herein by reference.

72. Under the several agreements between Plaintiff and the NetBank Group, the NetBank Group is required to pay Plaintiff for any and all put-backs to Defendants by Plaintiff.

73. Plaintiff has made put-backs in an amount in excess of $352,000. The NetBank Group has failed to pay or reimburse Plaintiff for the put-backs.

74. As a result of the NetBank Group's failure to pay the put-back items, Plaintiff has been damaged in an amount in excess of $352,000.

**WHEREFORE**, Plaintiff DLJMC respectfully requests that judgment issue:

a) against the Defendants in an amount in excess of $352,000 in an amount to be proven at trial;

b) requiring the Defendants to pay all fees and costs incurred by Plaintiff DLJMC in initiating and pursuing this litigation; and

c)  for any and all such relief to which Plaintiff DLJMC is entitled at law or at equity.

## ELEVENTH COUNT
## (BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING - NETBANK)

75.  Paragraphs 1 - 74 of this Complaint are incorporated herein by reference.

76.  The terms and provisions of the contract require that NetBank service the mortgage loans that are assigned to it for servicing. Implicit in that agreement is that NetBank will properly service the loans and cooperate with Plaintiff in the event of any litigation arises relating to the servicing of the loans.

77.  Suit has been filed against Plaintiff DLJMC in the State of Texas for actions related to Defendant NetBank's servicing of a specific loan, *Bohoroquez v. DLJ Management Corp.*, Cause No. 04-CV-135780, District Ct., Fort Bend, TX; 400th Judicial Cir.)

78.  Defendant NetBank has failed and refused to cooperate in the defense of the litigation filed against Plaintiff. This failure to cooperate includes, but is not limited to, failing to make servicing representatives available for depositions and trial so that a proper defense of the litigation can be prepared.

79.  As a result of Defendant NetBank's refusal to cooperate and make available the representative who serviced the loan upon which suit has been filed, Plaintiff DLJMC has been damaged in an amount to be proven at trial.

80. Plaintiff DLJMC's damages in this regard would include, but would not be limited to, all attorneys' fees and related costs in having to defend this action, as well as any judgment that might be entered against Plaintiff DLJMC in the pending litigation.

**WHEREFORE,** Plaintiff DLJMC respectfully requests that judgment issue:

a)  against Defendant NetBank in an amount to be proven at trial;

b)  requiring NetBank to pay all fees and costs incurred by Plaintiff DLJMC in initiating and pursuing this litigation; and

c)  for any and all such relief to which Plaintiff DLJMC is entitled at law or at equity.

## TWELFTH COUNT
## (BREACH OF CONTRACT – ALL DEFENDANTS)

81.  Paragraphs 1 - 80 of this Complaint are incorporated herein by reference.

82.  Under the several agreement between Plaintiff and the NetBank Group, the NetBank Group has an obligation to produce to DLJMC servicing and origination documents, records and information about DLJMC loans serviced and originated by the NetBank Group.

83.  Despite repeated requests from Plaintiff, the NetBank Group refuses to produce to Plaintiff its servicing and origination documents, records and information.  It also refuses to allow Plaintiff to review records, documents and information maintained by the NetBank Group related to the relevant loans.

84.  Plaintiff has been damaged as a result of the NetBank Group's refusal to provide servicing and origination information, documents and records to Plaintiff.  Further, it has been required to file suit against the NetBank Group to obtain access to the records, documents and information.

**WHEREFORE**, Plaintiff DLJMC respectfully requests that judgment issue:

a)  against the Defendants NetBank in an amount to be proven at trial;

b)  requiring the Defendants to pay all attorneys' fees and costs incurred by Plaintiff DLJMC in initiating and pursuing this litigation and in obtaining access to the servicing and origination records, documents and information; and

c)  for any and all such relief to which Plaintiff DLJMC is entitled at law or at equity.

## THIRTEENTH COUNT
### (BREACH OF THE IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING – ALL DEFENDANTS)

85. Paragraphs 1 - 84 of this Complaint are incorporated herein by reference.

86. The covenant of good faith and fair dealing is an implied term of the several agreements between Plaintiff and the NetBank Group. Thus, it is implicit in the several agreements that the NetBank Group will provide servicing and origination documents, records and information to Plaintiff about loans serviced and originated by the NetBank Group.

87. Despite repeated requests from Plaintiff, the NetBank Group refuses to provide servicing and origination documents, records and information to Plaintiff. It also refuses to allow Plaintiff to review records, documents and information maintained by the NetBank Group.

88. Plaintiff has been damaged as a result of the NetBank Group's refusal to provide servicing and origination information, documents and records to Plaintiff. Further, it has been required to file suit against the NetBank Group to obtain access to the records, documents and information.

WHEREFORE, Plaintiff DLJMC respectfully requests that judgment issue:

c) against the Defendants NetBank in an amount to be proven at trial;

d) requiring the Defendants to pay all attorneys' fees and costs incurred by Plaintiff DLJMC in initiating and pursuing this litigation and in obtaining access to the servicing and origination records, documents and information; and

c) for any and all such relief to which Plaintiff DLJMC is entitled at law or at equity.

## FOURTEENTH COUNT
### (BREACH OF FIDUCIARY DUTY – ALL DEFENDANTS)

89. Paragraphs 1 - 88 of this Complaint are incorporated herein by reference.

17

90. Under the terms and provisions of the several agreements between Plaintiff and the NetBank Group, the NetBank Group has fiduciary obligations and duties to Plaintiff.

91. The NetBank Group has breached their fiduciary duties and obligations to Plaintiff. These breaches include, but are not limited to, failing to forward borrower funds to Plaintiff or its designated representatives, and failing to provide information, documents and records related to the origination and servicing of loans.

92. As a result of the NetBank Group's breaching its fiduciary duties and obligations, Plaintiff has been damaged in the approximate amount $4 million dollars.

**WHEREFORE**, Plaintiff DLJMC respectfully requests that judgment issue:

a) against the Defendants in an approximate amount of $4 million in an amount to be proven at trial;

b) requiring the Defendants to pay all attorneys' fees and costs incurred by Plaintiff DLJMC in initiating and pursuing this litigation; and

c) for any and all such relief to which Plaintiff DLJMC is entitled at law or at equity.

## FIFTEENTH COUNT
### (MONEY HAD AND RECEIVED – ALL DEFENDANTS)

93. Paragraphs 1 - 92 of this Complaint are incorporated herein by reference.

94. Under the terms and provisions of the several agreements between Plaintiff and the NetBank Group, the NetBank Group is required to forward and account for all monies received to Plaintiff or its designated representative. Such funds are properly the property of Plaintiff.

95. Despite Plaintiff's repeated requests, the NetBank Group refuses to forward to Plaintiff funds that were paid to it by borrowers whose mortgage loans were serviced by the NetBank Group, and the NetBank Group has benefited from the receipt of these funds.

96. Under principles of equity, the Defendants should not be permitted to keep these funds, and these funds should be forwarded to Plaintiff DLJMC.

**WHEREFORE**, Plaintiff DLJMC respectfully requests that judgment issue:

a) against the Defendants in an amount to be proven at trial;

b) requiring the Defendants to pay all attorneys' fees and costs incurred by Plaintiff DLJMC in initiating and pursuing this litigation; and

c) for any and all such relief to which Plaintiff DLJMC is entitled at law or at equity.

## SIXTEENTH COUNT
### (CONVERSION – ALL DEFENDANTS)

97. Paragraphs 1 - 96 of this Complaint are incorporated herein by reference.

98. Under the terms and provisions of the several agreements between Plaintiff and the NetBank Group, the NetBank Group is required to forward and account for all monies received to Plaintiff or its designated representative. Such funds are properly the property of Plaintiff.

99. Despite Plaintiff's repeated requests, the NetBank Group refuses to forward to Plaintiff funds that were paid to it by borrowers whose mortgage loans were serviced by the NetBank Group. The NetBank Group unlawfully retains these funds and, upon information and belief, has converted these funds to its own use.

100. Plaintiff has been damaged as a result of the NetBank Group's unlawful conversion of these funds.

**WHEREFORE**, Plaintiff DLJMC respectfully requests that judgment issue:

a) against the Defendants in an amount to be proven at trial;

b) requiring the Defendants to pay all attorneys' fees and costs incurred by Plaintiff DLJMC in initiating and pursuing this litigation; and

c) for any and all such relief to which Plaintiff DLJMC is entitled at law or at equity.

STERN, LAVINTHAL, FRANKENBERG
& NORGAARD, LLC
Attorneys for Plaintiff DLJ Mortgage Corporation

By: _____
Steven L. Blaustein, Esq.

Dated: 12/15/06

# EXHIBIT "H"

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K/A

### CURRENT REPORT
### Pursuant to Section 13 OR 15(d) of The Securities Exchange Act of 1934

Date of Report (Date of earliest event reported)  **January 4, 2007 (October 2, 2006)**

# NETBANK, INC.
### (Exact name of registrant as specified in its charter)

| **Georgia** | **0-22361** | **58-2224352** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **1015 Windward Ridge Parkway, Alpharetta, GA** | **30005** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code  **770-343-6006**

**N/A**
(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**<u>Explanatory Note</u>**

This Amended Current Report on Form 8-K/A of NetBank, Inc. (the "Company") is being filed with the Securities and Exchange Commission ("SEC") to update the disclosure originally reported in the Current Report on Form 8-K of the Company filed with the SEC on October 5, 2006 (the "Prior Form 8-K").

2

**Item 5.02.  Entry Into a Material Definitive Agreement**

(c)  As reported in the Prior Form 8-K, on October 2, 2006, the Board of Directors (the "Board") of the Company selected Steven F. Herbert, then the Chief Finance Executive of the Company ("CFO"), to become Chief Executive Officer of the Company ("CEO"), and James P. Gross, then Controller of the Company, to become CFO, effective on October 5, 2006.  As of the date of filing of the Prior Form 8-K with the SEC, the terms of the compensation arrangements with Messrs. Herbert and Gross had not been changed to reflect their new positions.  In connection with the selection to their new positions, on December 18, 2006, the Compensation Committee (the "Committee") of the Board approved, subject to approval by the Office of Thrift Supervision ("OTS"), the following changes to the compensation arrangements with Messrs. Herbert and Gross, retroactively effective from October 9, 2006 (the "Commencement Date").  The Company received notification of OTS approval on January 4, 2007.

The following table sets forth, with respect to each executive officer named below, the base salary prior to promotion, the new base salary effective on the Commencement Date, and the maximum potential bonus under the Company's Management Incentive Plan for the respective periods indicated.  The maximum potential bonus for each of Messrs. Herbert and Gross for the first three quarters of 2006 is based upon their respective base salary as of January 1, 2006, which was $220,500 and $192,938, respectively.  The maximum potential bonus for each for the fourth quarter of 2006 is based upon their respective base salaries as of the Commencement Date.  Any bonuses shall be payable to Messrs. Herbert and Gross in restricted stock.

| | Base Salary Pay | | | |
| | Base Salary Pay Rate Prior to Commencement Date | Rate Retroactive from Commencement Date | Maximum Bonus as Percentage of Applicable Base Salary Q1-Q3 2006 | Maximum Bonus as Percentage of Applicable Base Salary Q4 2006 |
| Name and Title | | | | |
|---|---|---|---|---|
| Steven F. Herbert<br>    Chief Executive Officer | $    270,000 | $    360,000 | 150% | 150% |
| James P. Gross<br>    Chief Finance Executive | $    198,726 | $    240,000 | 37.5% | 75% |

The description of the Company's Management Incentive Plan in the Company's Current Report on Form 8-K, which was filed with the SEC on March 28, 2006, is incorporated by reference herein.  For the first three quarters of 2006, Mr. Herbert's bonus will be based on overall Company performance, line of business performance and individual performance.  These specified key performance measures (the "Performance Measures"), the various target levels (the "Target Metrics") within each Performance Measure and the relative weightings of such Performance Measures and Target Metrics previously determined by the Committee with respect to Mr. Herbert, as CFO, will continue to apply to Mr. Herbert for the first three quarters of 2006.  The overall Company Performance Measures (earnings per share, number of customers and cross-sell ratio) and Target Metrics that were previously established by the Committee with respect to the prior CEO will apply to Mr. Herbert and be the basis for any incentive bonus he receives for the fourth quarter of 2006.  For the entire year 2006, Mr. Gross's bonus will be based on the same Performance Measures (overall Company, line of business performance and individual performance), Target Metrics and relative weightings of each previously determined by the Committee and applicable to Mr. Gross prior to his promotion to CFO.  However, Mr. Gross's maximum potential bonus will be increased for the fourth quarter of 2006.

The Committee's approval was preceded by its review of market data, analysis of current compensation, and other considerations, and by its consultation with outside compensation consultants.  There were no changes to Mr. Herbert's employment agreement originally entered into in connection with his service as CFO.  As previously reported in the Prior Form 8-K, the Company expects to enter into a new employment agreement with Mr. Herbert in connection with his promotion to the position of CEO, and once the terms of that new agreement have been determined and approved, the Company plans to file an amendment to the Prior Form 8-K and this Current Report on Form 8-K/A under Item 5.02.  There were no changes to Mr. Gross's Change in Control Agreement, which was entered into prior to his promotion to Chief Finance Executive.  Mr. Gross continues to have no formal employment

agreement and serves at the pleasure of the Board. However, the Company expects to enter into an employment agreement with Mr. Gross in connection with his promotion to the position of CFO, and once the terms of that new agreement have been determined and approved, the Company plans to file an amendment to the Prior Form 8-K and this Current Report on Form 8-K/A under Item 5.02.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

NetBank, Inc.
(Registrant)

Date: January 9, 2007

/s/ Charles E. Mapson
(Signature)

Charles E. Mapson
Chief Legal Executive

4

# EXHIBIT "I"

Official Form 1 (04/07)

# United States Bankruptcy Court
Middle District of Florida
Jacksonville Division

| Name of Debtor - (If individual, enter Last, First, Middle): **NETBANK, INC.** | Name of Joint Debtor (Spouse) (Last, First, Middle): None |
|---|---|
| All Other Names used by the Debtor in the last 8 years (include married, maiden, and trade names): **None** | All Other Names used by the Joint Debtor in the last 8 years (include married, maiden, and trade names): |
| Last four digits of Soc. Sec. No./Complete EIN or other Tax I.D. No. (If more than one, state all): 58-2224352 | Last four digits of Soc. Sec. No./Complete EIN or other Tax I.D. No. (If more than one, state all): |
| Street Address of Debtor (No. & Street, City, and State): 751 OAK STREET SUITE 503 JACKSONVILLE, FL    Zip Code 32204 | Street Address of Joint Debtor (No. & Street, City, andvState):    Zip Code |
| County of Residence or of the Principal Place of Business:   Duval | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):    Zip Code | Mailing Address of Joint Debtor (if different from street address):    Zip Code |
| Location of Principal Assets of Business Debtor: (if different from address listed above) | Zip Code |

| Type of Debtor (Form of Organization) (Check one box) | Nature of Business (Check one box) | Chapter of Bankruptcy Code Under Which the Petition is Filed (Check one box) | |
|---|---|---|---|
| ☐ Individual (Includes joint debtors) *See Exhibit D on page 2 of this form.* | ☐ Health Care Business | ☐ Chapter 7 | ☐ Chapter 15 Petition for Recognition of a Foreign Main Proceeding |
| ☒ Corporation (includes LLC and LLP) | ☐ Single Asset Real Estate as defined in 11 U.S.C. § 101 (51B) | ☐ Chapter 9 | |
| ☐ Partnership | ☐ Railroad | ☒ Chapter 11 | |
| ☐ Other (If debtor is not one of the above entities, check this box and state type of entity below.) | ☐ Stockbroker ☐ Commodity Broker ☐ Clearing Bank ☒ Other | ☐ Chapter 12 ☐ Chapter 13 | ☐ Chapter 15 Petition for Recognition of a Foreign Nonmain Proceeding |

**Tax-Exempt Entity** (Check box, if applicable)
☐ Debtor is a tax-exempt organization under Title 26 of the United States Code (the Internal Revenue Code).

**Nature of Debts** (Check one box)
☐ Debts are primarily consumer debts, defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."    ☒ Debts are primarily business debts.

**Chapter 11 Debtors**
Check one box:
☐ Debtor is a small business as defined in 11 U.S.C. § 101(51D).
☒ Debtor is not a small business as defined in 11 U.S.C. § 101(51D).
Check if:
☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,190,000. .
Check all applicable boxes:
☐ A plan is being filed with this petition.
☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

**Filing Fee** (Check one box)
☒ Full filing fee attached.
☐ Filing fee to be paid in installments. (Applicable to individuals only.) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.
☐ Filing fee waiver requested (Applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B.

| Statistical/Administrative Information (Estimates only) | THIS SPACE FOR COURT USE ONLY |
|---|---|
| ☒ Debtor estimates that funds will be available for distribution to unsecured creditors. ☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors. | |

| Estimated Number of Creditors | 1-49 | 50-99 | 100-199 | 200-999 | 1,000-5,000 | 5,001-10,000 | 10,001-25,000 | 25,001-50,000 | 50,001-100,000 | Over 100,000 |
|---|---|---|---|---|---|---|---|---|---|---|
| | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

| Estimated Assets | ☐ $0 to $10,000 | ☐ $10,000 to $100,000 | ☐ $100,000 to $1 million | ☒ $1 million to $100 million | ☐ More than $100 million |
|---|---|---|---|---|---|

| Estimated Liabilities | ☐ $0 to $50,000 | ☐ $50,000 to $100,000 | ☐ $100,000 to $1 million | ☒ $1 million to $100 million | ☐ More than $100 million |
|---|---|---|---|---|---|

Prepared using Bankruptcy Plus® by Cornerstone Computer Group Inc., Bellingham, Washington (800) 397-8238

| **Voluntary Petition**<br>(This page must be completed and filed in every case). | **Name of Debtor(s):**<br>NETBANK, INC. | |

| Location<br>Where Filed:    None | Case Number | Date Filed |

| Name of Debtor<br>None | Case Number | Date Filed |

| District | Relationship | Judge |

| **Exhibit A**<br><br>(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br><br>[X] Exhibit A is attached and made a part of this petition. | **Exhibit B**<br><br>(To be completed if debtor is an individual whose debts are primarily consumer debts)<br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12,  or 13 of title 11, United States Code, and have explained the relief available under each such chapter.<br>I further certify that I delivered to the debtor the notice required by § 342(b) of the Bankruptcy Code.<br><br>X _____<br>    Signature of Attorney for Debtor(s)                    Date |

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

[ ] Yes, and Exhibit C is attached and made part of this petition.

[X] No

**Exhibit D**

(To be completed by every individual debtor.  If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

[ ] Exhibit D completed and signed by the debtor is attached and made a part of this petition.

If this is a joint petition:

[ ] Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition.

**Information Regarding the Debtor - Venue**
*(Check any applicable box)*

[X] Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

[ ] There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

[ ] Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Statement by a Debtor Who Resides as a Tenant of a Residential Property**

*Check all applicable boxes*

[ ] Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

[ ] Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

[ ] Debtor has included in this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of this petition.

Prepared using Bankruptcy Plus® by Cornerstone Computer Group Inc., Bellingham, Washington (800) 397-8238

| **Voluntary Petition** | Name of Debtor(s): |
|---|---|
| (This page must be completed and filed in every case). | NETBANK, INC. |

| **Signature(s) of Debtor(s) (Individual/Joint)** | **Signature of a Foreign Representative** |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct. | I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition. |
| (If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7) I am aware that I may proceed under chapter 7, 11, 12 and 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7. | (Check only one box.) |
| | ☐ I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by § 1515 of title 11 are attached. |
| [If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by § 342(b) of the Bankruptcy Code. | ☐ Pursuant to § 1511 of title 11, United States Code, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached. |
| I request relief in accordance with the chapter of title 11, United States Code, specified in this petition. | |
| X _____ | X _____ |
| Signature of Debtor | (Signature of Foreign Representative) |
| X _____ | |
| Signature of Joint Debtor | |
| | (Printed Name of Foreign Representative) |
| Telephone Number (if not represented by attorney) | |
| _____ | _____ |
| Date | Date |

| **Signature of Attorney** | **Signature of Non-Attorney Petition Preparer** |
|---|---|
| X _Alan M. Weiss_ (signature) | I declare under penalty of perjury that: 1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, 2) I prepared this document for compensation, and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h) and 342(b); and, 3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110 setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19B is attached. |
| Signature of Attorney for Debtor(s) | |
| ALAN M. WEISS, ESQ. | |
| Printed Name of Attorney for Debtor(s) | |
| Holland & Knight LLP | |
| Firm Name | |
| 50 North Laura Street, Suite 3900 | Printed Name and title, if any, of Bankruptcy Petition Preparer |
| Jacksonville, FL 32202 | |
| Address | |
| 904-353-2000          904-358-1872 | Social Security Number (If the bankruptcy petition preparer is not an individual, state the Social Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110) |
| Telephone Number          Fax Number | |
| 9-28-07 | |
| Date | |

| **Signature of Debtor (Corporation/Partnership)** | |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor. | |
| The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition. | Address |
| X _Steven F. Herbert_ (signature) | X _____ |
| Signature of Authorized Individual | Signature of Bankruptcy Petition Preparer or officer, principal, responsible person, or partner whose social security number is provided above. |
| STEVEN F. HERBERT | |
| Printed Name of Authorized Individual | |
| CEO | Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual. |
| Title of Authorized Individual | |
| 9-28-07 | |
| Date | If more than one person prepared this document, attach additional signed sheets conforming to the appropriate official form for each person. |
| | A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. § 110; 18 U.S.C. § 156. |

Prepared using Bankruptcy Plus® by Cornerstone Computer Group Inc., Bellingham, Washington (800) 397-5238

# United States Bankruptcy Court

## Middle District of Florida
### Jacksonville Division

In re: **NETBANK, INC.**

Debtor

Case No. _____
(If Known)

Chapter **11**

## Exhibit "A" to Voluntary Petition

1. If any of debtor's securities are registered under section 12 of the Securities and Exchange Act of 1934, the SEC file number is   0-22361

2. The following financial data is the latest available information and refers to debtor's condition on   25-Sep-2007

   a.   Total assets   $87,213,942.00

   b.   Total debts (including debts listed in 2.c., below)   $42,245,857.00

   c.   Debt securities held by more than 500 holders.

|  |  |  |  |  |  |  |  | Amount | Approximate Number of holders |
|---|---|---|---|---|---|---|---|---|---|
| Secured | ☐ | Unsecured | ☐ | Subordinated | ☐ | | | _____ | _____ |
| Secured | ☐ | Unsecured | ☐ | Subordinated | ☐ | | | _____ | _____ |
| Secured | ☐ | Unsecured | ☐ | Subordinated | ☐ | | | _____ | _____ |
| Secured | ☐ | Unsecured | ☐ | Subordinated | ☐ | | | _____ | _____ |
| Secured | ☐ | Unsecured | ☐ | Subordinated | ☐ | | | _____ | _____ |
| Secured | ☐ | Unsecured | ☐ | Subordinated | ☐ | | | _____ | _____ |
| Secured | ☐ | Unsecured | ☐ | Subordinated | ☐ | | | _____ | _____ |
| Secured | ☐ | Unsecured | ☐ | Subordinated | ☐ | | | _____ | _____ |

   d.   Number of shares of preferred stock   0   0

   e.   Number of shares of common stock   52820308   1000

   f.   Comments, if any:

3. Brief description of debtor's business:

   DEBTOR IS A FINANCIAL HOLDING COMPANY ENGAGED PRIMARILY IN RETAIL BANKING, MORTGAGE BANKING, BUSINESS FINANCE AND PROVIDING (ATM) AND MERCHANT PROCESSING SERVICES.

4. List the name of any person who directly or indirectly owns, controls, or holds, with power to vote, 5% or more of the voting securities of debtor:

   SEE ATTACHMENT SCHEDULE 4

   0   continuation sheet(s) attached

| | NETBANK, INC. - ATTACHMENT A-1<br>OTHER LOCATIONS IN WHICH THE DEBTOR CONDUCTS<br>BUSINESS | | |
|---|---|---|---|
| Address | City | State | Zip |
| 751 Oak Street, Suite 503 | Jacksonville | Florida | 32204 |
| 9710 Two Notch Road | Columbia | South Carolina | 29223 |
| 7811 Park Lane Road | Columbia | South Carolina | 29223 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| | NETBANK, INC.<br>ATTACHMENT SCHEDULE 4 | | |
|---|---|---|---|
| 5% Beneficial Owner | # of Shares Beneficially Owned | % of shares | Rpt Date |
| Daruma Asset Management, Inc. | 4,060,500 | 7.69% | 12/31/2006 |
| Och-Ziff Capital Management LP | 3,000,000 | 5.68% | 12/31/2006 |
| Private Capital Management, Inc. | 2,771,143 | 5.25% | 12/31/2006 |
| Barclays Global Investors NA | 2,653,626 | 5.02% | 12/31/2006 |
| | | | |
| Shares outstanding as of 12/31/06 | 52,820,308 | | |

84748130V1